FILED

2019 JUL -8  AM 10: 07

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA
BY_____

1   ALDEN F. ABBOTT
    General Counsel
2   K. MICHELLE GRAJALES
    mgrajales@ftc.gov
3   SAMUEL JACOBSON
    sjacobson@ftc.gov
4
5   FEDERAL TRADE COMMISSION
    600 Pennsylvania Ave., NW
6   Mail Stop: CC-10232
7   Washington, DC  20580
    (202) 326-3172
8
9   JOHN D. JACOBS, Cal. Bar No. 134154
10  Local Counsel
    jjacobs@ftc.gov
11  FEDERAL TRADE COMMISSION
12  10990 Wilshire Blvd., Ste. 400
    Los Angeles, CA 90024
13  Tel: (310) 824-4343; Fax: (310) 824-4380
14  Attorneys for Plaintiff

15

16              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
17

18  FEDERAL TRADE COMMISSION,        Civ. No.

19           Plaintiff,              **SACV19-01333 JVS (KESx)**

20      vs.                          **MEMORANDUM IN SUPPORT
                                     OF PLAINTIFF'S APPLICATION
21                                   FOR A TEMPORARY
                                     RESTRAINING ORDER AND
22  ELEGANT SOLUTIONS, INC., et al.  AN ORDER TO SHOW CAUSE
                                     WHY A PRELIMINARY
23           Defendants.            INJUNCTION SHOULD NOT
                                     ISSUE**
24

25

26

27                                   **FILED UNDER SEAL**

28

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................1

II. THE PARTIES ....................................................................................2

    A. Plaintiff..........................................................................................2

    B. Corporate Defendants....................................................................2

    C. Individual Defendants ...................................................................5

    D. The Common Enterprise ...............................................................6

III. DEFENDANTS' DECEPTIVE AND UNLAWFUL BUSINESS
PRACTICES .......................................................................................8

    A. Defendants' Deceptive Marketing of Student Loan Debt Relief
Services............................................................................................8

        1. Payment and Debt Reduction Misrepresentations.....................8

        2. Misrepresentations About the Application of Payments ..........10

        3. Servicer Misrepresentations.......................................................13

    B. Fees and Enrollment in Defendants' Debt Relief Program.................14

IV. A TEMPORARY RESTRAINING ORDER SHOULD ISSUE AGAINST
DEFENDANTS ................................................................................16

    A. This Court Has the Authority to Grant the Requested Relief.............16

    B. The FTC Meets the Standard for Preliminary Injunctive Relief.........17

        1. The FTC Is Likely to Succeed on the Merits.............................18

            a. Defendants Violate Section 5 of the FTC Act...............18

            b. Defendants Violate the TSR ...........................................20

        2. The Individual Defendants Are Liable for Injunctive and
Monetary Relief. ........................................................................21

        3. The Equities Weigh in Favor of Granting Injunctive Relief....23

    C. The Scope of the Proposed *Ex Parte* TRO Is Necessary and
Appropriate..................................................................................24

        1. Conduct Relief ...........................................................................25

|   |   | 2. | Asset Preservation Is Necessary to Preserve the Possibility of Final Relief.................................................................25 |
|---|---|---|---|
|   |   | 3. | A Receiver Is Necessary to Halt the Injury and Locate and Preserve Business Assets and Records ...................................27 |
|   |   | 4. | Immediate Access and Limited Expedited Discovery Are Appropriate .........................................................28 |
|   |   | 5. | The TRO Should Be Issued Without Notice to Defendants to Preserve the Court's Ability to Fashion Meaningful Relief.....29 |
| V. | CONCLUSION.................................................................30 |

**TABLE OF AUTHORITIES**

**Cases**

*CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135 (2d Cir. 1977)......24

*FTC v. A1 DocPrep, Inc.*, CV17-07044-SJO (JCx) (C.D. Cal. Sept. 28, 2017) ... 17, 28

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999)..................... passim

*FTC v. Alliance Document Preparation LLC*, cv-17-07048 SJO (KS) (C.D. Cal. Sept. 28, 2017)........................................................................................17

*FTC v. Amy Travel Servs., Inc.*, 875 F.2d 564 (7th Cir. 1989)........................ 21, 22

*FTC v. BAM Fin., LLC*, SACV15-01672 (C.D. Cal. Oct. 21, 2015)......................17

*FTC v. City W. Advantage, Inc.*, No. 2:08-cv-00609-BES-GWF, 2008 WL 2844696 (D. Nev. Jul. 22, 2008) ..........................................................................18

*FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016) ......................... 17, 22

*FTC v. Consumer Def., LLC*, 2:18-cv-00030-JCM-PAL, slip op. at 15 (9th Cir. June 17, 2019)......................................................................................17

*FTC v. Cyberspace.com, LLC*, 453 F.3d 1196 (9th Cir. 2006) ................. 18, 19, 20

*FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000)........................24

*FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001) ................................................18

*FTC v. Gill*, 71 F. Supp. 2d 1030 (C.D. Cal. 1999)......................................19

*FTC v. GTP Mktg., Inc.*, Civ. A. No. 4-90-123-K, 1990 WL 54788 (N.D. Tex. Mar. 15, 1990) ........................................................................................18

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) .................... 16, 17, 25, 26

*FTC v. IAB Mktg. Assocs., LP*, 972 F. Supp. 2d 1307 (S.D. Fla. 2013)................25

*FTC v. Impetus Enter., Inc.*, 8:18-cv-01987-JLS-KES (Nov. 13, 2018)................17

*FTC v. Int'l Computer Concepts, Inc.*, No. 5:94CV1678, 1994 WL 730144 (N.D. Ohio Oct. 24, 1994) ..................................................................................26

*FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052 (C.D. Cal. 2012) ........................................................................................18

iii

*FTC v. M&T Fin. Grp.*, CV17-6855-ODW(PLAx) (C.D. Cal. Sept. 19, 2017) .....17

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010) ................ 21, 22

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) ............................... 17, 18, 20

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997)......................21

*FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir. 1982)..............................25

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009)..............................................18, 22

*FTC v. Thomsen-King & Co.*, 109 F.2d 516 (7th Cir. 1940)...................................24

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984) ....................... 16, 28

*FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156 (9th Cir. 1984)..................... 17, 23

*FTC v. Wealth Educators, LLC*, SACV15-2357 (C.D. Cal. Apr. 6, 2015) ............17

*FTC v. Willms*, Case No. C11-828 MJP, 2011 WL 4103542 (W.D. Wash. Sept. 13, 2011) ....................................................................................................................26

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988) . 25, 27

*FTC v. World Wide Factors*, 882 F.2d 344 (9th Cir. 1989) ................. 17, 18, 23, 24

*Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423 (1974)..............................30

*In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984)........................................18, 19

*In re Thompson Med. Co.*, 104 F.T.C. 648 (1984) ...........................................18, 20

*In re Vuitton et Fils S.A.*, 606 F.2d 1 (2d Cir. 1979) ..................................................27

*Int'l Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir. 1974)................................26

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) .....................................25, 26

*Nat'l Soc'y of Prof'l Eng'rs. v. United States*, 435 U.S. 679 (1978)......................24

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946) .............................................29

*Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126 (9th Cir. 2006) ...............30

*SEC v. ETS Payphones, Inc.*, 408 F.3d 727 (11th Cir. 2005) ..................................25

*SEC v. First Fin. Grp. of Texas*, 645 F.2d 429 (5th Cir. 1981) ..............................28

*SEC v. Keller Corp.*, 323 F.2d 397 (7th Cir. 1963) ...............................................28

*SEC v. Manor Nursing Ctr., Inc.*, 458 F.2d 1082 (2d Cir. 1972) ...........................26

*United States v. Diapulse Corp. of Am.*, 457 F.2d 25 (2d Cir. 1972)......................24

iv

*United States v. Laerdal Mfg. Corp.*, 73 F.3d 852 (9th Cir. 1995)..........................17

*United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172 (9th Cir. 1987)..18

**Statutes**

15 U.S.C. § 45 ...............................................................................................1

15 U.S.C. § 45(a) ...........................................................................................2

15 U.S.C. § 53(b) ................................................................................... passim

15 U.S.C. §§ 41-58 .........................................................................................2

16 C.F.R. § 310 .................................................................................. 1, 2, 20

16 C.F.R. § 310.3(a)(2)(x) .............................................................................21

16 C.F.R. § 310.4(a)(5)(i) ..............................................................................20

Fed. R. Civ. P. 26(d) .....................................................................................29

Fed. R. Civ. P. 30(a)(2) .................................................................................29

Fed. R. Civ. P. 33(a) ......................................................................................29

Fed. R. Civ. P. 34(b) ......................................................................................29

Fed. R. Civ. P. 65(b) ......................................................................................29

Nev. Rev. Stat. § 78.585 (2013)......................................................................4

S.D. Codified Laws § 47-26-39 (2019) ...........................................................4

**Other Authorities**

FTC Policy Statement Regarding Advertising Substantiation, 104 F.T.C. 648

   (1984)..........................................................................................................18

L.R. 7-19.2 ....................................................................................................29

## I.   INTRODUCTION

Plaintiff, the Federal Trade Commission ("FTC"), brings this action to halt a pernicious debt relief scheme that preys on consumers with student loan debt. Defendants lure consumers with false or unsubstantiated promises to lower consumers' monthly student loan payments by consolidating consumers' loans and enrolling them in affordable student loan repayment plans. They also mislead consumers into believing that all or most of their payments will be applied to their student loans. Defendants claim they will take over the servicing of consumers' loans and direct consumers to submit monthly payments to Defendants.

In reality, Defendants do not obtain the specific lower payments promised consumers, make only sporadic, if any, payments to consumers' loans, and do not take over servicing of consumers' loans. However, because Defendants change the contact information on consumers' student loan servicing accounts, consumers often go several months or sometimes years before finding out their student loans are not being repaid. In short, Defendants fail to obtain the promised debt relief for consumers and have instead bilked consumers out of more than $23 million.

The individual defendants, and some of the corporate defendants, have been pursued by three state attorneys general over their debt relief business and are currently subject to consent orders in those states.[1] Defendants continue their operation in spite of these actions.

Defendants' actions violate Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

To put an immediate stop to Defendants' unlawful conduct, the FTC seeks a non-noticed *ex parte* temporary restraining order ("TRO") with an order to show

---

[1] *See* PX 22-24 (North Carolina, Oregon, and Washington consent orders).

1  cause why a preliminary injunction should not issue pursuant to Section 13(b) of
2  the FTC Act, 15 U.S.C. § 53(b).  The proposed TRO would enjoin Defendants'
3  illegal practices, freeze their assets, appoint a temporary receiver, allow the FTC
4  immediate access to Defendants' business premises to inspect and preserve
5  documents, and impose other relief.  These measures are necessary to prevent
6  continued consumer injury, dissipation of assets, and destruction of evidence,
7  thereby preserving this Court's ability to provide effective final relief.

8  **II.    THE PARTIES**
9        **A.    Plaintiff**
10       Plaintiff FTC is an independent agency of the United States government
11  created by statute.  15 U.S.C. §§ 41-58.  The FTC's responsibilities include
12  enforcing the FTC Act's prohibitions of unfair or deceptive practices, 15 U.S.C.
13  § 45(a), as well as enforcing the Rules it has promulgated under its rulemaking
14  authority, including the TSR, 16 C.F.R. Part 310.

15       **B.    Corporate Defendants**
16       Defendant Elegant Solutions, Inc., also d/b/a Federal Direct Group ("Elegant
17  Solutions"), is a South Dakota corporation formed in May 2016.[2]  The Articles of
18  Incorporation list 110 E. Center St., Ste. 2053, Madison, SD 57042 as the principal
19  executive office for Elegant Solutions, but Elegant Solutions has also used a
20  commercial Regus office located at 300 Spectrum Center Drive #400 Irvine, CA
21  92618 as well as 3 Studebaker, Irvine, CA 92618 as its business addresses.[3]
22  Elegant Solutions is registered as a foreign corporation in California.[4]  Federal
23
24  _____
25  [2] PX 20, p. 685, ¶ 21, Att. A.
    [3] PX 20, p. 685, ¶ 22, Att. A (110 E. Center St.); p. 686  ¶ 27, Att. A (300
26  Spectrum Center Dr.); p. 689, ¶ 36, Att. F (3 Studebaker); p. 690, ¶ 39, Att. G (3
27  Studebaker).
    [4] PX 20, p. 686, ¶ 24, Att. A.
28

Direct Group is registered with the South Dakota Secretary of State as a d/b/a of Elegant Solutions.[5]

Defendant Trend Capital Ltd., also d/b/a Mission Hills Federal ("Trend Capital"), is a South Dakota corporation that is registered to do business in California as a foreign corporation.[6]  The 2016 Articles of Incorporation list 110 E. Center St., Ste. 2053, Madison, SD 57042 as the principal executive office for Trend Capital, but Trend Capital has used other addresses in correspondence with banks and service providers, including 3 Studebaker, Irvine, CA 92618 and 30211 Avenida del las Banderas #200, Rancho Santa Maragarita, CA 92688.[7]  Mission Hills Federal is registered with the South Dakota Secretary of State as a d/b/a of Trend Capital.[8]

Defendant Dark Island Industries, Inc., also d/b/a Federal Direct Group and f/k/a Cosmopolitan Funding, Inc. ("Dark Island"), is a South Dakota corporation that is registered to do business in California as a foreign corporation.[9]  The Articles of Incorporation list 110 E. Center St., Ste. 2053, Madison, SD 57042 as the principal executive office for Dark Island, but Dark Island has listed 3 Studebaker, Irvine, CA 92618 as its business address in public documents.[10] Cosmopolitan Funding, Inc. incorporated in South Dakota in May 2016 and changed its name to Dark Island Industries, Inc. in June 2016.[11]

---

[5] PX 20, pp. 685-86, ¶ 23, Att. A.
[6] PX 20, pp. 694-95, ¶¶ 59, 62, Att. M.
[7] PX 20, p. 695-96, ¶ 60, Att. M (110 E. Center St.);  ¶ 66, Att. M (30211 Avenida Del Las Banderas); ¶ 70, Att. P (3 Studebaker).
[8] PX 20, p. 695, ¶ 61, Att. M.
[9] PX 20, pp. 690-91, ¶¶ 42, 45, Att. H.
[10] PX 20, pp. 690-91, ¶ 43 (110 E. Center St.), ¶ 45 (3 Studebaker), Att. H.
[11] PX 20, p. 690, ¶¶ 42, 44, Att. H.

3

Defendant Heritage Asset Management, Inc., also d/b/a National Secure Processing ("Heritage"), is a South Dakota corporation that is registered to do business in California as a foreign corporation.[12]  The Articles of Incorporation list 110 E. Center St., Ste. 2053, Madison, SD 57042 as the principal executive office for Heritage, but Heritage has also listed 6A Liberty #125, Aliso Viejo, CA 92656 as its business address in public documents.[13]  Heritage incorporated in South Dakota in May 2014 and dissolved in December 2017.[14]  National Secure Processing is registered with the South Dakota Secretary of State as a d/b/a of Heritage.[15]

Defendant Tribune Management, Inc., also d/b/a The Student Loan Group ("Tribune"), is a Nevada corporation.[16]  Tribune's Articles of Incorporation, filed in 2014, identify its registered agent as Corp 95, LLC at 2620 Regatta Dr. Suite 102, Las Vegas, Nevada, 89128 and Tribune has also listed 6A Liberty Ste. 175, Aliso Viejo, CA 92656 as its business address in public documents.[17]  The Student Loan Group is registered with the Nevada Secretary of State as a Fictitious Firm Name for Tribune.[18]  Tribune filed a Certificate of Dissolution in November 2017.[19]

---

[12] PX 20, pp. 698-99, ¶¶ 79, 83, Att. Q.

[13] PX 20, p. 699, ¶¶ 80 (110 East Center St.), 83 (6A Liberty), Att. Q.

[14] PX 20, p. 698-99, ¶¶ 79, 84, Att. Q.   South Dakota and Nevada permit lawsuits against dissolved corporations that commence within two years of dissolution. S.D. Codified Laws § 47-26-39 (2019); Nev. Rev. Stat. § 78.585 (2013).

[15] PX 20, p. 699, ¶ 81, Att. Q.

[16] PX 20, p. 703, ¶ 101, Att. X.

[17] PX 20, pp. 703-04, ¶ 101 (Corp 95), ¶ 106 (6A Liberty), Att. X.

[18] PX 20, p. 703, ¶ 104, Att. X.

[19] PX 20, p. 704, ¶ 105, Att. X.

## C.    Individual Defendants

Defendant Mazen Radwan has held himself out as an officer of Dark Island, Elegant Solutions, Heritage, Trend Capital, and Tribune.[20]   He has used the name "Michael Radwan" and "Mike Radwan" in bank and service provider documents in connection with the business activities alleged in this Complaint.[21]   He has been a signatory on the corporate defendants' bank and American Express accounts [22] and has served as the customer contact for Defendants' Internet Service Provider agreements.[23]

Defendant Rima Radwan has held herself out as an officer of Elegant Solutions, Dark Island, Heritage, Trend Capital, and Tribune.[24]   She has been a signatory on the corporate defendants' bank accounts and has served as the customer contact for Defendants' payroll company.[25]

Defendant Dean Robbins has held himself out as an officer of Elegant Solutions, Trend Capital, Dark Island, Heritage, and Tribune.[26]   He has been a signatory on the corporate defendants' bank and American Express accounts and has served as the customer contact for Defendants' virtual office provider.[27]

---

[20] PX 20, pp. 708-713, Table 1 (Individual-Entity Matrix).

[21] PX 20, pp. 693-94, ¶ 56; 700, ¶ 86.

[22] PX 20, pp. 708-713, Table 1 (Individual-Entity Matrix); *see also* pp. 687, 688, 693-94, 696, 700-02, 704-05, ¶¶ 29, 32-33, 55, 57, 69, 88, 90, 92, 95, 97, 108, 111, Atts. B, C, D, J, L, N, R, S, T, U, Y, Z (bank signature cards and credit card holder documents).

[23] PX 20, p. 69394, ¶ 56, Att. K (ISP).

[24] PX 20, pp. 708-713, Table 1 (Individual-Entity Matrix).

[25] PX 20, p. 708-713, Table 1 (Individual-Entity Matrix); *see also* pp. 687, 693, 701-02, 704-05, ¶¶ 29, 55, 90, 92, 95, 108, 111, Atts. B, J, S, T, U, Y, Z (bank signature cards and credit card holder documents); ¶ 35, Att. S (payroll).

[26] PX 20, pp. 708-713, Table 1 (Individual-Entity Matrix).

[27] PX 20, pp. 708-713, Table 1 (Individual-Entity Matrix); *see also* pp. 687, 693, 696, 701-02, 704-05, ¶¶ 29, 55, 69, 90, 92, 95, 108, 111, Atts. B, J, N, S, T, U, Y,

Dean Robbins designed the customer relationship management ("CRM") software used by Defendants for their student loan scheme.[28]

## D.    The Common Enterprise

Defendants conduct their debt relief scheme through an interrelated network of companies that are commonly owned or controlled by the individual defendants. They have operated this common enterprise since at least mid-2014 when they incorporated Heritage and Tribune and started using the d/b/a names of National Secure Processing and The Student Loan Group in communciations with consumers.[29]  In mid-2016, Defendants transitioned their student loan scheme to Defendants Dark Island Industries, Elegant Solutions, and Trend Capital, and started doing business as Federal Direct Group and Mission Hills Federal.[30]   All corporate defendants have been or are owned or controlled by the same three individual defendants; for example, each has expressly held him or herself out as a 33% owner of Elegant Solutions, Dark Island, Heritage, and Tribune in bank account or merchant applications.[31]  The same individuals each have had signatory control over the corporate funds in all five corporate Defendants' depository bank

---

Z (bank signature cards and credit card holder documents); p. 609, ¶ 39, Att. G (payroll).

[28] PX 20, p. 716, ¶ 124, Att. CC.

[29] Evidence suggests the individual Defendants actually started scamming students prior to the Complaint period, in 2013, through a previous partnership named SLS Managers and a previous corporation named DORM Group, Inc.  See PX 20, p. 716, ¶ 122, Att. CC.  Their enterprise originally involved four individuals, the three individual Defendants and their former partner, Omar Chmait.  After the individual Defendants allegedly ousted Mr. Chmait from their scheme, Chmait sued Mazen Radwan, Rima Radwan, and Dean Robbins for lost revenues.  Id.  In 2014, the individual Defendants appear to have continued their student loan debt relief scheme without Mr. Chmait by forming the first wave of corporations named in the Complaint, Heritage and Tribune.

[30] PX 20, pp. 685, 690, 696, ¶¶ 21, 42, 68.

[31] PX 20, p. 708-713, Table 1.

accounts.[32]  Each was issued copies of credit cards for at least two different corporate American Express accounts.[33]

Corporate defendants also share many of the same employees.  Payroll records show that eleven individuals employed by Tribune in 2017 were also employed by Elegant Solutions in 2018,[34] three individuals employed by Tribune Management in 2017 were also employed by Trend Capital in 2018,[35] and seventeen individuals employed by Heritage Asset in 2017 were also employed by Trend Capital in 2018.[36]

Defendants also use common business addresses to perpetuate their scheme. Defendants have listed the address of 3 Studebaker, Irvine, CA 92618, as the business address for Elegant Solutions, Dark Island Industries, and Trend Capital in service agreements with third parties.[37]  These same three corporate defendants have used an address, 26895 Aliso Creek Road, Aliso Viejo, CA 92656, which appears to belong to a UPS PO Box.[38]  Public documents for all five corporate defendants include a common address of 3265B Golden Lantern St., Suite 140, Dana Point, CA 92629.[39]  And public documents for four of the corporate defendants (all except Tribune) list a common address of 110 East Center St., Suite 2053, Madison, SD 57042.[40]

Corporate defendants also comingle funds by making wire transfers between corporate accounts and using one corporate account to pay American Express

[32] PX 20, pp. 687-88, 693, 700-702, 704-05, ¶¶ 29, 32, 55, 88, 92, 95, 108, 113.
[33] PX 20, Att. D.
[34] PX 20, p. 718, ¶ 132.
[35] Id.
[36] PX 20, p. 719, ¶ 133.
[37] PX 20, pp. 714-715, Table 2 (Address Matrix).
[38] Id.
[39] Id.
[40] Id.

charges incurred by other corporate defendants.[41]  In addition, the individual defendants use corporate accounts to pay for their luxury car leases, vacations, and personal expenses.[42]

## III.   DEFENDANTS' DECEPTIVE AND UNLAWFUL BUSINESS PRACTICES

### A.   Defendants' Deceptive Marketing of Student Loan Debt Relief Services

Defendants use at least three false or unsubstantiated representations in calls with consumers to induce them to enroll in Defendants' debt relief program: (1) consumers will be enrolled in a repayment plan that will reduce their monthly payments to a lower, specific amount or result in their loan balances being forgiven; (2) most or all of consumers' monthly payments to Defendants will be applied toward consumers' student loans; and (3) Defendants will assume responsibility for the servicing of consumers' student loans.

#### 1.   Payment and Debt Reduction Misrepresentations

Defendants telephone consumers offering to help them with their student loans.[43]  Defendants' telemarketers say that they will obtain specific, lower monthly student loan payments – typically less than half of what consumers were paying – by consolidating consumers' loans and/or enrolling them in income-based repayment.[44]  For example, one consumer recalls: "He told me that I would pay a lower monthly payment with Federal DG and that he would look into loan

---

[41] PX 20, pp. 737-38, ¶¶ 205-207.

[42] *Id.*

[43] *See, e.g.,* PX 2, p. 72, ¶ 3; PX 3, p. 141, ¶ 3;  PX 6, p. 226, ¶ 3; PX 7, p. 265, ¶ 4, PX 11, p. 380, ¶ 3 (consumers received telephone calls).

[44] *See, e.g.,* PX 1, p. 1, ¶¶ 3, 4; PX 2, p. 72, ¶¶ 3-4;  PX 8, p. 273,  ¶¶ 3-4; ¶ 3; PX 7, p. 265, ¶ 4, PX 13, p. 496, ¶¶ 3-4; PX 15, p. 541, ¶¶ 3-4; PX 16, p. 551, ¶¶ 3-4.

forgiveness options for me,"[45] and "…[she] told me that she worked with National Secure Processing and they could lower my monthly payments by consolidating my loans and placing me in an income-based repayment plan."[46]

Defendants' telemarketers also explain that consumers' consolidated loans will be eligible for loan forgiveness, ultimately saving them money.  In some instances, Defendants claim consumers will be eligible for loan forgiveness after a shorter time period than is actually available, such as three, ten, or 15 years.[47]  For example, "I asked them how long it would take to repay my loans and they said that if I made payments to National Secure Processing for seven years, then the remaining balance on my loan would be forgiven;"[48] and:

> He told me that if I worked with Federal DG, they would be able to set me up on a lower monthly payment plan than if I worked with my servicer alone. He explained to me that I could enter into a payment plan where I would pay approximately $90 per month for ten years and then the remainder of my loans would be forgiven.[49]

In fact, Defendants do not obtain the specific, lower monthly payment or savings promised most consumers.[50]  Defendants have arranged for many of the

---

[45] PX 14, p. 534, ¶ 3.

[46] PX 12, p. 407, ¶ 5.  *See also* PX 6, p. 226, ¶ 3 ("The representative told me that if I signed up, National Secure Processing would lower my monthly payments and save me up to $2,000 by consolidating my student loans.").

[47] PX 9, p. 313, ¶ 4 (three years); PX 13, p. 496, ¶ 4  (15 years); PX 15, p. 541, ¶ 3 (ten years); PX 17, p. 590, ¶ 4 (ten years).

[48] PX 4, p. 177, ¶ 3.

[49] PX 7, p. 265, ¶ 4.

[50] PX 1, p. 4, ¶ 18;  PX 2, pp. 74, 75, ¶ 19; PX 3, p. 143, ¶ 14; PX 4, p. 179, ¶ 12; PX 5, p. 210, ¶ 10; PX 6, p. 228, ¶ 15; PX 7, p. 266, ¶ 11; PX 8, p. 275, ¶ 16; PX 9, p. 315, ¶ 16; PX 10, p. 343, ¶ 23; PX 11, p. 382, ¶ 14; PX 12, p. 409, ¶ 15; PX 13, p.498, ¶ 13; PX 14, p. 545, ¶ 7; PX 15, p. 542, ¶ 7; PX 16, p. 553, ¶ 15; PX 17, p. 591, ¶ 12; PX 18, p. 625, ¶ 11; PX 19, p. 652, ¶ 22.

loans to be placed into forbearance or deferment.[51]  In other instances, Defendants have contrived for payment plans with zero dollar monthly payments for consumers by submitting falsified income and dependent numbers to consumers' servicers unbeknownst to the consumers.[52]  And in further cases, Defendants have altogether failed to obtain the promised consolidations.[53]  Indeed, some consumers were not eligible for loan consolidations at the time they received the sales pitch because they had already consolidated their loans.[54]

### 2.   Misrepresentations About the Application of Payments

Defendants' telemarketers also misrepresent what will happen to consumers' payments.  In their sales pitch, and in later correspondence with consumers, the telemarketers instruct consumers to stop communicating with or making payments to their "prior lender" or "current servicer" and to instead authorize Defendants to set up monthly electronic withdrawals from consumers' bank accounts.[55]  Defendants then claim that most or all of consumers' payments will be applied to

---

[51] *See, eg.,* PX 3, p. 143, ¶ 14 (deferment);  PX 4, p. 179, ¶ 12 (forbearance); PX 5, p. 210, , ¶ 8 (deferment); PX 10, p. 343, ¶ 23 (forbearance); PX 11, pp. 382, 383, ¶ 14 (deferment); PX 15, p. 542, ¶ 17 (forbearance); *see also* PX 21, p. 1155, ¶¶ 25.

[52] *See, eg.,* PX 16, p. 553, ¶ 15: "[FedLoan Servicing indicated] that my income information had been falsified so I had been placed into a $0 payment plan. I told FedLoan Servicing that I was unaware my information had been falsified and, in fact, I had submitted my tax returns to National Secure Processing...".  *See also* PX 2, pp. 74, 75, ¶ 19; PX 4, p. 179, ¶ 12 PX 6, p. 228, ¶ 15; PX 7, p. 266, ¶ 11; PX 12, p. 409, ¶ 15; PX 13, p. 498, ¶ 13 (consumers with zero dollar payments); PX 21, pp. 1155-56, ¶¶ 26-28.

[53] PX 2, p. 74, ¶ 19; PX 4, p. 180, ¶ 19; PX 6, p. 228, ¶ 14.

[54] PX 21, p. 1151, ¶ 15. In some instances, Defendants have consolidated loans for consumers who had already made qualifying payments in programs that offered loan forgiveness, thus cancelling consumers' existing history of on-time payments and "restarting the forgiveness periods." *Id.* at 1154-55, ¶ 24.

[55] *See, eg.,* PX 16, p. 552, ¶ 7; PX 3, p. 155, Att. C; PX 8, p. 280, Att. B; PX 11, p. 395, Att. D.

their student loans after consumers make between one and three initial or set-up fee payments.[56]  For example, "Joseph informed that I should not have any contact with my former servicer, and that Federal DG would handle everything for me;"[57] and "She told me I could make an initial payment between $200 and $300 and I would then be able to make monthly payments of approximately $50 which would be applied to the balance of my student loans."[58]

They also provide consumers phony payment breakdowns.  For example, Defendants told one consumer that $10 of her $51.67 monthly payment would be a management fee, and that the other $41.67 would go toward repaying her loans.[59] None of her payments were applied to her loans.[60]

In fact, the vast majority of revenues from consumers' payments end up in Defendants' coffers.[61]  Although Defendants have made some sporadic payments to consumers' lenders, most consumer declarants report that Defendants paid no money at all towards their loans.[62]  One declarant learned that Defendants had submitted only one payment over two years and only after Defendants had interfered to such a degree that his loans were in default.[63]  Some consumers learn

---

[56] PX 6, p. 226, ¶ 3; PX 11, p. 380, ¶ 4; PX 12, p. 407, ¶ 5; PX 15, p. 541, ¶ 3.
[57] PX 14, p. 534, ¶ 4.
[58] PX 16, p. 551, ¶ 4. *See also,* "I asked how much the monthly payments would be, and the representative told me that they would be approximately $51 per month. [The representative] also told me that the entire monthly payment would be applied to repay my loans," PX 4, p. 177, ¶ 4; and "The man I spoke to said that if I signed up with National Secure Processing, they would lock me into a better interest rate and apply lower monthly payments to the balance of my loans." PX 9, p. 313, ¶ 4.
[59] PX 2, p. 72, ¶ 5; *see also*, PX 17, p. 590, ¶ 5.
[60] PX 2, p. 75, ¶ 21.
[61] PX 20, p. 731, Table 4.
[62] PX 2, pp. 74-75, ¶¶ 16, 19, 21; PX 3, p. 143, ¶ 14; PX 6, p. 228, ¶ 18; PX 11, p. 384, ¶ 20; PX 15, p. 543, ¶ 13; PX 19, p. 652, ¶ 22.
[63] PX 10, p. 343, ¶¶ 22, 25.

from their loan servicers months or years after enrolling with Defendants that their payments to Defendants are not going towards their loans.[64]

When consumers confront Defendants to find out what happened to their multiple payments, Defendants inform them that their entire payments were collected as "handling" or "management" fees.[65]  In other instances, Defendants tell consumers that most of the consumer's payment has gone towards Defendants' fees except for a minimal portion (such as $10 per month), which went into a "trust" account to be saved up and paid to consumers' loans.[66]  There is no evidence from bank records, however, that Defendants are actually using a third-party financial institution to escrow consumer payments or set up consumer trust accounts.[67]

As a result of Defendants' failure to make payments on consumers' loans, many consumers have accrued additional, unpaid interest.[68]  In some cases, this interest has then capitalized, increasing consumers' principal balance and, concomitantly, the amount of interest they will have to pay over the life of the loan.[69]  Defendants' actions have subjected some consumers to becoming delinquent on their student loans.[70]

---

[64] *See, eg.*, PX 1, p. 4, ¶¶ 18, 19; PX 4, p. 178, ¶ 11; PX 13, p. 498, ¶ 13.

[65] PX 2, p. 74, ¶ 16; PX 11, p. 382, ¶ 11.

[66] PX 18, p. 626, ¶ 13; PX 8, p. 275, ¶ 18.

[67] PX 20, p. 723, ¶ 151.

[68] PX 1, p. 4, ¶ 20; PX 2, p. 75, ¶ 21; PX 3, p. 144, ¶ 19; PX 4, p. 180, ¶ 19; PX 6, pp. 228, 229, ¶ 18; PX 7, pp. 266-67, ¶ 13; PX 9, p. 316, ¶ 19; PX 11, p. 384, ¶ 20; PX 12, p. 411, ¶ 21; PX 13, p. 498, ¶ 16; PX 15, p. 543, ¶ 13; PX 16, pp. 553, 554, ¶ 18; PX 18, p. 628, ¶ 20; PX 19, p. 652, ¶ 22.

[69] *Id.*; *see also*, PX 21, p. 1156, ¶ 29 (federal loan servicer describes interest accrual and, sometimes, capitalization as a consequence of falsified repayment plan applications).

[70] *See, e.g.*, PX 21, p. 1154, ¶ 23.

### 3.   Servicer Misrepresentations

Defendants tell consumers in their initial sales pitch, and in later calls and emails, that they will be purchasing, taking over, or handling servicing of consumers' loans.  For example, one consumer declared, "[A representative] told me that National Secure Processing would be taking over my loans and therefore that I would no longer need to make payments to my previous loan servicer."[71] Defendants further advise consumers that they will handle all communications with consumers' lenders and instruct consumers to stop making payments to their "previous" servicers.[72]

Defendants are not federal loan servicers and do not purchase consumers' loans.[73]  Rather, they insert themselves as middlemen between consumers and their servicers, effectively preventing the repayment and proper servicing of consumers' loans.[74]  In many instances, Defendants use consumers' Federal Student Aid

---

[71] PX 13, p. 496, ¶ 4.  *See also*, PX 3, p. 141, ¶ 3; PX 11, p. 380, ¶ 4; PX 14, p. 534, ¶ 3.

[72] Some consumers receive emails from Defendants directing consumers to avoid communicating with their servicer and bolstering the misrepresentation that Defendants are taking over the servicing of consumers' loans: "As the consolidation process may take from 60 to 120 days to complete your current loan servicer make (sic) contact you in an attempt to retain you as a customer.  Please disregard this call as this may delay your consolidation process."  PX 3, p. 155, Att. C; *see also*, PX 8, p. 280, Att. B; PX 11, p. 395, Att. D (similar emails).  The wording of this email varies over time, but communications from 2019 still refer to consumers' loan services as "previous servicers," and suggests Defendants are consumers' current loan servicer.  *See* PX 16, p. 569, Att. C.

[73] PX 21, p. 1149, ¶ 9.  Well after consumers enroll in Defendants' programs, Defendants have sent some "payment reminder" emails that admit that National Secure Processing, "is not affiliated with the Department of Education and not a DOE servicer."  PX 11, p. 392, Att. C.

[74] *See* PX 21, p. 1148, ¶¶ 5-6 (explanation of how Student Loan Debt Relief ("SLDR") schemes work in MOHELA declaration); p. 1150, ¶ 11 (harms and

Personal Identification Number ("FSA PIN") and personal information to impersonate consumers in phone calls with consumers' servicers.[75] Defendants also use consumers' sign-in credentials to change consumers' contact information in their federal loan account files, effectively hindering or entirely preventing consumers' loan servicers from communicating with consumers.[76]

## B.    Fees and Enrollment in Defendants' Debt Relief Program

If consumers are interested in Defendants' debt relief program, Defendants' telemarketers collect consumers' FSA PINs, social security numbers, and bank account payment information and routing numbers, typically during the initial call.[77] Shortly thereafter, Defendants email consumers pre-filled electronic contracts with an Automated Clearing House ("ACH") authorization and fine-print disclosures and request that consumers sign electronically.[78]

After consumers submit the e-signed contract, Defendants typically collect an initial payment ranging from $100 to $500 and then an ongoing monthly

potential harms for Defendants' SLDR activities on MOHELA borrower accounts).

[75] PX 21, p. 1152, ¶ 17.

[76] PX 21, pp. 1153-54, ¶¶ 19-22 (MOHELA found altered contact information on more than 500 borrower accounts associated with Defendants); *see also*, PX 4, p. 179, ¶ 12; PX 5, p. 210, ¶ 9; PX 11, p. 382, ¶ 13; PX 18, p. 627, ¶ 19, PX 15, p. 542, ¶ 7 ("I contacted Sallie Mae…Sallie Mae was unable to verify my identity or discuss my loans because my contact information and password had been changed. I was cut off from communicating with Sallie Mae.").

[77] PX 2, p. 72, ¶ 6 (Defendants requested consumer's FSA username and PIN during first call); PX 5, p. 209, ¶ 4 (personal and banking information); PX 7, p. 265, ¶ 5 (checking account information), PX 8, p. 273, ¶ 5 (loan account information), PX 9, p. 313, ¶ 5 (bank account); PX 11, p. 380, ¶ 5 (personal information); PX 15, p. 541, ¶ 4 (social security number, FSA PIN, bank account information); PX 18, p. 625, ¶ 4 (personal and bank account information).

[78] *See, e.g.*, PX 2, p. 72, ¶ 7, Att. A; PX 5, p. 209, ¶ 5, Att. A; PX 6, p. 226, ¶ 5, Att. A.

payment, typically ranging from $50 to $200.[79]  Between the initial and monthly payments, Defendants have collected a total of between $773 and $7,000 from individual consumers.[80]  Defendants have taken more than $23 million from consumers since January 2016.[81]

In some instances, when consumers have contacted Defendants to cancel, Defendants have told consumers that they will suffer adverse credit consequences if they cancel or that Defendants will turn the consumers' accounts over to debt collectors.[82]  Defendants also have refused requests for refunds by consumers.[83]

---

[79] PX 2, p. 72, ¶ 4 (initial fee and then a monthly payment of $51.67); PX 3, p. 141, ¶ 4 (initial payment of $109, monthly payment of $78.13); PX 5, p. 209, ¶ 5 (initial payment of $109, monthly payment of $153.38); PX 6, p. 226, ¶ 3 (initial payment of $181, monthly payment of $104); PX 11, p. 380, ¶ 4 (initial payment of $109, monthly payment of $61); PX 12, p. 407, ¶ 5 ("enrollment fee" of $200, monthly payment of $130); PX 13, p. 496, ¶ 4 (an initial fee and then a monthly payment of $100); PX 16, p. 551, ¶ 5 (initial payment of $200, monthly payment of $45.74); PX 18, p. 625, ¶ 5 (consumer to initially pay "$109 for a couple months" and then a monthly payment of $61); PX 19, p. 649, ¶ 5 (initial payment of $109, monthly payment of $61.67).

[80] PX 1, p. 4, ¶ 20 ("I paid more than $7,000 to National Secure Processing and Mission Hills Federal."); PX 2, p. 74, ¶ 21 ($1,452.42); PX 3, p. 144, ¶ 19 ($5,137.82); PX 4, p. 180, ¶ 19 ($3,200); PX 5, p. 211, ¶ 16 ($5,323.92); PX 6, p. 228, ¶ 18 ($1,850); PX 7, p. 266, ¶ 13 (over $1,000); PX 8, p. 275, ¶ 21 ($3,768.24); PX 9, p. 316, ¶ 19 (almost $3,000); PX 10, p. 342, ¶ 19 ($1,355.04); PX 11, p. 384, ¶ 20 ($773); PX 12, p. 411, ¶ 21 ($3,211); PX 13, p. 498, ¶ 16 (over $3,000); PX 14, p. 535, ¶ 10 ($162.50); PX 15, p. 543, ¶ 13 ($1,900); PX 16, p. 553, ¶ 18 ($2,400); PX 17, p. 592, ¶ 16 ($1,415); PX 18, p. 628, ¶ 20 ($1,708); PX 19, p. 650, ¶ 22 (more than $1,000).

[81] PX 20, pp. 731, 732, ¶¶ 183, 184.  Defendants' *net* revenues from January 2016 to present are approximately $23,054,158.30.  Without discovery, the amount of gross revenues from Defendants' operations between 2014-2016 is unclear because the payment processor account records for that time period appear to potentially involve some revenues from unrelated debt relief operations.  PX 20, p. 725, ¶ 157.

[82] PX 4, p. 180, ¶ 18; PX 12, p. 410, ¶ 17; PX 14, p. 535, ¶ 9; PX 18, p. 627, ¶ 18.

## IV.   A TEMPORARY RESTRAINING ORDER SHOULD ISSUE AGAINST DEFENDANTS

This Court should issue an *ex parte* TRO enjoining Defendants' illegal practices, freezing their assets, appointing a temporary receiver, allowing the FTC immediate access to Defendants' business premises to inspect and preserve documents, and imposing other relief.  The Court has the authority to grant the requested relief, and the FTC meets the standard for preliminary injunctive relief.  Additionally, the scope of the proposed *ex parte* TRO is necessary and appropriate.

### A.   This Court Has the Authority to Grant the Requested Relief

This Court has the authority to grant temporary, preliminary, and permanent relief pursuant to the second proviso of Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), which states, "[I]n proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction."[84]  The Ninth Circuit has recognized that any case alleging violations of a law enforced by the FTC constitutes a proper case for which the FTC may seek injunctive relief.[85]  It further has held that Section 13(b) preserves the Court's inherent authority to order not only permanent relief, but also to grant preliminary and ancillary equitable relief,

---

[83] PX 8, p. 275, ¶ 18; PX 9, pp. 315-16, ¶ 18; PX 11, pp. 388, 389, ¶¶ 15, 17, 20; PX 15, p. 542, ¶ 8.

[84] 15 U.S.C. § 53(b).  This action is not brought pursuant to the first proviso of Section 13(b), which addresses the circumstances under which the FTC can seek preliminary injunctive relief before or during the pendency of an administrative proceeding.  Because the FTC brings this case pursuant to the second proviso of Section 13(b), its complaint is not subject to the procedural and notice requirements in the first proviso.  *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1111 (9th Cir. 1982); *see also, FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984).

[85] *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1233 (9th Cir. 1999).

1  including restitution and disgorgement of ill-gotten gains.[86]  Here, where the public

2  interest is at stake, exercise of the Court's broad equitable power is particularly

3  appropriate.[87]  Indeed, numerous courts in this district and throughout the Ninth

4  Circuit have granted or affirmed injunctive relief similar to that requested here.[88]

5  **B.    The FTC Meets the Standard for Preliminary Injunctive Relief**

6          In determining whether to grant a preliminary injunction under Section

7  13(b), a court "must 1) determine the likelihood that the Commission will

8  ultimately succeed on the merits and 2) balance the equities."[89]  Unlike private

9  litigants, the FTC need not prove irreparable injury.[90]  In balancing the equities, the

10

11  _____

12  [86] *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 598 (9th Cir. 2016) (citing *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994)); *see also H.N. Singer, Inc.*,

13  668 F.2d at 1113 (holding that a court may exercise the full breadth of its equitable

14  authority in a Section 13(b) action because Congress "did not limit that traditional equitable power" when enacting the FTC Act).

15  [87] *United States v. Laerdal Mfg. Corp.*, 73 F.3d 852, 857 (9th Cir. 1995); *Pantron I*

16  *Corp.*, 33 F.3d at 1102; *FTC v. World Wide Factors*, 882 F.2d 344, 347 (9th Cir. 1989).

17  [88] *See, e.g., Affordable Media*, 179 F.3d at 1232 & n. 2; *FTC v. Impetus Enter.*,

18  *Inc.*, 8:18-cv-01987-JLS-KES (Nov. 13, 2018); *FTC v. A1 DocPrep, Inc.*, CV17-07044-SJO (JCx) (C.D. Cal. Sept. 28, 2017); *FTC v. Alliance Document*

19  *Preparation LLC*, cv-17-07048 SJO (KS) (C.D. Cal. Sept. 28, 2017); *FTC v. M&T*

20  *Fin. Grp.*, CV17-6855-ODW(PLAx) (C.D. Cal. Sept. 19, 2017); *FTC v. BAM Fin., LLC*, SACV15-01672 (C.D. Cal. Oct. 21, 2015); *FTC v. Wealth Educators, LLC*,

21  SACV15-2357 (C.D. Cal. Apr. 6, 2015).

22  [89] *Affordable Media*, 179 F.3d at 1233 (quoting *FTC v. Warner Commc'ns, Inc.*,

23  742 F.2d 1156, 1160 (9th Cir. 1984)); *see also World Wide Factors*, 882 F.2d at 346-47.

24  [90] *FTC v. Consumer Def., LLC*, 2:18-cv-00030-JCM-PAL, slip op. at 15 (9th Cir.

25  June 17, 2019); *Affordable Media*, 179 F.3d at 1233.  Although not required to do so to obtain injunctive relief, the FTC also can show irreparable injury.  As

26  discussed above, all of Defendants' victims are at risk of delinquency on their

27  student loans and continue to lose significant funds from their payments to Defendants.  *Supra*, at pp. 12, 14 (§§ III.A.2, III.B).

28

public interest should receive greater weight than private interests.[91] As set forth below, the FTC has amply demonstrated that it will ultimately succeed on the merits of its claims and that the balance of equities favors injunctive relief.

### 1. The FTC Is Likely to Succeed on the Merits

To demonstrate likelihood of success on the merits, the FTC must make a "prima facie showing of illegality,"[92] and "the district court need only . . . find some chance of probable success on the merits" to grant an injunction.[93]  The FTC has met this standard.  The evidence shows that Defendants violate Section 5 of the FTC Act and the TSR by flagrantly misrepresenting their purported student debt relief services and further violate the TSR by collecting advance fees.  It also shows that the individual Defendants are liable for these violations.

### a. Defendants Violate Section 5 of the FTC Act

Section 5 of the FTC Act prohibits any material representation or omission that would likely mislead consumers acting reasonably under the circumstances.[94] A representation is likely to mislead consumers when either it is false or the maker lacked a reasonable basis for the claim.[95]  A claim is material if it "involves

---

[91] *World Wide Factors*, 882 F.2d at 347.

[92] *FTC v. GTP Mktg., Inc.*, Civ. A. No. 4-90-123-K, 1990 WL 54788, at *4 (N.D. Tex. Mar. 15, 1990).

[93] *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 176 (9th Cir. 1987); *accord. FTC v. City W. Advantage, Inc.*, No. 2:08-cv-00609-BES-GWF, 2008 WL 2844696, at *2 (D. Nev. Jul. 22, 2008).

[94] *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009); *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1199 (9th Cir. 2006); *FTC v. Gill*, 265 F.3d. 944, 950 (9th Cir. 2001); *Pantron I Corp.*, 33 F. 3d at 1095 (quoting *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 164-65 (1984)).

[95] FTC Policy Statement Regarding Advertising Substantiation, 104 F.T.C. 648, 839 (1984) (appended to *In re Thompson Med. Co.*, 104 F.T.C. 648 (1984)); *see also FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1057 (C.D. Cal. 2012).

information that is important to consumers and, hence, is likely to affect their choice of, or conduct regarding, a product."[96]  The Court is not confined to analyzing isolated words and phrases, but must consider the overall "net impression" that Defendants' representations make upon consumers.[97]

Here, Defendants make at least three false or unsubstantiated claims to induce consumers to purchase their student loan debt relief services.  First, Defendants represent that consumers will be enrolled in a repayment plan that will reduce their monthly payments to a specific lower amount (e.g., $51.67 per month) or have their loan balances forgiven.[98]  This claim is false or unsubstantiated because Defendants do not obtain the specific lower monthly payments or loan forgiveness promised consumers, and sometimes offer to enroll consumers in repayment plans or forgiveness programs for which they are not even eligible.[99]

Second, Defendants represent that most or all of consumers' monthly payments to Defendants will be applied toward consumers' student loans.[100]  This claim is false or unsubstantiated because Defendants at most make sporadic payments on consumers' student loans and, in many cases, do not make any payments at all.[101]

Third, Defendants represent that they will assume responsibility for the servicing of consumers' student loans.[102]  This claim is false or unsubstantiated

---

[96] Cyberspace.com, 453 F. 3d at 1201 (quoting In re Cliffdale Assocs., 103 F.T.C. at 165).

[97] Id. at 1200 (solicitation can be deceptive by virtue of its net impression even if it contains truthful disclosures); FTC v. Gill, 71 F. Supp. 2d 1030, 1043 (C.D. Cal. 1999).

[98] Supra pp. 8-10 (§ III.A.1).

[99] Supra pp. 9-10 (§ III.A.1).

[100] Supra pp. 10-12 (§ III.A.2).

[101] Supra pp. 11-12 (§ III.A.2).

[102] Supra pp. 13-14 (§ III.A.3).

because Defendants are not federal loan servicers, nor are they in any way affiliated with the Department of Education or federal loan servicers.  Rather, Defendants merely insert themselves as middlemen between consumers and their actual servicers.[103]

All three claims are material because they are express representations that go to the heart of the debt relief services promised by Defendants.[104]  Consumers would not have signed up for Defendants' services if they knew that Defendants would not obtain for them the promised debt relief services, make only sporadic, if any, payments on their student loans, and sever their relationships with their actual loan servicers.[105]

Thus, the FTC is likely to prevail in showing that Defendants violate Section 5 of the FTC Act.

### b.    Defendants Violate the TSR

Defendants violate two provisions of the TSR, which prohibits abusive and deceptive telemarketing acts or practices.  16 C.F.R. Part 310.  First, Defendants violate the TSR's prohibition on collecting advance fees for debt relief services. 16 C.F.R. § 310.4(a)(5)(i).  As discussed above, Defendants, after soliciting consumers over the telephone, typically have collected one to three payments of between $100 and $500 each before providing the promised debt relief services.[106]

---

[103] *Supra* pp. 13-14 (§ III.A.3).

[104] *Pantron I Corp.*, 33 F.3d at 1095-96 (holding that express claims are presumptively material) (citing *Thompson Med. Co.*, 104 F.T.C.at 816, *aff'd*, 791 F.2d 189 (D.C. Cir. 1986)).

[105] *Cyberspace.com*, 453 F. 3d at 1201.  Many consumers have stated as much. *See, e.g.*, PX 1, p. 4, ¶ 20; PX 15, p. 543, ¶ 13; PX 23, p. 652, ¶ 23.

[106] *Supra* pp. 14-15 (§ III.B).

And, in some cases, Defendants have never provided the promised services, but have continued to collect monthly payments ranging from $50 to $200.[107]

Second, Defendants violate the TSR's prohibition on making material misrepresentations about debt relief services. 16 C.F.R. § 310.3(a)(2)(x). This Count in the Complaint corresponds to Count I of the Complaint. The same three misrepresentations discussed above that violate Section 5 of the FTC Act also violate the Telemarketing Sales Rule.[108]

### 2. The Individual Defendants Are Liable for Injunctive and Monetary Relief.

An individual defendant may be held liable not only for his or her own unlawful conduct but may also be subject to injunctive and monetary relief for any corporate violations. To establish individual liability for injunctive relief based on corporate violations of Section 5 of the FTC Act, the FTC must show that the individual participated directly in the violative acts or practices or had authority to control them.[109] In general, an individual's status as an officer, or as someone with the authority to sign documents on the corporation's behalf, gives rise to a presumption of authority to control a small closely held corporation.[110]

Mazen Radwan, Rima Radwan, and Robbins are each liable for injunctive relief based on their participation in the debt relief scheme. Each is an owner and officer of all five corporate defendants (Dark Island, Elegant Solutions, Trend

---

[107] *Supra*, at p. 15 (§ III.B).

[108] *Supra* pp. 8-14 (§ III.A).

[109] *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1138 n.9 (9th Cir. 2010) (citing *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997)); *see also id.* ("Individual liability for injunctive relief under the Act has no mental state requirement.").

[110] *Publ'g Clearing House*, 104 F.3d at 1170-71; *see also FTC v. Amy Travel Servs., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989).

Capital, Heritage, and Tribune), a signatory on the corporate Defendants' bank accounts, and a holder of one or more of the corporate Defendants' credit cards.[111] In addition, each has been instrumental in obtaining services on behalf of the corporate defendants: Mazen Radwan has served as the customer contact for Defendants' telecommunications and merchant processing accounts; Rima Radwan has served as the customer contact for Defendants' payroll company; and Robbins has served as the customer contact for Defendants' virtual office provider[112] and created the CRM software that Defendants appear to use to operate their debt relief scheme.[113]

An individual subject to injunctive liability is further liable for monetary redress for corporate practices if the individual had, or should have had, knowledge or awareness of the corporate defendant's misrepresentations.[114]  This knowledge element, however, need not rise to the level of subjective intent to defraud consumers.[115]  Instead, the FTC need only demonstrate that the individual had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such representations, or an awareness of a high probability of fraud, coupled with an intentional avoidance of the truth.[116]  An individual's "degree of participation in business affairs is probative of knowledge."[117]

---

[111] *Supra* pp. 6,7. (§ II.D).
[112] *Supra* p. 5 (§ II.C).
[113] *Supra* pp. 5, 6 (§ II.C).
[114] *Network Servs. Depot*, 617 F.3d at 1138-39 (9th Cir. 2010); *Stefanchik*, 559 F.3d at 931.
[115] *Affordable Media*, 179 F.3d at 1234; *Amy Travel Servs.*, 875 F.2d at 574.
[116] *Commerce Planet*, 815 F.3d at 600; *Network Servs. Depot*, 617 F.3d at 1138-39; *Stefanchik*, 559 F.3d at 931.
[117] *Affordable Media*, 179 F.3d at 1235 (quoting *Amy Travel*, 875 F.2d at 574 (control of telemarketing company was "strong evidence of . . . knowledge")).

Mazen Radwan, Rima Radwan, and Robbins are each liable for monetary relief based on their actual or constructive knowledge of the wrongdoing. In addition to being officers and owners of the corporate Defendants, all three were previously named as defendants, along with Heritage, Tribune, and predecessor companies, in a lawsuit filed by the State of North Carolina for allegedly engaging in unlawful debt relief practices that are nearly identical to those alleged in the FTC's complaint.[118] Defendants, or their predecessor companies, also were sued by the State of Washington,[119] and entered into an Assurance of Voluntary Compliance ("AVC") with the State of Oregon concerning their student debt relief activities.[120] Thus, the FTC is likely to succeed in establishing that the individual Defendants had at least constructive, if not actual, knowledge of the unlawful conduct and therefore are liable for monetary relief.

### 3. The Equities Weigh in Favor of Granting Injunctive Relief

The public interest in halting Defendants' unlawful conduct outweighs any interest Defendants may have in continuing to unlawfully market their services. In balancing the equities between the public and private interest, "public equities receive far greater weight."[121] And because Defendants "can have no vested

---

[118] PX 22, pp. 1163 ¶¶ 3-4 (alleging that defendants "d[id] not pay consumers' student loan servicers as promised or misle[d] consumers about how much of their payments (if any) will actually go toward their student loans" and that defendants "collect[ed] hefty (and illegal) advance fees before any services are conducted on consumers' behalf").

[119] PX 24, pp. 1215-25.

[120] Robbins signed the Oregon AVC on behalf of Heritage in his capacity as Chief Technology Officer. PX 23, p. 1213.

[121] *Warner Commc'ns., Inc.*, 179 F.2d at 1165. *See also Affordable Media*, 179 F.3d at 1236 (quoting *World Wide Factors, Ltd.*, 882 F.2d at 347).

interest in business activity found to be illegal,"[122] a balance of equities tips definitively toward granting the requested relief.[123]

The evidence demonstrates that the public equities—protection of consumers from Defendants' unlawful student debt relief, effective enforcement of the law, and the preservation of assets—weigh in favor of granting the requested injunctive relief. Defendants' recidivist conduct indicates that they will likely continue to deceive the public absent such relief.[124] In contrast, "there is no oppressive hardship to Defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment."[125] Because the injunction will preclude only harmful, illegal behavior, the public equities supporting the proposed injunctive relief outweigh any burden imposed by such relief on Defendants.[126]

## C.   The Scope of the Proposed *Ex Parte* TRO Is Necessary and Appropriate

As the evidence shows, the FTC is likely to succeed in proving that Defendants have been engaging in deceptive and unfair practices in violation of the FTC Act and the TSR and that the balance of the equities strongly favors the public. Preliminary injunctive relief is thus justified and the Court should grant a

---

[122] *United States v. Diapulse Corp. of Am.*, 457 F.2d 25, 29 (2d Cir. 1972) (internal quotations and citation omitted).

[123] *CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 143 (2d Cir. 1977) ("A court of equity is under no duty 'to protect illegitimate profits or advance business which is conducted illegally.'" (citing *FTC v. Thomsen-King & Co.*, 109 F.2d 516, 519 (7th Cir. 1940))).

[124] *FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 536 (S.D.N.Y. 2000) ("[P]ast illegal conduct is highly suggestive of the likelihood of future violations.").

[125] *World Wide Factors*, 882 F.2d at 347.

[126] *See, e.g., Nat'l Soc'y of Prof'l Eng'rs. v. United States*, 435 U.S. 679, 697 (1978).

24

TRO that includes conduct relief, asset preservation, a temporary receiver, and immediate access to the business locations. Courts in this district and throughout the Ninth Circuit have routinely granted this relief in similar cases.[127]

### 1.   Conduct Relief

To prevent ongoing consumer injury, the proposed TRO prohibits Defendants from making deceptive debt relief representations (Paragraph I) and collecting unlawful advance fees (Paragraph II). These measures simply require Defendants to comply with the law and are squarely within the Court's broad equitable authority under Section 13(b) of the FTC Act "to grant any ancillary relief necessary to accomplish complete justice."[128]

### 2.   Asset Preservation Is Necessary to Preserve the Possibility of Final Relief

An asset freeze is appropriate once the Court determines that the FTC is likely to prevail on the merits and restitution would be an appropriate final remedy.[129] "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted."[130] Courts have found a strong likelihood that a defendant's assets will be dissipated during the pendency of a case where the business is permeated

---

[127] *See supra* n.88.

[128] *H.N. Singer, Inc.*, 668 F.2d at 1113.

[129] *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1031 (7th Cir. 1988); *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 717-19 (5th Cir. 1982); *see also FTC v. IAB Mktg. Assocs., LP*, 972 F. Supp. 2d 1307, 1313-15 (S.D. Fla. 2013); *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005) ("[T]he asset freeze is justified as a means of preserving funds for the equitable remedy of disgorgement.").

[130] *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009); *see also Affordable Media*, 179 F.3d at 1236-37.

by fraud.[131]  As the Ninth Circuit has observed in upholding an asset freeze, an individual who has "impermissibly awarded himself" funds that are not rightfully his, "is presumably more than capable of placing assets in his personal possession beyond the reach of a judgment."[132]

Here, an asset freeze (Paragraph IV) is necessary to preserve the status quo, ensure that funds do not disappear during the course of this action, and preserve Defendants' assets for final relief.  Defendants' student debt relief scheme is wholly premised on collecting fees from consumers for services they fail to deliver.  An analysis of Defendants' bank records shows that from October 2014 through February 2019 Defendants collected more than $23 million from consumers.[133]  From those funds, Defendants have transferred at least $4.6 million to accounts belonging to the individual Defendants and their respective spouses.[134]

Without an asset freeze, the dissipation of assets is likely.  Evidence shows that the individual Defendants use the corporate Defendants' bank accounts as their personal slush funds, spending substantial sums scammed from cash-strapped consumers to fund extravagant lifestyles consisting of luxury cars and exotic vacations.  For example, bank records show that since April 2015 the individual Defendants have transferred more than $134,000 to BMW Financial Services, GM

---

[131] *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1347 (2d Cir. 1974); *SEC v. Manor Nursing Ctr., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972); *see also FTC v. H.N. Singer, Inc.*, 668 F.2d at 1113; *FTC v. Willms*, Case No. C11-828 MJP, 2011 WL 4103542, at *11 (W.D. Wash. Sept. 13, 2011); *FTC v. Int'l Computer Concepts, Inc.*, No. 5:94CV1678, 1994 WL 730144, at *16-17 (N.D. Ohio Oct. 24, 1994).

[132] *Johnson*, 572 F.3d at 1085.

[133] *Supra*, at p. 15 (§ III.B).

[134] PX 20, p. 732, ¶ 186 (over $1.5 million went to Dean Robbins, $1.4 million to Mazen Radwan, and $1.7 to Rima Radwan).

1   Financial Services, Mercedes Benz Financial Services and Porsche to pay for auto

2   loans or leases.[135]

3          The individual Defendants also have charged substantial personal expenses

4   to corporate credit cards, which they have paid for using funds from the corporate

5   Defendants' bank accounts.[136] These charges include, for the period October 2018

6   to January 2019: more than $24,000 for restaurants, supermarkets, department

7   stores and food delivery services; more than $36,000 for travel-related expenses,

8   such as a vacation to Disney Resorts Hawaii and a Utah hunting trip, and more

9   than $11,000 for various other personal expenses, such as gym memberships,

10  ITunes purchases, barber shop and beauty salon visits, Roku and Netflix purchases,

11  massage parlor visits, tutoring services, a lifestyle expert program, and medical

12  expenses.[137]

13         Freezing individual assets is warranted where, as here, the individual

14  Defendants control the business that perpetrated the unfair and deceptive acts

15  alleged,[138] and giving notice could result in an inability to provide any relief at

16  all.[139]

17        **3.**    **A Receiver Is Necessary to Halt the Injury and Locate and**

18             **Preserve Business Assets and Records**

19         The FTC seeks appointment of a temporary receiver over the five corporate

20  Defendants (Paragraph XIV).  This Court has inherent power to appoint a receiver

21  incident to its statutory authority to issue permanent injunctions under Section

22

23

24

25  [135] PX 20, p. 726, 730, ¶¶ 161, 180.

    [136] PX 20, pp. 726, 736, ¶¶ 161, 163, 203.

26  [137] PX 20, p. 736, ¶ 203.

27  [138] *World Travel*, 861 F.2d at 1031.

    [139] *In re Vuitton et Fils S.A.*, 606 F.2d 1, 4-5 (2d Cir. 1979).

28

13(b) of the FTC Act.[140]  A receiver is necessary when a corporate defendant has defrauded the public.[141]

If Defendants are allowed to remain in control of their business, they are likely to destroy evidence and dissipate the fruits of their fraud.  A neutral receiver would prevent further harm to consumers and would locate and secure assets and records without disrupting any legitimate business activity.  A receiver would also help assess the extent of the fraud, trace its proceeds, prepare an accounting, and make an independent report of Defendants' activities to the Court.

### 4.   Immediate Access and Limited Expedited Discovery Are Appropriate

The proposed TRO directs Defendants to provide both the temporary receiver and the FTC with immediate access to the corporate Defendants' business premises (Paragraph XV(P)).  This will enable the receiver and the FTC quickly and efficiently to locate assets Defendants have wrongfully taken from consumers, identify possible additional defendants, and locate and secure documents pertaining to Defendants' business.  The business premises to which the receiver and the FTC would have immediate access include offices located at 3 Studebaker, Irvine, California 92618,[142] as well as additional business locations if they are discovered during the immediate access.

---

[140] *U.S. Oil & Gas*, 748 F.2d at 1432; *see also, e.g., A1 Docprep, Inc.*, CV17-07044-SJO (JCx).

[141] *SEC v. First Fin. Grp. of Texas*, 645 F.2d 429, 438 (5th Cir. 1981) ("[I]t is hardly conceivable that the trial court should have permitted those who were enjoined from fraudulent misconduct to continue in control of (the corporate defendant's) affairs…." (quoting *SEC v. Keller Corp.*, 323 F.2d 397, 403 (7th Cir. 1963)).

[142] PX 20, p. 714, Table 2.  This address belongs to a two-story office building that is leased to Defendant Dark Island.  Defendants have used this address to obtain virtual office and mail forwarding services, payroll services, merchant account

The FTC also seeks permission to conduct limited expedited discovery to locate and identify documents and assets (Paragraph XXV).  District courts may depart from normal discovery procedures to meet discovery needs in particular cases,[143] especially as preliminary relief in a case involving the public interest.[144]

### 5. The TRO Should Be Issued Without Notice to Defendants to Preserve the Court's Ability to Fashion Meaningful Relief

The substantial risk of asset dissipation and document destruction in this case, coupled with Defendants' ongoing and deliberate statutory violations, justifies non-noticed relief.  Federal Rule of Civil Procedure 65(b) permits this Court to grant a TRO without notice if it appears notice will result in "irreparable injury, loss, or damage" and the applicant certifies the reason why.[145]  Issuing the *ex parte* TRO without notice in this case is indispensable to preserving the status quo, including securing assets needed to provide full and effective relief pending a hearing on the preliminary injunction.

As discussed above, Defendants' business operations are permeated by unlawful practices.  The FTC's experience shows that defendants engaged in fraudulent schemes similar to Defendants' often withdraw funds from bank accounts and move or shred documents upon learning of impending legal action.[146]

---

services, and Internet services.  Dark Island appears also to operate a classic car sales and storage business out of the first floor of the building.  If the Court grants the FTC's proposed temporary restraining order, the Receiver would be charged with determining which assets belong to the receivership and which, if any, belong to third parties and must be released.

[143] *See* Fed. R. Civ. P. 26(d), 30(a)(2), 33(a), and 34(b).

[144] The Court's equitable powers are broader if the public interest is involved. *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).

[145] Fed. R. Civ. P. 65(b); *see also* L.R. 7-19.2.

[146] *See* Rule 65 Declaration of K. Michelle Grajales, pp. 4-11, ¶ 10 (citing numerous instances where FTC defendants have dissipated assets or destroyed evidence when given notice of the FTC action).

1   Defendants' conduct – including moving large sums from corporate accounts to the

2   individual Defendant's accounts – and the nature of Defendants' illegal scheme

3   makes it is highly likely that Defendants would conceal or dissipate assets absent

4   non-noticed relief.  Courts therefore have regularly granted the FTC *ex parte* relief

5   in similar cases.[147]  Non-noticed TROs are granted to serve the "underlying

6   purpose of preserving the status quo and preventing irreparable harm just so long

7   as is necessary to hold a hearing, and no longer."[148]

8   **V.    CONCLUSION**

9        Defendants are causing substantial public injury through their unlawful

10  student loan debt relief scheme.  The FTC respectfully requests the proposed *ex*

11  *parte* TRO be issued without notice to Defendants to protect the public from

12  further harm and help ensure effective relief for those already harmed.

13

14  Respectfully submitted,

15

16  Dated:  July 8, 2019

17                                          K. Michelle Grajales
                                            Samuel F. Jacobson
18                                          Attorneys for Plaintiff
                                            FEDERAL TRADE COMMISSION
19

20

21

22

23

24

25

---

26  [147] *See supra* n.88.

27  [148] *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006)

28  (quoting *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438-39 (1974)).