Edward Chang (SBN 268204)
echang@mcnamarallp.com
McNamara Smith LLP
655 West Broadway, Suite 1600
San Diego, California 92101
Telephone: 619-269-0400
Facsimile:  619-269-0401

*Attorneys for Receiver,*
*Thomas W. McNamara*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 8:19-cv-01333-JVS (KESx) |
| Plaintiff, | **PRELIMINARY REPORT OF TEMPORARY RECEIVER** |
| v. | |
| ELEGANT SOLUTIONS, INC., et al., | JUDGE:   Hon. James V. Selna CTRM:    10C |
| Defendants. | |

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................... 1
II. RECEIVERSHIP ACTIVITIES .................................................................... 2
    A.    Immediate Access – 3 Studebaker, Irvine, CA ........................... 2
    B.    Bank Accounts ............................................................................. 3
    C.    Documents/Information/Electronic Data ..................................... 4
    D.    Compliance with TRO ................................................................. 5
    E.    Accounting .................................................................................. 5
    F.    Notice to Consumers ................................................................... 5
    G.    Cooperation ................................................................................. 6
    H.    Vehicles ....................................................................................... 6
III. BUSINESS OPERATIONS – STUDENT LOAN DEBT RELIEF ............ 7
    A.    Sales Department ......................................................................... 8
    B.    Processing Department ............................................................... 10
    C.    Predatory Prices ........................................................................ 13
    D.    Unlawful Advance Fees ............................................................ 14
        1.    The Law – Telemarketing Sales Rule (16 C.F.R.
            § 310.4(a)(5)) ................................................................ 14
        2.    Defendants Requested and Received Advance Fees ............. 14
        3.    No Valid Escrow or Trust Procedure ...................... 15
    E.    Defendants Routinely Misrepresent Consumers' Income and
        Employment Status to Loan Servicers – Generally Without the
        Consumers' Knowledge ............................................................ 16
    F.    Defendants Fail to Account for or Pay Customers' "Trust"
        Funds to Loan Servicers ............................................................ 21
    G.    Individual Defendants Appear to Have Stolen Customers'
        "Trust" Account Funds ............................................................. 27
IV. BUSINESS OPERATIONS – RCC MOTORS ........................................ 30
V. CAN THE BUSINESSES BE OPERATED LAWFULLY AND
    PROFITABLY? ...................................................................................... 31
    A.    Student Loan Debt Relief .......................................................... 31
    B.    RCC Motors .............................................................................. 32

# I.

## INTRODUCTION

I was appointed Temporary Receiver of the Receivership Entities[1] by the Temporary Restraining Order ("TRO") entered July 8, 2019.  By this Preliminary Report, I report to the Court my team's preliminary observations and initial actions.

Our onsite review of operations has revealed Defendants' student loan debt relief services business to be unlawful and fraudulent at all levels:

- The sales intake process is dependent on deceit and misrepresentation prohibited by the TRO.
- Defendants are compensated by advance fees prohibited by the TRO.
- Defendants defrauded their customers and the U.S. Department of Education ("DOE") by securing, and then annually renewing, "No Payment" arrangements for thousands of customers by falsifying the customers' status as unemployed.

Based on the above, I have concluded that Defendants' business cannot be operated as a lawful business.  We have, therefore, suspended operations and will await further guidance from the Court.

We must also draw the Court's attention to the most significant discovery the receivership team made while reviewing the business operations.  It appears the Individual Defendants have stolen more than $1,280,000 of customer funds over the last 18 months.  The funds were taken or transferred from the customer "Trust account" and then ultimately deployed to pay Defendants Mazen Radwan, Rima

///

---

[1]  Receivership Entities are defined in the TRO to include: Corporate Defendants as well as any other entity that has conducted any business related to Defendants' marketing of Debt Relief Services, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant. *See* TRO, Definitions, page 6.

Radwan, and Dean Robbins's federal and state taxes, their American Express bills, and to make distributions to them.[2]

## II.

## RECEIVERSHIP ACTIVITIES

### A.    Immediate Access – 3 Studebaker, Irvine, CA

As authorized by the TRO (Section XXIII, page 26), we took control and exclusive custody of Defendants' business location at 3 Studebaker, Irvine, California at 10:30 a.m. on Wednesday, July 10, 2019.  We received initial support from uniformed officers of the Irvine Police Department.  After securing the premises, we provided access to counsel for the FTC consistent with the TRO (Section XV, page 21).  We retained a locksmith who changed all exterior locks in order to ensure receivership control of the premises.

The site is a two-story office building of approximately 24,000 square feet in an upscale office park in Irvine, California.  The monthly lease is $28,399, which was paid by Receivership Entity Trend Capital Ltd. d/b/a Mission Hills Federal ("MHF").  The only signage on the exterior of the building and the reception/entry area are large "RCC" banners, creating the impression that RCC Motors, a custom car business which is a d/b/a of Receivership Entity Dark Island Industries, Inc., is the only business operating at the site.

///

---

[2]  I provide this Preliminary Report to assist the Court should it need to evaluate the Defendants and their business operations in further proceedings.  In particular, I detail the grounds for my conclusion that Defendants' business operations cannot be continued legally and profitably.  While I typically provide a Preliminary Report to assist the Court prior to the Preliminary Injunction ("PI") hearing, the parties stipulated to the entry of the PI just a few hours ago.  My determination, based on substantial supporting information that my team and I have uncovered over the past week, is consistent with the PI as entered.  My findings may also be of assistance to the parties as they evaluate litigation steps going forward, particularly since the PI is without any admission of wrongdoing or violation of law.  Given the serious nature of some of our discoveries, in particular what appears to be theft of customer funds by the Defendants, I believed it to be the best course of action to present this information immediately.

After tenant build-outs directed by Defendants, the building has four identifiable spaces:  (1) a suite of cubicles and three individual offices for the Processing Department located upstairs; (2) an executive suite upstairs with four large offices; (3) a Sales Department downstairs (35 workstations and a podium for the floor manager); and (4) the RCC Motors office and warehouse downstairs, which includes a "clubhouse," one executive office, and garage/service/storage facilities, presently housing approximately 40 vehicles.  Exhibit 1 is a schematic of the office space at 3 Studebaker.

At our arrival, 39 employees were onsite (34 student loan employees and 5 RCC Motors employees).  In general, they were cooperative, completed questionnaires, and responded to most questions.  After a brief presentation as to the role of the Receiver, most were allowed to collect personal items and excused.

We also took immediate steps to take control of identified commercial mail drops: AIM Mail Center, 3265B Golden Lantern St., Suite B, Dana Point, CA 92629; Lakeside Business Suites, 2620 Regatta Drive, Suite 102, Las Vegas, NV 89128; The UPS Store #2950, 26895 Aliso Creek Road, Suite B, Aliso Viejo, CA 92656; The UPS Store #115, 24881 Alicia Pkwy, Suite E, Laguna Hills, CA 92653; Regus California Koll Center, 30211 Avenida De Las Banderas, #200, Rancho Santa Margarita, CA 92688; and Regus Irvine Spectrum Drive Center, 300 Spectrum Drive, Suite 400, Irvine, CA 92618.

### B.    Bank Accounts

Immediately after receiving the TRO, the FTC and the Receiver served the asset freeze notice on banks and other financial institutions at which Defendants were known to have accounts.  In the brief time since the TRO was entered, we have received limited follow up information from these institutions.

///

///

///

| Account Name | Financial Institution | Acct. No. | Balance Frozen |
|---|---|---|---|
| Elegant Solutions, Inc. | JPMC | 7434 | $1,091.86 |
| Elegant Solutions, Inc. | JPMC | 7906 | $5,050.16 |
| Elegant Solutions, Inc. | JPMC | 1828 | $103,829.52 |
| Trend Capital | CalWest Bank | 6344 | $2,000,021.92 |
| Trend Capital | CalWest Bank | 6336 | $146,922.67 |
| Trend Capital | CalWest Bank | 6310 | $117,494.46 |
| Trend Capital | CalWest Bank | 6328 | $56,807.85 |
| **TOTAL** | | | **$2,431,218.44** |

### C.    Documents/Information/Electronic Data

Upon taking possession, we confirmed that the hard copy documents onsite, which consisted primarily of paper files for each customer, were secure.  We retained a computer forensic firm to supervise the FTC's Digital Forensics Unit in making images of selected desktop computers and servers.

Defendants utilized both cloud computing services and local servers. The first floor included a room dedicated to servers and data storage systems complete with dedicated cooling and battery backup systems.  This room housed at least eight servers hosting Defendants' websites, customer relationship management ("CRM") systems, shared files, phone system, and audio recordings, storing several terabytes of data.  Defendants recorded all calls with consumers and had call recordings from 2014 to present.  Defendants also subscribed to Microsoft Office 365 (more than 100 accounts) and used Outlook for emails and Skype to chat.

Fundamental to Defendants' operations was a home-grown CRM system for data collection and management.  Several employees reported that Defendant Dean Robbins coded and maintained the CRM system, which has gone through several version, the latest of which is named Ezekial.  The latest iteration of Defendants' student loan business was divided into two portfolios – Mission Hills Federal

("MHF") and Federal Direct Group ("FDG").  MHF and FDG use separate databases within this Ezekial CRM.  Despite several requests, and the TRO's requirement that he cooperate with the Receiver, Defendant Dean Robbins declined to assist the Receiver in accessing the CRM system.  As a result, our ability to obtain information from the database is limited.  While Mr. Robbins initially declined to assist, Defendants' onsite IT employee was cooperative and immediately provided assistance with preserving the Receivership Entities' data.

### D.    Compliance with TRO

We took immediate steps to ensure compliance with the TRO by suspending all sales and processing activities and changing the locks to prevent further access by the Individual Defendants or their employees.

### E.    Accounting

Our forensic accountant, Lisa Jones, is in the process of reviewing available financial records, which include QuickBooks records for the named Receivership Entities.  Based on the information available to date, she has prepared a Receivership Initial Account Records Review report attached as Exhibit 2.

We have also identified accountants who have provided bookkeeping and tax preparation services for Receivership Entities in the past.  We will follow up with them to secure relevant records and tax returns.  As a starting point, we have the forensic work of the FTC's investigator (Declaration of Michael B. Goldstein, ECF No. 25) who concluded that Defendants had extracted more than $23 million in gross deposits from consumer payments.

### F.    Notice to Consumers

We added an outgoing voicemail message to the Receivership Entities' telephone numbers noting the entry of the TRO and strongly encouraging customers to contact their loan servicers.  We made several requests to Defendant Dean Robbins for the administrative credentials for the Defendants' websites; he did not provide these credentials until Wednesday, July 17 at 6:30 p.m.  As a

result, we were forced to replace the existing websites with a Notice to Consumers. Finally, we also posted a Notice to Consumers on the Receiver's website at http://regulatoryresolutions.com/ and will post regular updates on that website as the case progresses.

### G.    Cooperation

As noted above, at the outset we received no cooperation from any of the Individual Defendants.  On July 12, 2019, Rima Radwan and her counsel met with us and responded to our questions.  Despite multiple requests to counsel, however, neither Mazen Radwan nor Dean Robbins have made themselves available.  Mr. Robbins has also refused our requests to produce reports from the CRM system that he created and manages and ignored our request for website credentials until Wednesday evening.  Labiba Radwan, the sister of Mazen Radwan and Rima Radwan, who described herself as Chief Operations Officer ("COO"), was present at the time of the immediate access.  She was cooperative and instrumental in securing the cooperation of the other employees.  She met with us extensively on the day of entry, which we appreciated, but we did not always find her explanations to be credible.

### H.    Vehicles

Despite their claims that their goal was to alleviate consumers' hardships, Individual Defendants used proceeds of the student debt relief services business to fund an extravagant lifestyle, including a fleet of luxury cars, all leased or purchased by the Corporate Defendants.  At the time of our entry, each Individual Defendant had recently taken possession of a 2019 Rolls Royce (two Ghost sedans and a Dawn convertible), leased in the name of a Corporate Defendant.  To acquire these, their "old" leased vehicles (2017 Bentley Continental GTCs) were traded in and each Individual Defendant charged $15,000 to corporate American Express

///

///

credit cards to cover the initial Rolls Royce lease payments.[3]  Aggregate monthly lease payments for the three Rolls Royce vehicles are approximately $17,000.

Individual Defendants also arranged for Corporate Defendants to pay the leases for vehicles for the personal use of their spouses:  a 2019 BMW M850i xDrive Coupe for Defendant Dean Robbins' spouse; a 2019 Mercedes Benz G63 for Defendant Rima Radwan's spouse; and a 2018 Cadillac Escalade ESV for Defendant Mazen Radwan's spouse.  Corporate Defendant Dark Island Industries also purchased a 2019 GMC Sierra 1500 Denali truck and leased a 2017 BMW 328d xDrive Sports Wagon.

With the exception of the 2019 BMW M850i, which was already in the warehouse, Individual Defendants have now returned all these vehicles to the Receiver.

## III.

## BUSINESS OPERATIONS –

## STUDENT LOAN DEBT RELIEF

In the days since my appointment, we have evaluated the operations.  We found ample evidence onsite that the unlawful practices alleged by the FTC and prohibited by the TRO, were occurring and were ingrained in the student loan debt relief business of the Receivership Entities.  As discussed below, we also identified pervasive fraud at the core of the business, which included a breathtaking pattern of lies and misrepresentations perpetrated on loan servicers (and, therefore, ultimately the United States Department of Education) and customers.  Finally, we

///

---

[3]  Based on our preliminary analysis of the QuickBooks data for Elegant Solutions, Inc., Trend Capital Ltd., and Dark Island Industries, Inc. and review of American Express statements, Individual Defendants routinely charged personal expenses to Corporate Defendants' American Express credit cards.  QuickBooks data indicates Defendants paid approximately $1.5 million to American Express for the period of December 2017 through July 2019, almost all of which appears to be personal charges incurred by Individual Defendants.

discovered theft of customer funds by Individual Defendants which was astounding in its scale – and likely criminal.

### A.      Sales Department

New customers were secured by a telemarketing sales team which made and answered outbound and inbound calls to and from "leads" generated by lead generator vendors.  The department is housed on the west half of the ground floor with 35 telemarketer workstations, only 12 of which are currently active.  At our arrival, 10 telemarketers and floor manager Kendra Sanchez were present.  With one exception, they cooperated and completed questionnaires.  The floor manager remained for most of the day to walk us through the sales process and to assist us in accessing sales and training materials.

The floor manager told us that the business relied on outbound calling until mid-2017 when it switched to inbound, before adding back some outbound in May 2019.  Ownership (described by the sales team as "upstairs") made all arrangements with, and tracked the success of, the lead generator vendors.  The sales team professed ignorance as to the techniques deployed by those vendors.  Incoming calls were color-coded at each workstation, which enabled tracking and informed employees of the source of the call.

During 2019, sales staffing levels have varied from a maximum of 18 in February, a low of 10 in April, and the current 12, with standard working hours of 8 a.m. to 5 p.m. weekdays.  Given the workstation capacity of 35, this reflected a serious downturn in volume which was confirmed by the sales team.

Members of the sales team are modestly compensated at $13.50 per hour plus a bonus for completed "deals."[4]  The bonus increased as volume thresholds were met: $15 per deal for 1-25 deals in a month, $25 for 26-50 deals, and $30 for

---

[4] Within the Sales Department, a potential customer was elevated to "deal" status once the customer signed (electronically via DocuSign).  A copy of a form Services Agreement and its attachments is included in the case study of customer A. Morales attached as Exhibit 3.

more than 51 deals.  The floor manager gave each telemarketer a "light" target of 26 deals per month, but there were no "hard minimums."  She described her supervision as rather informal with her main focus to confirm sales agents accurately recorded the customer's information.  She also reviewed actual calls in real time or via recordings that were automatically made of all calls.  She reported, and the agents confirmed, that the agents also "self-policed," particularly that agents were not to say Defendants "work for the DOE," but rather should say "work alongside the DOE" or "follow the DOE guidelines and programs."

One of the longer-serving sales representatives opined that one deal per day was a "good day" and that securing one deal would require fielding nearly 100 inbound calls.  Defendant Dean Robbins kept close track of the "cost per acquisition," which confirmed that each new customer required the fielding of many calls.[5]  The floor manager estimated that the average deals per day was roughly 20-30.  All agreed that outbound calling was unproductive with a nearly zero percent conversion rate.  Sales agents speculated that outbound calling was added to fill time when inbound traffic was light.  Outbound calling stopped whenever the room was busy with inbound calls.

The floor manager described a clear chain of command.  She reported "upstairs" to COO Labiba Radwan as the day-to-day boss of operations (the "Boss Lady" according to her desk sign).  She also observed that the three owners had different roles – Defendant Rima Radwan was clearly in charge of the student loan business (it was "her business" and she was "Judge, Jury, Executioner," according

---

[5]  Although the sales agents were not subjected to a boiler room sales environment, Defendants were closely monitoring sales data and metrics.  The sales manager sent daily and weekly status reports to Defendants Rima Radwan and Dean Robbins and COO Labiba Radwan.  These reports detail sales activities, including total sales, number of calls transferred from lead generators to agents, closing percentage, and the ultimate cost per sale.  For example, for the period July 1-5, 2019, Defendants had an average of 11 sales agents on the phones, they closed 27 sales, or 7.4% of the leads transferred to the agents, and the cost per sale was $311.78.

to her desk sign); Defendant Mazen (aka Mike) Radwan was a "car guy" who was in charge of RCC Motors; and Defendant Dean Robbins was IT for the loan business and manager of the internal CRM (Ezekial) which he had created.

Once a "deal" was secured, the file was sent upstairs to the Processing Department, after which the sales representatives had no further involvement. Sales agents described Processing and "upstairs" as a different universe as to which they had no control, knowledge, or interaction.

We reviewed scripts, training materials, and sales directives found at each workstation in the Sales Department.  The deception reflected in these materials is more subtle and nuanced than the typical hard-sell boiler room, but the overall sales pitch was nonetheless designed to oversell the likelihood of success, create the impression of a direct connection to the DOE, stay vague on the fees, make arrangements for the advance fee, and delude the customer into believing that these sales agents had but one goal – to help the customer.  *See* Exhibit 4.

In order to complete the enrollment process, sales agents needed basic information about the customer's student loans.  To secure this information, they accessed the National Student Loan Data System using the customer's FSA ID and login credentials.  This practice is prohibited, and Defendants' use of FSA IDs may subject them to criminal and civil liability under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and other statutes.

**B.     Processing Department**

Upon our arrival, approximately 20 employees were present in the Processing Department.  Despite some initial reluctance, these employees cooperated and completed questionnaires.  The General Manager, Daisy Lopez, stayed for most of the day to explain the department's functions and returned the following day to explain the CRM system.

Ms. Lopez identified four separate groups within the Processing Department – data entry, filing, customer service, and collections.  All were paid $12 to $17 per

hour.  Data entry employees entered customers' information into applications for student loan consolidation, income driven repayment plans, and annual recertification.  File clerks managed the physical paper files maintained for each customer.  Customer service employees interacted with customers, responded to inquiries and complaints, and processed consolidation, income driven repayment plan requests and annual customer recertifications.  Collections employees contacted customers whose payments failed to clear in order to obtain updated payment information.

General Manager Lopez played a vital role, overseeing both the Processing and Sales Departments.  In Processing, her primary task was to oversee the receipt of customer payments which was done by uploading, on a daily basis, a customer list to the merchant processor with associated bank account information.  She also reviewed the rejected payments and directed collections employees to follow up with customers whose payments were rejected or who were attempting to cancel.

The General Manager and other processing employees were also responsible for sending customer payments to the student loan servicers.  However, as detailed below, these payments were haphazard at best.  We found Defendants often failed to send payments to loan servicers for months or years.  While General Manager Lopez stated that the Processing Department was focused on customer service and acted in the best interest of the customers, our review determined that the vast majority of Defendants' unlawful conduct can be traced to this department.

General Manager Lopez explained that the MHF portfolio was "acquired" in January 2018 and only performs recertifications for legacy customers.[6]  The sole focus of MHF was the annual recertification of these legacy accounts.  Defendants' play here was to collect the lucrative residual payments associated with

---

[6]  While the employees may have been trained to tell customers the "portfolio was acquired," the truth is Defendants merely rebranded previous business iterations of the National Secure Processing/The Student Loan Group business into MHF.

1    recertification – with each customer paying approximately $612 per year.

2    Defendants received approximately $3.9 million annually based on the 6,281

3    active customers listed in the CRM.[7]

4         Defendant Rima Radwan explained that the FDG portfolio started in January

5    2018 as part of the companies' "rebranding."  All new customers are added to the

6    FDG portfolio, which currently has 2,516 active customers.[8]

7         All complaints were routed to the Processing Department.  They raised

8    many issues, the most common being fraud.  Collection employee Richard McCoy

9    fielded complaints and forwarded them to Ms. Lopez.[9]  Complaining customers

10   also sought cancellation and refund, but Defendants invoked paragraph 14 of the

11   Services Agreement to combat cancellations.  Under that paragraph, customers

12   could only cancel within three days of executing the Services Agreement or before

13   the new loan program began.  After a consolidation or recertification was

14   completed, cancellation could only be made at the annual renewal and customers

15   were required to provide notice 90 days prior to the anniversary date.  Furthermore,

16   in their "Phone Procedures" script, management instructed the Processing

17   Department to use aggressive tactics to avoid cancellations at all costs, including

18   by making sure customers were aware of their contract's stringent cancellation

19   policies described above, requiring customers to send emails, including reasons for

20   the cancellation, and if necessary, agreeing to change customers to more affordable

21   programs by, for instance, unilaterally placing them in a zero payment plan, if

22   possible.  *See* Exhibit 7.

---

23

24   [7]  The CRM also lists 3,417 cancelled MHF customers, 2,163 suspended customers and 808 customers on hold.  Defendants kept track of this residual cash flow in the

25   CRM, which lists current monthly residual payments of $260,612.73 for 6,281 MHF accounts.  *See* Exhibit 5.

26   [8]  The CRM also lists 1,847 cancelled FDG customers, 1,666 suspended customers, and 467 customers on hold and $140,005.23 in monthly residual payments for

27   2,232 FDG accounts.  *See* Exhibit 5.

28   [9]  Exhibit 6 contains eight such emails reflecting various complaints.

## C.     Predatory Prices

The fees imposed by Defendants are predatory:

- New applications – FDG only.  $979 per year, billed at $81.58 per month (composed of a Document Preparation Fee ($799 per year/$66.58 per month) and an ACH processing fee of $15 per month (versus an actual cost to Defendants of $0.50 per month)).  At some point, Defendants added $10 per month to be held in "trust."  It is unclear just when or why this $10 "trust" payment was implemented. In any case, it does not appear to have been implemented with any consistency.

- Recertifications – MHF and FDG.  For MHF, $612 per year, billed at $51.00 per month (composed of a Document Preparation Fee ($492 per year/$41.00 per month) and an ACH processing fee of $10 per month).  In some instance, the $10 per month in "trust" may have been applied to these recertifications.  The FDG cost is higher at $672 (because of a higher ACH processing fee), billed $56.00 per month. The Services Agreement includes a boilerplate provision that the recertification process (and the fees therefor) will "automatically renew every year."  (Services Agreement, paragraph 3, step 5.)

These fees were generally disclosed and charged to customers in an opaque manner such that only a very savvy customer could fully grasp the negative impact of these fees on the pace of loan repayment.  In those situations where a "zero payment IBR" was approved based on unemployment, the customer would still have a monthly payment, but it would be $81.58 for an initial application and $61.00 for a recertification.  The monthly payment would be 100% fees.  Interest on the customers' loans would continue to accrue and the loan balance grow.

///

///

**D.   Unlawful Advance Fees**

Defendants' entire operation embraces and depends on the advance payment of fees.  Our review of operations makes clear that if Defendants refrained from advance fees and complied with the rigors of the TSR, the business would be doomed.

1.   The Law – Telemarketing Sales Rule (16 C.F.R. § 310.4(a)(5))

The Telemarketing Sales Rule (16 C.F.R. § 310, "TSR") expressly prohibits the collection of advance fees for any debt relief service.  *See* 16 C.F.R. § 310.4(a)(5).  The full text is complex, but at its core, it prohibits requesting or receiving payment of any fee unless and until (A) the telemarketer has settled at least one debt pursuant to an agreement executed by the customer, and (B) the customer has made at least one payment pursuant to that agreement.  The TSR includes a narrow exception which permits the collection of advance fees if the funds are placed in a dedicated escrow-type account that meets five specific requirements, namely:

- The account is at an insured financial institution;
- The customer owns those funds and is paid accrued interest;
- The account holder is not owned or controlled by the debt relief servicer;
- The account holder does not give or accept any referral fees; and
- The customer may withdraw from the debt relief service at any time without penalty and, upon withdrawal, must receive all funds in the account, except for compliant advance fees, within seven days of the withdrawal.

2.   Defendants Requested and Received Advance Fees

During the initial sales call, Defendants acquire the customer's ACH information and process the first payment almost immediately after the customer executes the Services Agreement and no later than 30 days after sign-up.  The

advance nature of these fees is broadcast in the Services Agreement itself, which states that approval of an application by the servicer "can take 30-90 days to complete."  At the outset, the customer agrees to a "monthly payment start date" which is a static date which recurs every month and is not dependent on any events.

### 3.   No Valid Escrow or Trust Procedure

Based on the convoluted manner in which Defendants set up their bank accounts, it appears they were aware of the advance fees prohibition and were making some misguided half-effort to fall within the escrow exception.[10]  COO Labiba Radwan explained that Corporate Defendants maintained three bank accounts for each of the two portfolios (MHF and FDG).  She explained that customer payments initially came into a "holding" bank account where they would remain until an approval was received from the loan servicer for the initial loan modification or the annual recertification.  Sometimes it would take months to get an approval, in which case, several months' worth of customer payments were received into the "holding" account before funds could be released.  COO Labiba Radwan stressed that only upon receipt of the loan servicer's approval would

---

[10]  Defendant Rima Radwan claims she was not aware of the advance fee rules. This claim lacks credibility for several reasons: (1) she has been in the student loan relief industry for more than seven years, (2) Defendants were previously the subject of three state enforcement actions, (3) she told us she was aware of and reviewed materials from FTC actions against other student loan operators (which invariably include advance fee violations), and (4) she established bank accounts which allowed Defendants to make a facial claim that they do not "touch" customer payments until a loan modification is approved.

Moreover, even a cursory Internet search would have directed Defendants to FTC press releases issued in 2010 addressing the rule banning advance fees and plainly explaining how to comply with the rule.  *See* Press Release, Federal Trade Commission, Debt Relief Companies Prohibited From Collecting Advance Fees Under FTC Rule That Takes Effect October 27, 2010 (Oct. 20, 2010), https://www.ftc.gov/news-events/press-releases/2010/10/debt-relief-companies-prohibited-collecting-advance-fees-under; Federal Trade Commission, Debt Relief Services & the Telemarketing Sales Rule: A Guide for Business, https://www.ftc.gov/tips-advice/business-center/guidance/debt-relief-services-telemarketing-sales-rule-guide-business.

customer funds be transferred from the "holding" account into the two other accounts: (1) an "operating" account, which received the fees due the Defendants, and (2) a "trust" account, which received the customer payments due to the lender and which had to be forwarded to the loan servicer to keep customer loans current. To be clear, although Defendants internally denominated two bank accounts as "trust" accounts, they are simply ordinary bank accounts.[11]  When asked why Defendants had not used a third-party escrow to hold customer funds, COO Labiba Radwan claimed not to know what an escrow was.

In short, Defendants did not establish any procedures that could remotely render their advance fees lawful under the TSR.  Customer funds are not placed in the account of a third party unaffiliated with Defendants.  Instead, the accounts are owned and controlled by Defendants.

**E.     Defendants Routinely Misrepresent Consumers' Income and Employment Status to Loan Servicers – Generally Without the Consumers' Knowledge**

In the course of our review and employee interviews, we learned that a fundamental component of the Defendants' operation was to falsely claim to loan servicers that customers were unemployed and had zero income.  Defendants routinely presented this falsehood to loan servicers at both the loan modification and recertification stages even when the customers certified to the Defendants that they were employed and earning substantial income.  We reviewed file after file of the most recent recertifications with General Manager Daisy Lopez and saw the same thing again and again:  Defendants initially reported the customer as

---

[11]  Our accountant has identified four accounts at CalWest Bank under the name of Trend Capital, Ltd. for the MHF business and three accounts at Wells Fargo under the name Elegant Solutions for the FDG business.  In the internal QuickBooks accounting, Defendants gave each of the accounts a nickname, "holding," "operating," and "trust."  These accounts, however, are all traditional business accounts with no special features.  The bank records on each do not include the words "trust," "holding," or "operating."  Those are internal references only. There are no trust documents, no trustee, and no holding company.

unemployed to get the loan modification, *even when the customer indicated he/she was employed and certified an amount of annual income to the Processing Department,* and at the annual recertification Defendants again reported the customer to be unemployed, *even when the customer presented paystubs demonstrating employment to the Processing Department*.

The practical result of these misrepresentations was that customers routinely received loan consolidations or modifications with no monthly payments – in Defendants' parlance a "zero payment IBR." This allowed Defendants to happily report to the customer that only a minimal monthly payment, made up almost exclusively of fees, was due. At the first annual recertification, the customer would again be reported as unemployed, resulting in another "zero payment IBR." The customer's monthly payment would decrease as a result, but only because Defendants charged less for recertification than for the initial application. In each subsequent annual recertification, the customer would again be reported as unemployed and, as a result, the monthly payment would remain the same.[12]

In its initial email to a consumer, FDG lays the groundwork for its ultimate submission of unemployment status to the consumer's loan servicer. The email template for the initial contact email in use by FDG as of July 10, 2019 requests the consumer's two most recent paystubs or 2017 tax returns, but then states:

> *If we do not receive this income documentation within 5 business days of this letter then we will proceed to process your consolidation using an "Unemployed" status. This will enable us to successfully acquire your new terms without income documentation*, and we will only need your updated income documentation during your requalification period next year.

---

[12] Some portion of Defendants' customers did have monthly payments due to loan servicers. *See* example discussion regarding B. Smith at pages 24-25 and "trust" accounts at pages 21-23. At this point, we are not sure what the number is. Defendant Dean Robbins is the creator of the CRM and the only person identified by employees as someone who can run macro reports – like how many of the customers pay into the "trust" account and the amounts of the payments. Unfortunately, Mr. Robbins has declined our request to run CRM reports.

*See, e.g.*, Exhibit 8 (emphasis added).  The language of the email strongly suggests that the provision of income documentation is optional, as it informs the consumer that if he or she takes no action FDG will still prepare and submit an application. Moreover, it fails to inform the consumer of the very real consequences of submitting an "Unemployed" status—that the payments (allegedly) made to his or her loan servicer will not reflect his or her actual income.

Once the consumer's loans were in a repayment program, FDG would next contact the consumer in advance of his or her recertification deadline.  As of May 15, 2019, the recertification email template in use by FDG, although it asks the consumer to provide paystubs within the next two weeks, assures the consumer that "[a]s part of our services, we will take the necessary steps to ensure you stay in the most affordable payment plan for your needs."  *See, e.g.*, Exhibit 9.  Again, the language of the email suggests to the consumers that there are no negative consequences if they fail to submit their paystubs, as regardless, FDG "will take the necessary steps" to keep the consumers "in the most affordable payment plan." *Id.*

We saw several variations on how the unemployment submission played out:

<u>Resubmissions When Customer Expresses Concern</u>

Sometimes when paystubs were actually submitted, the loan servicer responded that a higher payment was due, and customers complained.  Based on the complaints, Defendants would immediately submit a revised annual recertification reflecting unemployment.  There is no indication in the CRM notes that customers were told Defendants intended to lie about the customers' employment status.  Rather, customers were told that Defendants would "renegotiate" the payment.

- For example, one CRM note reflects, "Client called in and said new terms are not feasible and she would like us to renegotiate her

payment."  The next business day Defendants submitted a revised recertification reflecting that the customer was unemployed.  *See* Exhibit 10.

- One customer contacted Defendants as follows: "You guys are saying that Fedloan wants we [sic] to go from paying $79.86 to $372.34.  It's 100% not feasible. . . . This is supposed to be based on my income and I haven't made gotten [sic] a pay raise worth $300 per month (I've only received a $0.69 raise since the last time we redid my payment.)  Please contact Fedloan to work on another amount."  Notably, the reason the customer's payment was so low initially ($79.86 – $69.86 to Defendant for fees and $10 to the "trust" account) was that Defendants had claimed she was unemployed.  In response to getting the email request to "contact Fedloan and work on another amount," Defendants immediately sent a revised recertification to Fedloan claiming the customer was unemployed.  *See* Exhibit 11.

- A customer service employee emailed the assistant Processing manager, "Client called [to ask] if we received her pay stubs, let her know we have, also asked for a pyment [sic] breakdown, client requested to stay in same program currently in with payment of $102.46, explained we will re-process for $0.0, thanks".  The assistant manager forwarded the email to senior processing employee Jocelyn Palma (without any further explanation) who quickly filed an amended recertification as unemployed.  *See* Exhibit 12.

- General Manager Daisy Lopez and the assistant manager routinely instructed senior processing employee Jocelyn Palma to submit zero dollar requalifications – representing the customer was unemployed.  *See* Exhibit 13.

///

<u>Resubmissions When Payment Goes Up</u>

There are numerous internal conversations and emails in which processing employees routinely discuss resubmitting recertifications any time a customer's payment goes up – even when the customer has not complained or contacted Defendants about the increase.

- General Manager Daisy Lopez notes in an instant messaging conversation with a customer service employee that the company resubmitted the recertification when Fedloan came back with a new monthly payment of $547.42 without hearing from the customer.  As Ms. Lopez explained, "we resubmitted it to a lower payment ***as he did not reply that he could afford that high payment*** . . . [and] he's approved for the Max benefit so he's okay.  His payment will remain at $74.13/month."  *See* Exhibit 14 (emphasis added).  To get the customer to the "Max benefit" and keep the payment at the same level the Defendants lied to the servicer and said the customer was unemployed.  *See also* Exhibit 15 (Instant messaging communication between senior processor Jocelyn Palma and manager Daisy Lopez, "[I] was going to resubmit their repay because it seems their payment increased.").

<u>Defendants Unilaterally Resubmit</u>

We also found numerous examples where recertifications initially submitted with paystubs were then resubmitted two to three weeks later claiming the customer was unemployed.  There are no CRM notes reflecting customer contact between the submissions, so it appears the resubmissions were company-driven.

The false "unemployed" recertification submission was so ingrained in the Processing Department that managers had to flag cases where they thought the customer really did want to determine what the payment would be if it were based on his or her true income.

- For example, in an email from assistant manager Maria Juarez to senior processor Jocelyn Palma forwarding customer email and paystubs and noting: "Please process. Im [sic] guessing client wants us to see what it will be like with her income." *See* Exhibit 16.

## F.  Defendants Fail to Account for or Pay Customers' "Trust" Funds to Loan Servicers

While Defendants contractually agreed to maintain a customer's loan payments in a client trust account, our discussions and CRM review with General Manager Daisy Lopez identified a glaring failure to pay customer funds held in the "trust" account to lenders or to carefully account for and track these funds.  In the Services Agreement, Defendant agreed to use the following procedure:

> [A]ll monies received, except for Processing Fees, by Company from Client will be placed into a Trust Account until the date the consolidation has been approved.  No payments will be made to past or present lenders during this time. . . .

> [O]nce consolidation terms have been approved, payments to the approved lender will then commence.  ***Payments will be made from the Clients Trust Account on a monthly basis in the amount approved during the consolidation process.***

*See* Exhibit 3 ("Explanation of Services" in Services Agreement) (emphasis added).

The procedures were haphazard at best – almost certainly by design.  Time and again, we reviewed files where customer funds, which were to be paid out to lenders monthly, were accumulated for a year or more without any payment to the lender.  Ms. Lopez blamed this on overwork and the CRM system which required manual tracking and manual payment of funds, although she believed they were doing a better job recently.  But, when the failure to make lender payments was discovered and a lump sum was forwarded to a loan servicer, monthly payments were still not paid going forward.

///

Management routinely and arbitrarily determined whether to pay a loan servicer, even though the customer's funds in the "trust" account had been paid to Defendants with the expectation they would be paid to loan services to reduce the loan balance. Instant messaging conversations on or about February 19, 2019 between COO Labiba Radwan and General Manager Daisy Lopez confirm the capricious and cavalier attitude towards the payment of customer funds to the loan servicers:

> Daisy 1:07 PM:
> Also.  I have a client that puts $1,040.71 in trust and he has $15,610.65 that we can send over.  How much should I send over?
> Labiba 1:08 PM:
> I would send $5k now
> Labiba 1:08 PM:
> Wait another 30-45 days and send another $5k
> Labiba 1:09 PM:
> I would save the other $5k for next years payments
> Labiba 1:09 PM:
> Is he in a Zero IBR?
> Daisy 1:10 PM:
> No he's not.
> Labiba 1:10 PM:
> What is his monthly payment?
> Daisy 1:10 PM:
> $541.49
> Labiba 1:10 PM:
> with his lender
> Daisy 1:10 PM:
> but he's paid ahead anyway so we can do what you suggested
> Labiba 1:10 PM:
> Ok
> Labiba 1:11 PM:
> Send the other $5k in 6 months, that way you give some leeway for his payments

Another exchange, on December 28, 2018, demonstrates the failure to properly track and pay "trust" funds and the capricious nature of decisions to forward customer funds to servicers.  The customer had made 40 monthly payments into her "trust" account when the Processing Department discovered that no payments had ever been made on the loan.  COO Labiba Radwan and General Manager Lopez decided to send the loan servicer less than half of the funds in the

///

"trust" account, and then only after they had confirmed the customer had not made any "complaints."

> Daisy 12:52 PM:
>> We have an MHF client that we've never sent any payments to their lender and she has been putting $270.00 in trust. Currently she has $10,814.58 in trust. How much can I send over?
>
> Labiba 12:53 PM:
>> Can you do an electronic payment?
>
> Daisy 12:53 PM:
>> yeah it's Fedloan
>
> Labiba 12:54 PM:
>> Does this client have any complaints? Like will they dispute any of their payments with us?
>
> Daisy 12:54 PM:
>> Not that I can see. We just came across her account as we sent off her requal approval
>
> Labiba 12:54 PM:
>> If they are good and in good standing, I would day [sic] $5k is safe
>
> Daisy 12:54 PM:
>> Ok. I'll send that out.
>
> Labiba 12:55 PM:
>> That equates to $416.66 for each month for the last 12 months
>
> Labiba 12:55 PM:
>> How long have they been a client
>
> Daisy 12:55 PM:
>> July 2015
>
> Labiba 12:56 PM:
>> Vea [sic] send at least the $5,000
>
> Daisy 12:56 PM:
>> Ok. Will do.

An exchange between General Manager Lopez and a processing employee, on April 26, 2019, about a customer who wanted to pay off her loan gives another glimpse of Defendants' attitude towards the "trust" funds. The processing employee did not mention to the customer that she had over $3,000 in her "trust" account (which, again, should have been paid monthly to the loan servicer). When the requested payoff was raised with General Manager Lopez, her primary concern was to make sure Defendants received their fees for the remainder of a year-long contract. She then investigated and confirmed that the customer had sufficient funds in the "trust" account to pay the fees:

Leticia Mendoza 11:38 AM:
Per conversation, Client [M.] Lyon #MHF801024979, regards to pay off Fedloan, thanks
Daisy 11:39 AM:
Ok.  I'll review it in a bit:-)

* * * *

Daisy 2:14 PM:
I updated [M.] Lyon-1024979
Daisy 2:15 PM:
The trust showing on there is accurate.  However since we did the requal she will need to pay us for the remainder of her year contract which would end in Feb of next year. . . .
Daisy 2:16 PM:
It probably would be best for us to have verification that the April payment cleared and once it does we can issue the trust transfer for what she owes we then send the remainder to Fedloan. . . .
Leticia Mendoza 2:16 PM:
I never mentioned Trust to client, so if she does pay off fedloan we at least have the funds to cover her required payment, thanks
Daisy 2:17 PM:
It's more than enough as she has over $3,000 in trust so we either have to send that once we do the trust transfer to her as a refund to the lender if she still has a balance you know what I mean?
Leticia Mendoza 2:22 PM:
. . . we can just keep working on her account, use Trust to cover her required payments. . . .

We reviewed the CRM records for this customer and confirmed that General Manager Lopez did indeed take the annual fees from the client "trust" account before refunding the remainder to the client.[13]

After some large "trust" fund transfers to loan servicers (which were large only because Defendants had failed to make the proper monthly payments), the Individual Defendants instructed the Processing Department to notify them of all transfers of more than $1,000 from the "trust" accounts.[14]  Following this

---

[13]  We saw a number of examples where General Manager Lopez appeared primarily concerned about her ability to tap into "trust" funds to pay fees to the companies.  *See* Exhibit 17.

[14]  This requirement is puzzling, as the funds are customer funds and the Individual Defendants have no right to these funds.  Of course, if the owners are improperly tapping the "trust" funds to pay personal obligations, as appears to be the case, then they would want to keep tabs on funds leaving the "trust" accounts.

instruction, the Processing manager sent email notifications to Defendants Rima Radwan and Dean Robbins.  *See* examples at Exhibit 18.  Notably, these emails highlight that only a portion of the "trust" funds were being forwarded to lenders.[15]

One of the attached email notifications reflects that the customer paid $18,000 into the "trust" account, but Defendants had only released $5,000 to the servicer, less than one-third of the funds available.  The experience of this customer, B. Smith, mentioned in the email above, is illustrative of and consistent with dozens of customer records (hard files and/or CRM records) we reviewed:

- On November 3, 2015, B. Smith entered into a contract with Student Loan Group (one of the Defendants' previous iterations).  The application reported $60,000 in annual income.

- Nine days later, on November 12, 2015, Defendants filed an application on behalf of this customer for an income driven repayment plan based on a claim of no taxable income.

- For annual recertification applications in 2016, 2017, 2018, and 2019, Defendants filed false applications again and again, claiming this customer had no income and was unemployed.

- In the meantime, B. Smith was making payments of nearly $600 per month to Defendants, $546.56 of which should have gone to Fedloan as a monthly loan payment.  After 35 months, on October 12, 2018, the customer called the Processing Department to ask, among other things, about these payments.  At the time of that call, $18,583.04 was in her "trust" account – Defendants had not forwarded a single payment to Fedloan in three years.

///

---

[15]  Management and employees made clear to us that the "owners" were actively involved in the operations and all determinations, such as the process to determine when to pay out customer "trust" funds.

- Immediately after the customer's call, the Processing Department released only $5,000 to Fedloan and advised the owners of the transfer.  Defendants waited two months (until December, 2018) to release another $7,600 from the "trust" account to Fedloan.  Notes in the CRM reflect that after this second transfer, the "client has $7076.16 in trust."

- Six months after that (May 25, 2019), Defendants released another $5,000 from the "trust."

- In June, 2019, after three years and six months of receiving monthly payments from the customer – all of which were supposed to be paid to Fedloan – Defendants made their first monthly payment of $546.56 to Fedloan, but never sent the remaining funds.  Instead, when the receivership team entered the business on July 10, 2019, the CRM reflected that the customer still had $5,355.52 in "trust," which Defendants continue to control.[16]

Defendants' failure to send "trust" payments to loan servicers had a practical and detrimental impact on customers whose loan balances were getting larger with the addition of accrued interest.[17]  We reviewed a number of files where the failure

---

[16]  The experience of another customer, S. Harmon, further illustrates Defendants' malfeasance.  He was "notified that there have been no payments to [the student loan servicer] for over two years."  He contacted Defendants on April 25, 2019 and instructed them to immediately release the money in trust and cancel his account.  On the same day, Defendants verified there were funds in the "trust" account and noted "to check if client will pay us or not, if he does then we will release the trust."  An hour later, Defendants cancelled the account and were "going to wait and see if he will dispute payments."  Nearly three weeks later (and apparently after customer did not dispute payment), Defendants sent funds of $140 to the student loan servicer.  *See* Exhibit 19.

[17]  As an example, one customer signed up in March 2017 and reported income of $108,000, but Defendants submitted an income-driven repayment application reporting no income in 2017 and 2018 and one child in 2017 and two children in 2018, all of which was false.  When the customer found out, she complained that Defendants submitted "inaccurate" and "blatantly false" information three times, causing her loan to accrue significant interest and putting her in a worse position. *See* Exhibit 20.

to forward the payments resulted in the delinquent loans being reported to credit agencies.

### G. Individual Defendants Appear to Have Stolen Customers' "Trust" Account Funds

Defendants' informal three bank account structure ("holding," "operating," and "trust") did not remotely comply with the TSR, but it could have provided some protection to customers if Defendants had applied some rigorous procedures. But Defendants made no such efforts here. In fact, just the opposite. The most disturbing discovery the receivership team has made is that Individual Defendants appear to have looted customer funds held in the "trust" account to pay personal expenses.

While we do not yet have our arms around all the bank and accounting records at this early stage, we discovered a number of instances where the owners accessed the MHF "trust" account and received large amounts of customer money for their personal benefit:

- In March 2018, Mazen Radwan wrote himself a $60,000 check from the Trend Capital MHF "trust" account. He immediately deposited the check into his account at the Orange County's Credit Union. *See* Exhibit 21.

- Just four months later, on July 17 and 18, 2018, two online transfers were made from the MHF "trust" account to the "operating" account of $300,000 each, totaling $600,000. Prior to that transfer, the "operating" account had a balance of just $54,251.83. *See* Exhibit 22. Immediately after receipt of the $600,000, three checks for $160,010 each were issued from the operating account to purchase cashier's checks payable to the U.S. Treasury to pay federal taxes for Defendants Mazen Radwan, Rima Radwan, and Dean Robbins. *See* Exhibit 23. Checks were also issued to purchase cashier's checks

payable to the California Franchise Tax Board to pay the 2016 state income taxes for Defendants Mazen Radwan ($20,875), Rima Radwan ($40,010), and Dean Robbins ($40,010).  *See* Exhibit 23. Five days later, in an apparent effort to spend all of the $600,000 in "trust" funds, checks were issued to each of the Individual Defendants for $7,000.  *See* Exhibit 24.

- On November 8, 2018, Individual Defendants transferred $60,178.62 from the "trust" to the "operating" account.  The next day, they made two American Express payments totaling $91,248.08.

- On December 27, 2018, Individual Defendants made two transfers from the "trust" to the "operating" account for $60,264.19 and $3,991.99.  The next day, they made three payments from the "operating" account to American Express totaling $86,280.44, covered payroll expenses in the amount of $27,570.60, and made a GMC lease payment of $2,176.45.

- On February 7, 2019, Individual Defendants made three transfers of $150,000 each (totaling $450,000) from the "trust" account to the "operating" account.  On the same day, three checks were issued from the "operating" account to Individual Defendants in the amount of $170,000 each.  *See* Exhibit 25.

- Just three weeks later, on February 28, 2019, Individual Defendants again tapped customer funds by transferring $45,933.65 from the "trust" account to the "operating" account.  And the next day, March 1, 2019, they issued three $10,000 checks to each Individual Defendant with an additional check to Defendant Rima Radwan for $25,000.  *See* Exhibit 26.

///
///

1    In total, the Individual Defendants misappropriated at least $1,280,000 in

2 customer funds intended to be payments on customers' student loans.  (Of course,

3 this number is subject to revision as our review continues.)

4    Defendant Rima Radwan met with the receivership team on Friday, July 12,

5 2019.[18]  When asked about the "trust" accounts, she indicated that these accounts

6 held only customer funds to be paid to lenders.  This was consistent with the

7 forceful explanation offered by COO Labiba Radwan and General Manager Daisy

8 Lopez: the funds in the "trust" account were customers' funds which Defendants

9 would forward to the loan servicers as loan payments.  All three of the individuals

10 with whom we spoke – Defendant Rima Radwan, COO Labiba Radwan, and

11 General Manager Daisy Lopez – pointed to this three account structure ("holding,"

12 "operating," and "trust") as evidence Defendants were not taking advance fees and

13 that customer loan payments were segregated and protected.[19]

14    Defendant Rima Radwan also confirmed that we should not see any transfers

15 from the "trust" account to the "operating" account.  At the time we had the

16 discussion with Defendant Rima Radwan, we were not aware the Individual

17 Defendants were taking customer funds from the "trust" account for their own

18 personal use.  We can think of no legitimate business or otherwise lawful basis for

19 the Individual Defendants to transfer more than $1,280,000 from customers to

20 themselves.

21 ///

22

23 _____

[18]  Neither Defendants Mazen Radwan nor Dean Robbins have met with the
Receiver despite our requests.

24

25 [19]  The use of this three account structure, including the "trust" account to hold
customer funds, is a relatively new development in Defendants' operations.  In
previous corporate iterations, *see e.g.*, Corporate Defendant Heritage Asset
26 Management, Inc. (d/b/a National Secure Processing), the Defendants only used
two accounts, which they denominated "holding" and "operating".   We suspect
27 that the change to the three account structure was adopted so Defendants could
assert they "don't touch customer payments" until they get loan servicer approval
28 and therefore claim they do not take advance fees.

# IV.

## BUSINESS OPERATIONS – RCC MOTORS

Radwan Classic Cars aka RCC Motors ("RCC") is a classic car business launched in June, 2017 as a dba of Receivership Entity Dark Island Industries, Inc., owned in equal thirds by the Individual Defendants.  Since inception, the business has operated from the ground floor at the 3 Studebaker, Irvine site.  The RCC business has four components, each involving custom and classic cars: service; customization; consignment; and storage.

RCC occupies approximately one-half of the ground floor in the 3 Studebaker building which includes an executive office for Defendant Mazen Radwan, a clubhouse area, and warehouse space which presently houses approximately 40 vehicles.

At the time of our initial access, the current employees of RCC (two salesmen, two technicians, and a receptionist) were onsite.  All made themselves available for interviews and cooperated fully.  None of them had involvement in, or knowledge of, the student loan debt relief services business – rather, each ran his or her portion of RCC as distinct and separate from the loan business.

Defendant Mazen Radwan is RCC's CEO.  His office is located in the RCC space and is totally separated from the loan business.  RCC personnel confirmed that he is the only one among the three owners who has day-to-day involvement in the car business.  RCC personnel also indicated that although they knew Defendant Mazen Radwan was an owner of the student loan debt relief services business and attended some meetings upstairs, they believed that his primary focus, day-to-day, was running RCC.  Defendants Rima Radwan and Dean Robbins do not have offices in RCC's space, maintaining their offices upstairs instead.  RCC employees reported that Rima Radwan and Dean Robbins had little to no involvement in the operations of RCC.

///

RCC is most certainly not a profitable business and appears to be more of a hobby for Mazen Radwan than a serious business.  Since its inception in June of 2017, RCC has lost just short of one-half million dollars (-$471,477.23).  *See* Exhibit 2.

# V.

## CAN THE BUSINESSES BE OPERATED
## LAWFULLY AND PROFITABLY?

Section XV(T) (at page 21) of the TRO authorizes the Temporary Receiver to suspend business operations if, in his judgment, such operations cannot be continued legally and profitably.  In this case, we must resolve this lawful/profitable issue as to two separate businesses: the student loan debt relief business and the RCC Motors business.

### A.     Student Loan Debt Relief

The student loan debt relief business of these Receivership Entities is not a legitimate or lawful business.  While the principals (and employees) glibly invoke the mantra, "we just want to help the customer," they really saw consumers – many of whom were disadvantaged and desperate – as ripe targets.  The true business plan called for:  deceit and confusion to get and maintain customers; exorbitant fees collected unlawfully in advance; beginning with the first annual recertification, fees on residual customers that became a virtual annuity; false claims of "unemployed" status to secure No Payment programs, which made it easier to disguise the fees; and delaying or not remitting to the loan servicer customer funds intended by the customer to be loan payments.  The scope of the deceit and fraud at the heart of the business is remarkable, leaving no feasible way to salvage any legitimate business.  The student loan debt relief business cannot be operated lawfully under the auspices of the Receiver.

///

///

### B.   RCC Motors

Operation of a classic car business is certainly a lawful enterprise which is not prohibited by law or the TRO.  Hence, RCC could, in theory, operate as a lawful business going forward.  It could not, however, operate profitably under the auspices of this receivership.  The most recent financials show RCC has lost $471,477 in two years.  This is actually understated, because RCC's losses would escalate if its books accurately reflected its expenses for rent presently paid by Receivership Entity Trend Capital Ltd.  Rent alone would add at least $10,000 per month to the RCC overhead.

RCC has always been inextricably linked with, and dependent upon, the student loan debt relief services business for funding and facilities.  Individual Defendants capitalized the business as each was credited with investing $208,333.33 in RCC.

Hence, there are no owners who could provide capital unrelated to the student loan debt relief services business.  Any assets that RCC might have (e.g., unsold inventory, accounts receivable, equipment, etc.) first belong to the Receivership Estate.

In light of the above, the Receiver is exploring all reasonable steps to wind down RCC.


Dated:  July 18, 2019                    By:    /s/ Thomas W. McNamara
                                                Thomas W. McNamara
                                                Temporary Receiver

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 18, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all participants in the case who are registered CM/ECF users.


  /s/ Edward Chang
Edward Chang
*Attorney for Receiver,*
*Thomas W. McNamara*