ALDEN F. ABBOTT
General Counsel
K. MICHELLE GRAJALES
mgrajales@ftc.gov
SAMUEL JACOBSON
sjacobson@ftc.gov
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., NW
Mail Stop: CC-10232
Washington, DC  20580
(202) 326-3172

JOHN D. JACOBS, Cal. Bar No. 134154
Local Counsel
jjacobs@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Blvd., Ste. 400
Los Angeles, CA 90024
Tel: (310) 824-4343; Fax: (310) 824-4380
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>ELEGANT SOLUTIONS, INC., a corporation, also<br>d/b/a Federal Direct Group;<br>TREND CAPITAL LTD., a corporation, also d/b/a Mission Hills Federal;<br>DARK ISLAND INDUSTRIES, INC., a corporation, also d/b/a Federal Direct Group and f/k/a Cosmopolitan Funding Inc.; | Civ. No. 8:19-cv-01333-JVS-KES<br><br>**FIRST AMENDED COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

HERITAGE ASSET MANAGEMENT, INC., a corporation, also d/b/a National Secure Processing;
TRIBUNE MANAGEMENT, INC., a corporation, also d/b/a The Student Loan Group;
MAZEN RADWAN, a/k/a Michael Radwan and Mike Radwan, individually and as an officer of Elegant Solutions, Inc., Trend Capital Ltd., Dark Island Industries, Inc., Heritage Asset Management, Inc., and Tribune Management, Inc.;
RIMA RADWAN, individually and as an officer of Elegant Solutions, Inc., Trend Capital Ltd., Dark Island Industries, Inc., Heritage Asset Management, Inc., and Tribune Management, Inc.;
LABIBA VELAZQUEZ, a/k/a Labiba Radwan, individually and as an officer of Elegant Solutions, Inc. and Trend Capital Ltd.; and
DEAN ROBBINS, individually and as an officer of Elegant Solutions, Inc., Trend Capital Ltd., Dark Island Industries, Inc., Heritage Asset Management, Inc., and Tribune Management, Inc.

                              Defendants.

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

    1.    The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57(b) and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing

Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, in connection with their deceptive marketing and sale of student loan debt relief services.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

3.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices in or affecting commerce.

5. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b) and 57(b).

## DEFENDANTS

6. **Defendant Elegant Solutions, Inc., also d/b/a Federal Direct Group ("Elegant Solutions"),** is a South Dakota corporation formed in May 2016 that has listed its principal executive office as 110 E. Center St., Ste. 2053, Madison, SD 57042 in its Articles of Incorporation. Elegant Solutions has also used 300 Spectrum Center Drive #400, Irvine, CA 92618 as its business address in communications with banks and service providers. Elegant Solutions is registered as a foreign corporation in California. Federal Direct Group is registered with the South Dakota Secretary of State as a d/b/a of Elegant Solutions. Elegant Solutions transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, or as part of the common enterprise described in Paragraph 15, Elegant Solutions has advertised, marketed, offered to provide, sold, or provided student loan debt relief services to consumers throughout the United States.

7.      **Defendant Trend Capital Ltd., also d/b/a Mission Hills Federal ("Trend Capital"),** is a South Dakota corporation that is registered to do business in California as a foreign corporation and has listed its principal executive office as 110 E. Center St., Ste. 2053, Madison, SD 57042 in its Articles of Incorporation. Trend Capital has used 3 Studebaker, Irvine, CA 92618 as its business address in correspondence with service providers and addresses including 30211 Avenida del las Banderas #200, Rancho Santa Maragarita, CA 92688 in bank correspondence. Trend Capital incorporated in South Dakota in June 2016.  Mission Hills Federal is registered with the South Dakota Secretary of State as a d/b/a of Trend Capital. Trend Capital transacts or has transacted business in this District and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, or as part of the common enterprise described in Paragraph 15, Trend Capital has advertised, marketed, offered to provide, sold, or provided student loan debt relief services to consumers throughout the United States.

8.      **Defendant Dark Island Industries, Inc., also d/b/a Federal Direct Group and f/k/a Cosmopolitan Funding, Inc. ("Dark Island"),** is a South Dakota corporation that is registered to do business in California as a foreign corporation.  Dark Island has listed its principal executive office as 110 E. Center St., Ste. 2053, Madison, SD 57042 in its Articles of Incorporation.  Dark Island has listed 3 Studebaker Irvine, CA 92618 as its business address in public documents.

Cosmopolitan Funding, Inc., was incorporated in South Dakota in May 2016 and amended to be renamed Dark Island Industries, Inc. in June 2016. Dark Island was separately incorporated in South Dakota in May 2016. Dark Island transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, or as part of the common enterprise described in Paragraph 15, Dark Island has advertised, marketed, offered to provide, sold, or provided student loan debt relief services to consumers throughout the United States.

9. **Defendant Heritage Asset Management, Inc., also d/b/a National Secure Processing ("Heritage"),** is a South Dakota corporation that is registered to do business in California as a foreign corporation. Heritage has listed its principal executive office as 110 E. Center St., Ste. 2053, Madison, SD 57042 in its Articles of Incorporation. Heritage has also listed 6A Liberty #125, Aliso Viejo, CA 92656 as its business address in public documents. Heritage incorporated in South Dakota in May 2014. National Secure Processing is registered with the South Dakota Secretary of State as a d/b/a of Heritage. Heritage transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, or as part of the common enterprise described in Paragraph 15,

Heritage has advertised, marketed, offered to provide, sold, or provided student loan debt relief services to consumers throughout the United States.

10.     **Defendant Tribune Management, Inc., also d/b/a The Student Loan Group ("Tribune"),** is a Nevada corporation.  Tribune's Articles of Incorporation, filed in 2014, identify its registered agent as Corp 95, LLC at 2620 Regatta Dr. Suite 102, Las Vegas, Nevada, 89128. Tribune has listed 6A Liberty Ste. 175, Aliso Viejo, CA 92656 as its business address in public documents.  The Student Loan Group is registered with the Nevada Secretary of State as a Fictitious Firm Name for Tribune.  Tribune filed a Certificate of Dissolution in November 2017.  Tribune transacts or has transacted business in this District and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, or as part of the common enterprise described in Paragraph 15, Tribune has advertised, marketed, offered to provide, sold, or provided student loan debt relief services to consumers throughout the United States.

11.     **Defendant Mazen Radwan** has held himself out as an officer of Elegant Solutions, Trend Capital, Dark Island, Heritage, and Tribune.  He has used the name "Michael Radwan" and "Mike Radwan" in bank and service provider documents in connection with the business activities alleged in this Complaint.  He has been a signatory on the corporate defendants' bank and American Express accounts and has served as the customer contact for Defendants'

telecommunications and merchant processing agreements.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants, including the acts and practices set forth in this Complaint.  Mazen Radwan resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

12.    **Defendant Rima Radwan** has held herself out as an officer of Elegant Solutions, Trend Capital, Dark Island, Heritage, and Tribune.  She has been a signatory on the Corporate Defendants' bank accounts and has served as the customer contact for Defendants' payroll company. At all times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants, including the acts and practices set forth in this Complaint.  Rima Radwan resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

13.    **Defendant Labiba Velazquez**, also known as Labiba Radwan, has held herself out as an officer of Elegant Solutions and Trend Capital.  She has served as the customer contact for Defendants' payroll company and held an

American Express card for Elegant Solutions' account in her name. At all times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants, including the acts and practices set forth in this Complaint.  Labiba Velazquez resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

14.    **Defendant Dean Robbins** has held himself out as an officer of Elegant Solutions, Trend Capital, Dark Island, Heritage, and Tribune.  He has been a signatory on the Corporate Defendants' bank and American Express accounts and has served as the customer contact for Defendants' virtual office provider. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants, including the acts and practices set forth in this Complaint.  Dean Robbins resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISE

15.    Defendants Elegant Solutions, Trend Capital, Dark Island, Heritage, and Tribune (collectively, "Corporate Defendants") have operated as a common

enterprise while engaging in the deceptive acts and practices and other violations of law alleged below.  Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership or officers, business functions, employees, office locations, and that commingled funds.  Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.  Defendants Mazen Radwan, Rima Radwan, Labiba Velazquez, and Dean Robbins have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

## COMMERCE

16.    At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' DECEPTIVE STUDENT LOAN DEBT RELIEF OPERATION

17.    Since at least May 2014, Defendants have operated an unlawful debt relief enterprise that preys on consumers with student loan debt.  Defendants' scheme has involved promising consumers affordable loan repayment plans,

severing consumers' contact with their federal loan servicers, and pocketing the consumers' monthly loan payments.

18.     Defendants have lured consumers with telephone calls and emails promising to reduce consumers' monthly student loan payments or loan balances by consolidating their loans or enrolling them in income-based repayment plans. Defendants have promised to service the repayment of consumers' student loans and, in many instances, inform consumers they have already or will "manage" or "take over" the loans.  Defendants tell consumers who sign up for Defendants' services to cease making payments to their servicers and, instead, to make monthly loan payments to the Defendants.

19.     Defendants have then engaged in a variety of tactics to arrange for consumers' loans to go into forbearance, deferment, or zero dollar monthly payment status where lenders would not expect to receive monthly payments nor contact consumers when payments were not received.   In numerous instances, Defendants have required consumers to provide their federal student aid personal identification numbers ("FSA PINs"), or other personal information, in order to enroll in Defendant's debt relief program.  Defendants have used consumers' FSA PINs to change the contact information on file with consumers' federal loan servicers – effectively preventing contact between consumers and their federal loan servicers.

20.     Consumers have discovered, sometimes after years of making monthly loan payments to Defendants, that Defendants failed to apply most or any of their payments to their student loans, but rather diverted consumers' loan payments to themselves.  In numerous instances, Defendants also failed to obtain the lower monthly payment amount or loan balance that they promised consumers.

21.     In exchange for the promised debt relief services, Defendants have collected hundreds to thousands of dollars per consumer in illegal advance fees. Defendants have collected a total of more than $23 million from consumers since at least January 2016.  Moreover, because Defendants have failed to apply most or any of consumers' payments to their student loans, many consumers have accrued additional capitalized interest on the balance of their loans.  As a result, many consumers have owed more on the balances of their student loans after signing up with Defendants.

**Background on Student Loan Forgiveness and Repayment Programs**

22.     Student loan debt is the second largest class of consumer debt; more than 42 million Americans collectively owe nearly $1.5 trillion.  The student loan market shows elevated levels of distress relative to other types of consumer debt.

23.     To address this mounting level of distressed debt, the Department of Education ("ED") and state government agencies administer a limited number of student loan forgiveness and discharge programs.  Most consumers, however, are not eligible for these programs because of strict eligibility requirements.  For example, one program requires the consumer to demonstrate a total and permanent disability; another applies only to consumers whose school closed while the consumer was still enrolled.  A third program, the Borrower Defense to Repayment ("BDR"), may provide a loan discharge if the school, through an act or omission, violated state law directly related to the borrower's federal student loan or to the educational services for which the loan was provided.

24.     Other forgiveness programs require working in certain professions for a period of years.  Teacher Loan Forgiveness applies to teachers who have worked full-time for five years in a low-income elementary or secondary school or educational service agency.  Public Service Loan Forgiveness ("PSLF") applies to employees of governmental units or non-profit organizations who make timely monthly payments for a period of ten years while employed in the public sector.

25.     The federal government also offers loan forgiveness through income-driven repayment ("IDR") programs that enable borrowers to reduce their monthly payments and have portions of their loans forgiven.  IDR programs allow eligible borrowers to limit their monthly payments based on a percentage of their

discretionary monthly income.  To remain in an IDR program, borrowers must recertify their income and family size annually.  Obtaining forgiveness through IDR programs requires a minimum of 20 or 25 years of qualifying payments.

26.     Because a borrower's income is likely to fluctuate over the life of the loan, monthly payments under the IDR programs can vary considerably from year to year.  If a borrower's income were to increase over the repayment period, for example, the monthly payment amount could correspondingly increase to the point where those payments would pay off the loan before any amount could be forgiven at the end of the repayment term.

27.     Consumers can apply for BDR, PSLF, IDR, and other loan repayment and forgiveness or discharge programs through ED or their student loan servicers at no cost; these programs do not require the assistance of a third-party company or payment of application fees.

28.     ED will grant forbearance while processing applications for an alternative repayment plan, and in some cases of hardship.  During forbearance, and, under some circumstances, during deferment, unpaid interest is added to the principal balance.

**Defendants' Deceptive Marketing of Student Loan Debt Relief Services**

29.     To lure consumers into purchasing their purported student loan debt relief services, Defendants make at least three types of deceptive claims:  (1)

Consumers who purchase Defendants' debt relief services will be enrolled in a repayment plan that will reduce their monthly payments to a lower, specific amount or have their loan balances forgiven in whole or in part; (2) Most or all of consumers' monthly payments to Defendants will be applied toward consumers' student loans; and (3) Defendants will assume responsibility for the servicing of consumers' student loans.

30.     Defendants make outbound telemarketing calls to consumers to offer their services and convince student loan borrowers to sign up with the company. In some instances, consumers view the Defendants' websites and call Defendants' telemarketers for more information.

**Deceptive Representations During Calls**

31.     In telephone calls, Defendants' telemarketers have told numerous consumers that Defendants will obtain a student loan repayment schedule for consumers with specific monthly loan payment amounts that are significantly lower than what the consumer had been paying.  Defendants have typically quoted consumers a monthly payment that is half or less than what consumers were then paying their loan servicers at the time.  For example, one consumer who had been paying $200 per month was told her new monthly payment would be $50; another consumer who had been paying $130 per month was told the new payment would be $61.  Defendants have told numerous consumers that they will accomplish this

reduced payment by consolidating or refinancing the consumers' loans, enrolling them in a loan forgiveness program, or placing consumers into an income-based repayment program.  In some instances, Defendants have told consumers their loan balances will be forgiven after the consumer makes lower monthly payments for a specific period of years, for example, after three, seven, ten, or fifteen years of making loan payments to Defendants.

32.     In numerous instances, Defendants have represented in calls and emails to consumers that they will be purchasing, taking over, or handling servicing of consumers' loans.  Defendants have instructed consumers that Defendants will handle all loan communications and that consumers should stop payments to their "previous" servicers.  For example, some consumers received the following in an email from Defendants shortly after signing up:

> During this transition you may receive calls and/or correspondence from your previous servicers, please disregard as we will encounter a short transition period.

> If you are currently enrolled in any automatic payment withdrawals with your previous lenders, it is recommended that you check to make sure that future drafts will not be processed through your bank.

33.     In numerous instances, Defendants have represented that consumers will make one to three initial or set-up fee payments, followed by monthly loan payments of another amount.  In numerous instances, Defendants have also represented that all or most of the consumers' new, lower payments will be applied

to their student loans.   For example, one consumer reports Defendants "told me that $10 of the $51.67 [monthly payment] would be a management fee, and that the other $41.67 would go toward repaying my loans."

### Enrollment in Defendants' Debt Relief Program

34.     Defendants have collected consumers' personal information, FSA PINs, and bank account payment information from consumers interested in Defendants' services.

35.     Shortly thereafter, Defendants have emailed consumers a pre-filled electronic contract with an ACH authorization, which allows Defendants to take automatic debits from consumers' bank accounts, and fine-print disclosures that the consumer is requested to sign electronically.  Defendants require consumers to pay for their services via ACH withdrawal.

36.     Defendants have typically collected one to three "initial" payments ranging from $100 to $500, and then collected ongoing monthly payments in another amount, typically ranging from $50-$200.  Defendants have collected a total of approximately $773 to $7,000 for their debt relief services per consumer, the majority of which consumers believe are going towards paying off their student loan debt, but which are instead going to initial and monthly fees to Defendants.

37.     Defendants are not federal loan servicers and despite their representations to consumers, have not taken over or purchased consumers' student loans.

38.     In numerous instances, Defendants have failed to obtain the promised lower monthly payments.   Rather, Defendants have placed consumers' student loan accounts into deferment or forbearance or enrolled consumers in a repayment plan with a zero dollar monthly repayment.  In numerous instances, Defendants applied for zero dollar payment plans for consumers by providing false income or dependent information to consumers' servicers.

39.     In numerous instances, Defendants failed to apply the majority, if any, of consumers' payments to their loans.  Many consumers report that Defendants made no payments towards their student loans.  Other consumers learned that Defendants had only made one payment to their loans in over a year or several years of participation.

40.     In some instances, when consumers confronted Defendants to find out what had happened to the payments that had not been applied to their loans, Defendants informed consumers that their entire payments had been collected as "handling" or "management" fees.

**Defendants' Efforts to Perpetuate Their Unlawful Scheme**

41.     Defendants have engaged in additional tactics to string consumers along and prevent consumers from learning of Defendants' scheme.  For example, in numerous instances, Defendants have obtained consumers' sign-in information and changed consumers' contact information in their federal loan account files, effectively hindering or entirely preventing consumers' loan servicers from communicating with consumers.

42.     Defendants have used virtual office addresses and commercial corporate registrations to obscure the location and identity of the entities and individuals responsible for their actions.  Defendants also informed consumers who had enrolled with National Secure Processing that National Secure Processing had been purchased by Mission Hills Federal and, as a result, that consumers' accounts were being transferred to Mission Hills Federal.  In fact, Mission Hills Federal has been operated by the same individual defendants.

43.     In some instances, when consumers have contacted Defendants to cancel their enrollment in Defendants' program, Defendants have told consumers that they could suffer adverse credit consequences if they cancel or that they would be turned over to debt collectors.  In many instances, Defendants have refused or ignored requests for refunds by consumers.

44.     Consumers have often ended up owing more on their student loans after signing up for Defendants' services based on interest that accrued while Defendants failed to repay consumers' loans.

45.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

## THE FTC ACT

46.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

47.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## VIOLATIONS OF THE FTC ACT

### Count I

### Deceptive Representations

48.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of student loan debt relief services, Defendants have represented, directly or indirectly, expressly or by implication that:

          a.  Consumers who purchase Defendants' debt relief services will be
               enrolled in a repayment plan that will reduce their monthly

payments to a lower, specific amount or have their loan balances forgiven in whole or in part;

b. Most or all of consumers' monthly payments to Defendants will be applied toward consumers' student loans; or

c. Defendants will assume responsibility for the servicing of consumers' student loans.

49. In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 48 of this Complaint, such representations were false or not substantiated at the time Defendants made them.

50. Therefore, Defendants' representations as set forth in Paragraph 48 of this Complaint are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## THE TELEMARKETING SALES RULE

51. Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter. 16 C.F.R. Part 310.

52. Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg). A

"seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to a customer in exchange for consideration.  16 C.F.R. § 310.2(dd).  A "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor.  16 C.F.R. § 310.2(ff).  "Telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call.  16 C.F.R. § 310.2(gg).

53.    Defendants are sellers or telemarketers of "debt relief services" as defined by the TSR, 16 C.F.R. § 310.2(o).  Under the TSR, a "debt relief service" means any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.  16 C.F.R. § 310.2(o).

54.    The TSR prohibits sellers and telemarketers from requesting or receiving payment of any fees or consideration for any debt relief service until and unless:

a.   The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and

b.   The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor; and

c.   To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either:

   i.   Bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount.  The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or

   ii.   Is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.  The percentage charged cannot change from one individual

debt to another.  The amount saved is the difference between the amount owed at the time the debt was enrolled in the service and the amount actually paid to satisfy the debt.  16 C.F.R. § 310.4(a)(5)(i).

55.    The TSR prohibits sellers and telemarketers from misrepresenting directly or by implication, any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using the service.  16 C.F.R. § 310.3(a)(2)(x).

56.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**VIOLATIONS OF THE TELEMARKETING SALES RULE**

**Count II**

**Advance Fee for Debt Relief Services**

57.     In numerous instances, in connection with the telemarketing of student loan debt relief services, Defendants have requested or received payment of a fee or consideration for debt relief services before:

      a.    Defendants have renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and

      b.    The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor.

58.     Therefore, Defendants' acts or practices, as set forth in Paragraph 57 of this Complaint violate Section 310.4(a)(5)(i) of the TSR, 16 C.F.R. § 310.4(a)(5)(i).

## Count III

## Material Debt Relief Misrepresentations

59.     In numerous instances, in connection with the telemarketing of student loan debt relief services, Defendants have misrepresented, directly or indirectly, expressly or by implication, material aspects of their debt relief services, including, but not limited to that:

a.  Consumers who purchase Defendants' debt relief services willbe

enrolled in a repayment plan that will reduce their monthly

payments to a lower, specific amount or have their loan balances

forgiven in whole or in part;

b.  Most or all of consumers' monthly payments to Defendants will be

applied toward consumers' student loans; or

c.  Defendants will assume responsibility for the servicing of

consumers' student loans.

60.     Defendants' acts and practices, as set forth in Paragraph 59 of this

Complaint violate Section 310.3(a)(2)(x) of the TSR, 16 C.F.R. § 310.3(a)(2)(x).

## CONSUMER INJURY

61.     Consumers are suffering, have suffered, and will continue to suffer

substantial injury as a result of Defendants' violations of the FTC Act and the TSR.

In addition, Defendants have been unjustly enriched as a result of their unlawful

acts or practices.  Absent injunctive relief by this Court, Defendants are likely to

continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

62.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court

to grant injunctive and such other relief as the Court may deem appropriate to halt

and redress violations  of any provision of law enforced by the FTC.  The Court, in

the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

63.     Section 19 of the FTC Act, 15 U.S.C. § 57(b), Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b) and Section 626 of the Omnibus Act authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57(b), and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

A.     Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including a temporary and preliminary injunction, asset freeze, appointment of a receiver, an evidence preservation order, and expedited discovery;

B.     Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendants;

C.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.     Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.


Dated: August 27, 2019


Respectfully submitted,
ALDEN F. ABBOTT
General Counsel

K. Michelle Grajales
Samuel Jacobson
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION