Stephen Cochell (TX SBN 24044255)
srcochell@gmail.com
The Cochell Law Firm, P.C.
5850 San Felipe, Ste.500
Houston Texas 77057
(346)800-3500
srcochell@gmail.com
Pro Hac Vice

Robert Bare (SBN 271131)
rbare@barelaw.com
Bare Law
444 W. Ocean Blvd.
8th Floor,
Long Beach, CA  90802
Telephone:  (310) 984-3670
Facsimile:   (310) 320-0102

Attorneys for Defendants

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>ELEGANT SOLUTIONS, INC, et al.<br><br>Defendants. | Case No.:  8:19-cv-01333-JVS (KESx)<br><br>**DEFENDANTS' NOTICE OF MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Filed concurrently with Separate Statement of Material Undisputed Facts; Four Supporting Declarations and Two Deposition Transcripts (Excerpts)<br><br>TRIAL DATE:  May 23, 2020<br><br>HEARING DATE: April 6th, 2020<br><br>HEARING TIME: 1:30 PM<br><br>LOCATION: Courtroom 10C |

i

# NOTICE OF MOTION

Notice is hereby given that on April 6, 2020 at 1:30 p.m., or as soon thereafter as this matter may be heard, before the Honorable James V. Selna, in Courtroom 10C of the United States District Court for the Central District of California, at 411 West 4th Street, Room 1053 Santa Ana, CA 92701-4516. Defendants Elegant Solutions, Inc. Trend Capital, Ltd., Dark Island Industries, Inc., Heritage Asset Management, Inc., Tribune Management, Inc., Mazen Radwan, Rima Radwan, Labiba Velasquez Radwan and Dean Robbins will move the Court seeking the entry of summary judgment as to all claims filed by the FTC pursuant to Federal Rules of Civil Procedure Rule 56.

The Court should grant summary judgment as all claims because Section 13(b) of the FTC does not grant authority to impose restitution.  Section 13(b) was not intended to provide a stand-alone grant of authority to seek restitution, but was solely intended as a forward-looking remedy to restrain conduct pending issuance of an administrative adjudicatory complaint.  The district courts cannot imply remedies into a statute providing for injunctive relief where, as here, Congress adopted an elaborate enforcement scheme to afford consumer redress, including but not limited to restitution.

The FTC violated Section 13(b) by failing to file a parallel administrative adjudicatory action with the Commission within twenty days of the date of issuance

ii

of temporary and preliminary injunctive relief. Permanent injunctive relief is permitted in proper cases. However, the FTC cannot use the second proviso to nullify and circumvent the plain requirements requiring the FTC to file a parallel administrative complaint when it files a lawsuit seeking temporary and preliminary injunctive relief. The court should therefore deny permanent injunctive relief. Otherwise, administrative agencies will simply ignore Congressional statutes in violation of the bedrock principle of separation of powers.

The FTC's claims for restitution should also be denied as they are nothing more than a penalty. The FTC uses Section 13(b) for deterrent purposes and has no legal obligation to pay funds to alleged victims. Moreover, the FTC seeks gross revenues as the measure of damages for consumers without regard to Defendants' costs of doing business. In the instant case, the FTC cannot prove consumer injury because the consumers' student loans were paid or the money held in a holding/trust account.

The Court need not reach these legal issues, because the FTC cannot establish violations of the FTC Act based on the policies and procedures of the Corporate Defendants. As set out in detail in Rima Radwan's Declaration, the consumer declarations filed by the FTC (Dkt. 12-1 – 12-4) do not support violations of the FTC Act or the TSR because the consumers make claims despite the plain, clear and unambiguous language of the Service Agreements and Explanation of Benefits.

The Corporate Defendants' employees received extensive training and supervision in their tasks. The scripts and structured sales process was designed to eliminate any possibility of confusion about the companies' services. The DocuSign Service Agreements and Explanation of Benefits were reviewed with each client page by page with each consumer acknowledging the nature and cost of the services as well as the fact that the Corporate Defendants were a for-profit service and not affiliated with the Department of Education. All calls with consumers were *recorded.* The fees paid by consumers were *not* paid to the Corporate Defendants but were paid into a holding/trust account similar to a lawyer trust account where funds are deposited and transferred to the lawyer only upon performance of services. In the instant case, the funds were not transferred to the Corporate Defendants until the student programs were approved by the Department of Education.

Although the policies and practices of Heritage Asset Management, Tribune Management, Ltd. and Student Loan Services Managers complied with the FTC Act, Elegant Solutions improved the Service Agreement, the Explanation of Services, created a Client Portal for greater transparency and created the holding/trust account system to protect client funds. The supervisors assured that employees complied with the policies and procedures. Based on changes in November, 2017, when Elegant and Trend were established, the FTC cannot, as a

iv

matter of law, establish that Defendants were violating or about to violate the FTC Act or the Telemarketing Sales Rule. Even *assuming* that there were isolated violations, the conduct did not rise to the level of requiring injunctive relief; in other words, the injunctive relief was disproportionately severe to the perceived harm.

Similarly, the FTC cannot establish individual liability as to the Individual Defendants. Rima Radwan operated and controlled the student loan debt relief services companies establishing polices and procedures to be followed. To the extent that there was misconduct by individual employees, there is no evidence that such conduct was tolerated by management. Dean Robbins, Labiba Radwan Velasquez (referred to as Labiba Radwan) did not hire, fire or supervise employees and the policies and procedures for student loan debt relief companies were created and maintained at the direction and control of Rima Radwan. Rima Radwan cannot be held individually liable because she relied on her two managers, Daisy Lopez and Kendra Sanchez, to enforce company policies.

Finally, Radwan Classic Cars was not part of a common enterprise with the student loan debt relief services companies. Although the companies shared common ownership, there was no sharing of employees, computers, and no inter-company transfers or loans. The companies were located in one building and rent paid by Trend as part of an agreement between the companies. Employees from the student loan debt relief companies were not allowed into RCC's offices.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

NOTICE OF MOTION .................................................................................. ii

TABLE OF CONTENTS .............................................................................. vi

TABLE OF AUTHORITIES ........................................................................ vii

ARGUMENT ................................................................................................. 1

   I.  Defendants Did Not Violate the FTC Act. ........................................ 4

   III.  Defendants Were Not Violating or About to Violate the Act. ..................... 11

   IV. Even Assuming the FTC Establish a Violation of the Act, Section 13(b)
Does Not Allow for Recovery of Equitable Restitution. .................................... 11

      A.  Section 13(b) Was Added in 1973 to Aid the FTC by Enjoining Current
and Ongoing Future Violations of the Act Pending Adjudication by the
Commission. .................................................................................................. 13

      B.  Supreme Court, Ninth and Seventh Circuit Decisions Dictate a Re-
Examination of Singer and its Progeny. ............................................................ 14

      C.  Section 13(b) Itself Does Not Confer General Equitable Authority in FTC
Cases. ............................................................................................................ 17

      D.  Injunctive Relief ..................................................................................... 23

   V.  FTC Restitution is a Prohibited Penalty Under Kokesh v. SEC. ................. 25

   VI. The FTC Cannot Establish Any Injury to Consumers Nor Can it Establish
Individual Liability Against the Defendants. ...................................................... 27

   VII.The FTC Cannot Establish that RCC Motors Was Part of a Common
Enterprise........................................................................................................ 29

# TABLE OF AUTHORITIES

## Case Law

*Davis v. Michigan Dept. of Treasury,* 489 U.S. 803 (1989) ………..……….. 19, 24

C*orley v. U.S.*, 556 U.S. 303 (2009) …………………………………...…….. 23

*FTC v. AMG Capital Management, LLC*, No 16-17197,_F.3d _ (9ᵗʰ Cir. 2018) .. 20

*FTC v. Capital Management, LLC*, 910 F.3d 417 (9ᵗʰ Cir. 2019) ………….… 18

*FTC v. Credit Bureau Center,* 937 F.3d 764 (7th Cir. 2019) ……..…………... 17

*FTC v. Evans*, 775 F.2d 1084 (9th Cir. 1985) ………………...………..... 2, 11, 23

*FTC v. John Beck Amazing Profits*, LLC,
865 F. Supp. 2d 1052 (C.D. Cal. 2012) …………………………………… 29

FTC v. Mandel Brothers, Inc.,359 U.S. 385 (1959) …………………………. 23

*FTC v. Pantron I Corp*., 33 F.3d 1088, 1095 (9th Cir. 1994) …………………… 1

*FTC v. Singer*, 668 F.2d 1107 (9th Cir. 1982) …………..….…… 2-3, 13-14, 16, 22

*Gustafson v. Alloyd Co*., 513 U.S. 561 (1995) ………………………………. 23

*In re Hougland*, 886 F.2d 1182 (9th Cir. 1989) …………………………….... 24

*Kokesh v. SEC*, 137 S. Ct. 1635 (2017) …………………...………..………. 4, 25

*Meghrig v. KFC Western, Inc*. 516 U.S. 479 (1996) …………..…... 3, 15-16, 19, 22

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co. (AZ),*
632 F.3d 1111 (9th Cir. 2011) …………………………………………..… 3, 15

*Robinson v. Shell Oil Co.,* 519 U.S. 337 (1997) ………………………….…… 18

*Rodriguez v. AT&T Mobility Services, LLC*, 728 F.3d 975 (9th Cir. 2013) ….. 3, 22

vii

*Porter v. Warner*, 328 U.S. 395 (1946) ………………………...…. 13-16, 25-26

*S.E.C. v. McCarthy*, 322 F.3d 650 (9th Cir. 2003) ……………..…………. 20

*U.S. v. Philip Morris, USA, Inc*., 396 F.3d 1190 (D.C. Cir. 2005) …………….... 25

*United States v. Powell*, 6 F.3d 611 (9th Cir. 1993) ………………..………… 23

## **Statutes**

Federal Trade Commission Act, 15 U.S.C.

      Section 45 …………………………………………...….…… 3-4, 16, 24

      Section 53 …………………………..……..……… 2-4, 11-14, 16-25

      Section 57b …………………………………......………….. 16, 19-22, 24-25

## **Other**

Law Reviews

      J. Howard Beales & Timothy Muris, Striking the Proper Balance: Redress
      Under Section 13(b) of the FTC Act, 79 Antitrust L.J. 1 (2013) ………….. 21

Articles

      David E. Fitzgerald, FTC 90th Anniversary Symposium: Session
      on "Injunctions, Divestiture and Disgorgement" (Sept. 23, 2004) ………. 22

# **ARGUMENT**

Rima Radwan, Labiba Radwan, Mazen ("Mike") Radwan, Dean Robbins (the "Individual Defendants") and the Corporate Defendants move for summary judgment for the following reasons:

1.      The FTC cannot show violations of the FTC Act.   The declarations filed by consumers (hereafter "consumer declarants") previously marked as PX 1-19 are inaccurate representations of sales calls that were *recorded*.   The representations are contrary to Elegant's Service Agreements, website, sales policies and practices as well as the policies and procedures of its predecessor.   The clients reviewed the Service Agreements page by page, signed their understanding and agreement to each page as well as reviewing and signing their understanding to each of the bullet statements contained in the Explanation of Benefits.   As a matter of law, a consumer cannot agree to the terms of service, clearly written and explained to them and then later claim fraud.   It is well established that a consumer cannot, as a matter of law, claim fraud or deceptive conduct if they have signed a disclosure that fairly describes the services rendered.   *Bott v Vistaprint*, 2009 WL 2884727 (S.D. Tex), 392 Fed. Appx 327 (5th Cir. 2010) (Court dismissed class

action finding class representatives acted *unreasonably* when they partially reviewed disclosures and later claimed fraud).[1]

2.    Defendants modified and improved their sales policies and procedures in November 2017---thirteen months prior to filing of the Complaint.    Section 13(b)(1) provides authority whenever the Commission has reason to believe: "that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission…."   Because the alleged misconduct was discontinued prior to filing of this action, the FTC is not entitled to injunctive relief.  *FTC v. Evans*, 775 F.2d 1084 (9th Cir. 1985) (injunctive relief denied where evidence did not support claim that violation about to occur).

2.    The authority to grant a Temporary Restraining Order and Preliminary Injunction was not authorized by Congress under Section 13(b) where, as here, the FTC seeks to use Section 13(b) as a "standalone" provision to obtain "equitable restitutionary relief" for consumers.  *Cf. FTC v. Singer*, 668 F.2d 1107 (9th Cir. 1982).  The law underlying the standard and methodology for statutory interpretation *changed* in two material respects:  (1) discarding the

---

[1] *Baxter v Intelius, Inc*. 2010 WL 3791487 (C.D. Cal. 2010) (customer cannot "blindly" accept offer) (J. Guilford); *Hager v Vertrue, Inc*., 2011 WL 4501046 (D. Mass. 2011). Section 5 of the FTC Act requires a consumer to act *reasonably* under the circumstances. *FTC v. Pantron I Corp.,* 33 F.3d 1088, 1095 (9th Cir.1994).

"interpretive" approach in favor of textual analysis of statutory interpretation; and the (2) Supreme Court's supervening decision in *Meghrig v. KFC Western, Inc*. 516 U.S. 479 (1996), followed by the Ninth Circuit's decision in *Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co. (AZ),* 632 F.3d 1111, 1121 (9th Cir. 2011) (ancillary remedies were not appropriate as to Truth-in-Lending regulations because elaborate enforcement mechanism in statute confined the court's equitable powers to injunctive relief). *Meghrig* and *Owner Operators* compel dismissal of the FTC's monetary claims.  See *CBC*, 937 F.3d at 767 ("section 13(b) does not authorize restitutionary relief.") Thus, the precedent controlling this Court's decision is *Owner-Operator* and *Meghrig*.  To the extent that the "implied restitution" approach by *Singer* conflicts with *Owner-Operator* and *Meghrig*, it lacks precedential value.  *Rodriguez v. AT&T Mobility Services, LLC*, 728 F.3d 975 (9th Cir. 2013).

3.     Congress expressly directed that the district courts dissolve any TRO or Preliminary Injunction where, as here, the FTC failed to file an administrative complaint pursuant to Sections 5 and Section 45 of the Act. ("Provided, however, That if a complaint is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect;....."  Congress granted authority to the FTC to

"bring suit" in district court to restrain and preliminarily enjoin acts pending issuance of administrative action before the Commission and instructed that courts "shall dissolve" injunctive relief if administrative complaints are not filed within twenty days.  The second proviso provides, in pertinent part, that the FTC "may seek" a permanent injunction in proper cases.  This language is not a grant of authority to "bring suit", but merely allows the FTC to seek a permanent injunction rather than issue a "cease-and-desist" order under Section 45 of the Act.

4.     Equitable Restitution is prohibited because it is nothing more than a penalty. *Kokesh v. SEC*, 137 S. Ct. 1635 (2017).  Even *assuming* that restitution is allowed under Section 13(b), the FTC cannot impose restitution of all gross revenues received but must deduct marginal costs.

5.     The FTC cannot establish individual liability as to each defendant.

6.     Dark Island Industries, Inc. dba Radwan Classic Cars ("RCC') was not part of a common enterprise with the student loan debt relief companies.

## I.     Defendants Did Not Violate the FTC Act.

At some point, even companies with great reputations have complaints lodged by consumers.  Defendants provided consumers with *document preparation services* that allowed them to apply for loan consolidations and other programs that would have required the consumers to devote a substantial amount of  time and paperwork dealing with their servicers and the Department of Education ("DOE").

4

DSMUF 11.   Consumers chose to use services offered by the Student Loan Document Preparation Businesses and to pay for these services rather than do it themselves.   DSMUF 21.   Other student loan document prep companies were set up to take consumer's money and provide little, if any services.   This is not one of those cases.   Indeed, the Court need not reach the legal issues because Defendants are entitled to summary judgment on the facts.

The FTC's complaint appears to be a one-size-fits-all complaint for student loan cases based primarily on consumer declarations drafted by FTC lawyers who, in this case, failed to review the Service Agreements or understand how Defendants actually operated. The claims alleged are not identified to any claims by the consumer declarants. The actual policies and practices followed by Defendants are dramatically different from the claims made by the FTC.  The first and third causes of action alleged by the FTC generally asserts that consumers enrolled in repayment plans that would reduce their monthly payments to a specific balance or be forgiven in whole or in part, most of the monthly payments would reduce their loan balances and defendants would assume servicing of the student loans.  Dkt. 63 at 20-21.

The Declaration of Rima Radwan provides a comprehensive summary of how the student loan businesses operated.   As set out above, the Corporate Defendants *recorded* each call to assure that their services and related charges were clearly understood and the subject of agreement with each consumer. DSMUF 33,

5

41.  Unfortunately, these recordings have not been produced by the FTC.[2]  In the majority of cases filed by the FTC, the investigators usually conduct an undercover call to make their case.  No such undercover call was disclosed in discovery.

In November 2017, Elegant Solutions dba FDG was formed.   New contracts were developed building off contracts used by Tribune Management dba The Student Loan Group.  **Exhibit 1,** Rima Radwan Declaration ¶ 32; DSMUF 37. When Elegant began its operations, the agents were extensively trained on legal compliance and instructed on what they could and could not say or do.   Ex. 1, ¶ 45-49; DSMUF 73-77.  There were significant changes to service agreements (Ex. 1, ¶ 28-32)  and addition of a Client Portal (Ex. 1, ¶ 50-51)  that provided clients with full access and transparency to their agreements, payments made to lenders and customer service that answered client questions, addressed complaints and where the notes of service agents document the services provided. Ex. 1, ¶ 51-52; DSMUF 78-79.

Corporate Defendants' business records refute each of the consumer-declarants' claims that they were misled.  DSMUF 130-405. [3]   Elegant's and

---

[2] The recordings were allegedly in the Receiver's possession. However, this hard drive could not be located when counsel visited the Receiver's warehouse.  The Receiver claims that all the recordings were imaged and sent to the FTC.  Dkt. 119-2.

[3] The consumer declarants are as follows:  Shawn Avant: DSMUF 130-145; Erica Bennett: DSMUF 146-158; Kelly Bishop: DSMUF 159-176; Lisa Bonilla: DSMUF 177-189; Allison Brockel: DSMUF 190-206; Mary Bursey: DSMUF 207-220; Sapphira Clemans:  DSMUF 221-

Trend's managers, Kendra Sanchez and Daisy Lopez also testified that these procedures were followed and enforced.  DSMUF 28, 30, 69 70, 97, 109 (Sanchez); DSMUF 28, 30, 69, 95, 96, (Lopez). Training materials used by Elegant make it clear that Elegant's services were intended to serve each client's goal in adjusting their student loan debt burden.  DSMUF 71, 72, 100.

The evidence shows that consumers participated in recorded telephone calls where they were thoroughly counseled and signed an FDG contract that included a checklist entitled "Explanation of Benefits."  Salespeople read ten separate statements about Corporate Defendants' services while the consumer listened on the phone and checked each box acknowledging their understanding of the services. **Exhibit 1,** ¶ 37. Ex. B; DSMUF 41-52, 71, 72, 104. These included:

_____ Client acknowledges and understands that Client is obtaining the services of Company and its affiliates for services provided in the Company's Service Agreement and that Company is a private organization, not a lender and not affiliated with the Department of Education and/or government.

_____ Client acknowledges and understands that Company will be making changes to Client's current student loan accounts and information on these accounts as needed. Company will utilize forbearance or deferment time with current servicer until consolidation

235; Jared Cooper:  DSMUF 236-250; Sheri Fleming:  DSMUF 251-264; Ilander Horejs: DSMUF 265-280; Evan Preston: DSMUF 281-292; Yuliya Sanker: DSMUF 293-307; Greyson Schultz:  DSMIF 308-321; Jamie Shelton-Larimore: DSMUF 322-334; Deborah Sickle: DSMUF 335-350; Misty Smith DSMUF 351-364; Crystal Somers: DSMUF 365-379; Laurie Taylor:  DSMUF 380-390; Tyler Thompson: DSMUF 391-405.

7

is complete and new terms are achieved as explained in Service Agreement.

_____ Client acknowledges and understands the services explained in Service Agreement will begin 3-5 days prior to Clients first payment date -noted in Service Agreement - and that cancellation of these services must be requested in writing 5 days prior to Client's first payment date or 90 days prior to Clients annual recertification date.

_____ Client acknowledges and understands the Cancellation Policy held by Company and its affiliates and he/she is free to apply for loan program(s) without the assistance of Company, Client is choosing to elect the services of Company pursuant to this Service Agreement.

_____ Client acknowledges and understands that if Client is unable to achieve a Federal Student Loan Consolidation Loan, principal reduction, interest rate reduction, deferment, forbearance, and/or reduced payment option, due to rejection or unachievable programs with current lenders, Client will receive a 100% refund of all monies paid to the Company as per Company's Refund Policy. If Company is successful in completing one of the above, then Client will be ineligible for a refund…*      *      *      *

_____ Client acknowledges that all monies received, except for Processing Fees, by Company from Client will be placed into a Trust Account until the date that the consolidation has been approved. No payments will be made to past or present lenders during this time.

_____ Client Acknowledges that once consolidation terms have been approved, payments to the approved lender will then commence. Payments will be made from the Clients Trust Account on a monthly basis in the amount approved during the consolidation process.

*Id.* The consumer declarants in this case complain of various issues but <u>ignore</u> the fact that full disclosure of the scope, nature and limitations of Corporate Defendants' services was made at the time of entering into the Service Agreement.

8

DSMUF 130-405. The consumers executed contracts and specifically initially acknowledged their understanding of the services provided as sales representatives reviewed their contracts with them. DSMUF 41-52, 99, 104. Simply stated, the consumers were not misled by Defendants because they <u>knew</u> and <u>understood</u> the nature, type and cost of services to be rendered. Id. Thus, Defendants were not violating or about to violate the Act.

## II.   Defendants Did Not Violate the Telemarketing Rule.

The second cause of action alleges Corporate Defendants violated the Telemarketing Rule.   The elements of this cause of action are that: (1) a telemarketer or seller of "debt relief services"; (2) requests or obtains payment of fees; (3) before the seller has renegotiated, settled or reduced one or more debts and (4) the consumer has made at least one payment pursuant to the settlement agreement; and (5) to the extent the debts are renegotiated, reduced , settled,  or otherwise altered individually, the fee bears a proportional relationship between the total fee for renegotiation, settlement, reduction or alteration of the debt balance and the entire debt amount owed at the time of the services.

Simply stated, Corporate Defendants were not offering "debt relief services" within the meaning of 16 CFR § 310.2(o). A debt relief service refers to any service that "renegotiates, settles,  or in any way alters the terms of payment or debt between a person and one or more <u>unsecured</u> <u>creditors</u>, including by not limited to a

9

reduction in the balance, interest rate or fees owed by a person to an <u>unsecured creditor</u> or debt collector." *Id*. (emphasis supplied).

Corporate defendants provided a document preparation service to help student borrowers take advantage of and apply for government programs. They prepared documents for student borrowers as a service, but which could have been submitted the student borrowers themselves.  The services focus on reconsolidating loans with the Department of Education, which <u>originated</u> the loans.  There is no "negotiation" of a lesser amount of the debt but an application to the DOE to qualify for one of its debt programs.

Importantly, student loans provided by the Department of Education are *secured debt* because the debt cannot, except in rare circumstances be dischargeable in bankruptcy and the debt can be recovered through garnishment, deducted from tax returns, social security or other government benefits. When students attend school, they are disbursed on a semester by semester basis. The disbursement has its own interest rate and can differ each semester.  Defendants then help consolidate the loans into one interest rate with the Department of Education.  The debt is not purchased, transferred and never moves—it remains with the DOE.  Defendants simply put together the paperwork for the student borrowers and assisted them in submitting paperwork to qualify for one of the DOE's programs.  Simply stated, the TSR Rule does not apply and should therefore be dismissed.

Even *assuming* that the TSR Rule applied to the instant case, Corporate Defendants complied or substantially complied with the Rule.  Funds were placed in a trust account and segregated from operating funds.  Like a lawyer's trust account, funds were not transferred to Corporate Defendants until the services were performed.  Although the vast majority of student borrowers had their plans approved, <u>full refunds were provided to students who did not have their plans approved.</u>  Simply stated, no consumer suffered harm by using Corporate Defendants' services.  The Court should dismiss this claim.

## III.   Defendants Were Not Violating or About to Violate the Act.

Section 13(b)(1) provides authority to courts to issue in whenever the Commission has reason to believe:  "that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission…."  In *FTC v. Evans*, the Court held that Section 13(b) <u>cannot</u> be used to remedy past violations and that injunctive relief may be sought when the FTC believes a "person is violating or is about to violate" a law enforced by the FTC. 775 F.2d at 1087.   The policies and procedures changed in November 2017. DSMUF 58-104.  Thus, injunctive relief cannot be granted.

## IV. Even Assuming the FTC Establish a Violation of the Act, Section 13(b) Does Not Allow for Recovery of Equitable Restitution.

11

Congress adopted an elaborate enforcement scheme to protect both consumers and businesses accused of unfair or deceptive practices. Under Section 5(b) of the FTC Act, the Commission may challenge "unfair or deceptive act[s] or practice[s]" (or violations of other consumer protection statutes) through maintenance of an administrative adjudication. When there is "reason to believe" that a law violation has occurred, the Commission may issue a complaint setting forth its charges. After hearing by an Administrative Law Judge ("ALJ"), the FTC may adopt the findings of the ALJ and enter an order which become final and binding 60 days after it is served unless the order is stayed by the Commission or by a reviewing court. The ALJ may propose a cease and desist order.

If a respondent violates a final order, it is liable for a civil penalty for each violation, as set forth in Commission Rule 1.98(c). The penalty is assessed by a district court in a suit brought to enforce the Commission's order. 15 U.S.C. §45(l), (m).   Importantly, Section 5(m)(1)(B) provides that penalties may be imposed if the individual acted with "actual[4] knowledge" that the conduct was unlawful.[5]

---

[5] The Commission can also promulgate rules that "define with specificity acts or practices which are unfair or deceptive." *Id.* § 57a(a)(1)(B). 936 F.3d at 771. By preemptively resolving whether certain conduct violates the FTCA, rulemaking permits the Commission to pursue "quick enforcement" actions against violators. Id. Once the Commission promulgates a rule, it can seek legal and equitable remedies, including restitution, from violators. *See* 15 U.S.C. §57b(a)(1), (b). And if it establishes that a violator had "actual knowledge or knowledge fairly implied on the basis of objective circumstances" that his conduct violated a rule, the Commission can also pursue civil penalties. *Id.* § 45(m)(1)(A).

## A. Section 13(b) Was Added in 1973 to Aid the FTC by Enjoining Current and Ongoing Future Violations of the Act Pending Adjudication by the Commission.

Section 13(b) of the FTC Act, 15 U.S.C. Sec. 53(b), authorizes the Commission to seek preliminary and permanent injunctions to remedy "any provision of law enforced by the Federal Trade Commission." Section 13(b) was added to the FTC Act as part of amendments to the Trans-Alaska Pipeline Act of 1973. At the time, the provision was expected to be used principally for obtaining preliminary injunctions against corporate acquisitions <u>pending completion of FTC administrative hearings</u>. Whenever the Commission has "reason to believe" that any party "is violating, or is about to violate" a provision of law enforced by the Commission, the Commission may ask the district court to enjoin the allegedly unlawful conduct pending completion of an FTC administrative proceeding to determine whether the conduct is unlawful. Further, under the second proviso of Section 13(b), "in proper cases," the Commission may seek, and the court may grant, a *permanent* injunction.

The Commission essentially argued that the proviso in Section 13(b) allowing courts to award a "permanent injunction" in "proper cases" was sufficient to allow the FTC to seek remedial monetary relief or any other form of equitable relief from a district court. *Singer,* 668 F.2d at 1113. The FTC also argued that, to

13

preserve the possibility of ultimate monetary equitable relief, it should be able to obtain a freeze of assets and imposition of temporary receivers in appropriate cases.

In *Singer,* the Court relied primarily on *Porter v. Warner*, 328 U.S. 395 (1946) as authority for this dramatic expansion of judicial and administrative power.[6] *Porter* held that when Congress granted district courts the power to impose injunctive relief, it also granted authority to grant any ancillary relief necessary to accomplish "complete justice"  because it "did not limit that traditional equitable power explicitly or by necessary and  inescapable inference."  *Singer*, 668 F.2d at 1113; The actual holding in *Porter,* however, has to be viewed in context.  Congress granted the Price Controls Board broad powers under the Emergency Price Control Act ("EPCA") to limit profiteering during wartime. Unlike the language in Section 13(b) allowing injunctive relief only, Section 205(a) provided that the Administrator could apply for a "permanent or temporary injunction restraining order, **or other order** shall be granted without bond." *Id*. at 1088 (emphasis supplied).  This provision allowed the EPCA to seek restitution.

## B. Supreme Court, Ninth and Seventh Circuit Decisions Dictate a Re-Examination of Singer and its Progeny.

The *Singer* and *Porter* decisions were typical of their era utilizing an interpretive approach to statutory interpretation that left the judicial branch free to

_____

[6] *See FTC v. Singer*, 668 F.2d 1107 (9th Cir. 1982).

14

craft whatever remedies necessary to effectuate their understanding of congressional intent. *CBC,* 937 F.3d at 777. However, the Supreme Court abandoned the interpretive approach and adopted an approach that focuses on the text and structure of a statute.[7] *CBC,* 937 F.3d at 777-778.

In *Owner-Operator,* 632 F.3d at 1121, the Ninth Circuit held that ancillary remedies including restitution and disgorgement could not be implied where, as it this case, the statute confined the court's equitable powers to injunctive relief. Injunctive relief constitutes a distinct type of equitable relief; it is not an umbrella term that encompasses restitution or disgorgement. *See Owner–Operator Indep. Drivers Ass'n v. Landstar, 632 F.3d 1302, 1324 (11th Cir. 2010), quoting Owner-Operator Indep. Driver's Assoc'n v. New Prime, Inc.,* 213 F.R.D. 537, 545 (W.D.Mo. 2002) ("Although disgorgement is an equitable remedy, it does not qualify as injunctive relief."). The *Owner Operators'* decision followed the

---

[7] "We are all textualists. That means that a judge must relate all sources of and arguments about statutory interpretation to a text the legislature has enacted."  (emphasis supplied). William N. Eskridge Jr., Interpreting Law: A Primer on How to Read Statutes and The Constitution 81 (2016). we must look not only to the "particular statutory language at issue" but also to "the language and design of the statute as a whole." *K Mart Corp v. Cartier, Inc.*, 486 U.S. 281, 291 (1988); *see also Carpenters Health & Welfare Tr. Funds v. Robertson (In re Rufener Constr.)*, 53 F.3d 1064, 1067 (9th Cir. 1995). Statutory construction is a "holistic endeavor," *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), that relies on context to be "a preliminary determinant of meaning," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 168 (2012).

15

Supreme Court's *precedent* in *Meghrig* 516 U.S. at 487-488.[8] In *Meghrig*, the Court dramatically limited *Porter*:

> As we explained in *Middlesex County Sewerage Authority v. National Sea Clammers Assn.,* 453 U.S. 1, 14, 101 S. Ct. 2615, 2623, 69 L.Ed.2d 435 (1981), where Congress has provided "<u>elaborate enforcement provisions</u>" for remedying the violation of a federal statute, as Congress has done with RCRA and CERCLA, "<u>it cannot be assumed that Congress intended to authorize by implication additional judicial remedies for private citizens suing under</u>" the statute. " '[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.' " *Id.,* at 14-15, 101 S. Ct., at 2623 (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S. Ct. 242, 247, 62 L.Ed.2d 146 (1979)). (emphasis supplied)

The FTC has "elaborate enforcement provisions" in Section 19 and Section 45 of the FTC Act.  Section 13(b) is intended to enjoin misleading or deceptive activity preserving the status quo pending the FTC's filing and resolution of administrative proceedings.[9]

As in *Owner Operators*, the FTC argues that *Porter* allows the Court to exercise full equitable powers unless the statute expressly provides otherwise.  In this case, by contrast, the statute has done precisely that; it has provided a different scheme of enforcement, listing only injunctive relief to the exclusion of other

---

[8] The Court did not specifically cite *Meghrig* but the reasoning in *Owner Operators* is virtually identical.

[9] It's inescapable that *Meghrig* not only displaced *Amy Travel*'s [and *Singer's*] categorical approach to judicially implied remedies but also its interpretation of section 13(b). Every one of *Meghrig*'s reasons for refusing to find restitutionary authority in the RCRA applies with equal force to section 13(b).  *CBC,* 937 F.3d at 783.

16

equitable remedies. Indeed, it is an elemental canon of statutory authority that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it. Neither *Singer* nor its progeny analyzed the plain language of the statute nor did they apply the legal principles in *Meghrig* and *Owner Operators*. Accordingly, these decisions lack precedential force and value.

## C. Section 13(b) Itself Does Not Confer General Equitable Authority in FTC Cases.

Simply stated, the courts may <u>not</u> imply restitutionary relief in a statute where, as here, the text of the statute is unambiguous. *FTC v. Credit Bureau Center,* 937 F.3d 764, 767 (7th Cir. 2019) (term "injunction" refers to forward looking remedies and is not a backward-looking remedy) *See Owner Operators*, 632 F.3d at 1121.

It is important to note what Section 13(b) actually provides and does not provide:

(b)TEMPORARY RESTRAINING ORDERS; PRELIMINARY INJUNCTIONS

Whenever the Commission has reason to believe—

(1) that any person, partnership, or corporation is <u>violating</u>, or is <u>about to violate</u>, any provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof **pending the issuance of a complaint** by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or **until the order of the Commission** made thereon has become final, would be in the interest of the public— the Commission by any of its attorneys designated by

17

> it **for such purpose** *may bring suit in a district court* of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond: *Provided, however*, That if a complaint is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect: *Provided further*, That in proper cases the Commission may seek, and after proper proof, the court may issue, **a permanent injunction**.

(emphasis supplied).  This one (very lengthy) sentence must be interpreted as a whole and harmonized to effect Congressional intent.  Simply stated, Section 13(b) did <u>not</u> authorize restitution, disgorgement, or damages judgments but simply allowed injunctions as a stop-gap measure pending administrative adjudication.

In *FTC v. Capital Management, LLC*, 910 F.3d 417, 429 (9th Cir. 2019),  Two members of the panel—Judge O'Scannlain joined by Judge Bea—concurred specially urging that the court's interpretation of "§13(b)'s authorization of 'injunction[s]' to empower district courts to compel defendants to pay monetary judgments styled as 'restitution' " "is no longer tenable." *Id.* (brackets in original). The "text and structure of the statute," they observed, "unambiguously foreclose such monetary relief." *Ibid.* The Ninth Circuit's "invention of this power wrests from Congress its authority to create rights and remedies." *Id.*

### 1. The Court Must Interpret and Apply the Plain Language of the Statute.

It is axiomatic that the Court must interpret the plain language of a statute to

18

determine its meaning and the intent of Congress. The Court's first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to a particular dispute in the case. *Robinson v. Shell Owner Co.,* 519 U.S. 337 (1997). The Court's inquiry must cease if statutory language is unambiguous and "the statutory scheme is coherent and consistent." *Id.* The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole. *Id.* at 341. *Davis v. Michigan Dept. of Treasury,* 489 U.S. 803, 809 (1989). "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Meghrig*, 516 U.S. at 487-488. Neither the text nor the legislative history of Section 13(b) permits the FTC to file full-fledged damages lawsuits seeking disgorgement or restitution. As set out below, Congress provided for consumer redress in Section 19 of the Act.

## 2.  Section 13(b) Is Not Ambiguous

The FTC purports to have authority to file this enforcement action under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). [Dkt. 1]. Significantly, Section 13(b) authorizes the FTC to file suit in federal court seeking an "injunction" only when a defendant allegedly "***is violating, or is about to violate***, any provision of law enforced by the Federal Trade Commission." (emphasis added). Under

19

Section 13(b), therefore, the FTC's authority to sue in federal court for injunctive relief is <u>limited</u> to matters involving ***ongoing*** or ***imminent future*** conduct when there is a need for ***<u>prospective</u>*** relief (*i.e.*, where a party is currently violating the FTC Act or is about to do so).    There is nothing ambiguous about the words— "violating or is about to violate."  Nor do these terms *remotely* refer to historical conduct or the FTC's standing to seek damages for past conduct. [10]

Section 13(b) anticipated that "a court could award to prevent an ongoing or imminent harm—but not to deprive a defendant of 'unjust gains from past violations.'" *AMG*, at 430. The Court concluded that: "Further, 'injunction' cannot be reasonably interpreted to authorize other forms of equitable relief, because Congress would have said so it if did." *Id.*

In Section 19 of the statute, Congress granted the Commission authority to "commence a civil action" for violation of FTC rules. 15 U.S.C. § 57(b). "It is a well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey a different

---

[10] Section 13(b) further limits the scope of the FTC's authority to seek injunctive relief from a district court by the phrase allowing "the Commission by any of its attorneys designated by it <u>for</u> such purpose *may bring suit in a district court* of the United States <u>*to enjoin any such act or practice.*</u>   This phrase conditions the authority of the Commission or its attorneys to bring an action only to "enjoin any such act or practice."  Clearly, there is <u>nothing</u> in this provision that authorizes the FTC to "enjoin any such act or practice" <u>and</u> then seek a full-fledged damages lawsuit for <u>past</u> allegedly deceptive acts.

meaning for those words." *S.E.C. v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003). The ability to bring suit to restrain or enjoin conduct is fundamentally different and distinct from the authority to "commence a civil action" seeking disgorgement and restitution. Congress provided statutory options to pursue injunctive relief while the Commission was adjudicating claims, or the FTC had the option to obtain injunctive relief under Section 13(b) and simultaneously commence a civil action to pursue consumer redress under Section 19. In sum, the plain language of the statute does not allow the FTC to go any further than seeking an injunction to protect consumers while the Commission pursues adjudicatory proceedings under Section 5.

### 3.  Section 19(b) Provides Context to Section 13(b).

In 1975, two years after adopting Section 13(b), Congress adopted Section 57(a), which authorizes "Suits by Commission Against Persons, Partnerships, or Corporations; Jurisdiction Relief for Dishonest or Fraudulent Acts." This provision provides that the Commission pursue *adjudicatory* proceedings and also specifically provides for remedies that may be enforced by the district courts upon final resolution of the case. Section 19 of the FTC Act, 15 U.S.C. § 57(b) specifically provides for consumer redress including refund of money, payment of damages but prohibited *imposition* of any exemplary or punitive damages.

Section 57(c), in turn, allows the FTC to file a civil action to enforce a cease and desist order. The legislative history of the Act is admittedly sparse, but it is

21

clear that no one understood Section 13(b) to authorize consumer redress.  Indeed, Congress adopted Section 19 to accomplish that purpose.[11]

Even though the plain meaning and context of Section 13(b) stands on its own, Section 19 amplifies and provides full context to the statute. Section 13(b) also makes reference to a subsequent clause providing: "*Provided further*, that in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." (emphasis supplied).  Proper cases refer to the antecedent clauses which make clear that Section 13(b) authorizes injunctive relief pending filing of a complaint by the Commission under Section 19(a*) If Congress wanted to grant broad authority to the FTC to pursue damages, restitution and disgorgement actions, it would have expressly provided for these powers in Section 13(b).*   Congress did <u>not</u> grant these powers.[12]

The reasoning and theory of implied restitution set out in *Singer* is clearly irreconcilable with the reasoning and theory of the Supreme Court in *Meghrig*

---

[11] J. Howard Beales & Timothy J. Muris, Striking the Proper Balance: Redress Under Section 13(b) of the FTC Act, 79 Antitrust L.J. 1, 16-17 (2013).

[12] The FTC recognized that it did not have express authority to obtain restitution or disgorgement under Section 13, so it devised a "program" to persuade the courts that they could imply authority despite the fact that Congress did not intend to grant the kinds of sweeping powers allowed under Singer.   Fitzgerald, David, "The Genesis of Consumer Protection Remedies Under Section 13(b) of the FTC Act."
https://www.ftc.gov/sites/default/files/documents/public_events/FTC%2090th%20Anniversary%20Symposium/fitzgeraldremedies.pdf

and the Ninth Circuit in *Owner Operator*.    It is well established that this Court must adopt the reasoning and theory of the higher authority if it clearly supersedes the logic of prior decisions.  *Rodriguez v AT &T Mobility Services, LLC*, 728 F.3d 975, 979 (N.D. Cal. 2019)

**D. Injunctive Relief**

A permanent injunction may be granted in "proper cases" although that term is not defined.  In *FTC v. Evans*, the Court adopted the FTC's interpretation of "proper case" allowing use of Section 13(b) in any case involving a law enforced by the FTC.  In other words, *Evans* held that the FTC can seek permanent injunctive relief without following the extensive enforcement mechanisms prescribed by Congress.  Use of the term "proper cases", however, is not language that delegates unbridled discretion to an administrative agency.  Rather, "proper cases" *limits* the FTC's power to seek permanent injunctive relief and must be placed in the context of other provisions of the statute.   A court must therefore interpret the statute "as a symmetrical and coherent regulatory scheme," *Gustafson v. Alloyd Co.,* 513 U.S. 561, 569, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), and "fit, if possible, all parts into an harmonious whole," *FTC v. Mandel Brothers, Inc.,*359 U.S. 385, 389, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959).

It is a bedrock principle of statutory construction that a statute should not be interpreted in a manner that renders any part of it ineffective." *Corley v. U.S.*, 556

U.S. 303, 314 (2009)  *United States v. Powell*, 6 F.3d 611, 614 (9th Cir. 1993) ("It is a basic rule of statutory construction that one provision should not be interpreted in a way which is internally contradictory or that renders other provisions of the same statute inconsistent or meaningless." (internal quotation marks and citation omitted)). [W]e keep in mind that statutory provisions are to be read in harmony in the context of the whole statute." *In re Hougland*, 886 F.2d 1182, 1184 (9th Cir. 1989) (citing *Davis v. Mich. Dep't of the Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989)).

Thus, construction of the term "proper case," must be construed in the context of the express condition set out in Section 13(b)(2) "that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon **has become final**…."   A permanent injunction cannot be sought by the FTC where, as here, it failed to issue a complaint within the Commission's adjudicatory process.   **Exhibit 1**, Rima Radwan Dec. ¶99; **Exhibit 2**, Mazen Radwan Declaration. **Exhibit 3** ¶3, Labiba Radwan Dec. ¶3; **Exhibit 4,** Dean Robbins Dec. ¶3.

Simply stated, Congress said what it meant and meant what it said.   Congress did not create an elaborate enforcement scheme only to have the FTC *disregard* and

*circumvent* the safeguards in Section 19 and Section 45 by simply filing a complaint denominated as a suit for "permanent injunctive relief" <u>preceded by a temporary restraining order, preliminary injunction, and discovery</u>.   Taking the FTC's argument to its logical conclusion, the FTC can effectively *nullify* the twenty-day limit under the First Proviso by simply filing a lawsuit that seeks permanent injunction <u>and</u> a TRO, a Preliminary Injunction <u>and</u> full-fledged discovery.   <u>The FTC's interpretation of the Second Proviso renders the First Proviso a nullity.</u> Given the "elaborate enforcement scheme" in Section 19, and the express limitations in Section 13(b), it is abundantly clear that Congress did not intend to grant the FTC open-ended authority to pursue disgorgement and equitable restitution through Section 13(b).   <u>A contrary result renders Section 19 a mere nullity</u>. *See U.S. v. Philip Morris, USA, Inc*., 396 F.3d 1190, 1196 (D.C. Cir. 2005) (rejecting disgorgement as relief under RICO).

## V.   FTC Restitution is a Prohibited Penalty Under Kokesh v. SEC.

In *Kokesh v.  SEC, 137 S.Ct. 1635 (2017)*, the Supreme Court rejected the Solicitor General's argument that *Porter v Warner* supported the SEC's power to impose disgorgement without explicit Congressional authority.  [Dkt. 156-7 at 7-9 and 13]. In *Kokesh,* the Supreme Court rejected the Solicitor General's argument that *Porter* authorized the SEC's broad use of disgorgement where, as in this case,

25

Congress did not specifically authorize this remedy *CBC*, 937 F.3d at 783-786. Indeed, the *Kokesh* Court *unanimously* held that an order requiring an individual to pay a non-compensatory sanction to the *Government* operates as a penalty. *Kokesh* at 1644.[13] The circuit courts' reliance on *Porter* as authority to impose "equitable" asset freezes, disgorgement and restitution in FTC cases is unsupported and ignores the fact that: (1) disgorgement was used as a deterrent, which is a hallmark of a penalty[14]; and (2) that seizure of funds constitutes a penalty because the funds are paid to the United States Treasury and not to consumers.   The Court made it clear that district courts must determine Defendant's gain based on gross revenues minus overhead; otherwise, the goal of restitution is nothing more than a polite synonym for disgorgement. [15]

---

[13] The Court rejected an expansive reading of *Porter* and parenthetically referred to *Porter* as "distinguishing between restitution paid to an aggrieved party and penalties paid to the Government."

[14]  Various circuit courts have found that disgorgement is designed to deter and punish wrongdoers.   *CFTC v. Co. Petro Marketing Group, Inc* 68 F.3d 573, 583-84 (9th Cir. 1982) (permitting disgorgement and recognizing it deterrent effect); *FTC v. Loan Pointe, LLC*, 525 Fed. Appx. 696 (10th Cir. 2013) also found that disgorgement "is a distinctly public-regarding remedy, available only to government entities seeking to enforce explicit statutory provisions…Its primary purpose 'is to deter violations of the laws by depriving violators of their ill-gotten gains.'" *Id.* at 698 *citing FTC v. Bronson*, 654 F.3d 359, 373-4 (2d Cir. 2011).

[15] "'As a general rule, the defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement. Denial of an otherwise appropriate deduction, by making the defendant liable in excess of net gains, results in a punitive sanction that the law of restitution normally attempts to avoid'.) In such cases, disgorgement does not simply restore the status quo; it leaves the defendant worse off." *Id*. at 1644-1645.

## VI.    The FTC Cannot Establish Any Injury to Consumers Nor Can it Establish Individual Liability Against the Defendants.

The Ninth Circuit adopted a two-pronged test for determining when an individual may be held personally liable for violations of the FTC Act. *FTC v. Commerce Planet*, 815 F.3d 593, 599-600 (9th Cir. 2016).  That test requires the FTC prove that the individual: (1) participated directly in, or had the authority to control, the unlawful acts or practices at issue; **and** (2) had actual knowledge of the misrepresentations involved, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high probability of fraud and intentionally avoided learning the truth.  *Id*. at 600.

In the instant case, there is no evidence that Mazen Radwan, Labiba Radwan or Dean Robbins had any control over the policies or practices in the student document preparation companies.  DSMUF  8, 9, 10.  Mazen Radwan and Dean Robbins did not supervise, hire or fire employees nor did they have anything to do with setting company policies or procedures. DSMUF 9,18. Labiba Radwan performed some HR responsibilities but did not set company policy and/or practices and had no authority to act without authorization from Rima Radwan. DSMUF 6, 10, 20.

Rima Radwan set up policies and procedures that did not violate FTC laws or regulations and virtually assured that all customers were fully aware of the

27

services rendered and their cost.   DSMUF 28-104 The Sales and Customer Service Representatives were trained to comply fully with the FTC Act.   DSMUF 36, 71, 75, 84, 100, 104.   Because of her health condition and need to avoid illness, Ms. Radwan trained and entrusted Daisy Lopez and Kendra Sanchez to handle complaints lodged with the student loan document prep companies. DSMUF 30.   If the managers thought they had an unusual problem, they were free to contact Ms. Radwan.[16]  DSMUF 30.   Similarly, Dean Robbins and Labiba Radwan did not hire, fire or supervise employees nor did they have any role in forming company policy or procedures for serving clients or have any direct contact with clients.   DSMUF 19-20, 29.   Labiba Radwan's did not participate in the decision to terminate employees but was there to provide their final paycheck and answer any questions regarding benefits.   DSMUF Labiba Radwan exercised no control over RCC.   *Id.*

The unrebutted evidence shows that Mazen Radwan did not hire, fire or supervise employees or exercise control over the student loan document preparation companies. DSMUF 8.   Conversely, there is no evidence that Rima Radwan, Labiba Radwan or Dean Robbins hired, fired, supervised employees or had any control over the policies and procedures for Radwan Classic Cars.   DSMUF 17, 19

---

[16] Ms. Radwan was involved in the few complaints filed by state attorney generals.  However, none of these complaints suggested that policies or practices for the student loan debt relief companies needed to be changed.

28

### VII.   The FTC Cannot Establish that RCC Motors Was Part of a Common Enterprise.

In *FTC v. Arrete,* 19-cv-02109 ("Arrete"), this Court recognized that [w]here one or more corporate entities operate in common enterprise, each may be held liable for the deceptive acts and practices of the others." *F.T.C. v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2012).  In determining whether a common enterprise exists, courts consider whether there is (1) common control; (2) sharing office space and offices; (3) whether business is done through interrelated companies; and (4) whether funds are commingled. *Id.*

In the instant case, the only connection between Dark Island Industries, LLC dba "Radwan Classic Cars" ("RCC") and the other Corporate Defendants was common ownership, but not control.  Control cannot be assumed where, as here, the owners were <u>required</u>, as a condition of getting an account from a financial institution, to become signatories on bank accounts or to be designated as officers on merchant processing accounts.[17]   The Court should not elevate form over substance.

Unlike *Arrete*, RCC and the student loan debt relief defendants did not share offices or computers systems, their businesses were conducted separately and there

---

[17] Owners should not be deemed to be active managers controlling a company simply because a bank or merchant processor insists that they sign forms as a condition of conducting business.

29

were no funds transferred between RCC and the other companies.   DSMUF 18. Indeed, employees of the student loan debt relief defendants were not allowed to go into RCC's showrooms and offices.   DSMUF 18. There was a lease arrangement that required MHF to pay rent because RCC leased the premises and spent approximately $400,000 to build out the offices for MHF and FDG.   DSMUF 18 FDG and RCC were to start paying rent in 2020 after FDG became more profitable. DSMUF 18.

WHEREFORE, Defendants request this Honorable Court grant summary judgment in favor of Defendants and against Plaintiff, and award Defendants their costs and legal fees.

Respectfully submitted,

By: /s/ *Stephen R. Cochell*
Stephen R. Cochell
Texas Bar No.: 24044255
2616 South Loop West, Ste 470
Houston, Texas 77054
Telephone: (346) 800-3500
srcochell@gmail.com

Robert Bare (SBN 271131)
Bare Law
444 W. Ocean Blvd.
8th Floor,
Long Beach, CA  90802
Telephone:   (310) 984-3670
Fascimile:    (310) 320-0102
rbare@barelaw.com

30

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on this date, I served the foregoing on counsel for Plaintiff K. Michelle Grajales and  John D. Jacobs, as well as the Receiver, and his counsel through the Court's Electronic Case Filing System.
Date: March 9, 2020.

*/s/ Robert Bare*
Robert Bare

## CERTIFICATE OF COMPLIANCE

I certify that Defendants' Motion for Summary Judgment complies with Rule 11, Federal Rules of Civil Procedure and the Local Rules of the Central District of California.

*/s/ Robert Bare*
Robert Bare