K. MICHELLE GRAJALES
mgrajales@ftc.gov
SAMUEL JACOBSON
sjacobson@ftc.gov
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., NW
Mail Stop: CC-10232
Washington, DC  20580
(202) 326-3172

JOHN D. JACOBS, Cal. Bar. No. 134154
Local Counsel
jjacobs@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Blvd., Ste. 400
Los Angeles, CA 90024
Tel: (310) 824-4343; Fax: (310) 824-4380
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

FEDERAL TRADE COMMISSION,

Plaintiff,

vs.

ELEGANT SOLUTIONS, INC., et al.

Defendants.

Civ. No. 8:19-cv-01333-JVS-KES

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**Judge: Hon. James V. Selna**
**Hearing Date:  April 6, 2020**
**Time: 1:30 p.m.**
**Courtroom: 10C**

# TABLE OF CONTENTS

I.    FACTS ...................................................................................................2

    A.    Defendants Made False Promises to Lure Consumers Into Purchasing
         Their Services. ..............................................................................2

    B.    Defendants Took Advance Fees. ...........................................................4

    C.    Defendants Failed to Deliver the Promised Debt Relief Services. .......5

         1.    Defendants Failed to Achieve the Promised Repayment Terms. .5

         2.    Defendants Failed to Pay Consumers' Loans. ..............................6

         3.    Defendants Did Not Take Over Consumers' Loans. .....................8

    D.    Defendants Continued to Misrepresent Their Services and Collect
         Advance Fees Even After Being Sued by Three States. .......................8

    E.    Defendants Operated Their Student Debt Relief Operation Through a
         Maze of Interrelated Companies. ........................................................10

    F.    Defendants Bilked Consumers Out of More Than $30 Million and
         Caused Them to Suffer Additional Harms. .........................................12

    G.    Individual Defendants Participated in and Controlled the Student Debt
         Relief Scam and Knew of Its Unlawful Practices. ..............................13

         1.    Rima Radwan ...........................................................................13

         2.    Mazen Radwan .........................................................................14

         3.    Dean Robbins ...........................................................................14

         4.    Labiba Velazquez (née Radwan) ...............................................15

II.   ARGUMENT ........................................................................................16

    A.    Defendants Violated the FTC Act and TSR. .......................................17

1           1.     Defendants Violated § 5(a) of the FTC Act (Count I). ...............17

2           2.     Defendants Violated the TSR (Counts II and III). ......................21

3

4           3.     Corporate Defendants Formed a Common Enterprise. ..............22

5           4.     Individual Defendants Are Personally Liable. ...........................23

6     B.    Defendants' So-Called Affirmative Defenses Fail to Raise any

7          Genuine Issue of Material Fact Warranting Trial. ..............................26

8     C.    The Equitable Monetary Relief the FTC Seeks Is Reasonable and

9          Appropriate...........................................................................................27

10    D.    The FTC Seeks Appropriate Injunctive Relief. ..................................28

III.    CONCLUSION...............................................................................................30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

*Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130 (9th Cir. 2000) ............................ 17, 27

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).............................................16

*CFTC v. CoPetro Mktg Grp., Inc.*, 680 F.2d 573 (9th Cir. 1982) ..........................28

*Consumer Fin. Prot. Bureau v. IrvineWebWorks, Inc.*, No. SACV 14-1967
   JVS(ANx), 2016 WL 1056662 (C.D. Cal. Feb. 5, 2016)....................................21

*Delaware Watch v. FTC*, 332 F.2d 745 (2d Cir. 1964) ..........................................22

*Dizon v. Asiana Airlines Inc.*, 240 F. Supp. 3d 1036 (C.D. Cal. 2017)............ 16, 17

*Figueroa v. Islands Rests. L.P.*, No. CV 12-00766-RGK (JCGx), 2012 WL
   2373249 (C.D. Cal. June 22, 2012) .................................................................26

*FTC v. A1 DocPrep, Inc.*, CV17-07044-SJO (JCx)
   (C.D. Cal. Nov. 16, 2018) ........................................................................ 29, 30

*FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999)......................................25

*FTC v. Alliance Document Preparation LLC*, cv-17-07048 SJO (KS) (C.D. Cal.
   Sept. 5, 2018) .......................................................................................... 29, 30

*FTC v. Am. Fin. Benefits Ctr.*, 324 F. Supp. 3d 1067 (N.D. Cal. 2018).................22

*FTC v. AMG Capital Mgmt., LLC*, 910 F.3d 417 (9th Cir. 2018)..........................27

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989) ...............................25

*FTC v. BAM Fin., LLC*, SACV15-01672 (C.D. Cal. Jul, 11, 2016)........................29

*FTC v. Colgate-Palmolive Co.*, 380 U.S. 374 (1965)............................................30

*FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016) ...............................25

*FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048 (C.D. Cal. 2012), *aff'd in
   relevant part*, 815 F.3d 593 (9th Cir. 2016) ................................................ 27, 28

*FTC v. Cyberspace.com*, 453 F.3d 1196 (9th Cir. 2006)........................... 17, 20, 21

*FTC v. Data Med. Capital*, No. SA CV 99-1266 AHS (EEx), 2010 WL 1049977
   (C.D. Cal. Jan. 15, 2010) ...................................................................... 17, 23

*FTC v. Febre*, 128 F.3d 530 (7th Cir. 1997)............................................................28

*FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001) ...................................................... 17, 20

*FTC v. Gill*, 71 F. Supp. 2d 1030 (C.D. Cal. 1999)................................................20

*FTC v. Grant Connect, LLC*, 763 F.3d 1094 (9th Cir. 2014) ..................................29

*FTC v. Inc21.com Corp.*, 475 Fed. Appx. 106 (9th Cir. 2012) ...............................28

*FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975 (N.D. Cal. 2010).................... 27, 29

*FTC v. J.K. Pub'ns, Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000) ...........................22

*FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d. 1052

(C.D. Cal. 2012) ............................................................................... 17, 19

*FTC v. John Beck Amazing Profits, LLC*, 888 F. Supp. 2d 1006

(C.D. Cal. Aug. 21, 2012) ................................................................. 29, 30

*FTC v. Johnson*, 156 F. Supp. 3d 1202 (D. Nev. 2015) .........................................23

*FTC v. Lights of Am., Inc.*, No. SACV10-01333 JVS (MLGx), 2013 WL 5230681

(C.D. Cal. Sep. 17, 2013) ...........................................................................18

*FTC v. M&T Fin. Grp.*, CV17-6855-ODW(PLAx) (C.D. Cal. June 8, 2018) ........30

*FTC v. Medicor, LLC*, No. CV 01-1896 CBM (EX), 2002 WL 1925896 (C.D. Cal.

Jul. 18, 2002) .............................................................................................29

*FTC v. Network Servs. Depot*, 617 F.3d 1127 (9th Cir. 2010) .................. 22, 24, 25

*FTC v. OMICS Grp.*, 374 F. Supp. 3d 994 (D. Nev. 2019)....................................30

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) ............................. 18, 21, 28

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997).....................24

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009)........................................... passim

*FTC v. Thompson Medical Co.*, 104 F.T.C. 648 (1984), *aff'd*, 791 F.2d 189

(D.C. Cir. 1986) .........................................................................................21

*FTC v. USA Fin., LLC*, 415 Fed. Appx. 970 (11th Cir. 2011) ...............................27

*FTC v. Wellness Support Network*, No. 10-cv-04879-JCS, 2014 WL 644749 (N.D.

Cal. Feb. 19, 2014) ....................................................................................30

*Litton Indus. v. FTC*, 676 F.2d 364 (9th Cir. 1982).................................................30

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ..............16

*Resort Car Rental v. FTC*, 518 F.2d 962 (9th Cir. 1975) ........................................20

*SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072 (9th Cir. 2010)...................28

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953)............................................28

*Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080 (9th Cir. 2002) ...............................26

**Statutes**

15 U.S.C. § 53(b) .......................................................................................................28

**Rules**

16 C.F.R. § 310.2(o) ..................................................................................................21

16 C.F.R. § 310.4(a)(5)(ii) .........................................................................................22

16 C.F.R. § 310.4(a)(5)(ii)(B), (C), (E) ....................................................................22

16 C.F.R. Part 310 .....................................................................................................21

47 C.F.R. § 310.3(a)(2)(x) .........................................................................................22

47 C.F.R. § 310.4(a)(5)(i) ..........................................................................................22

Fed. R. Civ. P. 56(a)...................................................................................................16

# TABLE OF PLAINTIFF'S EXHIBITS

Exhibit                                                                                    Page Number

*Exhibits Filed in Support of Temporary Restraining Order*

PX 1 – Declaration of Shaun Avant (Dkt. 20)................................................1

PX 2 – Declaration of Erica Bennett (Dkt. 20)...........................................72

PX 3 – Declaration of Kelly Bishop (Dkt. 20) .....................................141

PX 4 – Declaration of Lisa Bonilla (Dkt. 20).........................................177

PX 5 – Declaration of Alison Brockel (Dkt. 21).........................209

PX 6 – Declaration of Mary Bursey (Dkt. 21).....................................265

PX 7 – Declaration of Sapphira Clemans (Dkt. 21) ............................265

PX 8 – Declaration of Jared Cooper (Dkt. 21) ...................................273

PX 9 – Declaration of Sheri Fleming (Dkt. 21)....................................313

PX 10 – Declaration of Ilander Horejs (Dkt. 22)...............................340

PX 11 – Declaration of Evan Preston (Dkt. 22) ...............................380

PX 12 – Declaration of Yuliya Sanker (Dkt. 22)............................. 407

PX 13 – Declaration of Greyson Schultz (Dkt. 24)................................496

PX 14 – Declaration of Jamie Shelton-Larimore (Dkt. 24)..................534

PX 15 – Declaration of Deborah Sickel (Dkt. 24)................................541

PX 16 – Declaration of Misty Smith (Dkt. 24)..................................551

PX 17 – Declaration of Crystal Somers (Dkt. 24) ...............................590

PX 18 – Declaration of Laurie Taylor (Dkt. 24)................................625

PX 19 – Declaration of Tyler Thompson (Dkt. 24)................................649

PX 20 – Declaration of Michael B. Goldstein (Dkt. 25) ......................680

PX 21 – Declaration of Scott Lause (Dkt. 27)................................. 1147

PX 22 – *State of North Carolina v. Mazen A. Radwan, et al.*, 16-CV-012135

(N.C. Sup. Ct. 2016) (Dkt. 27) ...................................................... 1162

PX 23 – *In re: D.O.R.M. Group, et al.*, Oregon Assurance of Voluntary
   Compliance (Dkt. 27) ....................................................... 1206

PX 24 – *State of Washington v. D.O.R.M. Group, et al.*, 16-2-17718-2 SEA
   (Wash. Sup. Ct. 2016) (Dkt. 27).................................... 1215


*Exhibits Filed in Support of Preliminary Injunction*

PX 25 – Supplemental Declaration of Michael B. Goldstein (Dkt. 46-47)........ 1236

PX 26 – Declaration of Ray Eggersgluss (Dkt. 48).......................... 1429


*Exhibit Filed in Support of Opposition to Motion to Release Frozen Funds*

PX 27 – Declaration of Emilie Saunders (Dkt. 76.2) ...................... 1430


*Exhibits Filed Concurrently With Motion for Summary Judgment*

PX 28 – Declaration of Richard Kaplan .............................. 1491

PX 29 – Declaration of Calvin Brown ............................... 1495

PX 30 – Declaration of Ajay Patel.................................. 1499

PX 31 – Supplemental Declaration of Emilie Saunders .................... 1503

PX 32 – Declaration of Connor Geiran ............................. 1688

PX 33 – Declaration of Rufus Jenkins .............................. 1697

PX 34 – Rima Radwan Excerpted Deposition Transcript and Exhibits ............. 1702

PX 35 – Mazen Radwan Excerpted Deposition Transcript and Exhibits........... 1953

PX 36 – Dean Robbins Excerpted Deposition Transcript and Exhibits ............. 2076

PX 37 – Labiba Radwan Excerpted Deposition Transcript and Exhibits........... 2163

PX 38 – Kendra Sanchez Excerpted Deposition Transcript and Exhibits.......... 2286

PX 39 – Daisy Lopez Excerpted Deposition Transcript and Exhibits .............. 2353

PX 40 – Discovery Responses ..................................... 2529

PX 41 – Temporary Restraining Order, *State of North Carolina v. Mazen A.*

*Radwan, et al.*, 16-CV-012135 (N.C. Sup. Ct. Oct. 3, 2016) .......................... 2565

PX 42 – Post-Trial Brief, *Chmait v. Radwan et al.*, 30-2014-00745712-CU-FR-

CJC, (Cal. Sup. Ct. Apr. 19, 2017) ....................................................................2570

The Court should grant Plaintiff Federal Trade Commission's ("Plaintiff" or "FTC") Motion for Summary Judgment Against Defendants Elegant Solutions, Inc., Trend Capital, LLC, Dark Island Industries, Inc., Tribune Management, Inc., Heritage Capital Management, Inc., Rima Radwan, Mazen Radwan, Labiba Velazquez, and Dean Robbins ("Defendants") because there is no material issue of fact regarding Defendants' unlawful student debt relief scheme and Plaintiff is entitled to judgment as a matter of law.

Since at least April 2014, Defendants, thrice-over recidivists, bilked more than $27 million from consumers struggling to repay their student loans. Defendants promised they would reduce consumers' monthly loan payments to specific, lower amounts (e.g., $61) or that consumers' loans would be forgiven after a specific number of years (e.g., 3 or 7). Defendants also promised that they would apply most or all of consumers' payments to their student loans, and purchase or take over servicing of those loans. Defendants collected hefty illegal advance fees for these purported services.

Defendants failed, however, to deliver on their promises. While they quoted consumers purported new, lower monthly loan payments, Defendants did not actually obtain the claimed new loan payment amounts. Instead, Defendants, unbeknownst to consumers, routinely falsified consumers' employment statuses and incomes to place then in repayment plans without a monthly payment. Defendants then pocketed the new amount consumers thought they were paying toward their loans. This practice caused consumers' principal loan balances to remain the same or increase, while consumers continued to accrue additional unpaid interest and pay Defendants fees. Defendants' loan forgiveness claims also were false; there are no federal loan forgiveness programs with repayment terms of three or seven years.

Further, despite promising consumers that all or most of their monthly payments to Defendants would be applied to their loans, Defendants typically took most of consumers' payments as fees and placed only a small portion aside, purportedly for payment to consumers' lenders. Moreover, as Defendants readily admit, Defendants routinely failed to make even these minimal payments to consumers' lenders, pocketing consumers' money instead. By failing to make these payments, Defendants sometimes caused consumers' loans to become delinquent or go into default.

To prevent consumers from uncovering Defendants' deceptive conduct, Defendants pretended to be federal student loan servicers that would purchase or take over servicing of consumers' loans. Defendants then used consumers' personal information to gain access to their loan accounts and change their contact information to Defendants' own. As a result, many consumers did not learn of Defendants' failure to make payments on their loans until months or years later. By then, many consumers had, on top of Defendants' fees, accrued additional unpaid interest on their student loans, such that they often ended up owing thousands of dollars more than when they signed up for Defendants' services.

Defendants' practices, which are set forth in further detail below, violate the FTC Act and the Telemarketing Sales Rule ("TSR"). In light of the substantial and indisputable evidence supporting its claims, the FTC seeks judgment against the Defendants on all Counts, and respectfully requests that the Court issue a permanent injunction to prevent future violations of the law and award $27,584,969.00 in equitable monetary relief.

## I.  FACTS

### A.  Defendants Made False Promises to Lure Consumers Into Purchasing Their Services.

Defendants marketed their purported services to consumers with substantial

student loan debts using both inbound and outbound telemarketing. (USF ¶¶ 149, 151). Defendants' scripts directed telemarketers to tell consumers that Defendants were a student loan management company that would help consumers save money by consolidating their federal student loans, enrolling them in an income-based repayment program, or qualifying them for a loan forgiveness program (though telemarketers routinely deviated from these scripts). (USF ¶¶ 152-53, 160). Defendants' telemarketers also made more specific loan forgiveness claims, such as that consumers' loan balances would be forgiven after the consumers made lower monthly payments for a specific span of years, such as three, seven, ten, or fifteen. (USF ¶ 154).

Defendants typically quoted consumers a monthly payment amount that was significantly less than what consumers were paying at the time. (USF ¶¶ 156-57). For example, Defendants told one consumer who had a $200 monthly payment that her new payment would be $50 and another consumer who had been paying $130 per month that her new payment would be $61. (USF ¶ 158-59). Defendants often informed consumers that all or most of their payment would be applied to their student loans. (USF ¶ 161). Defendants typically did not disclose in this initial sales pitch that the new monthly payment included hefty management and processing fees. (USF ¶¶ 163-64). Thus, numerous consumers understood that the amount quoted would be applied to their student loans. (USF ¶ 166).

Defendants also represented to consumers that they would be purchasing, taking over, or handling servicing of consumers' loans. (USF ¶ 167). For example, Defendants told one consumer that they were "a servicer" who would "service [her] loans directly through the Department of Education" and another that their goal was to "eliminate your middle lender." (USF ¶¶ 168-69). Defendants further instructed consumers that Defendants would handle all loan communications and that consumers should stop making payments to their "previous" servicers. (USF ¶

171-72). Such representations were consistent with Defendants' scripts, one of which instructed telemarketers to tell consumers that "our main goal is to eliminate the middle lender … and get you back on track to just paying the main source." (USF ¶ 170).

After consumers agreed to enroll in Defendants' "program," Defendants emailed consumers a pre-filled enrollment packet for consumers to sign electronically using DocuSign, frequently while the sales person was on the phone with the consumer. (USF ¶ 174). The packet included, among other things, a privacy policy, service agreement, and an ACH debit authorization form, authorizing electronic withdrawals from consumers' bank accounts. (USF ¶ 175). Buried in the middle of this lengthy packet was a statement of Defendants' fees, along with various other disclaimers. (USF ¶ 176). However, Defendants' application automatically jumped from signature block to signature block instead of requiring consumers to scroll through each page. (USF ¶ 177).

### B. Defendants Took Advance Fees.

After collecting consumers' bank account information, but before providing any of the promised debt relief, Defendants began debiting consumers' accounts via ACH transfer. (USF ¶ 217). Defendants' fee structure varied over time, but typically consisted of an annual management or service fee of between $599 and $799 for the first year and $492 for each subsequent year, broken into twelve equal monthly payments, and a monthly processing fee of between $10 and $15. (USF ¶ 218). From at least April 2014 to July 2016, Defendants also charged consumers an additional "down payment" or "initiation" fee of between $30 and $6,600. (USF ¶ 219).

After debiting consumers' accounts, Defendants' payment processors placed the funds in a "holding" account controlled by Defendants. (USF ¶ 221). From there, the management fees were disbursed to Defendants' "operating" account and

the processing fees to the processor. (USF ¶ 222). The remaining funds were transferred to a third account that Defendants referred to as the "trust" account, but which was, in fact, just another business account controlled by Defendants.[1] (USF ¶¶ 223-24). Defendants did not segregate the funds in the "trust" account by consumer and consumers could not withdraw funds from the account. (USF ¶ 225). Nor did Defendants pay consumers' interest on their "trust" balances. (USF ¶ 226).

### C. Defendants Failed to Deliver the Promised Debt Relief Services.

#### 1. Defendants Failed to Achieve the Promised Repayment Terms.

While Defendants quoted consumers new loan payment amounts, they did not actually obtain these new loan amounts. (USF ¶ 178). Instead, they frequently falsified consumers' information to place consumers in plans without a monthly payment for which the consumer did not qualify, and then kept the money consumers were sending in for their loans. (USF ¶¶ 187, 190-92, 197, 207-11). Defendants' practices caused consumers to accrue additional unpaid interest on their loans and their principal balances to stay the same or increase. (USF  ¶233-34).

To qualify consumers for repayment plans without monthly payments, Defendants frequently misrepresented on income-driven repayment ("IDR")[2] applications that consumers were unemployed with no income when, in fact, consumers had told Defendants they were employed and, in some cases, submitted recent recent paystubs, W-2's, or other forms of income verification. (USF ¶ 187).

---

[1] From at least 2014 to January 2016, the "trust" account was maintained by Payment Automation Network (PAN), one of Defendants' payment processors. This account too was, in fact, just a business checking account. (USF ¶¶ 227-28).
[2] IDR programs allow eligible borrowers to limit their monthly payments based on a percentage of their discretionary monthly income and are available to eligible consumers through ED or federal student loan servicers at no cost. (USF ¶ 144).

For example, Defendants reported one consumer as being unemployed and having no income on her initial IDR plan request and multiple subsequent recertification requests, despite the consumer having reported to Defendants that she was employed with an annual income of $115,000. The consumer was approved for an IDR plan with a $0 monthly payment. (USF ¶ 190).

In another case, Defendants reported a consumer as being unemployed and having no income, despite the consumer having reported to Defendants that she was employed with an annual income of $46,000. The consumer also submitted to Defendants a joint tax return showing that she and her husband had an adjusted gross income of $103,736. The consumer was approved for an IDR plan with a $0 monthly payment. (USF ¶ 191).

Nor were these one-off instances. According to Defendants' records, of the 14,116 consumers with $0 monthly loan payments, nearly a quarter (more than 3,300) reported having incomes that were too great to qualify them for a $0 payment based on Department of Education guidelines.[3] (USF ¶ 192).

In many instances, Defendants also failed to obtain the promised loan forgiveness for consumers. (USF ¶178). In fact, there are no federal loan forgiveness programs with repayment terms of three or seven years and there are strict eligibility requirements for five, ten or fifteen year programs, despite Defendants' claims. (USF ¶¶ 179-80).

### 2.    Defendants Failed to Pay Consumers' Loans.

As discussed above, Defendants promised consumers that their monthly

---

[3] Under the Department's guidelines, to qualify for a $0 monthly payment under any IDR plan, a borrower's annual discretionary income may not exceed $599. A borrower's discretionary income is equal to the difference between his or her adjusted gross income and 150 percent of the federal poverty guideline. (USF ¶ 146).

payments to Defendants would be applied toward their student loans. In reality, Defendants typically placed only a small portion of consumers' monthly payments into a "trust" account, purportedly for payment on consumers' loans, and took the rest as fees.[4] (USF ¶ 194).

Further, Defendants routinely failed to make even these minimal "trust" payments to lenders, a fact Defendants readily admit. (USF ¶ 197). In fact, Defendants eventually were forced to start an "audit" of their "legacy" accounts, allegedly to determine how much they owed consumers' lenders. (USF ¶ 199). This "audit" showed Defendants' customers had a combined balance of at least $2,718,728 in "trust" that Defendants should have paid consumers' lenders, but did not. (USF ¶¶ 200, 207).

Upon verifying that customers had money in "trust," Defendants decided on an ad hoc, case-by-case basis whether to make payments to customers' lenders. (USF ¶ 201). However, even when Defendants did make such payments, the payments frequently were for much less than the amount consumers had in "trust." (USF ¶ 202). For example, after determining that one consumer had $18,000 in "trust," Defendants sent a payment to the consumer's lender for only $5,000. (USF ¶ 203). In another case, Defendants decided to send only a $5,000 payment to a consumer's lender even though Defendants "never sent any payments to their [sic] lender" and the consumer had over $10,000 in her "trust." (USF ¶ 204).[5]

---

[4] For post-November 2017 accounts, the average monthly service fee ("MSF") was $63.99, the average monthly processing fee ("MPF") was $15.00, and the average monthly "trust" payment was $22.51. For pre-November 2017 accounts, the average MSF was $44.72, the average MPF was $10, and the average monthly "trust" payment was $26.84. (USF ¶¶ 195-96).

[5] In some cases, Defendants also sometimes took out additional management fees before making any payment to consumers' lenders. (USF ¶ 205).

In addition, Defendants routinely transferred funds from the "trust" account into their "operating" and personal accounts. (USF ¶ 208). For example, in March 2018, Mazen Radwan wrote himself a $60,000 check from the "trust" account and deposited it into his personal bank account. (USF ¶ 209). Thereafter, on July 17 and 18, 2018, Defendants made two online transfers of $300,000 each from the "trust" account to the "operating" account, which they subsequently used to pay their personal income taxes. (USF ¶ 210). In total, Defendants transferred at least $1,280,000 from the "trust" account to their "operating" account and other accounts controlled by Rima Radwan, Mazen Radwan, and Robbins. (USF ¶ 211). This amount does not include consumer payments that Defendants had already set aside as management and processing fees.

### 3. Defendants Did Not Take Over Consumers' Loans.

Defendants were not federal student loan servicers and were not in any way approved by or affiliated with the federal government or servicers. (USF ¶ 181). Nor did Defendants purchase consumers' student loans. (USF ¶ 181). Instead, Defendants used consumers' usernames, passwords, and FSA PINs to gain access to consumers' federal student loan servicing accounts and change consumers' contact information to Defendants' own, severing consumers' communications with their actual servicers. (USF ¶ 212). As a result, many consumers did not learn that Defendants were failing to make payments on their loans for months or even years after signing up for Defendants' services. (USF ¶ 214).

### D. Defendants Continued to Misrepresent Their Services and Collect Advance Fees Even After Being Sued by Three States.

Beginning in 2016, Defendants or their predecessor companies, D.O.R.M. Group, Inc. ("D.O.R.M.") and Student Loan Service Managers ("SLSM"), became the target of several state law enforcement actions for conduct including false advertising and failing to deliver promised services. A state court in Washington

entered the first Consent Decree on July 26, 2016. (USF ¶ 113). Then, in September 2016, the North Carolina Attorney General sued Heritage Asset Management, Inc. ("Heritage"), Tribune Management, Inc. ("Tribune"), and D.O.R.M. Group, along with Mazen Radwan, Rima Radwan, and Dean Robbins, for, among other things, engaging in unfair or deceptive practices in connection with marketing debt adjusting services in violation of state law. (USF ¶ 114). In October 2016, the state court issued a Temporary Restraining Order and later entered a Consent Judgment and Permanent Restraining Order on March 6, 2017 that permanently prohibited the defendants from operating in North Carolina. (USF ¶¶ 115-16). D.O.R.M. Group also entered into an Assurance of Voluntary Compliance ("AVC") with the State of Oregon in March 2017 to settle allegations that the company operated an unlawful debt management service. (USF ¶ 117). Dean Robbins signed the AVC on behalf of D.O.R.M. Group. (USF ¶ 118).

In addition to being the subject of these state law enforcement actions, Defendants received hundreds of complaints from deceived consumers. (USF ¶ 239). According to Defendants' training materials, some of consumers' most common questions were: "Why aren't my loans being repaid? / Nothing has been paid to my loans? / You're a scam where's my $?" (USF ¶ 240).

Consumers also cancelled in large numbers. Indeed, Defendants' records show that more than a quarter of Defendants' customers ended up cancelling their service. (USF ¶ 241). According to Defendants' training materials, one of the top five reasons why consumers cancelled was, "I didn't know I am paying fees, I thought the money I pay you goes towards my loans." Another was "My Loan Manager lied to me." (USF ¶ 242).

Despite these state law enforcement actions, complaints, and cancellations, Defendants continued to misrepresent their services and collect advance fees until July 10, 2019, when the Court-appointed Receiver took control of the Corporate

Defendants and temporarily suspended their operations. (USF ¶ 126).

### E.   Defendants Operated Their Student Debt Relief Operation Through a Maze of Interrelated Companies.

Defendants Rima Radwan, Mazen Radwan, and Dean Robbins have been in the student debt relief business since at least 2013. (USF ¶ 105). From approximately August 2013 through June 2014, they did business as Student Loan Service Managers, a general partnership. (USF ¶ 105). In June 2014, they dissolved the partnership and transferred the partnership's assets, consisting primarily of customer accounts, to a new company, D.O.R.M. Group, Inc. (USF ¶ 106). D.O.R.M. Group continued to manage the loans for clients signed up by the partnership, as well enroll new customers. (USF ¶ 107).

Several months after starting business as D.O.R.M. Group, Rima, Mazen and Dean decided they needed to "rebrand," because "D.O.R.M. Group had brought on a lot of liabilities and had bad accounts, so we had a bad image on the Internet." (USF ¶ 108). To do so, they split D.O.R.M. Group's business between two new companies—Tribune and Heritage—of which Rima, Mazen, and Dean were equal owners. (USF ¶ 109). Tribune, doing business as Student Loan Group, became responsible for acquiring new customers. (USF ¶ 110). Heritage, doing business as National Secure Processing, took over responsibility for managing clients' loans, including the loans of clients signed up by D.O.R.M. Group and the partnership. (USF ¶ 111). The two companies shared an office building, located at 6A Liberty, Aliso Viejo, CA 92656, and officers: Rima was the CEO, Mazen was the CFO, and Dean was the CTO. (USF ¶¶ 129-30). Defendants also routinely transferred funds between the companies. (USF ¶ 132).

In November 2017, following the state actions, Defendants decided to "re-brand" for a second time. (USF ¶ 119). Defendants were having "issues" with payments not being sent to consumers' lenders and re-branded "to kind of get away

from all that." (USF ¶ 120). Rima Radwan identified this issue as a reason for the re-brand, along with the FTC's recent Game of Loans sweep, which targeted student debt relief companies that were misrepresenting their services and taking advance fees. (USF ¶ 121).

As part of their re-brand, Defendants ceased doing business as Student Loan Group and National Secure Processing and transferred their assets, operations and a number of employees to two new companies—Elegant Solutions, Inc. ("Elegant") and Trend Capital, Ltd. ("Trend")—of which Rima Radwan, Mazen Radwan, and Robbins are equal owners. (USF ¶ 122). Elegant, doing business as Federal Direct Group ("FDG"), was responsible for acquiring new customers and managing those customers' loans. (USF ¶ 123). Trend, doing business as Mission Hills Federal ("MHF"), took over responsibility for servicing the loans of Defendants' "legacy" clients—*i.e.*, the clients signed up by Tribune, D.O.R.M. Group, and the partnership.[6] (USF ¶ 124).

Like Tribune and Heritage before them, Elegant and Trend shared an office building, located at 3 Studebaker, Irvine, CA 92618, and officers: Rima Radwan (CEO), Mazen Radwan (CFO), and Robbins (CTO). (USF ¶¶ 3, 10, 30-31, 52-53, 76-77). In addition, the two companies used the same Customer Relationship Management ("CRM") program, known as the "Ezekial CRM." (USF ¶ 133).

Around the same time, Rima Radwan, Mazen Radwan, and Robbins also incorporated Dark Island Industries, Inc. ("Dark Island") and capitalized it, in part, using funds from their personal accounts. (USF ¶ 136). Dark Island also operated from 3 Studebaker, Irvine, CA 92618, the rent for which was paid by Trend, and shared the same officers as the other Corporate Defendants. (USF ¶ 135). Dark Island, doing business as Federal Direct Group, contracted with Automatic Funds

---

[6]At the time of transition, Defendants had 12,669 "legacy" accounts. (USF ¶ 125).

Transfer Services, Inc. ("AFTS") to provide payment processing services to the student debt relief business.[7] (USF ¶ 137). It also set up the Internet services that Defendants used to conduct their student debt relief operation. (USF ¶ 140). In addition to participating in the student debt relief operation, Dark Island operated a classic car business from 3 Studebaker. (USF ¶¶ 44, 134).

Defendants continued doing business (i.e., signing up new customers and managing existing customers' loans) as Federal Direct Group and Mission Hills Federal until July 10, 2019, when the Receiver took control of the Corporate Defendants. (USF ¶ 126). At that time, there were 6,281 active MHF or "legacy" accounts and 2,516 active FDG accounts. (USF ¶ 127).

## F. Defendants Bilked Consumers Out of More Than $30 Million and Caused Them to Suffer Additional Harms.

Between April 2014 and July 2019, Defendants collected $31,140,943.00 from consumers. (USF ¶ 230). Consumers also suffered other harms. Numerous consumers' loans accrued unpaid interest while they were enrolled with Defendants. (USF ¶ 233). In some instances, thousands of dollars of unpaid interest that accrued on consumers' loans while in Defendants' program capitalized—i.e., it was added to consumers' principal. (USF ¶ 234). Many consumers had to change repayment programs upon learning that Defendants had falsified their repayment applications. (USF ¶ 236). Changing repayment plans restarts the clock for purposes of a consumer making the required number of monthly payments towards

---

[7] Defendants claim their attorney Robert Bare mistakenly used Dark Island's name when completing underwriting paperwork for AFTS. However, Dean Robbins, not Mr. Bare, signed the contract on behalf of Dark Island, and Defendants received monthly invoices from AFTS identifying Dark Island as the customer. (USF ¶¶ 138-39). Thus, Defendants had ample notice and opportunity to remedy any "mistakes." That they did not speaks to the fluid boundaries between Defendants' companies and their lack of respect for corporate formalities.

forgiveness. (USF ¶ 236). Thus, consumers who were enrolled by Defendants in the wrong repayment program often lost months or years of monthly payments towards their goal of obtaining loan forgiveness. (USF ¶ 236). Some consumers' loans went into delinquency or default as a result of Defendants' failure to make payments. (USF ¶ 237).

### G. Individual Defendants Participated in and Controlled the Student Debt Relief Scam and Knew of Its Unlawful Practices.

#### 1. Rima Radwan

Rima Radwan was an equal owner of all five Corporate Defendants, the CEO of Elegant, Trend, Tribune, and Heritage, and the CFO of Dark Island. (USF ¶ 50). She also was a signatory on Corporate Defendants' bank accounts and held one or more corporate credit cards. (USF ¶ 57). As such, she at all times had the authority to control Corporate Defendants' student debt relief practices and finances.

Rima Radwan had the idea to start the student debt relief business, having previously worked for two other student debt relief companies, including one—StudentLoanProcessing.US—that was later sued by the CFPB for deceiving consumers and taking advance fees. (USF ¶¶ 58-60). She also was "the brains [of] the operation." (USF ¶ 61). Her "duties" were to "run all of the operations and everything in the business," (USF ¶ 62) including drafting sales scripts, (USF ¶ 64), training customer service representatives, (USF ¶ 65), creating website content (USF ¶ 66), and deciding on the corporate structure and re-branding, (USF ¶ 67).

Rima Radwan was a named defendant in the North Carolina complaint and was aware of the Oregon and Washington actions. (USF ¶ 69). She also received numerous consumer complaints. (USF ¶ 73). In addition, she was familiar with law enforcement actions brought by the FTC and other government agencies against other student debt relief companies for making misrepresentations and taking

upfront fees, including the action brought by the CFPB against her former employer. (USF ¶ 70). Indeed, she emailed a copy of the CFPB's subpoena to SLP to Mazen Radwan and Robbins (USF ¶ 71), and the FTC found a proposed settlement order from the CFPB's lawsuit on her work computer. (USF ¶ 72).

### 2.  Mazen Radwan

Mazen Radwan was an equal owner of all five Corporate Defendants, the CFO of Elegant, Trend, Tribune, and Heritage, and the CEO of Dark Island. (USF ¶ 28). He also was a signatory on Corporate Defendants' bank accounts and held one or more corporate credit cards. (USF ¶ 29). As such, he at all times had the authority to control Corporate Defendants' student debt relief practices and finances.

Mazen Radwan provided the capital to start the student debt relief business. (USF ¶ 45). He also opened bank accounts for the Corporate Defendants, (USF ¶ 38), leased an office in South Dakota so that some of the Corporate Defendants could be incorporated there, (USF ¶ 39), and arranged for Internet services and payment processing services for the Corporate Defendants. (USF ¶ 42). He managed Defendants' relationship with Payment Automation Network. (USF ¶ 43).

Mazen Radwan was a named defendant in the North Carolina complaint and signed the resulting Consent Order. (USF ¶ 46). Shortly after that complaint was filed, he met with the State attorney prosecuting the case, who explained why the State filed suit. (USF ¶ 47). Mazen Radwan also knew about the Oregon and Washington actions. (USF ¶ 48). In addition, he received consumer complaints from the Better Business Bureau and payment processors. (USF ¶ 49).

### 3.  Dean Robbins

Dean Robbins was an equal owner of all five Corporate Defendants and the CTO of Elegant, Trend, Tribune, Heritage, and Dark Island. (USF ¶ 74). He also

was a signatory on Corporate Defendants' bank accounts and held one or more corporate credit cards. (USF ¶ 83). As such, he at all times had the authority to control Corporate Defendants' student debt relief practices and finances.

Dean Robbins primarily was responsible for developing and maintaining the student loan business's CRM and handling other technology issues. (USF ¶ 81). Dean Robbins developed at least two iterations of CRM software for Defendants' student loan business, Ezekial and Lazarus. (USF ¶ 82A). Dean Robbins maintained the company's CRM on-site and made periodic visits to Defendants' sales floor to handle CRM issues as they cropped up. (USF ¶ 82). His other responsibilities included: purchasing web-hosting and domain name services, (USF ¶ 84), creating and maintaining websites, (USF ¶ 85), buying and evaluating leads, (USF ¶ 86), setting up virtual office and mail forwarding services, (USF ¶ 87), obtaining payment processing services, (USF ¶ 88), and providing payment information to Defendants' payment processors to allow them to debit consumers' accounts, (USF ¶ 89).

Dean Robbins was a named defendant in the North Carolina complaint and he signed the resulting Consent Order. (USF ¶ 90). He was also aware of the Oregon and Washington law enforcement actions and signed an AVC with the State of Oregon on behalf of D.O.R.M. Group. (USF ¶ 91). In addition, he received at least one consumer complaint from the Better Business Bureau. (USF ¶ 92). He also was familiar with law enforcement actions against other student debt relief companies for allegedly taking upfront fees. (USF ¶ 93).

### 4.    Labiba Velazquez (née Radwan)

Labiba Valazquez was the Director of Operations for Elegant, Trend,

Tribune and Heritage.[8] (USF ¶ 94). She was responsible for deciding how much and when to send payments to consumers' lenders, (USF ¶ 99), addressing issues with Defendants' payment processors, (USF ¶ 100), assisting in "developing strategies and implementation plans to improve and standardize all aspects of operations," ensuring "that operations processes stay within agreed upon budgets and timelines," (USF ¶¶ 96, 97), and handling Human Resources issues, including hiring sales representatives, (USF ¶ 101).

Velazquez was aware of the state law enforcement actions brought by North Carolina, Washington, and Oregon. (USF ¶ 102). She also received consumer complaints, including from consumers stating that the company was a "scam." (USF ¶ 103).

## II.   ARGUMENT

Summary judgment is appropriate on all counts because "there is no genuine dispute as to any material fact and [the FTC] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are "facts that might affect the outcome of the suit," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and the Court views the evidence in the light most favorable to the non-moving party. *FTC v. Stefanchik*, 559 F.3d 924, 927 (9th Cir. 2009). "Once the moving party has met its burden, the non-moving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Dizon v. Asiana Airlines Inc*., 240 F. Supp. 3d 1036, 1039 (C.D. Cal. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986)). Additionally, "[a] genuine issue of material fact must be more than a scintilla of evidence, or evidence that is

---

[8] Labiba Velazquez shared a corner office at 3 Studebaker with Rima Radwan. (USF ¶¶ 51, 98).

merely colorable or significantly probative." *Id.* at 1040 (citing *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000)).

Here, there is no genuine dispute regarding any material fact relating to Defendants' liability for the deceptions and rule violations at the heart of the scheme, rendering them liable under all counts. Defendants' purported affirmative defenses fail to raise any material factual dispute necessitating trial. Defendants are thus liable for the full amount paid by consumers less any refunds. Finally, injunctive relief is needed to deter and prevent future misconduct.

## A.    Defendants Violated the FTC Act and TSR.

Defendants engaged in deceptive practices and collected unlawful fees through the telemarketing and sale of purported student loan debt relief services.

### 1.    Defendants Violated § 5(a) of the FTC Act (Count I).

There is no genuine factual dispute that Defendants made deceptive representations concerning their student loan debt relief services in violation of the FTC Act's prohibition against "deceptive acts or practices." 15 U.S.C. § 45(a). "An act or practice is deceptive if 'first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material.'" *Stefanchik*, 559 F.3d at 928 (quoting *FTC v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001)).

Courts examine the overall "net impression" that a claim conveys and its tendency or capacity to deceive. *FTC v. Cyberspace.com*, 453 F.3d 1196, 1200 (9th Cir. 2006); *FTC v. Data Med. Capital*, No. SA CV 99-1266 AHS (EEx), 2010 WL 1049977, at *28 (C.D. Cal. Jan. 15, 2010). A representation is likely to mislead consumers when "(1) such representation was false or (2) the advertiser lacked a reasonable basis for its claims." *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d. 1052, 1067 (C.D. Cal. 2012). Express claims are presumed to be

material to consumers, and it is reasonable for consumers to rely on them. *See, e.g.*, *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994); *FTC v. Lights of Am., Inc.*, No. SACV10-01333 JVS (MLGx), 2013 WL 5230681, at *41 (C.D. Cal. Sep. 17, 2013).

### a. <u>Defendants made at least three types of false or unsubstantiated representations</u>.

The undisputed facts show Defendants made at least three false or unsubstantiated claims to induce consumers to purchase their student loan debt relief services (Count I). First, Defendants represented that consumers would be enrolled in a repayment plan that would reduce their monthly payments to specific lower amounts (*e.g.*, $51.67 per month) or result in their loan balances being forgiven. *Supra* pp. 2-4 (§I.A.). Defendants pretended they obtained the new monthly payment amounts on consumers' loans. In fact, they routinely falsified consumers' employment statuses, incomes, or numbers of dependants to enroll them in programs for which they were not eligible. *Supra* pp. 5-6 (§ I.C.). Defendants then kept the money consumers thought they were paying according to the "new" loan terms that Defendants had quoted them. *Supra* pp. 6-8 (§ I.C.).

Further, many consumers did not obtain the loan forgiveness they were promised – despite Defendants' claims, there are no programs that provide loan forgiveness in three or seven years. To the contrary, Defendants' practices actually hindered consumers from making payments towards loan forgiveness because Defendants enrolled consumers in repayment programs for which they did not qualify. *Supra* pp. 12-13 (§ I.F.). Thus, Defendants' claims were false or unsubstantiated.

Second, Defendants represented that most or all of consumers' monthly payments to Defendants would be applied toward consumers' student loans. *Supra* p. 3 (§I.A.). In fact, Defendants kept most of the funds and placed only a small

portion of consumers' monthly payments into a "trust" account for intended payment to consumers' lenders. *Supra* pp. 4-5 (§ I.B.). Futhermore, Defendants routinely failed even to apply these limited "trust" payments to consumers' loans.

Defendants blame these lender payment issues on their payment processors. Yet despite knowing since 2014 that payments were not being made to consumers' lenders, they did not terminate two of these processors, Payment Automation Network and Electronic Payment Systems, until January 2016 and October 2017, respectively. (USF ¶ 198). Moreover, even when Defendants identified consumers with "trust" balances that should have been paid to their lenders, Defendants routinely paid only a portion of these funds to consumers' lenders. (USF ¶ 202).

Third, Defendants represented that they would or had purchased or otherwise assumed responsibility for the servicing of consumers' student loans. *Supra* pp. 3-4 (§I.A). This claim is false or unsubstantiated because Defendants are not federal loan servicers, nor are they in any way affiliated with the Department of Education or federal loan servicers. Rather, Defendants merely inserted themselves as middlemen between consumers and their actual servicers, severing communications between them. *Supra* p. 8 (§I.C.3.).

### b. <u>Defendants' misrepresentations were likely to and did mislead reasonable consumers, and were material.</u>

As described above, Defendant' claims were likely to deceive reasonable consumers because they were false or unsubstantiated. *John Beck*, 865 F. Supp. 2d at 1067. Here, the deceptiveness of Defendants' representations is readily apparent. Defendants preyed on consumers heavily in debt and looking for an affordable way to repay their student loans. They promised to get consumers a specific, lower repayment amount or into a forgiveness program and, in many instances, used bogus applications to ensure zero funds would go towards consumers' student loans. Defendants blatently misrepresented who they were, informing consumers

they had purchased consumers' loans and routinely claimed they were servicing those loans. *Supra* pp. 2-4, 5-9 (§§I.A., I.C.).

Although the service contract contained disclaimer language (that changed over time), including the statement "that Company is a private organization, not a lender and not affiliated with the Department of Education and/or government," that disclaimer was one part of a lengthy auto-filled contract that some consumers describe having to review electronically while the telemarketers were talking to them. *Supra* p. 4 (§I.A.). Defendant Robbins indicated that the form would jump from signature line to signature line, further dimishing the likelihood that consumers would see, much less understand, any of the disclaimers, which contradicted Defendants' express sales claims. (USF ¶ 177). As such, any disclaimers failed to cure the deceptive net impression made by Defendants' misrepresentations. *Cyberspace.com*, 453 F.3d at 1200 (affirming summary judgment finding that marketing materials were likely to mislead consumers acting reasonably under the circumstances as a matter of law, despite disclosures).

Further, consumers only received the contract *after* they had heard Defendants' sales pitch, provided the telemarketers with their personal information, and indicated they agreed to sign up. *Resort Car Rental v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) ("The Federal Trade Act is violated if [the advertising] induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract."); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001).

Additionally, though not required, there is proof of actual deception in this case that consumers were, in fact, misled. *Cyberspace.com*, 453 F.3d at 1201 ("Although '[p]roof of actual deception is unnecessary to establish a violation of Section 5,' such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances." (citation omitted)).

Defendants received at least hundreds of consumer complaints, corroborating the deception described by nineteen consumer declarants. *Supra* p. 9 (§I.D.).

All three claims are presumed material because they are express representations that go to the heart of the debt relief services promised by Defendants. *Pantron I Corp.*, 33 F.3d at 1095-96 (holding that express claims are presumptively material) (citing *FTC v. Thompson Medical Co.*, 104 F.T.C. 648, 816 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986)). Further, the claims were likely to, and did, affect consumers conduct. *Cyberspace.com*, 453 F.3d at 1201 (defining materiality as likely to affect consumers' conduct). Consumers would not have signed up for Defendants' services if they knew that Defendants would not obtain for them the promised lower, monthly payments, make only sporadic, if any, payments on their student loans, and sever their communications with their actual loan servicers. (USF ¶ 238).

### 2.    Defendants Violated the TSR (Counts II and III).

Defendants also violated the TSR by charging unlawful advance fees and making material misrepresentations about their purported debt relief services. 16 C.F.R. Part 310. As a preliminary matter, Defendants provided "debt relief services" as defined in the TSR by promising to alter the terms of consumers' student loans by obtaining a specific lower monthly payment amount, consolidating loans, and placing consumers in "forgiveness plans."[9] *See Consumer Fin. Prot. Bureau v. IrvineWebWorks, Inc.*, No. SACV 14-1967 JVS(ANx), 2016 WL 1056662, at *7 (C.D. Cal. Feb. 5, 2016) (holding student loan debt relief

---

[9] Under the TSR, a "debt relief service" means "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector." 16 C.F.R. § 310.2(o).

services were "debt relief services" under the TSR); *see also FTC v. Am. Fin.
Benefits Ctr.*, 324 F. Supp. 3d 1067, 1082 (N.D. Cal. 2018).

Defendants violated the TSR's prohibition on collecting advance fees for
debt relief services. 47 C.F.R. § 310.4(a)(5)(i). As discussed above, throughout the
complaint period, Defendants regularly collected payments from consumers before
providing any services. Their so-called "trust" account also failed to satisfy the
TSR's specifically enumerated requirements for permitted escrow accounts for
consumers' payments. 16 C.F.R. § 310.4(a)(5)(ii). Defendants admit that the funds
in the holding accounts were controlled by Defendants (and not consumers as
required by the Rule) and that they did not pay interest on consumers' balances. 16
C.F.R. § 310.4(a)(5)(ii)(B), (C), (E). Thus, Defendants' practices still constituted
the collection of advance fees.

Defendants also violated the TSR's prohibition on making material
misrepresentations about debt relief services. 47 C.F.R. § 310.3(a)(2)(x). As
discussed above, Defendants misrepresented the monthly payment and forgiveness
benefits they would obtain for consumers as well as the application of payments to
consumers' student loans. Defendants also misrepresented that they had taken over
servicing or had purchased consumers' student loans. *Supra* pp. 2-4 (§I.A.).

### 3. Corporate Defendants Formed a Common Enterprise.

The defining concept of a common enterprise is operating through a "maze
of interrelated companies" evidenced by shared control, office space, employees,
and/or services. *See Delaware Watch v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964);
*FTC v. Network Servs. Depot*, 617 F.3d 1127, 1142 (9th Cir. 2010) ("[E]ntities
constitute a common enterprise when they exhibit either vertical or horizontal
commonality—qualities that may be demonstrated by a showing of strongly
interdependent economic interests or the pooling of assets and revenues."); *accord
FTC v. J.K. Pub'ns, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000) (common

enterprise shown where corporate defendants were under common control; shared office space, employees, and officers). This standard is easily met here where Defendants conducted their debt relief scheme through an interrelated network of companies that are commonly owned or controlled by the Individual Defendants.

Defendants operated this common enterprise since at least mid-2014 through Heritage and Tribune and then transitioned their scheme in 2016 to Dark Island, Elegant and Trend. *Supra* pp. 10-11 (§ I.E.). All of the Corporate Defendants have been or are owned or controlled by the same three Individual Defendants:  Mazen Radwan, Rima Radwan, and Dean Robbins. (USF ¶ 128). The same three individuals each had signatory control over the corporate funds in all five Corporate Defendants' depository bank accounts. (USF ¶¶ 29, 57, 83). Each was issued copies of credit cards for at least two different corporate American Express accounts. (USF ¶¶ 29, 57, 83). And Mazen Radwan, Rima Radwan, and Dean Robbins described themselves as officers of each Corporate Defendant in bank account applications. (USF ¶ 130). Defendants Heritage, Trend and Elegant had a fourth control person: Labiba Velazquez. Velazquez served as the Director of Operations for those companies starting in April 2014. (USF ¶ 94). She also had a corporate Amex card. (USF ¶ 94A).

In addition to common ownership and control, several of the Corporate Defendants shared employees and common office locations to perpetuate their scheme. (USF ¶¶ 129, 131). Corporate Defendants also comingled funds. (USF ¶ 132). As a common enterprise, Defendants are jointly and severally liable for the acts and practices alleged in the complaint. *FTC v. Johnson*, 156 F. Supp. 3d 1202, 1207 (D. Nev. 2015); *Data Med. Capital*, 2010 WL 1049477, at *23.

### 4.    Individual Defendants Are Personally Liable.

An individual defendant may be held liable not only for his or her own unlawful conduct but may also be subject to injunctive and monetary relief for any

corporate violations. To establish individual liability for injunctive relief based on corporate violations of Section 5 of the FTC Act, the FTC must show that the individual participated directly in the violative acts or practices or had authority to control them. *Network Servs. Depot*, 617 F.3d at 1138 n.9 ("Individual liability for injunctive relief under the Act has no mental state requirement[.]"). In general, an individual's status as an officer, or as someone with the authority to sign documents on the corporation's behalf, gives rise to a presumption of authority to control a small closely held corporation. *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170-71 (9th Cir. 1997).

Mazen Radwan, Rima Radwan, Velazquez and Robbins are each liable for injunctive relief based on their participation in the debt relief scheme. Each is an officer of all five Corporate Defendants and was instrumental in obtaining or managing services on behalf of the Corporate Defendants: Mazen Radwan obtained Defendants' telecommunications and merchant processing accounts, (USF ¶¶ 41-43); Velazquez was a customer contact for merchant processing services, (USF ¶ 100); Rima Radwan handled Defendants' payroll company, (USF ¶ 65A); and Robbins set up Defendants' virtual offices and created the CRM software that Defendants used to operate their debt relief scheme, (USF ¶¶ 81, 87). And Individual Defendants Mazen Radwan, Rima Radwan, and Robbins were equal owners of all five Corporate Defendants, signatories on Corporate Defendants' bank accounts, and holders of one or more of the Corporate Defendants' credit cards. *Supra* pp. 13-16 (§ I.G.). Although she was not an owner, Defendant Velazquez participated closely in the business, as evidenced by her routinely receiving sales reports, handling human resources for the Corporate Defendants, addressing issues with Defendants' payments processors, and making decisions about the amount and timing of payments to consumers' lenders. (USF ¶¶ 95, 99, 101).

An individual is further liable for monetary redress for corporate practices if the individual had, or should have had, knowledge or awareness of the corporate defendant's misrepresentations. *Network Servs. Depot*, 617 F.3d at 1138-39; *Stefanchik*, 559 F.3d at 931. This knowledge element, however, need not rise to the level of subjective intent to defraud consumers. *FTC v. Affordable Media*, 179 F.3d 1228, 1234 (9th Cir. 1999). Instead, the FTC need only demonstrate that the individual had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such representations, or an awareness of a high probability of fraud, coupled with an intentional avoidance of the truth. *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 600 (9th Cir. 2016). An individual's "degree of participation in business affairs is probative of knowledge." *Affordable Media*, 179 F.3d at 1235 (quoting *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 574 (7th Cir. 1989) (individual defendants' control of telemarketing company was "strong evidence of … knowledge")).

The Individual Defendants are each liable for monetary relief based on this standard. In addition to being officers and/or owners of the Corporate Defendants, all four were aware of the North Carolina, Oregon, and Washington actions against some of the Individual Defendants, Heritage, Tribune, and predecessor companies. *Supra* pp. 8-9 (§ I.D.). These actions, which included allegations nearly identical to the allegations in the FTC's complaint, should have at the very least put Defendants on notice that their practices were unlawful.

In addition, Defendants received at least hundreds of consumer complaints, including from consumers alleging Defendants' business was a scam. *Supra* p. 9 (§ I.D.). As the owners and/or officers of the Corporate Defendants, Mazen Radwan, Rima Radwan, Dean Robbins, and Labiba Velazquez were or should have been aware of these complaints; in fact, each personally received at least one such complaint. (USF ¶¶ 49, 73, 92, 103).

Defendants' CRM software, which Robbins created and maintained, also contains data showing that more than a quarter of Defendants' customers cancelled. (USF ¶ 81). According to Defendants' training materials, two of the top five reasons consumers cancelled were, "I didn't know I am paying fees, I thought the money I pay you goes towards my loans" and "My Loan Manager lied to me." (USF ¶ 242). Again, these cancellations should have at the very least put Individual Defendants on notice that their conduct was unlawful. Thus, there is no genuine issue of material fact disputing that each of the Individual Defendants had at least constructive, if not actual, knowledge of the unlawful conduct and therefore are liable for monetary relief.

**B.** **Defendants' So-Called Affirmative Defenses Fail to Raise any Genuine Issue of Material Fact Warranting Trial.**

Defendants' purported Affirmative Defenses in their Answer fail to raise any genuine issues of material fact necessitating trial. First, most of Defendants' Affirmative Defenses, including Affirmative Defense Numbers 2, 3, 4, 6, 7, 9, and 10, amount to bare factual denials.[10] *Cf. Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002) ("A defense which demonstrates that plaintiff has not met its burden of proof as to an element plaintiff is required to prove is not an affirmative defense."); *Figueroa v. Islands Rests. L.P.*, No. CV 12-00766-RGK (JCGx), 2012 WL 2373249, at *2-3 (C.D. Cal. June 22, 2012) (noting that "[n]egative defenses that are pled as affirmative defenses are subject to a motion to

---

[10] Defendant Velazquez filed her Answer, and the other Defendants filed an amended Answer, on March 8, 2020, more than six months after the deadline. Dkt. Nos. 128, 129; *see also* Dkt. No. 67 (summons requiring Answer by Sept. 4, 2019). Plaintiff may seek the appropriate sanctions, including preclusion of affirmative defenses or striking the untimely Answers if the Court does not moot such relief by granting summary judgment.

strike under Rule 12(f)"). Defendants' unsupported assertions do not demonstrate an actual material issue requiring trial. *See Addisu*, 198 F.3d at 1134.

Defendants also assert as Affirmative Defenses two issues that would not be a defense here, even if true. Affirmative Defense Number 1 asserts that Defendants' representations were good faith sales practices. However, a defendant cannot avoid liability under Section 5 of the FTC Act by showing that he acted in good faith because the statute does not require an intent to deceive. *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1084 (C.D. Cal. 2012), *aff'd in relevant part*, 815 F.3d 593 (9th Cir. 2016); *FTC v. USA Fin., LLC*, 415 Fed. Appx. 970, 974 n.2 (11th Cir. 2011). Similarly, Affirmative Defense Number 8 asserts that the FTC lacks authority under Section 13(b) of the FTC Act to seek relief which Defendants claim are "civil monetary penalties." However, the Ninth Circuit has recently and "repeatedly held that §13 of the FTC Act 'empowers district courts to grant any ancillary relief necessary to accomplish complete justice, including restitution.'" *FTC v. AMG Capital Mgmt., LLC*, 910 F.3d 417, 426 (9th Cir. 2018) (internal citations and quotations omitted).

### C. The Equitable Monetary Relief the FTC Seeks Is Reasonable and Appropriate.

Where consumers suffer economic injury from violations of the FTC Act, equity requires monetary relief equal to the resulting injury. *See Stefanchick*, 559 F.3d at 931 (affirming summary judgment award equal to the full amount of loss incurred by consumers); *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1011 (N.D. Cal. 2010) ("[because the] FTC Act was designed to protect consumers from economic injuries . . . courts have often awarded restitution in the full amount of funds lost by consumers rather than limiting restitution solely to a defendant's profits"). The correct measure of the monetary award appropriate is "the amount of money paid by consumers, less any refunds made." *Commerce Planet*, 878 F.

Supp. 2d at 1088; *see also Stefanchik*, 559 F.3d at 931; *FTC v. Inc21.com Corp.*, 475 Fed. Appx. 106, 110 (9th Cir. 2012). So long as the FTC reasonably approximates the amount of consumer harm, that damage figure should stand unless a defendant can show it is not reasonable. *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) (the risk of uncertainty of a monetary judgment should fall on the wrongdoer whose illegal conduct created that uncertainty); *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997).

Here, the uncontroverted evidence supports the entry of an equitable monetary award of $27,584,969.00 against all Defendants in Section VI of the Proposed Order. This figure represents the gross revenues of Elegant Solutions, Trend, Heritage, and Tribune, minus refunds and payments to lenders.[11]

### D.    The FTC Seeks Appropriate Injunctive Relief.

In addition to a monetary award, the FTC requests that the Court enter the proposed injunctive relief to prevent future violations of the FTC Act. Section 13(b) of the FTC Act provides that "after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b). *See also Pantron I Corp.*, 33 F.3d at 1102 (FTC Act provides courts with broad authority to grant any ancillary relief necessary to accomplish complete justice). A permanent injunction is appropriate where there is a "cognizable danger of recurrent violation," *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953), or some "reasonable likelihood of future violations," *CFTC v. CoPetro Mktg Grp., Inc.*, 680 F.2d 573, 582 n.16 (9th Cir. 1982). To determine the appropriate scope of an injunction, courts analyze: "(1) the seriousness and deliberateness of the violation; (2) the ease with which the violative claims may be transferred to other products [or services]; and (3) whether

---

[11] These revenues are pulled from Defendants' corporate tax filings, profit and loss statements, and depository account records. (USF ¶¶ 230-32).

the [defendant] has a history of prior violations." *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1055 (9th Cir. 2014) (citation omitted).

The proposed injunctive relief is appropriate given the seriousness of the FTC Act violations, the scope of consumer injury, the transferability of the false claims at issue to other products and services, and the recidivism of the Defendants. It takes little imagination to see Individual Defendants attempting to use Corporate Defendants for future illegal ventures or incorporating a new entity in hopes of carrying on such ventures undetected. Indeed, Defendants have demonstrated that when they garner too many complaints or face legal inquiries under existing company names, they have simply re-incorporated under new company names and continued to violate the FTC Act and the TSR.

The proposed ban on debt relief products or services in Section I of the Proposed Order is appropriate given Defendants' recidivist abusive practices towards desperate consumers. Because Defendants demonstrated an inability to engage in the debt relief business lawfully, only a permanent ban will assure they will not be able to take advantage of consumers in the future. Courts in the Ninth Circuit have approved similar bans as proper injunctive relief. *See, e.g.*, *FTC v. A1 DocPrep, Inc.*, CV17-07044-SJO (JCx) (C.D. Cal. Nov. 16, 2018); *FTC v. Alliance Document Preparation LLC*, cv-17-07048 SJO (KS) (C.D. Cal. Sept. 5, 2018); *FTC v. John Beck Amazing Profits, LLC*, 888 F. Supp. 2d 1006, 1014-15 (C.D. Cal. 2012); *FTC v. BAM Fin., LLC*, SACV15-01672 (C.D. Cal. July 11, 2016) (debt collection); *Inc21.com*, 745 F. Supp. 2d at 1010 (ban on telephonic billing); *FTC v. Medicor, LLC*, No. CV 01-1896 CBM (EX), 2002 WL 1925896, at *1-2 (C.D. Cal. Jul. 18, 2002) (telemarketing and work-at-home medical billing opportunities bans).

Section II of the Proposed Order is appropriate given Defendants' deceptive telemarketing. Defendants admit to conducting both outbound and inbound

telemarketing of their student loan debt relief business. A permanent injunction banning Defendants from telemarketing as well as debt relief services is appropriate in light of their recidivism and knowledge of wrongdoing. Their cavalier attitude about complying with the state orders suggests that nothing short of a ban will protect consumers.

The other proposed injunctive prohibitions are reasonably related to Defendants' illegal practices and have sufficient breadth to provide appropriate fencing-in relief. *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965) (violations of FTC Act justify fencing-in relief); *Litton Indus. v. FTC*, 676 F.2d 364, 370 (9th Cir. 1982); *FTC v. Wellness Support Network*, No. 10-cv-04879-JCS, 2014 WL 644749, at *21 (N.D. Cal. Feb. 19, 2014); *John Beck*, 888 F. Supp. 2d at 101. Sections III, IV, and V are appropriate because Defendants' fraud is easy to transfer to any good or service. These sections provide important fencing-in relief to help ensure that Defendants will not transfer their scheme to other types of products or services.

Sections VIII through XV of the Order contain reporting and monitoring provisions that are standard in FTC fraud cases and will serve to aid the FTC in monitoring Defendants' compliance with the provisions of the Order if entered by the Court. *See, e.g.*, *FTC v. A1 DocPrep, Inc.*, CV17-07044-SJO (JCx) (C.D. Cal. Nov. 16, 2018); *FTC v. Alliance Document Preparation LLC*, cv-17-07048 SJO (KS) (C.D. Cal. Sept. 5, 2018); *FTC v. M&T Fin. Grp.*, CV17-6855-ODW(PLAx) (C.D. Cal. June 8, 2018); *FTC v. OMICS Grp.*, 374 F. Supp. 3d 994, 1014, 1022-24 (D. Nev. 2019) ("monitoring provisions are necessary to ensure compliance").

## III.   CONCLUSION

For the foregoing reasons, the FTC requests that the Court grant its motion for summary judgment on all counts and issue the proposed summary judgment order against Defendants.

1

2

3     Dated:  March 9, 2020                    Respectfully submitted,

4                                             /s/ K. Michelle Grajales

5                                             K. Michelle Grajales
                                              Samuel F. Jacobson
6                                             Attorneys for Plaintiff

7                                             FEDERAL TRADE COMMISSION

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28