K. MICHELLE GRAJALES
mgrajales@ftc.gov
SAMUEL JACOBSON
sjacobson@ftc.gov
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., NW
Mail Stop: CC-10232
Washington, DC  20580
(202) 326-3172

JOHN D. JACOBS, Cal. Bar. No. 134154
Local Counsel
jjacobs@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Blvd., Ste. 400
Los Angeles, CA 90024
Tel: (310) 824-4343; Fax: (310) 824-4380
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>ELEGANT SOLUTIONS, INC., et al.<br><br>Defendants. | Civ. No. 8:19-cv-01333-JVS-KES<br><br>**PLAINTIFF'S UNCONTROVERTED STATEMENT OF FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF SUMMARY JUDGMENT**<br><br>**Judge: Hon. James V. Selna**<br>**Hearing Date: April 6, 2020**<br>**Time: 1:30 p.m.**<br>**Courtroom: 10C** |

## I.  UNCONTROVERTED FACTS

| Uncontroverted Fact | Supporting Evidence / Authority |
|---|---|
| **I.  BACKGROUND** | |
| **A. CORPORATE DEFENDANT BACKGROUND** | |
| 1.  Elegant Solutions, Inc., also d/b/a Federal Direct Group ("Elegant Solutions"), was incorporated in South Dakota in May 2016. | Dkt. 56 (Answer ¶ 6); Dkt. 25, PX 20 at 685, 743-44 (Goldstein Decl. ¶ 21, Att. A); PX 34 (R. Radwan trans. at 69:9-15) (Elegant Solutions did business as Federal Direct Group). |
| 2.  Elegant Solutions listed its principal executive office as 110 E. Center St., Ste. 2053, Madison, SD 57042 in its Articles of Incorporation. | Dkt. 56 (Answer ¶ 6); Dkt. 25, PX 20 at 685, 744, 747-48 (Goldstein Decl. ¶ 22, Att. A). |
| 3.  Elegant Solutions conducted business at 3 Studebaker, Irvine, CA 92618. | Dkt. 25, PX 36 (Robbins trans. at 40:9-12); PX 38 (Sanchez trans. at 29:3-11); PX 39 (Lopez trans. 23:21-24); PX 20 at 689, 768, 775 (Goldstein Dec. ¶¶ 36, 39, Atts. F-G). |

| 4. | Elegant Solutions has also used 300 Spectrum Center Drive #400, Irvine, CA 92618 as its business address in communications with banks and service providers. | Dkt. 56 (Answer ¶ 6); Dkt. 25, PX 20 at 686, 751 (Goldstein Decl. ¶ 27, Att. A). |
|---|---|---|
| 5. | Elegant Solutions is registered as a foreign corporation in California. | Dkt. 56 (Answer ¶ 6); Dkt. 25, PX 20 at 686, 747 (Goldstein Decl. ¶ 24, Att. A). |
| 6. | Federal Direct Group is registered with the South Dakota Secretary of State as a d/b/a of Elegant Solutions. | Dkt. 56, Answer ¶ 6; Dkt. 25, PX 20 at 685-86, 746 (Goldstein Decl. ¶ 23, Att. A). |
| 7. | Trend Capital Ltd., also d/b/a Mission Hills Federal ("Trend Capital"), was incorporated in South Dakota in June 2016. | Dkt. 56 (Answer ¶ 7); Dkts. 25, 25-1, PX 20 at 694, 844-46 (Goldstein Decl. ¶ 59, Att. M); PX 34 (R. Radwan trans. at 70:9-13). |
| 8. | Trend Capital is registered to do business in California as a foreign corporation. | Dkt. 56 (Answer ¶ 7); Dkts. 25, 25-1, PX 20 at 695, 848 (Goldstein Decl. ¶ 62, Att. M). |
| 9. | Trend Capital has listed its principal executive office as 110 E. Center St., Ste. 2053, Madison, SD 57042 in its Articles of Incorporation. | Dkt. 56 (Answer ¶ 7); Dkts. 25, 25-1, PX 20 at 695, 845, 847-48 (Goldstein Decl. ¶ 60, Att. M). |
| 10. | Trend Capital conducted business at 3 Studebaker, Irvine, CA 92618. | Dkt. 56 (Answer ¶ 7); Dkts. 25, 25-1, PX 20 at 696, 861, 863, 869 (Goldstein Decl. ¶ |

PLAINTIFF'S UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 8:19-cv-01333-JVS-KES

| | |
|---|---|
| | 70, Atts. O-P);  PX 36 (Robbins trans. at 40:9-18); PX 39 (Lopez trans. 23:21-24). |
| 11.  Trend Capital used a business address of 30211 Avenida del las Banderas #200, Rancho Santa Maragarita, CA 92688 in bank correspondence. | Dkt. 56 (Answer ¶ 7); Dkts. 25, 25-1, PX 20 at 696, 852 (Goldstein Decl. ¶ 66, Att. M). |
| 12.  Mission Hills Federal is registered with the South Dakota Secretary of State as a d/b/a of Trend Capital. | Dkt. 56 (Answer ¶ 7); Dkts. 25, 25-1, PX 20 at 695, 847 (Goldstein Decl. ¶ 61, Att. M). |
| 13.  Dark Island Industries, Inc., f/k/a Cosmopolitan Funding, Inc. ("Dark Island"), was incorporated in South Dakota in May 2016. | Dkt. 56 (Answer ¶ 8); Dkts. 25, 25-1, PX 20 at 690, 779-83 (Goldstein Decl. ¶¶ 42, 44, Att. H). |
| 14.  Dark Island has listed its principal executive office as 110 E. Center St., Ste. 2053, Madison, SD 57042 in its Articles of Incorporation. | Dkt. 56 (Answer ¶ 8); Dkts. 25, 25-1, PX 20 at 690, 780, 786 (Goldstein Decl. ¶ 43, Att. H). |
| 15.  Dark Island conducted business at 3 Studebaker, Irvine, CA 92618. | Dkt. 56 (Answer ¶ 8); Dkts. 25, 25-1, PX 20 at 691, 784-85 (Goldstein Decl. ¶ 45, Att. H); PX 34 (R. Radwan trans. at 93:22-24); PX 39 (Lopez trans. 23:21-24). |
| 16.  Cosmopolitan Funding, Inc. was incorporated in South Dakota in May | Dkt. 56 (Answer ¶ 8); Dkts. 25, 25-1, PX 20 at 690, 779-83 |

| | |
|---|---|
| 2016 and renamed Dark Island Industries, Inc. in June 2016. | (Goldstein Decl. ¶¶ 42, 44, Att. H). |
| 17. Dark Island is registered to do business in California as a foreign corporation. | Dkt. 56 (Answer ¶ 8); Dkts. 25, 25-1, PX 20 at 690-91, 784 (Goldstein Decl. ¶ 45, Att. H). |
| 18. Dark Island did business as Federal Direct Group. | Dkts. 25, 25-1, PX 20 at 692, 793 (Goldstein Decl. ¶¶ 51-52, Att. I); PX 31 at 1523-34 (Saunders Supp. Decl. Att. A); PX 36 at 2153 (Robbins Ex. 14). |
| 19. Heritage Asset Management, Inc., also d/b/a National Secure Processing ("Heritage"), incorporated in South Dakota in May 2014. | Dkt. 56 (Answer ¶ 9); Dkts. 25, 25-1, 25-2, PX 20 at 698, 875-77 (Goldstein Decl. ¶ 79, Att. Q). |
| 20. Heritage is registered to do business in California as a foreign corporation. | Dkt. 56 (Answer ¶ 9); Dkts. 25, 25-2, PX 20 at 699, 880 (Goldstein Decl. ¶ 83, Att. Q). |
| 21. Heritage has listed its principal executive office as 110 E. Center St., Ste. 2053, Madison, SD 57042 in its Articles of Incorporation. | Dkt. 56 (Answer ¶ 9); Dkts. 25, 25-2, PX 20 at 699, 876 (Goldstein Decl. ¶ 80, Att. Q). |
| 22. Heritage has listed 6A Liberty #125, Aliso Viejo, CA 92656 as its business address in public documents. | Dkt. 56 (Answer ¶ 9); Dkts. 25, 25-2, PX 20 at 699, 880 (Goldstein Decl. ¶ 83, Att. Q); PX 36 (Robbins trans. at |

| | | 24:19-24). |
|---|---|---|
| 23. | National Secure Processing is registered with the South Dakota Secretary of State as a d/b/a of Heritage. | Dkt. 56 (Answer ¶ 9); Dkts. 25, 25-2, PX 20 at 699, 878 (Goldstein Decl. ¶ 81, Att. Q). |
| 24. | Tribune Management, Inc., also d/b/a The Student Loan Group ("Tribune"), incorporated in Nevada in August 2014. | Dkt. 56 (Answer ¶ 10); Dkts. 25, 25-2, PX 20 at 703, 927 (Goldstein Decl. ¶ 101, Att. X); PX 34 (R. Radwan trans. at 57:16-18) (Tribune did business as "SLG"). |
| 25. | Tribune has listed 6A Liberty Ste. 175, Aliso Viejo, CA 92656 as its business address in public documents. | Dkt. 56 (Answer ¶ 10); Dkts. 25, 25-2, PX 20 at 704, 934 (Goldstein Decl. ¶ 106, Att. X); PX 36 (Robbins trans. at 24:19-25:2). |
| 26. | The Student Loan Group is registered with the Nevada Secretary of State as a Fictitious Firm Name for Tribune. | Dkt. 56 (Answer ¶ 10); Dkts. 25, 25-2, PX 20 at 703, 929 (Goldstein Decl. ¶ 104, Att. X). |
| 27. | Tribune filed a Certificate of Dissolution in November 2017. | Dkt. 56 (Answer ¶ 10); Dkts. 25, 25-2, PX 20 at 704, 933 (Goldstein Decl. ¶ 105, Att. X). |

| II.    THE INDIVIDUAL DEFENDANTS WERE EACH DIRECTLY INVOLVED IN THE WRONGFUL CONDUCT | |
|---|---|
| **A. MAZEN RADWAN** | |
| 28.  Mazen Radwan was an owner of all five Corporate Defendants. | PX 35 (M. Radwan trans. at 19:21-20:2, 20:18-25); PX 36 (Robbins trans. at 22:16-18; 23:22-24, 27:23-25, 38:8-10; 41:16-19; 43:6-11); PX 40 at 2543-46 (Defendants Heritage, Tribune, Trend, Elegant, Mazen Radwan, Rima Radwan, and Dean Robbins's Response to Plaintiffs' Second Set of Interrogatories at 15-18); PX 40 at 2562 (Defendant Dark Island's Response to Plaintiff's Second Set of Interrogatories at 7). |
| 29.  Mazen Radwan was a signatory on Corporate Defendants' bank accounts and a holder of one or more of Corporate Defendants' credit cards. | Dkts. 25, 25-1, 25-2, PX 20 at 687-88, 693-94, 696; 700-02, 704-05, 708-13, 754-55, 825, 827, 829, 856-57, 888-89, 891, 893-96, 899-901, 903, 907, 912-14, 918-20, 936, 941-42, 948, 950-52 (Goldstein Decl. ¶¶ 29, 32-33, 55, 57, 69, 88, |

| | |
|---|---|
| | 90, 92, 95, 97, 108, 111, Atts. B-D, J, L, N, R-U, Y-Z); Dkt. 46, PX 25 at 1238, 1351 (Goldstein Supp. Decl. ¶¶ 14-15, Att. R); PX 35 (M. Radwan trans. at 120:18-121:15); |
| 30.  Mazen Radwan has held himself out as an officer of Elegant Solutions. | Dkt. 56 (Answer ¶ 11); Dkt. 25, PX 20 at 708-713, 751, 755 (Goldstein Decl., Table 1, Atts. A-B); PX 36 (Robbins trans. at 41:20-25); PX 40 at 2546 (Defendants Heritage, Tribune, Trend, Elegant, Mazen Radwan, Rima Radwan, and Dean Robbins's Response to Plaintiffs' Second Set of Interrogatories at 18). |
| 31.  Mazen Radwan has held himself out as an officer of Trend Capital. | Dkt. 56 (Answer ¶ 11); Dkts. 25, 25-1, PX 20 at 708-713, 849, 852, 858 (Goldstein Decl., Table 1, Atts. M-N); PX 36 (Robbins trans. at 38:11-17); PX 40 at 2545 (Defendants Heritage, Tribune, Trend, Elegant, Mazen |

| | Radwan, Rima Radwan, and Dean Robbins's Response to Plaintiffs' Second Set of Interrogatories at 17). |
|---|---|
| 32.  Mazen Radwan has held himself out as an officer of Dark Island. | Dkt. 56 (Answer ¶ 11); Dkts. 25, 25-1, PX 20 at 708-713, 785, 787, 825 (Goldstein Decl., Table 1, Atts. H, J); PX 36 (Robbins trans. at 43:12-15); PX 40 at 2562 (Defendant Dark Island's Response to Plaintiffs' Second Set of Interrogatories at 7). |
| 33.  Mazen Radwan has held himself out as an officer of Heritage. | Dkt. 56 (Answer ¶ 11); Dkts. 25, 25-2, PX 20 at 708-713, 879, 886, 888-89 (Goldstein Decl., Table 1, Att. Q-R); PX 36 (Robbins trans. at 22:23-23:6); PX 40 at 2543 (Defendants Heritage, Tribune, Trend, Elegant, Mazen Radwan, Rima Radwan, and Dean Robbins's Response to Plaintiffs' Second Set of Interrogatories at 15) |
| 34.  Mazen Radwan has held himself out as | Dkt. 56 (Answer ¶ 11); Dkts. |

| | |
|---|---|
| an officer of Tribune. | 25, 25-2, PX 20 at 708-713, 939, 957 (Goldstein Decl., Table 1, Att. Y-Z); PX 34, (R. Radwan trans. at 57:5-10); PX 36 (Robbins trans. at 23:25-24:3); PX 40 at 2544 (Defendants Heritage, Tribune, Trend, Elegant, Mazen Radwan, Rima Radwan, and Dean Robbins's Response to Plaintiffs' Second Set of Interrogatories at 16). |
| 35.  Mazen Radwan has used the aliases "Michael Radwan" and "Mike Radwan" in connection with Defendants' student loan debt relief business. | Dkt. 56 (Answer ¶ 11); Dkt. 25, PX 20 at 693-94, 700 (Goldstein Decl. ¶¶ 56, 86); PX 35 (M. Radwan trans. at 11:3-5). |
| 36.  Mazen Radwan, Rima Radwan, and Labiba Velazquez are siblings. | PX 34 (R. Radwan trans. at 16:20-17:4). |
| 37.  Mazen Radwan handled the Corporate Defendants' tax filings. | PX 35 (M. Radwan trans. at 71:1-4); see also PX 35 (M. Radwan trans. at 31:7-10) (Mazen Radwan kept apprised of Trend Capital's financials). |
| 38.  Mazen Radwan opened bank accounts for certain of the Corporate Defendants. | PX 34 (R. Radwan trans. at 63:18-64:3); PX 35 (M. |

| | |
|---|---|
| | Radwan trans. at 120:18-121:5); Dkts. 25, 25-1, 25-2, PX 20 at 687-88, 693-94, 696; 700-02, 704-05, 708-13 (Goldstein Decl. ¶¶ 28-30, 32-33, 55, 57, 69, 88-89, 90, 92, 95, 97, 108, 111, Atts. B-D, J, L, N, R-U, Y-Z). |
| 39. Mazen Radwan leased an office in South Dakota so that certain of the Corporate Defendants could be incorporated there. | PX 34 (R. Radwan trans. at 48:1-13); PX 35 (M. Radwan trans. at 94:12-95:11, 97:6-21). |
| 40. Mazen Radwan purchased Defendant Heritage and Tribune's corporate names. | PX 35 (M. Radwan trans. at 32:35-33:11). |
| 41. Mazen Radwan arranged for Internet services on behalf of the Corporate Defendants. | Dkts. 25, 25-1, PX 20 at 693-94, 832, 834-37, 839 (Goldstein Decl. ¶ 56, Att. K); PX 34 (R. Radwan trans. Ex. 20) (Cox Communications correspondence); PX 35 (M. Radwan trans. at 100:15-101:23, 158:8-15). |
| 42. Mazen Radwan applied for payment processing services for certain of the Corporate Defendants. | PX 35 (M. Radwan trans. at 122:6-123:2) ("I did some of the applications."). |

| | |
|---|---|
| 43. Mazen Radwan managed the relationship with Payment Automation Network, one of Defendants' payment processors. | PX 35 (M. Radwan trans. at 49:12-50:2, 52:11-53:21; 56:3-14, 74:17-75 & Ex. 4). |
| 44. Mazen Radwan maintained an office in the "car business" section of the 3 Studebaker offices and periodically attended management meetings with the other student loan business owners. | PX 35 (M. Radwan trans. at 195:1-4). |
| 45. Mazen Radwan provided initial funding for the student debt relief business. | PX 35 (M. Radwan trans. at 15:3-8, 16:15-18); PX 36 (Robbins trans. at 14:20-22); Dkt. 25-3, PX 20 at 977 (Goldstein Decl., Att. CC). |
| 46. Mazen Radwan was a named defendant in the complaint filed by the State of North Carolina in 2016 and signed the resulting Consent Order. | Dkt. 27, PX 22 at 1162-98 (N.C. Complaint); Dkt. 27, PX 22 at 1199-1205 (N.C. Consent Judgment). |
| 47. Mazen Radwan met with the State attorney prosecuting the North Carolina case, who explained why the State filed suit. | PX 35 (M. Radwan trans. at 37:1-7, 40:10-41:2, 41:12-24). |
| 48. Mazen Radwan knew about the State of Oregon and State of Washington actions. | PX 35 (M. Radwan trans. at 42:15-18, 43:14-23). |

| | |
|---|---|
| 49. Mazen Radwan received consumer complaints from the Better Business Bureau and payment processors, which he forwarded to General Manager Daisy Lopez for response. | PX 35 at 2030, 2037, 2044-46, 2055-56, 2064-65, 2074 (M. Radwan trans. at 64:17-25, 65:16-66:14, 80:15-23, 82:19-83:13, 87:22-89:13, 91:13-22, 106:13-107:23, 160:25-161:11 & Exs. 5, 6, 14). |
| **B. RIMA RADWAN** | |
| 50. Rima Radwan was an owner of all five Corporate Defendants. | PX 34 (R. Radwan trans. at 31:14-16, 55:15-16, 61:24-62:1; 89:8-10 (Dark Island); 108:1-7); PX 36 (Robbins trans. at 22:16-18; 23:22-24, 38:8-10; 41:16-19; 43:6-11); PX 40 at 2543-46 (Defendants Heritage, Tribune, Trend, Elegant, Mazen Radwan, Rima Radwan, and Dean Robbins's Response to Plaintiffs' Second Set of Interrogatories at 15-18); PX 40 at 2562 (Defendant Dark Island's Response to Plaintiff's Second Set of Interrogatories at 7). |
| 51. Rima Radwan shared a large corner office in the 3 Studebaker building with | PX 39 (Lopez trans. at 147:4-16); Dkt. 46, PX 25 at 1237- |

| | |
|---|---|
| co-Defendant Labiba Radwan. | 38, 1247 (Goldstein Supp. Decl. ¶¶ 7, 11, Att. A). |
| 52.  Rima Radwan has held herself out as an officer of Elegant Solutions. | Dkt. 56 (Answer ¶ 12); Dkt. 25, PX 20 at 708-713, 748-49, 751, 768-69 (Goldstein Decl., Atts. B, F); PX 34 (R. Radwan trans. at 62:2-63:1); PX 36 (Robbins trans. at 41:20-25); PX 40 at 2546 (Defendants Heritage, Tribune, Trend, Elegant, Mazen Radwan, Rima Radwan, and Dean Robbins's Response to Plaintiffs' Second Set of Interrogatories at 18). |
| 53.  Rima Radwan has held herself out as an officer of Trend Capital. | Dkt. 56 (Answer ¶ 12); Dkts. 25, 25-1, PX 20 at 708-713, 852-53, 869-70 (Goldstein Decl., Atts. M, P); PX 34 (R. Radwan trans. at 62:2-63:1); PX 36 (Robbins trans. at 38:11-17); PX 40 at 2545 (Defendants Heritage, Tribune, Trend, Elegant, Mazen Radwan, Rima Radwan, and Dean Robbins's Response to Plaintiffs' Second Set of |

| | Interrogatories at 17). |
|---|---|
| 54.  Rima Radwan has held herself out as an officer of Dark Island. | Dkt. 56 (Answer ¶ 12); Dkts. 25, 25-1, PX 20 at 708-713, 785-87, 825 (Goldstein Decl., Atts. H, J); PX 34 (R. Radwan trans. at 62:2-63:1); PX 36 (Robbins trans. at 43:12-15); PX 40 at 2562 (Defendant Dark Island's Response to Plaintiff's Second Set of Interrogatories at 7). |
| 55.  Rima Radwan has held herself out as an officer of Heritage. | Dkt. 56 (Answer ¶ 12); Dkts. 25, 25-2, PX 20 at 708-713, 879, 881, 886, 888-89 (Goldstein Decl., Atts. Q-R); PX 34 (R. Radwan trans. at 31:25-32:10); PX 36 (Robbins trans. at 22:23-23:6); PX 40 at 2543 (Defendants Heritage, Tribune, Trend, Elegant, Mazen Radwan, Rima Radwan, and Dean Robbins's Response to Plaintiffs' Second Set of Interrogatories at 15). |
| 56.  Rima Radwan has held herself out as an officer of Tribune. | Dkt. 56 (Answer ¶ 12); Dkts. 25, 25-2, PX 20 at 708-713, |

| | |
|---|---|
| | 938, 957 (Goldstein Decl., Atts. Y-Z); PX 34 (R. Radwan trans. at 56:2-10); PX 36 (Robbins trans. at 23:25-24:3); PX 40 at 2544 (Defendants Heritage, Tribune, Trend, Elegant, Mazen Radwan, Rima Radwan, and Dean Robbins's Response to Plaintiffs' Second Set of Interrogatories at 16). |
| 57.  Rima Radwan was a signatory on Corporate Defendants' bank accounts and a holder of one or more of Corporate Defendants' credit cards | Dkts. 25, 25-1, 25-2, PX 20 at 687-88, 693-94, 696; 700-02, 704-05, 708-13, 754-55, 825, 827, 829, 856-57, 888-89, 891, 893-96, 899-901, 903, 907, 912-14, 918-20, 936, 941-42, 948, 950-52 (Goldstein Decl. ¶¶ 29, 32-33, 55, 57, 69, 88, 90, 92, 95, 97, 108, 111, Atts. B-D, J, L, N, R-U, Y-Z); PX 34 (R. Radwan trans. at 63:18-64:3); Dkt. 46, PX 25 at 1238, 1351 (Goldstein Supp. Decl. ¶¶ 14-15, Att. R). |
| 58.  Rima Radwan had the idea to start the student debt relief business. | Dkts. 25-2, PX 20 at 975 (Goldstein Decl., Att. CC); PX |

| | |
|---|---|
| | 34 (R. Radwan trans. at 23:13-25:11); PX 35 (M. Radwan trans. at 15:3-8); PX 36 (Robbins trans. at 11:22-12:12). |
| 59.  Rima Radwan previously worked for two other student debt relief companies, StudentLoanProcessing.US and Student Loan Managers. | Dkts. 25-2, PX 20 at 975 (Goldstein Decl., Att. CC); PX 34 (R. Radwan trans. at 18:24-20:4). |
| 60.  StudentLoanProcessing.US was sued by the CFPB for deceiving consumers and taking advance fees. | *See CFPB v. IrvineWebWorks, Inc., et al.* SACV 14-1967 JVS (ANx) (2016) (Studentloanprocessing.us was a defendant); PX 34 (R. Radwan trans. 71:16-72:14, Ex. 4) (R. Radwan denies having read a copy of the stipulated final order from this case that was recovered from her work computer but recalled asking a former co-worker "Hey, look at Student Loan Processing.  I heard they had some consumer thing going on."). |
| 61.  Rima Radwan was "the brains [of] the | PX 36 (Robbins trans. at |

| | |
|---|---|
| operation." | 14:20-24); *see also*, PX 35 (M. Radwan trans. at 66:23-67:1) ("Rima was in charge of the business."). |
| 62. Rima Radwan's "duties" were to "run all of the operations and everything in the business." | Dkt. 99-2 (R. Radwan Declaration ¶ 16c); PX 34 (R. Radwan trans. at 48:19-23). |
| 63. Rima Radwan testified that her "primary role at Elegant Solutions was to set policy and address operations problems that came up through the supervisors or from employees." | Dkt. 99-2 (R. Radwan Declaration ¶ 15). |
| 64. Rima Radwan drafted sales scripts on behalf of the student debt relief business. | PX 34 (R. Radwan trans. at 130:22-131:2; 148:20-25, Ex. 27; 149:18-24; 151:12-22; 156:14-21); PX 40 at 2538-39 (Defendants Heritage, Tribune, Trend, Elegant, Mazen Radwan, Rima Radwan, and Dean Robbins's Response to Plaintiffs' Second Set of Interrogatories at 10-11). |
| 65. Rima Radwan trained customer service representatives on behalf of the student debt relief business. | Dkt. 99-2 (R. Radwan Declaration ¶ 15); PX 34 (R. Radwan trans. at 195:22-196:4); PX 38 (Sanchez trans. |

PLAINTIFF'S UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 8:19-cv-01333-JVS-KES

| | |
|---|---|
| | at 65:12-21) (Rima Radwan would "come down and motivate" the sales staff); PX 40 at 2538-39 (Defendants Heritage, Tribune, Trend, Elegant, Mazen Radwan, Rima Radwan, and Dean Robbins's Response to Plaintiffs' Second Set of Interrogatories at 10-11). |
| 65A.Rima Radwan handled employee payroll. | Dkt. 25, PX 20 at 688, 769 (Goldstein Decl., ¶ 35, Att. F). |
| 66.  Rima Radwan created the content for Elegant, Trend, Tribune, and Heritage's websites. | PX 36 (Robbins trans. at 49:7-11); PX 40 at 2538-39 (Defendants Heritage, Tribune, Trend, Elegant, Mazen Radwan, Rima Radwan, and Dean Robbins's Response to Plaintiffs' Second Set of Interrogatories at 10-11). |
| 67.  Rima Radwan decided on the corporate structure for the student debt relief business and when to re-brand. | PX 34 (R. Radwan trans. at 34:14-35:17); PX 35 (M. Radwan trans. at 31:21-32:11, 36:18-22); PX 36 (Robbins trans. at 27:15-19, 34:23-25). |
| 68.  Rima Radwan set the price for the | PX 35 (M. Radwan trans. at |

| | |
|---|---|
| student loan debt relief services offered by Corporate Defendants. | 164:9-14). |
| 69. Rima Radwan was a named defendant in the complaint filed by the State of North Carolina in 2016 and was aware of the State of Oregon and State of Washington actions. | Dkt. 27, PX 22 at 1162-98 (N.C. Complaint); PX 34 (R. Radwan trans. at 202:19-203:5 (North Carolina, 207:2-208:23 (Washington and Oregon); *see also* PX 35 (M. Radwan trans. at 42:5-12). |
| 70. Rima Radwan was familiar with law enforcement actions brought by the FTC and other government agencies against other student debt relief companies for making misrepresentations and taking upfront fees, including the action brought by the CFPB against her former employer. | PX 31 at 1557-1603 (Saunders Supp. Decl., Att. A); PX 34 (R. Radwan trans. at 36:5-36:9) (she followed the FTC's Game of Loans Sweep involving actions against student loan debt relief companies). |
| 71. Rima Radwan emailed a copy of the CFPB's civil investigative demand ("CID") to StudentLoanProcessing.US to Mazen Radwan and Robbins. | PX 31 at 1557-1603 (Saunders Supp. Decl. Att. A). |
| 72. On July 10, 2019, a proposed settlement order from the CFPB's lawsuit against StudentLoanProcessing.US was found on Rima Radwan's work computer. | PX 34 (R. Radwan trans. 71:16-72:14 & Ex. 4) (Radwan denies having knowledge of the order but states, "I would presume maybe [Counsel] |

| | Robert Bare sent it to me.") |
|---|---|
| 73. Rima Radwan received numerous consumer complaints, including from the Better Business Bureau. | Dkt. 46, PX 25 at 1238, 1314-30 (Goldstein Supp. Decl. ¶ 11 & Att. O); PX 34 (R. Radwan trans. at 75:2-76:6 & Ex. 18 (Rima Radwan negotiated with the BBB), 211:9-212:4 & Ex. 11, (Mazen Radwan forwarded consumer complaint to Rima Radwan and servicing manager), 213:10-214:18 & Ex. 13 (Skype conversation about handling BBB complaints), 220:22-221:13 & Ex. 16 (email that consumer complained to the FTC ), 222:24-223:8 & Ex. 21 (email about consumer complaint)). |
| **C. DEAN ROBBINS** | |
| 74. Dean Robbins was an owner of all five Corporate Defendants. | PX 34 (R. Radwan trans. 108:1-7); PX 36 (Robbins trans. at 22:16-18; 23:22-24, 38:8-10; 41:16-19; 43:6-11); PX 40 at 2543-46 (Defendants Heritage, Tribune, Trend, Elegant, Mazen Radwan, Rima |

|  |  |  |
|---|---|---|
|  |  | Radwan, and Dean Robbins's Response to Plaintiffs' Second Set of Interrogatories at 15-18); PX 40 at 2562 (Defendant Dark Island's Response to Plaintiff's Second Set of Interrogatories at 7). |
| 75. | Dean Robbins maintained a large office next to Rima Radwan and Labiba Velazquez's office in the 3 Studebaker building. | Dkt. 46, PX 25 at 1237-38, 1247 (Goldstein Supp. Decl. ¶¶ 7, 12 & Att. A); PX 39 (Lopez trans. at 147:11-6). |
| 76. | Dean Robbins has held himself out as an officer of Elegant Solutions. | Dkt. 56 (Answer ¶ 13); Dkt. 25, PX 20 at 708-713, 747, 751 (Goldstein Decl. Att. A); PX 36 (Robbins trans. at 41:20-25; PX 40 at 2546 (Defendants Heritage, Tribune, Trend, Elegant, Mazen Radwan, Rima Radwan, and Dean Robbins's Response to Plaintiffs' Second Set of Interrogatories at 18). |
| 77. | Dean Robbins has held himself out as an officer of Trend Capital. | Dkt. 56 (Answer ¶ 13); Dkts. 25, 25-1, PX 20 at 708-713, 848, 852, 858 (Goldstein Decl. Atts. M-N); PX 36 (Robbins |

| | |
|---|---|
| | trans. at 38:11-17); PX 40 at 2545 (Defendants Heritage, Tribune, Trend, Elegant, Mazen Radwan, Rima Radwan, and Dean Robbins's Response to Plaintiffs' Second Set of Interrogatories at 17). |
| 78.  Dean Robbins has held himself out as an officer of Dark Island. | Dkt. 56 (Answer ¶ 13); Dkts. 25, 25-1, PX 20 at 708-713, 785, 787, 825 (Goldstein Decl., Atts. H, J); PX 36 (Robbins trans. at 43:12-15); PX 40 at 2562 (Defendant Dark Island's Response to Plaintiff's Second Set of Interrogatories at 7). |
| 79.  Dean Robbins has held himself out as an officer of Heritage. | Dkt. 56 (Answer ¶ 13); Dkts. 25, 25-2, PX 20 at 708-713, 879, 886, 888-89 (Goldstein Decl., Atts. Q-R); PX 36 (Robbins trans. at 22:23-23:6); PX 40 at 2544 (Defendants Heritage, Tribune, Trend, Elegant, Mazen Radwan, Rima Radwan, and Dean Robbins's Response to Plaintiffs' Second |

| | |
|---|---|
| | Set of Interrogatories at 16). |
| 80. Dean Robbins has held himself out as an officer of Tribune. | Dkt. 56 (Answer ¶ 13); Dkts. 25, 25-2, PX 20 at 708-713, 938, 959 (Goldstein Decl., Atts. Y, AA); PX 36 (Robbins trans. at 23:25-24:6); PX 40 at 2544 (Defendants Heritage, Tribune, Trend, Elegant, Mazen Radwan, Rima Radwan, and Dean Robbins's Response to Plaintiffs' Second Set of Interrogatories at 16). |
| 81. Dean Robbins' primary responsibility was developing and maintaining the student loan business' Customer Response Management software ("CRM") and handling other technology issues. | Dkt. 56 (Answer ¶ 13); Dkt. 25-3, PX at 977-78 (Goldstein Decl., Att. CC), PX 34 (R. Radwan trans. Ex. 2) (meeting agenda with "Dean – programming, manage, oversee IT."); PX 36 (Robbins trans. at 14:20-24, 45:5-46:8); PX 38 (Sanchez trans. at 38:5-11) (Dean Robbins developed Defendants' CRM). |
| 82A. Dean Robbins developed two iterations of CRM software for Defendants' student loan business | PX 32 (Geiran Decl. ¶ 3); *see also*, Dkt. 54 at 4 (Receiver's Report) ("Several employees |

| | |
|---|---|
| named "Lazarus" and "Ezekial." | reported that Defendant Dean Robbins coded and maintained the CRM system, which has gone through several version, the latest of which is named Ezekial."). |
| 82. Dean Robbins maintained the company's CRM on-site and made periodic visits to Defendants' sales floor to handle CRM issues as they cropped up. | PX 38 (Sanchez trans. at 65:25-66:9, 120:23-121:18). |
| 83. Dean Robbins was a signatory on Corporate Defendants' bank accounts and a holder of one or more of Corporate Defendants' credit cards. | Dkts. 25, 25-1, 25-2, PX 20 at 687-88, 693-94, 696; 700-02, 704-05, 708-13, 754-55, 825, 827, 829, 856-57, 888-89, 891, 893-96, 899-901, 903, 907, 912-14, 918-20, 936, 941-42, 948, 950-52 (Goldstein Decl. ¶¶ 29, 32-33, 55, 57, 69, 88, 90, 92, 95, 97, 108, 111, Atts. B-D, J, L, N, R-U, Y-Z); Dkt. 46, PX 25 at 1238, 1351 (Goldstein Supp. Decl. ¶¶ 14-15, Att. R); PX 34 (R. Radwan trans. at 63:18-64:3). |
| 84. Dean Robbins purchased web-hosting | Dkts. 25, 25-3, 25-4, PX 20 at |

| | |
|---|---|
| and domain name services for the student debt relief business. | 720-23, 1065-1077, 1089-1102 (Goldstein Decl. ¶¶ 137-49, Atts. HH-KK); PX 36 (Robbins trans. at 48:10-25). |
| 85. Dean Robbins created and maintained websites for the student debt relief business. | PX 36 (Robbins trans. at 49:1-6). |
| 86. Dean Robbins bought and evaluated leads for the student debt relief business. | PX 36 (Robbins trans. at 58:8-59:15). |
| 87. Dean Robbins set up virtual office and mail forwarding services for the student debt relief business. | Dkts. 25, 25-1, PX 20 at 690, 697, 775, 861-65, 867 (Goldstein Decl. ¶¶ 39, 72, Att. G, O); PX 36 (Robbins trans. at 51:17-25). |
| 88. Dean Robbins obtained payment processing services for the student debt relief business. | PX 36 at 2135-36, 2161 (Robbins trans. at 218:14-219:17 & Ex. 14). |
| 89. Dean Robbins provided payment information to Defendants' payment processors to allow them to debit consumers' accounts. | PX 36 (Robbins trans. at 50:24-51:14, 223:20-225:16). |
| 90. Dean Robbins was a named defendant in the complaint filed by the State of North Carolina in 2016 and signed the resulting Consent Order. | Dkt. 27, PX 22 at 1162-98 (N.C. Complaint), 1199-1205 (N.C. Consent Judgment). |

| | |
|---|---|
| 91. Dean Robbins was aware of the law enforcement actions by the State of Oregon and Washington and signed an AVC with the State of Oregon on behalf of D.O.R.M. Group. | Dkt. 27, PX 23 at 1213 (Or. AVC); PX 36 (Robbins trans. at 27:8-11, 253:9-14, 260:19-262:4, 264:2-13). |
| 92. Dean Robbins received at least one consumer complaint from the Better Business Bureau. | PX 36 (Robbins trans. at 250:17-251:6, 252:8-12 & Ex. 21). |
| 93. Dean Robbins was familiar with law enforcement actions against other student debt relief companies for allegedly taking upfront fees. | PX 36 (Robbins trans. at 264:21-265:25). |
| **D. LABIBA VELAZQUEZ** | |
| 94. Labiba Velazquez held herself out as the Director of Operations of one or more of the Corporate Defendants. | PX 37 (Velazquez trans. at 22:3-15); PX 38 (Sanchez trans. at 33:6-19). |
| 94A.Labiba Velazquez held a corporate American Express card. | Dkt. 25, PX 20 at 1110 Goldstein Decl. Att. NN) (Labiba Radwan card included in statement); |
| 95. Labiba Velazquez routinely received sales reports from Defendant Elegant Solutions' sales floor manager. | PX 38 (Sanchez trans. at 38:12-39:14). |
| 96. Labiba Velazquez's duties included ensuring "that operations processes stay within agreed upon budgets and | PX 31 at 1522 (Saunders Supp. Decl. Att. A). |

| | |
|---|---|
| timelines." | |
| 97.  Labiba Velazquez was responsible for assisting in "developing strategies and implementation plans to improve and standardize all aspects of operations." | PX 31 at 1522 (Saunders Supp. Decl. Att. A). |
| 98.  Labiba Velazquez shared a corner office with Rima Radwan. | Dkt. 46, PX 25 at 1237-38, 1247 (Goldstein Supp. Decl. ¶¶ 7, 11, Att. A); PX 39 (Lopez trans. at 147:11-6). |
| 99.  In some instances, Labiba Velaquez decided whether to pay particular consumers' lenders, the amount of payment, and the timing of payment. | PX 37 at 2194-98, 2203-06, 2220, 2226-27 (Velazquez trans. at 99:12-103:20, 157:24-160:18 & Exs. 2, 12); PX 39 at 2392-93, 2523-24, 2527-28 (Lopez trans. at 177:22-178:8 & Exs. 15-16). |
| 100. Labiba Velazquez was responsible for addressing issues with Defendants' payment processors. | PX 37 (Velazquez trans. at 63:8-64:8, 65:9-14). |
| 101. Labiba Velazquez was responsible for handling Human Resources issues, including hiring sales representatives. | PX 35 (M. Radwan trans. at 196:22-25); PX 37 (Velazquez trans. at 28:23-29:15); PX 38 (Sanchez trans. at 33:6-19, 34:11-17, 68:9-11); *see also* PX 34 (R. Radwan trans. at 58:13-15) (client service |

| | issues). |
|---|---|
| 102. Labiba Velazquez was aware of the state law enforcement actions brought by the North Carolina, Washington, and Oregon. | PX 37 (Velazquez trans. at 68:19-24, 69:18-24, 70:10-13). |
| 103. Labiba Velazquez was included in company communications about consumer complaints, including complaints from consumers stating that the company was a "scam." | PX 37 (Velazquez trans. at 60:20-24, 117:18-21, 148:1-5 & Ex. 9). |
| 104. Labiba Velazquez's legal name is Labiba Radwan and she has used both names in connection with Defendants' student loan debt relief operation. | PX 37 (Velazquez trans. at 14:23-15:14). |
| **III.  DEFENDANTS HAVE A HISTORY OF DEBT RELIEF FRAUD** | |
| 105. From approximately August 2013 through June 2014, Defendants Mazen Radwan, Rima Radwan, and Dean Robbins did business as Student Loan Service Managers ("SLSM"), a general partnership. | Dkt. 25-3, PX 20 at 976, 991 (Goldstein Decl., Att. CC); PX 34 (R. Radwan trans. at 23:13-25:11; 27:7-27:15); PX 35 (M. Radwan trans. at 16:10-18); PX 36 (Robbins trans. at 11:22-12:3, 15:16-18). |
| 106. In June 2014, they dissolved the partnership and transferred the partnership's assets, consisting primarily of customer accounts, to a | Dkt. 25-3, PX 20 at 991-92 (Goldstein Decl., Att. CC); PX 34 (R. Radwan trans. at 27:7-15); PX 36 (Robbins trans. at |

| | |
|---|---|
| new company called D.O.R.M. Group, Inc. ("D.O.R.M. Group") d/b/a SLS Managers. | 16:8-17:3). |
| 107. D.O.R.M. Group continued to manage the loans for clients signed up by the partnership, as well as enroll new customers. | Dkt. 25-3, PX 20 at 991-92 (Goldstein Decl., Att. CC); PX 36 (Robbins trans. at 17:4-6; 19:8-20:8). |
| 108. Several months after starting business as D.O.R.M. Group, Rima Radwan, Mazen Radwan, and Dean Robbins decided they needed to "rebrand," because "D.O.R.M. Group had brought on a lot of liabilities and had bad accounts, so we had a bad image on the Internet." | Dkt. 25-3, PX 20 at 995 (Goldstein Decl., Att. CC); PX 42 at 2573-74 (R. Radwan trans. at 23:21-24:1). |
| 109. Defendants split D.O.R.M. Group's business between two new companies—Tribune Management, Inc. and Heritage Asset Management, Inc. | Dkt. 25-3, PX 20 at 995-96 (Goldstein Decl., Att. CC); PX 34 (R. Radwan trans. at 27:16-28:5); PX 36 (Robbins trans. at 21:21-24:13; 33:1-25). |
| 110. Tribune, doing business as Student Loan Group, became responsible for acquiring new customers. | PX 36 (Robbins trans. at 21:21-24:13; 33:1-25). |
| 111. Heritage, doing business as National Secure Processing, took over responsibility for managing clients' | PX 36 (Robbins trans. at 21:21-24:13; 33:1-25). |

| | |
|---|---|
| loans, including the loans of clients signed up by D.O.R.M. Group and the partnership. | |
| 112. In July 2016, the Washington State Attorney General sued D.O.R.M. Group in state court for violating the State's Consumer Protection Act and Debt Adjusting Act, including failing to make required disclosures, false advertising, and failing to deliver promised services. | Dkt. 27, PX 24 at 1215-25 (Wa. Complaint). |
| 113. The state court entered a Consent Decree on July 26, 2016. | Dkt. 27, PX 24 at 1226-35 (Wa. Consent Decree). |
| 114. In September 2016, the North Carolina Attorney General sued Heritage, Tribune, and D.O.R.M. Group, along with Mazen Radwan, Rima Radwan, and Dean Robbins, for, among other things, engaging in unfair or deceptive practices in connection with the marketing debt adjusting services in violation of state law. | Dkt. 27, PX 22 at 1162-98 (N.C. Complaint). |
| 115. In October 2016, a North Carolina state court found that there was good cause to believe that the defendants had "collected, and continue to collect, | PX 41 at 2566 (N.C. TRO ¶¶ 2-3). |

| | |
|---|---|
| advanced fees" and "engaged in…a pattern and practice of misleading deceptive misrepresentations" and issued a Temporary Restraining Order temporarily enjoining the defendants from doing business in North Carolina. | |
| 116. The court entered a Consent Judgment and Permanent Restraining Order on March 6, 2017 that permanently prohibited the defendants from operating in North Carolina. | Dkt. 27, PX 22 at 1199-1205 (N.C. Consent Judgment) |
| 117. In March 2017, D.O.R.M. Group entered into an Assurance of Voluntary Compliance ("AVC") with the State of Oregon to settle allegations that the company operated an unlawful debt management service. | Dkt. 27, PX 23 at 1206-14 (Or. AVC). |
| 118. Dean Robbins signed the AVC on behalf of D.O.R.M. Group. | Dkt. 27, PX 23 at 1213 (Or. AVC). |
| 119. In November 2017, following the state law enforcement actions, Defendants decided to "re-brand" for a second time. | PX 35 (M. Radwan trans. at 36:18-37:7); PX 39 (Lopez trans. at 92:19-93:2). |
| 120. According to Defendants' General Manager, Daisy Lopez, Defendants also were having "issues" with payments not being sent to consumers' lenders and | PX 39 (Lopez trans. at 92:19-93:2). |

| | |
|---|---|
| re-branded "to kind of get away from all that." | |
| 121. Rima Radwan also identified this issue as a reason for the re-brand, along with the FTC's recent Game of Loans sweep. | PX 34 (R. Radwan trans. at 34:14-35:12; 36:5-23; 37:24-38:10). |
| 122. Defendants ceased doing business as Student Loan Group and National Secure Processing and transferred their assets, operations and a number of employees to two new companies—Elegant Solutions, Inc. and Trend Capital, Ltd. | PX 31 at 1517-18 (Saunders Supp. Decl. Att. A); PX 34 (R. Radwan trans. at 60:20-61:17); PX 35 (M. Radwan trans. at 35:4-10); PX 36 (Robbins trans. at 28:6-9). |
| 123. Elegant, doing business as Federal Direct Group, was responsible for acquiring new customers and managing those customers' loans. | PX 34 (R. Radwan trans. at 69:9-70:2; 111:16-21); PX 36 (Robbins trans. at 39:9-40:8). |
| 124. Trend, doing business as Mission Hills Federal, took over responsibility for servicing the loans of Defendants' "legacy" clients—*i.e.*, the clients signed up by Tribune, D.O.R.M. Group, and the partnership. | PX 34 (R. Radwan trans. at 64:17-64:21, 67:19-68:7; 70:9-17; 108:19-111:14); PX 36 (Robbins trans. at 28:6-9, 35:16-37:22). |
| 125. At the time of transition, Defendants had 12,669 "legacy" accounts. | PX 32 (Geiran Decl. ¶ 30). |
| 126. Defendants continued doing business | PX 36 (Robbins trans. at 39:1- |

| | |
|---|---|
| (i.e., signing up new customers and managing existing customers' loans) as Federal Direct Group and Mission Hills Federal until July 10, 2019, when the Court-appointed Receiver took control of the Corporate Defendants and temporarily suspended their operations. | 3; 42:6-9). |
| 127. As of July 10, 2019, there were 6,281 active Mission Hills Federal or "legacy" accounts and 2,516 active Federal Direct Group accounts. | PX 32 (Geiran Decl. ¶ 30); PX 34 (R. Radwan trans. at 306:4-6). |
| **B. DEFENDANTS OPERATED AS A COMMON ENTERPRISE** | |
| 128. All Corporate Defendants had the same three owners. | PX 34 (R. Radwan trans. at 62:20-64:3, 108:1-7); PX 36 (Robbins trans. at 22:16-18, 23:22-24, 38:8-10, 41:16-19, 43:6-11); PX 40 at 2543-46 (Defendants Heritage, Tribune, Trend, Elegant, Mazen Radwan, Rima Radwan, and Dean Robbins's Response to Plaintiffs' Second Set of Interrogatories at 15-18). |
| 129. Corporate Defendants had common office locations. | PX 36 (Robbins trans. at 24:19-25:2); PX 39 (Lopez |

| | trans. at 23:21-24). |
|---|---|
| 130. All Corporate Defendants had the same officers. | PX 36 (Robbins trans. at 22:23-23:3; 23:25-24:3). |
| 131. Several of the Corporate Defendants shared employees. | Dkt. 25, PX 20 at 718-19 (Goldstein Decl. ¶¶ 132-33); *see also*, PX 38 (Sanchez trans. at 141:11-24) (floor manager for Federal Direct Group recalls 10 sales employees were from Student Loan Group); PX 39 (Lopez trans. at 92:4-18). |
| 132. Corporate Defendants commingled funds. | Dkts. 25, 25-4, PX 20 at 737-39, 1126-46 (Goldstein Decl. ¶ 204-09, Atts. QQ-TT); Dkt. 99-2 at 4-5 (R. Radwan Decl. ¶ 12). |
| 133. Elegant and Trend used the same Customer Relationship Management ("CRM") program, known as the "Ezekial CRM." | PX 36 (Robbins trans. at 47:16-25); PX 39 (Lopez trans. at 40:19-21). |
| 134. Although Defendants Dark Island Industries operated a car business, the car business was linked with, and dependent upon, the student debt relief business for funding and facilities. | Dkt. 54 at 32 (Receiver's Report). |

| | |
|---|---|
| 135. Trend Capital paid the rent for Dark Island's business premesis at 3 Studebaker, Irvine, California. | Dkt. 54 at 32 (Receiver's Report); Dkt. 99-2 at 4-5 (R. Radwan Decl. ¶ 12). |
| 136. Defendants Mazen Radwan, Rima Radwan, and Dean Robbins capitalized Dark Island Industries, in part, using funds traceable to the student debt relief business. | Dkt. 54-1 at 9 (Receiver's Ex. 2, Receivership Initial Accounting Records Review); PX 34 (R. Radwan trans. at 96:22-98:14 (Defendants contributed funds from their personal accounts), 79:17-80:19 (Rima Radwan had no sources of income other than Heritage and Tribune in 2016 and 2017)); PX 35 (M. Radwan trans. at 25:4-26:9) (M. Radwan, R. Radwan, and Robbins funded Dark Island with their own money and then paid themselves back). |
| 137. Dark Island d/b/a Federal Direct Group and EDU STUDENT LOAN contracted with Automatic Funds Transfer Services, Inc. ("AFTS") to process payments from clients of the enterprise's student debt relief business. | Dkts. 25, 25-1, PX 20 at 691-92, 793-96 (Goldstein Dec. ¶¶ 49-52, Att. I); PX 36 at 2135-36, 2153 (Robbins trans. at 218:14-17 & Ex. 14). |
| 138. Dean Robbins signed the contract | PX 36 at 2135-36, 2161 |

| | |
|---|---|
| between Dark Island and AFTS. | (Robbins trans. at 218:14-219:17 & Ex. 14). |
| 139. Defendants received monthly invoices from AFTS identifying Dark Island as the customer. | PX 31 at 1523-34 (Saunders Supp. Decl. Att. A). |
| 140. Dark Island set up the Internet services that Defendants used to conduct their student debt relief operation. | Dkts. 25, 25-1, PX 20 at 693-94, 832-40 (Goldstein Dec. ¶ 56, Att. K); Dkt. 27, PX 21 at 1153 (Declaration of Scott Lause ¶ 21). |
| **C.  STUDENT LOAN INDUSTRY BACKGROUND** | |
| 141. Student loan debt is the second largest class of consumer debt; more than 42 million Americans collectively owe nearly $1.5 trillion.  The student loan market shows elevated levels of distress relative to other types of consumer debt. | Dkt. 46 (Answer ¶ 22). |
| 142. To address this mounting level of distressed debt, the Department of Education ("ED") and state government agencies administer a limited number of student loan forgiveness and discharge programs.  Most consumers, however, are not eligible for these programs | Dkt 46 (Answer ¶ 23). |

| | |
|---|---|
| because of strict eligibility requirements.  For example, one program requires the consumer to demonstrate a total and permanent disability; another applies only to consumers whose school closed while the consumer was still enrolled.  A third program, the Borrower Defense to Repayment ("BDR"), may provide a loan discharge if the school, through an act or omission, violated state law directly related to the borrower's federal student loan or to the educational services for which the loan was provided. | |
| 143. Other forgiveness programs require working in certain professions for a period of years.  Teacher Loan Forgiveness applies to teachers who have worked full-time for five years in a low-income elementary or secondary school or educational service agency.  Public Service Loan Forgiveness ("PSLF") applies to employees of governmental units or non-profit organizations who make timely | Dkt. 46 (Answer ¶ 24). |

| | |
|---|---|
| monthly payments for a period of ten years while employed in the public sector. | |
| 144. The federal government also offers loan forgiveness through income-driven repayment ("IDR") programs that enable borrowers to reduce their monthly payments and have portions of their loans forgiven. IDR programs allow eligible borrowers to limit their monthly payments based on a percentage of their discretionary monthly income.  To remain in an IDR program, borrowers must recertify their income and family size annually. Obtaining forgiveness through IDR programs requires a minimum of 20 or 25 years of qualifying payments. | Dkt. 46 (Answer ¶ 25). |
| 145. Because a borrower's income is likely to fluctuate over the life of the loan, monthly payments under the IDR programs can vary considerably from year to year.  If a borrower's income were to increase over the repayment period, for example, the monthly payment amount could correspondingly | Dkt. 46 (Answer ¶ 26). |

| | |
|---|---|
| increase to the point where those payments would pay off the loan before any amount could be forgiven at the end of the repayment term. | |
| 146. Under ED's guidelines, to qualify for a $0 monthly payment under any of the IDR plans, a borrower's discretionary income may not exceed $599. A borrower's discretionary income is equal to the difference between his or her adjusted gross income and 150 percent of the federal poverty guideline. | StudentAid.gov, Income-Driven Plans Questions and Answers, https://studentaid.gov/manage-loans/repayment/plans/income-driven/questions (last visited Mar. 5, 2020). |
| 147. Consumers can apply for BDR, PSLF, IDR, and other loan repayment and forgiveness or discharge programs through ED or their student loan servicers at no cost; these programs do not require the assistance of a third-party company or payment of application fees. | Dkt. 46 (Answer ¶ 27). |
| 148. ED will grant forbearance while processing applications for an alternative repayment plan, and in some cases of hardship.  During forbearance, and, under some circumstances, during deferment, unpaid interest is added to | Dkt. 46 (Answer ¶ 28). |

| | |
|---|---|
| the principal balance. | |
| **IV.    DEFENDANTS USED FALSE REPRESENTATIONS TO LURE CONSUMERS.** | |
| 149. Defendants used both inbound and outbound telemarketing to connect consumers with their sales people. | PX 38 (Sanchez trans. at 39:17-40:16). |
| 150.  Defendants marketed their services to consumers seeking help with their student loans. | Dkt. 20, PX 1 at 1 (Avant Decl. ¶ 3);  Dkt. 20-1, PX 4 at 177 (Bonilla Decl. ¶ 3); Dkt. 21, PX 6 at 226 (Bursey Decl. ¶ 2); Dkt. 21, PX 7 at 265 (Clemans Decl. ¶ 3); Dkt. 21-1, PX 9 at 313 (Fleming Decl. ¶ 3); Dkt. 22, PX 10 at 340 (Horejs Decl. ¶ 3); Dkt. 22, PX 11 at 380 (Preston Decl. ¶ 3); Dkt. 22, PX 12 at 407 (Sanker Decl. ¶ 2); Dkt. 24, PX 16 at 551 (Smith Decl. ¶ 3); Dkt. 24-1, PX 17 at 590 (Somers Decl. ¶ 3); PX 38 (Sanchez trans. at 26:8-14). |
| 151. Consumers of Defendants' purported services had an average of $42,626 in student loans. | PX 32 (Geiran Decl. ¶ 61). |

**A. DEFENDANTS HAVE REPRESENTED THAT CONSUMERS WHO PURCHASED THEIR DEBT RELIEF SERVICES WOULD BE ENROLLED IN A REPAYMENT PLAN THAT WILL REDUCE THEIR MONTHLY PAYMENTS TO A LOWER, SPECIFIC AMOUNT OR HAVE THEIR LOAN BALANCES FORGIVEN IN WHOLE OR IN PART.**

| | |
|---|---|
| 152. Defendants provided their telemarketers with various sales scripts, though telemarketers routinely deviated from these scripts. | PX 38 (Sanchez trans. at 44:1-19); Dkt. 46, PX 25 at 1282-83 (Goldstein Decl., Att. K); Dkt. 54-1 at 58-72 (Receiver's Ex. 4, FDG Scripts). |
| 153. Defendants' sales scripts directed telemarketers to tell consumers that Defendants were a student loan management company that would help consumers save money by consolidating their federal student loans, enrolling them in an income-based repayment program, or qualifying them for a loan forgiveness program. | Dkt. 46, PX 25 at 1282-83 (Goldstein Supp. Decl. ¶ 8j, Att. K); Dkt. 54-1 at 58-72 (Receiver's Ex. 4, FDG Scripts); PX 38 at 2308-10, 2330-31 (Sanchez trans. at 45:1-46:2, 47:3-15 & Ex. 2) ("FDG Opener" Scripts), 2310-11, 2328 (Sanchez trans. at 47:22-48:14 & Ex. 2) ("FDG Outbound Script"), 2312-13, 2338 (Sanchez trans. at |

| | |
|---|---|
| | 53:7-54:2 & Ex. 2) ("LT3 Transfer Script"), 2314, 2340-41 (Sanchez trans. at 55:2-14 & Ex. 2) ("Federal DG"). |
| 154. In some instances, Defendants told consumers their loan balances would be forgiven after the consumer made lower monthly payments for a specific period of years, for example, after three, seven, ten, or fifteen years of making loan payments to Defendants. | Dkt. 20-1, PX 4 at 177 (Bonilla Decl. ¶ 3) (forgiveness in seven years); Dkt. 21, PX 5 at 209 (Brockel Decl. ¶ 4) (ten years); Dkt. 21, PX 7 at 265 (Clemans Decl. ¶ 4) (ten years); Dkt. 21-1, PX 9 at 313 (Fleming Decl. ¶ 4) (three years); Dkt. 24, PX 13 at 496 (Schultz Decl. ¶ 4) (fifteen years); Dkt. 24, PX 15 at 541 (Sickel Decl. ¶ 3) (ten years); Dkt. 24-1, PX 17 at 590 (Somers Decl. ¶ 4) (ten years). |
| 155. In some instances, Defendants offered consumers loan forgiveness for ten years without verifying that those consumers met the employment qualifications for | Dkt. 24-1, PX 17 at 590 (Somers Decl. ¶¶ 3-4) (Defendants offered an unemployed consumer 10 |

| | |
|---|---|
| Public Service Loan Forgiveness. | year loan forgiveness); *see also*, Dkt. 21, PX 5 at 209 (Brockel Decl. ¶ 4); Dkt. 21, PX 7 at 265 (Clemans Decl. ¶ 4) Dkt. 24, PX 15 at 541 (Sickel Decl. ¶ 3). |
| 156. In telephone calls, Defendants' telemarketers told numerous consumers that Defendants would obtain a student loan repayment schedule for consumers with specific monthly loan payment amounts that are significantly lower than what consumers were paying. | Dkt. 20, PX 1 at 1, (Avant Decl. ¶¶ 3-5); Dkt. 20, PX 2 at 72 (Bennett Decl. ¶¶ 3-4); Dkt. 21, PX 5 at 209 (Brockel Decl. ¶ 5); Dkt. 21, PX 6 at 226 (Bursey Decl. ¶ 3); Dkt 21, PX 7 at 265 (Clemens Decl. ¶ 4); Dkt. 21, PX 8 at 273 (Cooper Decl. ¶¶ 3-4); Dkt. 21-1, PX 9 at 313 (Fleming Decl. ¶ 4);  Dkt. 22, PX 10 at 340 (Horejs Decl. ¶ 6); Dkt. 22, PX 11 at 380 (Preston Decl. ¶ 4); Dkt. 22, PX 12 at 407 (Sanker Decl. ¶ 5); Dkt. 24, PX 13 at 496, (Schultz Decl. ¶¶ 3-4); Dkt. 24, PX 14 at 534 (Shelton-Larimore Decl. ¶ |

| | |
|---|---|
| | 2); Dkt. 24, PX 15 at 541 (Sickel Decl. ¶¶ 3-4); Dkt 24, PX 16 at 551 (Smith Decl. ¶¶ 3-4);; Dkt. 24-1, PX 17 at 590 (Somers Decl. ¶ 4); Dkt. 24-1, PX 18 at 625 (Taylor Decl. ¶ 4); Dkt. 24-1, PX 19 at 649 (Thompson Decl. ¶ 4); Dkt. 27, PX 21 at 1150-51, 1160 (Lause Decl. ¶ 12, Att. B). |
| 157. Defendants typically quoted consumers a monthly payment that was significantly less than what consumers were paying at the time, but more than zero. | Dkt. 20, PX 1 at 1, (Avant Decl. ¶¶ 3-5); Dkt. 20, PX 2 at 72 (Bennett Decl. ¶¶ 3-4);  Dkt. 21, PX 7 at 265 (Clemens Decl. ¶ 4); PX 8 at 273 (Cooper Decl. ¶¶ 3-4); Dkt 21; Dkt. 22, PX 11 at 380 (Preston Decl. ¶ 4); Dkt. 22, PX 12 at 407 (Sanker Decl.  ¶¶ 2, 5); Dkt. 24, PX 13 at 496, (Schultz Decl. ¶¶ 3-4); Dkt. 24, PX 15 at 541 (Sickel Decl. ¶¶ 3-4); Dkt 24, PX |

| | |
|---|---|
| | 16 at 551 (Smith Decl. ¶¶ 3-4); PX 32 (Geiran Decl. ¶ 59). |
| 158. Defendants told one consumer who had been paying $200 per month that her new monthly payment would be $50. | Dkt. 24, PX 16 at 551 (Smith Decl. ¶¶ 3-4). |
| 159. Defendants told another consumer who had been paying $130 per month that her new monthly payment would be $61. | Dkt. 22, PX 11 at 380 (Preston Decl. ¶ 4). |
| 160. Defendants told numerous consumers that they would accomplish this reduced payment by consolidating or refinancing the consumers' loans, enrolling them in a loan forgiveness program, or placing consumers into an income-based repayment program. | Dkt. 20, PX 1 at 1 (Avant Decl. ¶ 4); Dkt. 20, PX 2 at 72, (Bennett Decl. ¶ 3); Dkt. 20-1, PX 4 at 177 (Bonilla Decl. ¶ 2);  Dkt. 21, PX 5 at 209 (Brockel Decl. ¶ 4); Dkt. 21, PX 6 at 226 (Bursey Decl. ¶ 3); Dkt. 21, PX 7 at 265 (Clemans Decl. ¶ 4); Dkt. 21, PX 8 at 273 (Cooper Decl. ¶¶ 3-4); Dkt. 21-1, PX 9 at 313 (Fleming Decl. ¶ 4); Dkt. 22, PX 11 at 380 (Preston Decl. ¶ 5); Dkt. 22, PX 12 at 407 (Sanker Decl. ¶ 5); Dkt. 24, PX 13 |

| | at 496 (Schultz Decl. ¶ 3); Dkt 24, PX 16 at 551 (Smith Decl. ¶ 4); Dkt. 24-1, PX 17 at 590 (Somers Decl. ¶ 4); Dkt. 24-1, PX 18 at 625 (Taylor Decl. ¶ 5); Dkt. 24-1, PX 19 at 649 (Thompson Decl. ¶ 3); PX 38 (Sanchez trans. at 25:9-16) (sales floor manager stated "…when we would speak with a consumer over the phone, we would get their loans pulled up and help them enroll into an income-based repayment program and part of that is doing a loan consolidation."); *see also* Dkt. 46, PX 25 at 1282-83 (Goldstein Supp. Decl., Att. K); Dkt. 54-1 at 58-72 (Receiver's Ex. 4, FDG Scripts). |
|---|---|

| **B. DEFENDANTS HAVE REPRESENTED THAT MOST OR ALL OF CONSUMERS' MONTHLY PAYMENTS TO DEFENDANTS WOULD BE APPLIED TOWARD CONSUMERS' STUDENT LOANS** | |
| --- | --- |
| 161. In numerous instances, Defendants represented that all or most of the consumers' new, lower payments would be applied to their student loans. | Dkt. 20, PX 1 at 1, (Avant Decl. ¶ 5); Dkt. 20, PX 2 at 72, (Bennett Decl. ¶ 5); Dkt. 20-1, PX 3 at 164, (Bishop Decl. Att. E); Dkt. 20-1, PX 4 at 177 (Bonilla Decl. ¶ 4); Dkt. 21, PX 6 at 226 (Bursey Decl. ¶ 4); Dkt. 21, PX 7 at 265 (Clemans Decl. ¶ 4); Dkt. 22, PX 10 at 340 (Horejs Decl. ¶ 7); *see* Dkt. 24, PX 13 at 496 (Schultz Decl. ¶ 3) (consumer understood the full $100 payment would be applied to student loans); Dkt. 24, PX 15 at 541 (Sickel Decl. ¶ 3-4); Dkt 24, PX 16 at 551 (Smith Decl. ¶ 4); Dkt. 24-1, PX 17 at 590 (Somers Decl. ¶ 5); Dkt. 27, PX 21 at 1151-52, 1160 (Lause Decl. ¶ 15, Att. B). |

| | |
|---|---|
| 162. Defendants quoted consumers a single, new monthly payment. | Dkt. 20, PX 1 at 1, (Avant Decl. ¶ 4) (quoted $283); Dkt. 20, PX 2 at 72, (Bennett Decl. ¶ 5); Dkt. 20-1, PX 3 at 141-42, (Bishop Decl. ¶¶ 4, 12); Dkt. 20-1, PX 4 at 177 (Bonilla Decl. ¶ 4);  Dkt. 21, PX 5 at 209 (Brockel Decl. ¶ 5); Dkt. 21, PX 6 at 226 (Bursey Decl. ¶ 3); Dkt. 21, PX 7 at 265 (Clemans Decl. ¶ 4); Dkt. 21, PX 8 at 273 (Cooper Decl. ¶ 4); Dkt. 21-1, PX 9 at 313 (Fleming Decl. ¶ 4); Dkt. 22, PX 10 at 340 (Horejs Decl. ¶ 6) Dkt. 22, PX 11 at 380 (Preston Decl. ¶ 4); Dkt. 22, PX 12 at 407 (Sanker Decl. ¶ 5); Dkt. 24, PX 13 at 496 (Schultz Decl. ¶ 4); Dkt. 24, PX 15 at 541 (Sickel Decl. ¶ 3) Dkt 24, PX 16 at 551 (Smith Decl. ¶ 4); Dkt. 24-1, PX 17 at 590 (Somers Decl. ¶ 4);  Dkt. 24- |

| | |
|---|---|
| | 1, PX 18 at 625 (Taylor Decl. ¶ 4); Dkt. 24-1, PX 19 at 649 (Thompson Decl. ¶ 4); *see also*, Dkt. 46, PX 25 at 1282-83 (Goldstein Supp. Decl. ¶ 8j, Att. K) (FDG Script); Dkt. 54-1 at 58-72 (Receiver's Ex. 4, FDG Scripts); PX 38 (Sanchez trans. at 88:1-89:14). |
| 163. Defendants typically did not disclose in the initial sales pitch that the new monthly payment included hefty management and processing fees. | Dkt. 20, PX 1 at 4, (Avant Decl. ¶ 19) (Defendants only made one payment to lender); Dkt. 20, PX 2 at 74-75, (Bennett Decl. ¶ 19) (no payments to lender); Dkt. 20-1, PX 3 at 143, (Bishop Decl. ¶ 13); Dkt. 20-1, PX 4 at 177 (Bonilla Decl. ¶ 4); Dkt. 21, PX 5 at 209 (Brockel Decl. ¶ 5); Dkt. 21, PX 6 at 226 (Bursey Decl. ¶ 4); Dkt. 21, PX 7 at 265 (Clemans Decl. ¶ 4); Dkt. 22, PX 10 at 340 (Horejs Decl. ¶ 7); Dkt. 22, PX 11 at |

| | |
|---|---|
| | 382 (Preston Decl. ¶ 14); Dkt. 22, PX 12 at 409 (Sanker Decl. ¶ 12); Dkt. 24-1, PX 18 at 626-27 (Taylor Decl. ¶ 13) (consumer was not told until 2.5 years after signing up that $51 of her $61 monthly payment was going to fees); Dkt. 24-1, PX 19 at 649 (Thompson Decl. ¶ 5); PX 38 (Sanchez trans. at 73:4-76:6) Ex. 5 ("Rebuttals and Objections:  300 Spectrum Center Drive") (script with "We have no up front fees, our fees are incorporated into the monthly payment I quoted you."); *see also*, Dkt. 46, PX 25 at 1282-83 (Goldstein Supp. Decl. ¶ 8j, Att. K) (FDG Script); Dkt. 54-1 at 58-72 (Receiver's Ex. 4, FDG Scripts). |
| 164. Defendants' sales scripts did not instruct telemarketers to disclose that the quoted, | Dkt. 46, PX 25 at 1282-83 (Goldstein Supp. Decl. ¶ 8j, |

| | |
|---|---|
| new monthly payment included hefty management and processing fees. | Att. K) (FDG Script); Dkt. 54-1 at 58-72 (Receiver's Ex. 4, FDG Scripts); PX 38 at 2308-10, 2330-31 (Sanchez trans. at 45:1-46:2, 47:3-15 & Ex. 2) ("FDG Opener" Scripts), 2310-11, 2332 (Sanchez trans. at 47:22-48:14 & Ex. 2) ("FDG Outbound Script"), 2312-13, 2338 (Sanchez trans. at 53:7-54:2 & Ex. 2) ("LT3 Transfer Script"), 2314, 2340-41 (Sanchez trans. at 55:2-14 & Ex. 2) ("Federal DG"). |
| 165. In some cases, Defendants misstated the portion of the monthly payment that went to consumers' lenders and the portion that went to Defendants' management fees. | Dkt. 20, PX 2 at 72, 74-75 (Bennett Decl. ¶ 5, 19); Dkt. 20-1, PX 3 at 142, 144, (Bishop Decl. ¶¶ 12, 19); PX 3 at 164 (Bishop Decl. Att. E) (email with "$98.33 is being paid towards your Student Federal Loans."); Dkt. 22, PX 12 at 409 (Sanker Decl. ¶ 12) ($44.97 |

| | |
|---|---|
| | was a management fee and…$76.46 was being paid toward my student loans.); Dkt. 24, PX 15 at 541 (Sickel Decl. ¶ 3) ($500 "set up fee" and ongoing payment of $61 to loans); Dkt. 24-1, PX 17 at 590 (Somers Decl. ¶ 5) (no more than $20 management fee and approximately $83 per month would be applied to student loans). |
| 166. Numerous consumers understood that the amount quoted during the sales call would be their new student loan payment and that Defendants would apply most or all of that amount to their student loans. | Dkt. 20, PX 1 at 1 (Avant Decl. ¶ 5);  Dkt. 20, PX 2 at 72 (Bennett Decl. ¶ 5);  Dkt. 20-1, PX 3 at 141 (Bishop Decl. ¶ 4); Dkt. 20-1, PX 4 at 177 (Bonilla Decl. ¶ 4); Dkt. 21, PX 5 at 209 (Brockel Decl. ¶ 5); Dkt. 21, PX 6 at 226 (Bursey Decl. ¶ 4); Dkt. 21, PX 7 at 265 (Clemans Decl. ¶ 4); Dkt. 21, PX 8 at 735 (Cooper Decl. ¶ 5); Dkt. 21-1, PX 9 |

| | at 313 (Fleming Decl. ¶ 4); Dkt. 22, PX 10 at 340 (Horejs Decl. ¶ 7); Dkt. 24, PX 13 at 496 (Schultz Decl. ¶ 5); Dkt. 24, PX 15 at 541 (Sickel Decl. ¶ 3); Dkt. 24, PX 16 at 551 (Smith Decl. ¶ 4); Dkt. 24-1, PX 17 at 590 (Somers Decl. ¶ 5); Dkt. 24-1, PX 18 at 625 (Taylor Decl. ¶ 3); Dkt. 24-1, PX 19 at 649 (Thompson Decl. ¶ 5). |
|---|---|
| **C. DEFENDANTS REPRESENTED THEY WOULD ASSUME RESPONSIBILITY FOR THE SERVICING OF CONSUMERS' STUDENT LOANS.** | |
| 167. In numerous instances, Defendants represented in calls and emails to consumers that they were or would be purchasing, taking over, or handling servicing of consumers' loans. | Dkt. 20-1, PX 3 at 141, (Bishop Decl. ¶ 3) ("I believed The Student Loan Group was my loan servicer."); Dkt. 20-1, PX 4 at 177 (Bonilla Decl. ¶ 5); Dkt. 21, PX 5 at 209 (Brockel Decl. ¶ 3); Dkt. 21, PX 8 at 273 (Cooper Decl. ¶ 5); Dkt. 22, PX 10 at 340 (Horejs Decl. ¶ 6); Dkt. 22, PX |

| | 11 at 380 (Preston Decl. ¶ 5); Dkt. 24, PX 13 at 496 (Schultz Decl. ¶ 4); Dkt. 24, PX 14 at 534 (Shelton-Larimore Decl. ¶ 3); Dkt. 24-1, PX 17 at 590 (Somers Decl. ¶ 4); Dkt. 24-1, PX 18 at 625 (Taylor Decl. ¶ 4). |
|---|---|
| 168. Defendants told one consumer that they were "a servicer" who would "service [her] loans directly through the Department of Education." | PX 31 at 1681 (Saunders Supp. Decl. Att. D – L. Taylor call trans. at 5:7-8). |
| 169. Another consumer was told that "the main goal is to eliminate your middle lender and get you back on track with paying the main source, which is going to be the Department of Education." | PX 31 at 1643 (Saunders Supp. Decl. Att. C – Y. Sanker call trans. at 14:15-18). |
| 170. Such representations were consistent with Defendants' scripts, one of which instructed telemarketers to tell consumers that "our main goal is to eliminate the middle lender … and get you back on track to just paying the main source." | Dkt. 47, PX 25 at 1428 (Goldstein Supp. Decl., Att. W). |
| 171. Defendants instructed consumers that Defendants would handle all loan | Dkt. 20-1, PX 3 at 155 (Bishop Att. C) (Notice box on email to |

| | |
|---|---|
| communications and that consumers should stop payments to their "previous" servicers. | consumer states "your current loan service make (sic) contact you in an attempt to retain you as a customer.  Please disregard this call as this may delay your consolidation process[.]"); Dkt. 20-1, PX 4 at 177 (Bonilla Decl. ¶ 4);  Dkt. 21, PX 8 at 280 (Cooper Decl. Att. B) (email advising consumer to stop contact and payments to Navient); Dkt. 22, PX 12 at 408 (Sanker Decl. ¶ 8); Dkt. 24, PX 14 at 534 (Shelton-Larimore Decl. ¶ 4). |
| 172. For example, some consumers received the following in an email from Defendants shortly after signing up:<br><br>During this transition you may receive calls and/or correspondence from your previous servicers, please disregard as we will encounter a short transition period.<br><br>If you are currently enrolled in any automatic payment withdrawals with your previous lenders, it is recommended that | Dkt. 22, PX 11 at 395 (Preston Decl. Att. D);  *see* Dkt. 21, PX 8 at 280 (Cooper Decl. Att. B) (email with nearly identical language); Dkt. 24-1, PX 19 at 669 (Thompson Att. C) (email). |

| | |
|---|---|
| you check to make sure that future drafts will not be processed through your bank. | |
| 173. Consumers understood from Defendants' representations that Defendants were or would be purchasing, taking over, or handling servicing of their loans. | Dkt. 20-1, PX 3 at 141, (Bishop Decl. ¶ 3); Dkt. 20-1, PX 4 at 177 (Bonilla Decl. ¶ 5); Dkt. 21, PX 5 at 209 (Brockel Decl. ¶ 3); Dkt. 21, PX 8 at 273 (Cooper Decl. ¶ 5); Dkt. 22, PX 10 at 340 (Horejs Decl. ¶ 6); Dkt. 22, PX 11 at 380 (Preston Decl. ¶ 5); Dkt. 24, PX 13 at 496 (Schultz Decl. ¶ 4); Dkt. 24, PX 14 at 534 (Shelton-Larimore Decl. ¶ 3); Dkt. 24-1, PX 17 at 590 (Somers Decl. ¶ 4); Dkt. 24-1, PX 18 at 625 (Taylor Decl. ¶ 4). |
| 174. After consumers agreed to enroll in Defendants' "program," Defendants emailed consumers a pre-filled enrollment packet for consumers to sign electronically using DocuSign. | Dkt. 20, PX 1 at 1 (Avant Decl. ¶ 6); PX 1 at pp. 6-12 (Avant Att. A); Dkt. 20, PX 2 at 72, (Bennett Decl. ¶ 7) ("The contract was completely filled out except for the signature box…"); Dkt. 20-1, PX 4 at 177 (Bonilla Decl. ¶ |

|  | 6); Dkt. 21, PX 5 at 209 (Brockel Decl. ¶ 5); PX 5 at 214-225 (Brockel Att. A) (contract); Dkt. 21, PX 6 at 231-38 (Bursey Decl. Att. A); Dkt. 21, PX 8 at 277-78 (Cooper Decl. Att. A) (email with enrollment packet and summary attachments); Dkt. 22, PX 12 at 413-24 (Sanker Att. A) (enrollment packet); Dkt 24, PX 16 at 555-63 (SmithAtt. A) (enrollment packet); Dkt. 24-1, PX 17 at 596-607 (Somers Att. A) (enrollment packet); Dkt. 24-1, PX 18 at 630-48 (Taylor Att. A) (enrollment packet); Dkt. 24-1, PX 19 at 654-65 (Thompson Att. A) (enrollment packet); PX 36 (Robbins trans. at 209:22-210:4 & Ex. 13); PX 38 (Sanchez trans. at 35:11-36:1, 63:12-64:3) (consumer would sign the contract while the |

| | sales agent was still on the phone). |
|---|---|
| 175. The packet included, among other things, a privacy policy, service agreement, and a debit authorization form, which authorized Defendants to initiate Automated Clearing House ("ACH") debits from consumers' bank accounts. | Dkt. 20, PX 1 at 1 (Avant Decl. ¶ 6); PX 1 at pp. 6-12 (Avant Att. A); Dkt. 20, PX 2 at 72, (Bennett Decl. ¶ 7) ("The contract was completely filled out except for the signature box…"); Dkt. 20-1, PX 4 at 177 (Bonilla Decl. ¶ 6); Dkt. 21, PX 5 at 209 (Brockel Decl. ¶ 5); PX 5 at 214-225 (Brockel Att. A) (contract); Dkt. 21, PX 6 at 231-38 (Bursey Decl. Att. A); Dkt. 21, PX 8 at 277-78 (Cooper Decl. Att. A) (email with enrollment packet and summary attachments); Dkt. 22, PX 12 at 413-24 (Sanker Att. A) (enrollment packet); Dkt 24, PX 16 at 555-63 (SmithAtt. A) (enrollment packet); Dkt. 24-1, PX 17 at 596-607 (Somers Att. A) (enrollment packet); Dkt. 24-1, |

| | |
|---|---|
| | PX 18 at 630-48 (Taylor Att. A) (enrollment packet); Dkt. 24-1, PX 19 at 654-65 (Thompson Att. A) (enrollment packet); PX 36 (Robbins trans. at 210:5-12). |
| 176. In the middle of the enrollment packet was a statement of Defendants' fees, along with various other disclaimers. | Dkt. 20, PX 1 at 1 (Avant Decl. ¶ 6), 6-12 (Avant Att. A); Dkt. 20, PX 2 at 72 (Bennett Decl. ¶ 7) ("The contract was completely filled out except for the signature box…"); Dkt. 20-1, PX 4 at 177 (Bonilla Decl. ¶ 6); Dkt. 21, PX 5 at 209 (Brockel Decl. ¶ 5); PX 5 at 214-225 (Brockel Att. A) (contract); Dkt. 21, PX 6 at 231-38 (Bursey Decl. Att. A); Dkt. 21, PX 8 at 277-78 (Cooper Decl. Att. A) (email with enrollment packet and summary attachments); Dkt. 22, PX 12 at 413-24 (Sanker Att. A) (enrollment packet); Dkt 24, PX 16 at 555-63 (Smith Att. A) (enrollment |

| | |
|---|---|
| | packet); Dkt. 24-1, PX 17 at 596-607 (Somers Att. A) (enrollment packet); Dkt. 24-1, PX 18 at 630-48 (Taylor Att. A) (enrollment packet); Dkt. 24-1, PX 19 at 654-65 (Thompson Att. A) (enrollment packet). |
| 177. Defendants' application automatically jumped from signature block to signature block instead of requiring consumers to scroll through each page. | PX 36 (Robbins trans. at 208:23-217:8). |
| **D. DEFENDANTS' REPRESENTATIONS WERE FALSE** | |
| 178. In numerous instances, Defendants failed to achieve the promised loan repayment amounts or promised loan forgiveness. | Dkt. 20, PX 2 at 74, (Bennett Decl. ¶ 19); Dkt. 20-1, PX 3 at 144, (Bishop Decl. ¶ 19); Dkt. 20-1, PX 4 at 179-80 (Bonilla Decl. ¶¶ 12, 19) ("National Secure Prcessing and Mission Hills did not make any payments on my loans, my loans were not consolidated, and I was not enrolled in and forgiveness plan.:); Dkt. 21, PX 5 at 210 (Brockel Decl. ¶ 8); Dkt. 21, PX 6 at 228 |

|  | (Bursey Decl. ¶ 14); Dkt. 21, PX 7 at 266 (Clemans Decl. ¶ 11); Dkt. 21, PX 8 at 275 (Cooper Decl. ¶ 16); Dkt. 21-1, PX 9 at 315-16 (Fleming Decl. ¶¶ 16, 19);  Dkt. 22, PX 10 at 343 (Horejs Decl. ¶ 23); Dkt. 22, PX 11 at 382-83 (Preston Decl. ¶ 14); Dkt. 22, PX 12 at 409 (Sanker Decl. ¶ 15); Dkt. 24, PX 13 at 498 (Schultz Decl. ¶ 13); Dkt. 24, PX 14 at 535 (Shelton-Larimore Decl. ¶ 7); Dkt. 24, PX 15 at 542-43 (Sickel Decl. ¶¶ 7, 13) ("They did not put me into a forgiveness program or obtain a lower payment for me as promised."); Dkt 24, PX 16 at 553 (Smith Decl. ¶ 15); Dkt. 24-1, PX 17 at 591 (Somers Decl. ¶ 12); Dkt. 24-1, PX 18 at 626 (Taylor Decl. ¶ 12); Dkt. 24-1, PX 19 at 651 (Thompson Decl. ¶ 21); Dkt. 27, PX 21 at 1150-51, 1160 |
|  |  |

| | |
|---|---|
| | (Lause Decl. ¶ 12, Att. B). |
| 179. There are no federal loan forgiveness programs with repayment terms of three or seven years. | Department of Education guidance on forgiveness programs does not include any with three or seven year terms. *See* https://studentaid.gov/manage-loans/forgiveness-cancellation |
| 180. Federal loan forgiveness programs with repayment terms of five, ten or fifteen years have strict employment requirements. | *See* https://studentaid.gov/manage-loans/forgiveness-cancellation/teacher (Department of Education materials on qualification for Teacher Loan Forgiveness); https://studentaid.gov/manage-loans/forgiveness-cancellation/public-service (Public Service Loan Forgiveness). |
| 181. Defendants are not federal loan servicers and despite their representations to consumers, have not taken over or purchased consumers' | Dkt. 27, PX 21 at 1149, 1151 (Lause Decl. ¶¶ 9, 14). |

| | |
|---|---|
| student loans. | |
| 182. Defendants' routinely failed to forward consumers' payments to federal student lenders. | Dkt. 20, PX 1 at 4, (Avant Decl. ¶ 19); Dkt. 20, PX 2 at 74, (Bennett Decl. ¶ 19); Dkt. 20-1, PX 3 at 144, (Bishop Decl. ¶ 19); Dkt. 20-1, PX 4 at 179 (Bonilla Decl. ¶ 12); Dkt. 21, PX 5 at 210 (Brockel Decl. ¶ 8); Dkt. 21, PX 6 at 228 (Bursey Decl. ¶ 14); Dkt. 21, PX 7 at 266 (Clemans Decl. ¶ 11); Dkt. 21, PX 8 at 275 (Cooper Decl. ¶ 16, 18) (Defendants paid nothing to lenders and refused to refund $3,768.24 of consumers' money they were holding in a "trust" account); Dkt. 21-1, PX 9 at 315 (Fleming Decl. ¶ 16); Dkt. 22, PX 10 at 343 (Horejs Decl. ¶ 25); Dkt. 22, PX 11 at 384 (Preston Decl. ¶ 20); Dkt. 22, PX 12 at 409 (Sanker Decl. ¶ 15); Dkt. 24, PX 13 at 498 (Schultz Decl. ¶ 13); Dkt. 24, PX 14 at 535 (Shelton- |

| | |
|---|---|
| | Larimore Decl. ¶ 7); Dkt. 24, PX 15 at 542 (Sickel Decl. ¶ 7); Dkt 24, PX 16 at 553 (Smith Decl. ¶ 15); Dkt. 24-1, PX 17 at 592 (Somers Decl. ¶ 16) (only $385 out of over $1,800 paid to Defendants was applied to loans); Dkt. 24-1, PX 18 at 628 (Taylor Decl. ¶ 20); Dkt. 24-1, PX 19 at 651 (Thompson Decl. ¶ 21); Dkt. 27, PX 21 at 1151-52, 1160 (Lause Decl. ¶ 15, Att. B); PX 34 (R. Radwan trans. at 232:6-20); PX 36 (Robbins trans. at 93:23-95:24); PX 37 (Velazquez trans. at 63:8-19; 89:16-21); PX 39 (Lopez trans. 28:13-29:16, 168:2-18, 171:21-172:18); Dkt. 99-2 at 5, 15 (R. Radwan Decl. ¶¶ 13, 39). |

| V. DEFENDANTS' "PROGRAM" WAS AN ELABORATE SERVICING SCAM THAT DIVERTED MILLIONS OF DOLLARS OF CONSUMERS' LOAN PAYMENTS INTO DEFENDANTS' POCKETS. | |
|---|---|
| 183. Defendants routinely failed to obtain the specific, lower monthly payments promised consumers. | PX 32 (Geiran Decl. ¶ 57); Dkt. 20, PX 2 at 74, (Bennett Decl. ¶ 19); Dkt. 20-1, PX 3 at 144, (Bishop Decl. ¶ 19); Dkt. 20-1, PX 4 at 179 (Bonilla Decl. ¶ 12); Dkt. 21, PX 5 at 210 (Brockel Decl. ¶ 8); Dkt. 21, PX 6 at 228 (Bursey Decl. ¶ 14); Dkt. 21, PX 7 at 266 (Clemans Decl. ¶ 11); Dkt. 21, PX 8 at 275 (Cooper Decl. ¶ 16); Dkt. 21-1, PX 9 at 315 (Fleming Decl. ¶ 16);  Dkt. 22, PX 10 at 343 (Horejs Decl. ¶ 23);  Dkt. 22, PX 11 at 382-83 (Preston Decl. ¶ 14); Dkt. 22, PX 12 at 409 (Sanker Decl. ¶ 15); Dkt. 24, PX 13 at 498 (Schultz Decl. ¶ 13); Dkt. 24, PX 14 at 535 (Shelton-Larimore Decl. ¶ 7); Dkt. 24, PX 15 at 542 (Sickel Decl. ¶ |

| | |
|---|---|
| | 7); Dkt 24, PX 16 at 553 (Smith Decl. ¶ 15); Dkt. 24-1, PX 17 at 591 (Somers Decl. ¶ 12); Dkt. 24-1, PX 18 at 626 (Taylor Decl. ¶ 12); Dkt. 24-1, PX 19 at 651 (Thompson Decl. ¶ 21); Dkt. 27, PX 21 at 1150-51, 1160 (Lause Decl. ¶ 12, Att. B). |
| 184. Of the 20,322 accounts in the Lazarus CRM (pre-July 2016 accounts), 19,784 (97.4%) had a monthly loan payment that was less than the monthly payment quoted consumers. | PX 32 (Geiran Decl. ¶ 57). |
| 185. Defendants frequently sought forbearance of consumers' student loan payments for 3 to 4 months. | Dkt. 20-1, PX 4 at 179 (Bonilla Decl. ¶ 12); Dkt. 22, PX 10 at 342 (Horejs Decl. ¶ 20); Dkt. 24, PX 15 at 542 (Sickel Decl. ¶ 7). |
| 186. Defendants routinely enrolled consumers in income-driven repayment ("IDR") plans without monthly repayment amounts. | Dkt. 20, PX 1 at 4 (Avant Decl. ¶ 19) (consumer learned he had been placed by Defendants in $0 income-based repayment program); Dkt. 20, PX 2 at 74-75, (Bennett Decl. ¶ 19); Dkt. 20- |

| | |
|---|---|
| | 1, PX 4 at 179 (Bonilla Decl. ¶ 12); Dkt. 21, PX 6 at 227-28 (Bursey Decl. ¶ 13); Dkt. 21, PX 7 at 266 (Clemans Decl. ¶ 11); Dkt. 22, PX 12 at 409 (Sanker Decl. ¶ 14); Dkt. 24, PX 13 at 498 (Schultz Decl. ¶ 13); Dkt. 27, PX 21 at 1155 (Lause Decl. ¶ 26). |
| 187. To qualify consumers for these programs, Defendants frequently misrepresented on IDR applications that consumers were unemployed with no income when, in fact, consumers had told Defendants they were employed and, in some case, submitted recent recent paystubs, W-2's, or other forms of income verification. | Dkt. 20, PX 1 at 4 (Avant Decl. ¶ 19) (consumer was signed up for $0 payment); *compare* to PX 1 at 12, (Avant Att. A) (application shows that consumer had an annual income of $70,000); Dkt. 20, PX 2 at 75, (Bennett Decl. ¶ 20) (consumer was told by servicer she was not eligble for the $0 repayment programs Defendants obtained for her); Dkt. 20-1, PX 4 at 179 (Bonilla Decl. ¶ 12) ("[Loan servicer] informed me that I was listed as being a single mother of four children with |

| | |
|---|---|
| | an annual income around $27,000 when I was really married with one child and a substantially higher income."); Dkt. 22, PX 12 at 409 (Sanker Decl. ¶ 14) ("I had previously provided accurate pay stubs to National Secure Processing and Mission Hills Federal showing that my income was not $0."); *compare to* PX 12 at 414 (Sanker Decl. Att. A) (showing income of $35,000); Dkt 24, PX 16 at 553 (Smith Decl. ¶ 15);  Dkt. 24-1, PX 19 at 651-52 (Thompson Decl. ¶ 21); Dkt. 27, PX 21 at 1155-56 (Lause Decl. ¶¶ 26-28); PX 37 (Velazquez Ex. 17); PX 39 (Lopez trans. at 112:13-19, 114:11-115:12, 123:1-12 & Exs. 9-10); Dkt. 54 at 16-21 (Receiver's Report); Dkt. 54-2 at 88-105 (Receiver's Exs. 8-16). |
| 188. Defendants internally referred to their | PX 39 (Lopez trans. at 56:14- |

| | |
|---|---|
| widespread practice of falsely representing a consumer as unemployed as seeking the "Maximum Benefit" or "Max Benefit." | 23). |
| 189. Defendants also instructed their employees not to ask for a consumer's pay stubs if the employees were planning to seek a $0 monthly payment for the consumer. | PX 31 at 1535-36 (Saunders Supp. Decl. Att. A) (NSP meeting agendas). |
| 190. For example, Defendants reported one consumer as being unemployed and having no income on her initial IDR plan request and multiple subsequent recertification requests, despite the consumer having reported to Defendants that she was employed with an annual income of $115,000. The consumer was approved for an IDR plan with a $0 monthly payment. | PX 39 at 2373-74, 2404, 2406, 2409, 2413, 2418, 2424, 2443, 2454 (Lopez trans. at 104:4-18, 112:13-19 & Ex. 9). |
| 191. In another case, Defendants reported a consumer as being unemployed and having no income, despite the consumer having reported to Defendants that she was employed with an annual income of $46,000. The consumer also submitted to Defendants | PX 37 at 2207-2210, 2230-32, 2238-39, 2250, 2257 (Velazquez trans. at 186:16-189:15 & Ex. 17). |

| | |
|---|---|
| a joint tax return showing that she and her husband had an adjusted gross income of $103,736. The consumer was approved for an IDR plan with a $0 monthly payment. | |
| 192. Based on Defendants' CRM records, of the 14,116 consumers with $0 monthly loan payments, nearly a quarter (more than 3,300) reported having incomes that were too great to qualify them for a $0 payment based on Department of Education guidelines. | PX 32 (Geiran Decl. ¶¶ 22-29, 40-47); StudentAid.gov, Income-Driven Plans Questions and Answers, https://studentaid.gov/manage-loans/repayment/plans/income-driven/questions (last visited Mar. 5, 2020). |
| 193. In numerous instances, consumers were unaware that their loan repayment amount had been set to zero and their monthly payments were not being applied to their loans. | Dkt. 20, PX 1 at 4 (Avant Decl. ¶ 19); Dkt. 20, PX 2 at 74-75 (Bennett Decl. ¶ 19); Dkt. 20-1, PX 3 at 143 (Bishop Decl. ¶ 14); Dkt. 20-1, PX 4 at 179 (Bonilla Decl. ¶ 12); Dkt. 21, PX 5 at 210 (Brockel Decl. ¶ 8); Dkt. 21, PX 6 at 228 (Bursey Decl. ¶¶ 14, 15); Dkt. 21, PX 7 at 266 (Clemans Decl. ¶ 11); Dkt. 21, PX 8 at 275 (Cooper Decl. ¶ 16); Dkt. 21-1, PX 9 at 315 (Fleming |

| | Decl. ¶ 16); Dkt. 22, PX 10 at 343 (Horejs Decl. ¶ 23); Dkt. 22, PX 11 at 382-83 (Preston Decl. ¶ 14); Dkt. 22, PX 12 at 409 (Sanker Decl. ¶¶ 14-15); Dkt. 24, PX 13 at 498 (Schultz Decl. ¶ 13); Dkt. 24, PX 15 at 542 (Sickel Decl. ¶¶  7-8); Dkt 24, PX 16 at 553 (Smith Decl. ¶ 15); Dkt. 24-1, PX 17 at 591 (Somers Decl. ¶ 13). |
|---|---|
| 194. Defendants typically placed only a small portion of consumers' monthly payments into a "trust" account, and took the rest as fees. | PX 32 (Geiran Decl. ¶¶ 11-13, 33-35). |
| 195. For the FDG (post-November 2017) accounts, the average monthly management fee was $63.99, the average monthly processing fee was $15.00, and the average monthly "trust" payment was $22.51. | PX 32 (Geiran Decl. ¶¶ 11-13). |
| 196. For the MHF (pre-November 2017) accounts, the average monthly management fee was $44.72, the average monthly processing fee was $10, and the average monthly "trust" | PX 32 (Geiran Decl. ¶¶ 33-35). |

| | |
|---|---|
| payment was $26.84. | |
| 197. Defendants routinely failed to make even these minimal "trust" payments to lenders. | Dkt. 99-2 at 5, 15 (R. Radwan Decl. ¶¶ 13, 39); PX 36 (Robbins trans. at 93:23-95:24); PX 37 (Velazquez trans. at 63:8-19; 89:16-21); PX 39 (Lopez trans. at 28:13-29:16, 168:2-18, 171:21-172:18). |
| 198. Despite being aware of the issue of payments not being made to lenders as early as July 2014, Defendants continued to debit affected consumers' accounts and did not terminate their relationships with these payment processors until January 2016 and October 2017, respectively. | PX 31 at 1506-15, 1537-40 (Saunders Supp. Decl. Att. A); PX 35 (M. Radwan trans. at 77:15-78:22); PX 36 (Robbins trans. at 94:14-95:12). |
| 199. In late-2018, Defendants began conducting an "audit" of their "legacy" accounts allegedly to determine how much they owed to consumers' lenders. | PX 34 (R. Radwan trans. at 232:6-232:20); PX 39 (Lopez trans. at 171:21-173:10). |
| 200. Through this "audit," Defendants determined that customers had a combined balance of at least $2,718,728 in "trust." | PX 32 (Geiran Decl. ¶ 32). |
| 201. Upon verifying that customers had | PX 34 (R. Radwan trans. at |

| | |
|---|---|
| money in "trust," Defendants decided on an ad hoc, case-by-case basis whether to make payments to customers' lenders. | 232:21-235:3, 244:7-25 & Ex. 9) (case-by-case decision for clients who cancelled); PX 39 (Lopez trans. at 178:17-179:13). |
| 202. Even when Defendants did make such payments, the payments frequently were for much less than the full amount consumers had in "trust." | Dkt. 54-3 at 127-28 (Receiver's Ex. 18, Emails re: Partial Trust Releases); PX 39 (Lopez trans. at 175:4-176:5). |
| 203. For example, after determining that one consumer had $18,000 in "trust," Defendants sent a payment to the consumer's lender for only $5,000. | PX 34 (R. Radwan Ex. 9); PX 39 (Lopez Ex. 14). |
| 204. In another case, Defendants decided to send only a $5,000 payment to a consumer's lender even though Defendants "never sent any payments to their [sic] lender" and the consumer had over $10,000 in her "trust." | PX 39 (Lopez Ex. 15). |
| 205. In some cases, Defendants took out additional management fees before making any payment to consumers' lenders. | Dkt. 54-3 at 106-126 (Receiver's Ex. 17, Emails and CRM Notes re: Fee Payments from Trust); PX 39 (Lopez trans. at 138:7-16; 178:17-179:13; 180:5-21 & Exs. 12, 15-16). |

| | |
|---|---|
| 206. For example, after one consumer cancelled her service and locked Defendants out of her loan servicing account, Defendants transferred $205 from her "trust" to themselves before sending the remaining amount to the consumer's actual loan servicer. | Dkt. 54-3 at 106-07 (Receiver's Ex. 17, Emails and CRM Notes re: Fee Payments from Trust). |
| 207. The funds in the "trust" account were supposed to have been paid to consumers' lenders. | PX 34 (R. Radwan trans. at 178:3-5, 178:19-22); PX 36 (Robbins trans. at 100:12-17); PX 37 (Velazquez trans. at 88:18-89:1); PX 39 (Lopez trans. at 76:1-12, 158:20-23, 176:14-177:5). |
| 208. In addition, Defendants transferred funds from the "trust" account into their "operating" and personal accounts. | Dkt. 54 at 27-29 (Receiver's Report); Dkt. 54-1 at 7-8 (Receiver's Ex. 2, Receivership Initial Accounting Records Review); Dkt. 54-4 at 150-165 (Receiver's Exs. 21-26). |
| 209. For example, in March 2018, Mazen Radwan wrote himself a $60,000 check from the "trust" account and deposited it into his personal bank account. | PX 35 (M. Radwan trans. at 170:12-171:19 & Ex. 18). |
| 210. On July 17 and 18, 2018, Defendants | Dkt. 54 at 27-28 (Receiver's |

| | |
|---|---|
| made two online transfers of $300,000 each from the "trust" account to the "operating" account, which they subsequently used to pay their personal income taxes. | Report); Dkt. 54-4 at 150-165 (Receiver's Exs. 22-23). |
| 211. In total, Defendants transferred at least $1,280,000 from the "trust" account to their "operating" account and other accounts controlled by Rima Radwan, Mazen Radwan, and Robbins. | Dkt. 54 at 29 (Receiver's Report); Dkt. 54-4 at 150-165 (Receiver's Exs. 21-26). |

### A. DEFENDANTS SEVERED CONSUMERS FROM THEIR LOAN SERVICERS

| | |
|---|---|
| 212. Defendants used consumers' usernames, passwords, and FSA PINs to gain access to consumers' federal student loan servicing accounts and change consumers' mailing addresses, phone numbers, and email addresses to Defendants' own. | Dkt. 21, PX 5 at 210 (Brockel Decl. ¶ 9); Dkt. 22, PX 11 at 382 (Preston Decl. ¶ 13); Dkt. 22, PX 12 at 409 (Sanker Decl. ¶ 13); Dkt. 24, PX 13 at 498 (Schultz Decl. ¶ 14); Dkt. 24, PX 15 at 542 (Sickel Decl. ¶ 7); Dkt. 24-1, PX 18 at 627 (Taylor Decl. ¶ 19); Dkt. 24-1, PX 19 at 651-52 (Thompson Decl. ¶ 21); Dkt. 27, PX 21 at 1153-54, 1159 (Lause Decl. ¶¶ 19-22, Att. A); Dkt. 46, PX 25 at 1239-40 (Goldstein Supp. |

| | |
|---|---|
| | Decl. ¶ 19); PX 31 at 1519 (Saunders Supp. Decl. Att. A) (Work Flow Check List); PX 32 (Geiran Decl. ¶¶ 20, 39); PX 39 (Lopez trans. at 34:12-35:8). |
| 213. Defendants' changes to consumers' contact information impeded loan servicers' communications with consumers. | Dkt. 22, PX 11 at 382 (Preston Decl. ¶ 13); Dkt. 24, PX 15 at 542 (Sickel Decl. ¶ 7) ("Sallie Mae was unable to verify my identity or discuss my loans because my contact information had been changed. I was cut off from communicating with Sallie Mae."); Dkt. 46, PX 25 at 1239-40 (Goldstein Supp. Decl. ¶ 19). |
| 214. Many consumers did not learn that Defendants were not making payments on their loans for months or even years after signing up for Defendants' services. | Dkt. 20, PX 1 at 4, (Avant Decl. ¶ 18) (learned after 4 years); Dkt. 20-1, PX 3 at 141-42, (Bishop Decl. ¶¶ 4, 13, 14) (learned after over 3 years of paing Defendants); Dkt. 20-1, PX 4 at 177-78 (Bonilla Decl. ¶¶ 3.11) (consumer learned |

| | |
|---|---|
| | after 4 years); Dkt. 21, PX 5 at 211 (Brockel Decl. ¶ 11) (3 years); Dkt. 21, Dkt. 21-1, PX 9 at 313, 315 (Fleming Decl. ¶ 5, 15, 16) (more than 4 years); Dkt. 24, PX 13 at 498 (Schultz Decl. ¶ 16) (nearly 3 years). |

| | |
|---|---|
| **B. DEFENDANTS COLLECTED ILLEGAL ADVANCE FEES AND POCKETED MOST OF CONSUMERS' MONTHLY PAYMENTS** | |
| 215. Defendants collected consumers' personal information, FSA PINs, and bank account payment information from consumers interested in Defendants' services during the enrollment call. | Dkt. 20, PX 2 at 72, (Bennett Decl. ¶ 6) (FSA username and password); Dkt. 21, PX 8 at 273 (Cooper Decl. ¶ 5); Dkt. 21-1, PX 9 at 313 (Fleming Decl. ¶ 5) (bank information); Dkt. 22, PX 11 at 380 (Preston Decl. ¶ 5) (personal information); Dkt. 24, PX 14 at 534 (Shelton-Larimore Decl. ¶ 4) (social security number and bank information); Dkt. 24, PX 15 at 541 (Sickel Decl. ¶ 4) (social security number, federal loan PIN, direct deposit information); Dkt. 24-1, PX 18 at 625 (Taylor Decl. ¶ 4) |

| | |
|---|---|
| | (personal and bank information); PX 38 (Sanchez trans. at 36:20-24) (consumer's bank information requested during sales call). |
| 216. Consumers were required to pay Defendants via ACH transfer from their bank accounts. | Dkt. 20, PX 1 at 10 (Avant Decl. Att. A) (ACH authorization form); Dkt. 20, PX 2 at 83 (Bennett Decl. Att. A); Dkt. 20-1, PX 4 at 186 (Bonilla Decl. Att. A); Dkt. 21, PX 5 at 218 (Brockel Decl. Att. A); Dkt. 21, PX 6 at 235 (Bursey Decl. Att. A); Dkt. 22, PX 12 at 417 (Sanker Decl. Att. A); Dkt. 24, PX 15 at 541 (Sickel Decl. ¶ 4); Dkt 24, PX 16 at 560 (Smith Decl. Att. A); Dkt. 24-1, PX 17 at 600 (Somers Decl. Att. A); Dkt. 24-1, PX 18 at 634 (Taylor Decl. Att. A); Dkt. 24-1, PX 19 at 658 (Thompson Decl. Att. A). |
| 217. After collecting consumers' bank account information and requiring them | PX 31 at 1519 (Saunders Supp. Decl. Att. A) (Work |

| | |
|---|---|
| to sign the debit authorization form, but before providing any of the promised debt relief, Defendants began debiting consumers' accounts via ACH transfer. | Flow Check List notes that consolidation process "[b]egins once the first payment clears"); PX 32 (Geiran Decl. ¶¶ 19, 58); PX 34 at 1775-81, 1903 (R. Radwan trans. at 188:10-194:8 & Ex. 24) (Defendants' sample of 50 accounts and timing of work flow with collection of payments). |
| 218. Defendants' fee structure varied over time, but typically consisted of an annual management fee of between $599 and $799 for the first year and $492 for each subsequent year, broken into twelve equal monthly payments, and a monthly processing fee of between $10 and $15. | PX 32 (Geiran Decl. ¶¶ 9-12, 33-34, 53-55); PX 40 at 2533-34 (Defendants Heritage, Tribune, Tren, Elegant, Mazen Radwan, Rima Radwan, and Dean Robbins's Response to Plaintiffs' Second Set of Interrogatories at 5-6). |
| 219. From at least April 2014 to July 2016, Defendants also charged consumers an additional "initiation" fee of between $30 and $6,600. | Dkt. 20, PX 2 at 80, (Bennett Att. A) (contract includes "Initiation Fee: $109.00"); Dkt. 20-1, PX 3 at 141, (Bishop Decl. ¶ 4) (initial payment of $109, ongoing payments of $79); Dkt. 20-1, |

|  | PX 4 at 183 (Bonilla Decl. Att. A) (contract includes "Downpayment: $201.11"); Dkt. 21, PX 5 at 215 (Brockel Att. A) (contract includes "Initiation Fee: $109.00"); Dkt. 21, PX 6 at 268 (Bursey Decl. ¶ 3); Dkt. 21, PX 8 at 274 (Cooper Decl. ¶ 9) (consumer paid an initial $200 "processing fee" and a monthly payment of $269.16); Dkt. 22, PX 11 at 380 (Preston Decl. ¶ 4) (initial fee was "$109 for the first couple of months" and then $61);  Dkt. 22, PX 12 at 414 (Sanker Att. A) (contract includes "Initiation Fee: $200."); Dkt. 24, PX 15 at 541 (Sickel Decl. ¶ 3) ($500 set up fee and then $61 payments); Dkt 24, PX 16 at 557 (Smith Decl. Att. A) (contract states "Initiation Fee: $200" and "Est. New Loan Payment: $45.74"); Dkt. 24-1, |

| | |
|---|---|
| | PX 18 at 631 (Taylor Att. A) (Contract includes "Initiation Fee: $109.00" and "Est. New Loan Payment: $61.67"); Dkt. 24-1, PX 19 at 655 (Thompson Decl. Att. A) (Contract includes "Initiation Fee: $109.00" and "Est. New Loan Payment: $61.67"); PX 32 (Geiran Decl. ¶ 51). |
| 220. The average initiation fee was $183; the median was $125; the most common was $109. | PX 32 (Geiran Decl. ¶ 51). |
| 221. After debiting consumers' accounts, Defendants' payment processors placed the funds in a "holding" account controlled by Defendants. | PX 34 at 1768-69, 1902 (R. Radwan trans. at 176:22-177:12 & Ex. 24). |
| 222. From there, the management fees were disbursed to Defendants' "operating" account, while the processing fees remained in the "holding" account to eventually be paid to the payment processor. | PX 34 at 1766-67, 1769-70, 1847, 1902 (R. Radwan trans. at 174:25-175:22, 177:4-178:8 & Ex. 24). |
| 223. The remaining funds were transferred to a third account referred to by Defendants as the "trust" account. | PX 34 at 1766-67, 1769-70, 1847, 1902 (R. Radwan trans. at 174:25-175:22, 177:4-178:8 |

| | |
|---|---|
| | & Ex. 24); *see also*, PX 37 (Velazquez trans. at 81:13-82:13) (Elegant Solutions and Trend Capital each had a holding, operating, and trust account). |
| 224. The "trust" account was, in fact, just another business account controlled by Defendants. | Dkts. 25, 25-1, PX 20 at 758, 857 (Goldstein Decl. Atts. C, N) (Wells Fargo 2938, Bank of the West 8836); PX 34 (R. Radwan trans. at 182:24-183:16). |
| 225. Defendants did not segregate the funds in the "trust" account by consumer and consumers could not withdraw funds from the account. | PX 34 (R. Radwan trans. at 183:6-184:3,184:10-13); PX 37 (Velazquez trans. at 86:20-87:2); PX 39 (Lopez trans. at 164:6-20). |
| 226. Nor did Defendants pay consumers' interest on their "trust" balances. | PX 34 (R. Radwan trans. at 184:4-6). |
| 227. From at least 2014 to January 2016, the "trust" account was maintained by Payment Automation Network (PAN), one of Defendants' payment processors. | Dkt. 25, PX 20 at 727 (Goldstein Decl. ¶ 164 & Table 3); PX 36 (Robbins trans. at 94:14-23); PX 37 (Velazquez trans. at 125:23-126:17). |
| 228. The PAN "trust" account was, in fact, | Dkt. 25-4, PX 20 at 724-25; |

| | |
|---|---|
| just a business checking account. | 1106-07 (Goldstein Decl. ¶¶ 155-56; Att. MM). |
| 229. Defendants used a number of payment processors during the complaint period. | PX 34 (R. Radwan trans. at 187:6-17); PX 35 (M. Radwan trans. at 123:9-11). |
| **C. CONSUMERS PAID MORE THAN $30 MILLION TO DEFENDANTS AND SUFFERED ADDITIONAL HARMS** | |
| 230. Between April 2014 and July 10, 2019, Defendants collected $31,140.943.00 from consumers.  Their net revenues, after subtraction of refunds and payments to federal loan servicers was $27,584,969. | PX 33 at 1699-00 (Jenkins Decl. ¶ 4, Table 1). |
| 231. Defendants made a total of $3,147,885.00 payments to consumers' federal student loan servicers. | PX 33 at 1699-00 (Jenkins Decl. ¶ 4, Table 1). |
| 232. Defendants refunded consumers $408,089.00. | PX 33 at 1699-00 (Jenkins Decl. ¶ 4, Table 1). |
| 233. Consumers' loans accrued unpaid interest while they were enrolled with Defendants. | Dkt. 20, PX 1 at 4 (Avant Decl. ¶ 20); Dkt. 20, PX 2 at 75 (Bennett Decl. ¶ 21); Dkt. 20-1, PX 3 at 144, (Bishop Decl. ¶ 19); Dkt. 20-1, PX 4 at 180 (Bonilla Decl. ¶ 19); Dkt. 21, PX 6 at 228-29 (Bursey Decl. ¶ 18); Dkt. 21, PX 7 at |

| | |
|---|---|
| | 266 (Clemans Decl. ¶ 11); Dkt. 21-1, PX 9 at 316 (Fleming Decl. ¶ 19); Dkt. 22, PX 12 at 411 (Sanker Decl. ¶ 21); Dkt. 24, PX 13 at 498 (Schultz Decl. ¶ 16); Dkt. 24, PX 15 at 542 (Sickel Decl. ¶ 7); Dkt 24, PX 16 at 553 (Smith Decl. ¶ 15); Dkt. 24-1, PX 19 at 652 (Thompson Decl. ¶ 22); Dkt. 27, PX 21 at 1155-56 (Lause Decl. ¶¶ 25, 29). |
| 234. In some instances, the unpaid interest that accrued on consumers' loans while in Defendants' program capitalized. | Dkt. 20-1, PX 4 at 179 (Bonilla Decl. ¶ 12); Dkt. 21-1, PX 9 at 316 (Fleming Decl. ¶ 19); Dkt. 22, PX 11 at 384 (Preston Decl. ¶ 20); Dkt. 24-1, PX 18 at 628 (Taylor Decl. ¶ 20); Dkt. 27, PX 21 at 1156 (Lause Decl. ¶ 29). |
| 235. Some consumers ended up owing thousands of dollars in capitalized interest on their loans as a result of their interractions with Defendants. | Dkt. 20, PX 1 at 4 (Avant Decl. ¶ 20) (ended up owing several thousand dollars in capitalized interest); Dkt. 20-1, PX 3 at 144 (Bishop Decl. ¶ 19) ($2,800 in capitalized |

PLAINTIFF'S UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 8:19-cv-01333-JVS-KES

| | |
|---|---|
| | interest); Dkt. 20-1, PX 4 at 180 (Bonilla Decl. ¶ 19) ($4,000 in capitalized interest); Dkt. 21, PX 6 at 228-29 (Bursey Decl. ¶ 18) ($2,000 in capitalized interest); Dkt. 21-1, PX 9 at 316 (Fleming Decl. ¶ 19) (over $5,000). |
| 236. Many consumers had to change repayment programs upon learning that Defendants had falsified their repayment applications.  These consumers typically lost years of credit for making on-time monthly payments for purposes of qualifying for loan forgiveness. | Dkt. 27, PX 21 at 1154-55 (Lause Decl. ¶ 24). |
| 237. Some consumers' loans went into delinquency or default as a result of Defendants' failure to make student loan payments. | Dkt. 21, PX 5 at 210 (Brockel Decl. ¶ 8); Dkt. 22, PX 10 at 343 (Horejs Decl. ¶ 23); Dkt. 24-1, PX 17 at 591 (Somers Decl. ¶ 12); PX 21 at 1156-57 (Lause Decl. ¶ 30). |
| 238. Consumers would not have signed up for Defendants' services if they knew that Defendants would not obtain for them the promised lower, monthly | Dkt. 20, PX 1 at 4, (Avant Decl. ¶ 20); Dkt. 20-1, PX 3 at 144, (Bishop Decl. ¶ 19); Dkt. 20-1, PX 4 at 180 (Bonilla |

| | |
|---|---|
| payments, make only sporadic, if any, payments on their student loans, and sever their communications with their actual loan servicers. | Decl. ¶ 19); Dkt. 21, PX 5 at 211 (Brockel Decl. ¶ 16); Dkt. 21, PX 6 at 228-29 (Bursey Decl. ¶ 18); Dkt. 21, PX 7 at 266-67 (Clemans Decl. ¶ 13); Dkt. 21, PX 8 at 275 (Cooper Decl. ¶ 21); Dkt. 21-1, PX 9 at 316 (Fleming Decl. ¶ 19); Dkt. 22, PX 10 at 343 (Horejs Decl. ¶ 25); Dkt. 22, PX 12 at 411 (Sanker Decl. ¶ 21); Dkt. 24, PX 13 at 498 (Schultz Decl. ¶ 17); Dkt. 24, PX 14 at 535 (Shelton-Larimore Decl. ¶ 10); Dkt. 24, PX 15 at 543 (Sickel Decl. ¶ 13); Dkt 24, PX 16 at 554 (Smith Decl. ¶ 18); Dkt. 24-1, PX 18 at 628 (Taylor Decl. ¶ 20); Dkt. 24-1, PX 19 at 652 (Thompson Decl. ¶ 23). |
| 239. Defendants received at least hundreds of complaints from deceived consumers. | PX 31 (Saunders Supp. Decl. ¶ 5 & Att. B); PX 39 (Lopez trans. at 128:20-129:15). |
| 240. According to Defendants' training materials, some of consumers' most | PX 25 at 1237, 1266 (Goldstein Supp. Decl. ¶ 8f & |

| | |
|---|---|
| common questions were: "Why aren't my loans being repaid? / Nothing has been paid to my loans? / You're a scam where's my $?". | Att. G). |
| 241. Consumers also cancelled in large numbers. Indeed, Defendants' CRM records show that more than a quarter of Defendants' customers ended up cancelling their service. | PX 32 (Geiran Decl. ¶¶ 7, 30, 49). |
| 242. According to Defendants' training materials, one of the top five reasons why consumers cancelled was, "I didn't know I am paying fees, I thought the money I pay you goes towards my loans." Another was "My Loan Manager lied to me." | PX 25 at 1237, 1263 (Goldstein Supp. Decl. ¶ 8e & Att. F). |

## II.   CONCLUSIONS OF LAW

1.     This Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345; 15 U.S.C. §§ 45(a), 53(b), and 57(b) .

2.     Venue is proper as to all parties in this district under 28 U.S.C. §1391(b)(1), (b)(2), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

3.     Defendants' activities are in or affecting commerce, as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

4.     The Complaint states a claim upon which relief may be granted pursuant to Sections 13 and 19 of the FTC Act, 15 U.S.C. §§ 53, 57, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, that Defendants violated Section 5 of the FTC Act and Sections 310.3(a)(2)(x) and 310.4(a)(5)(i) of the TSR, 16 C.F.R. §§ 310.3(a)(2)(x), 310.4(a)(5)(i), when they made material misrepresentations while selling their debt relief services and when they collected advance fees for debt relief services. *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (holding representations are material if they involve "information that is important to consumers and . . . likely to affect their choice of, or conduct regarding, a product."); *see also FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994) ("Express product claims are presumed to be material.").

5.     Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).

6.     Defendants advertised, marketed, offered to provide, sold, or provided debt relief services as defined by 16 C.F.R. § 310.2(o).

7.     Defendant Rima Radwan is liable for injunctive relief because she had control over the Corporate Defendants and/or participated in the wrongful conduct. *FTC v. Publishing Clearinghouse, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).

8.     Defendant Mazen Radwan is liable for injunctive relief because he had control over the Corporate Defendants and/or participated in the wrongful conduct. *Id.*

9.     Defendant Labiba Velazquez is liable for injunctive relief because she had control over the Corporate Defendants and/or participated in the wrongful conduct. *Id.*

10.     Defendant Dean Robbins is liable for injunctive relief because he had control over the Corporate Defendants and/or participated in the wrongful conduct.  *Id.*

11.     Rima Radwan is liable for monetary relief because she had, at least, "actual knowledge of material misrepresentations, . . . reckless[] indifferen[ce] to the truth or falsity of a misrepresentation, or . . . awareness of a high probability of fraud along with an intentional avoidance of the truth." *FTC v. Grant Connect LLC*, 763 F.3d 1094, 1101-02 (9th Cir. 2014).

12.     Mazen Radwan is liable for monetary relief because he had, at least, "actual knowledge of material misrepresentations, . . . reckless[] indifferen[ce] to the truth or falsity of a misrepresentation, or . . . awareness of a high probability of fraud along with an intentional avoidance of the truth." *Id.*

13.     Labiba Velazquez is liable for monetary relief because she had, at least, "actual knowledge of material misrepresentations, . . . reckless[] indifferen[ce] to the truth or falsity of a misrepresentation, or . . . awareness of a high probability of fraud along with an intentional avoidance of the truth." *Id.*

14.     Dean Robbins is liable for monetary relief because he had, at least, "actual knowledge of material misrepresentations, . . . reckless[] indifferen[ce] to the truth or falsity of a misrepresentation, or . . . awareness of a high probability of fraud along with an intentional avoidance of the truth." *Id.*

15.     The FTC is entitled to monetary relief in the full amount consumers paid to the Corporate Defendants, less payments to lenders and refunds issued by the Corporate Defendants, during the periods that the Defendants participated in the wrongful conduct.  *See, e.g., FTC v. Figgie Int'l*, 994 F.2d 595, 605-06 (9th Cir. 1993) (holding that consumers are assumed to have relied upon the deceptive

claims because they were widely disseminated, and that consumers were entitled to full refunds because the fraud was in the selling).

16.     Therefore, Rima Radwan, Mazen Radwan, Labiba Velazquez, and Dean Robbins' monetary liability for violations of the FTC Act and the TSR is joint and several with each other and the Corporate Defendants for the time period they had control or participated in the wrongful conduct. *See FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (rejecting arguments that defendants should not be liable for the full amount of consumer loss because they only received a percentage of the funds); *see also FTC v. Commerce Planet Inc.*, 815 F.3d 593, 603 (9th Cir. 2016).

17.     Once the FTC meets its initial burden of proving the amount it seeks "reasonably approximates the defendant's unjust gains," the burden shifts to the defendants to show that those figures were inaccurate, and "any risk of uncertainty [in this calculation] . . . fall[s] on the wrongdoer." *FTC v. Commerce Planet Inc.*, 815 F.3d. at 603 (citations omitted).

18.     There is a cognizable danger that Defendants will violate the FTC Act and the TSR again; therefore, a permanent injunction to fence in future conduct is appropriate. *See FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395, 85 S. Ct. 1035, 1048 (1965); *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *FTC v. USA Fin., LLC*, 415 Fed. App'x 970, 975 (11th Cir. 2011) (per curiam); *Litton Indus., Inc. v. FTC*, 676 F.2d 364, 370 (9th Cir. 1982) (quoting *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952)).

Dated:  March 9, 2020                    Respectfully submitted,

                                         /s/ K. Michelle Grajales
                                         K. Michelle Grajales
                                         Samuel F. Jacobson
                                         Attorneys for Plaintiff
                                         FEDERAL TRADE COMMISSION