K. MICHELLE GRAJALES
mgrajales@ftc.gov
SAMUEL JACOBSON
sjacobson@ftc.gov
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., NW
Mail Stop: CC-10232
Washington, DC  20580
(202) 326-3172

JOHN D. JACOBS, Cal. Bar. No. 134154
Local Counsel
jjacobs@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Blvd., Ste. 400
Los Angeles, CA 90024
Tel: (310) 824-4343; Fax: (310) 824-4380
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br><br>Plaintiff,<br><br><br>vs.<br><br><br>ELEGANT SOLUTIONS, INC., et al.<br><br><br>Defendants. | Civ. No. 8:19-cv-01333-JVS-KES<br><br>**PLAINTIFF'S STATEMENT OF GENUINE DISPUTES**<br><br>**Judge: Hon. James V. Selna**<br>**Hearing Date: April 20, 2020**<br>**Time: 1:30 p.m.**<br>**Courtroom: 10C** |

Plaintiff Federal Trade Commission ("FTC" or "Commission") respectfully submits this Statement of Genuine Disputes setting forth Plaintiff's responses and objections to Defendants' Statement of Undisputed Facts ("DUSF"), Dkt. 131-1. While the FTC has styled its filing "Plaintiff's Statement of Genuine Disputes" as required by Local Rule 56-3, there are no genuine disputes of material facts in this matter. In fact, both parties agree on the core material facts, including:

- Defendants' basic business model (i.e., charging consumers fees for debt relief services);
- Defendants' failure to make promised payments on consumers' loans;
- Defendants' placement of consumers in repayment programs without monthly payments;
- Defendants' debiting of consumers' bank accounts before obtaining the promised debt relief services;
- Defendants' re-branding of their business from the Student Loan Group and National Secure Processing to Federal Direct Group and Mission Hills Federal due to growing legal liabilities; and
- Defendants Rima Radwan, Mazen Radwan, and Dean Robbins' ownership of the Corporate Defendants.

To the extent that any core issue is in "dispute," it is because Defendants make unsupported or self-serving assertions that are belied by the evidence in the record. Fed. R. Civ. P. 56(c)(1)-(2). Indeed, many of Defendants' so-called "facts" are not facts at all, but rather are mischaracterizations or legal conclusions masquerading as facts. Other "facts" rely on materials that cannot be presented in a form that would be admissible in evidence—e.g., Individual Defendants' speculation as to consumers' understanding of Defendants' fees and services. Fed. R. Civ. P. 56(c)(2).

| DSUF No. | FTC Response and Objections |
|---|---|
| | **I.      Corporate Defendants Operated as a Common Enterprise.** |
| 1, 3-5, 11-16 | 1.      The FTC does not dispute that Defendants Elegant Solutions, Inc. d/b/a Federal Direct Group ("Elegant" or "FDG"), Trend Capital, Ltd. d/b/a Mission Hills Federal ("Trend" or "MHF"), Tribune Management, Inc. d/b/a Student Loan Group ("Tribune" or "SLG"), and Heritage Asset Management, Inc. d/b/a National Secure Processing ("Heritage" or "NSP") offered debt relief services including preparing loan consolidation and repayment program applications on behalf of consumers. The companies shared employees and office buildings. Dkt. 133-3, Plaintiff's Uncontroverted Statement of Facts and Conclusions of Law ("FTC-USF") ¶¶ 129-31. They also commingled funds. *Id.* ¶ 132. |
| 2, 6, 13 | 2.      The FTC does not dispute that Defendants Rima Radwan, Mazen Radwan, and Dean Robbins are equal owners of the Corporate Defendants. They also held themselves out as officers of each of the Corporate Defendants. FTC-USF ¶¶ 30-34, 52-56, 76-80, 94, 130. |
| 4-5, 16, 101 | 3.      The FTC does not dispute that the operation ceased doing business under the Tribune and Heritage corporate identities in 2017.  Defendants continued the operation under Elegant, Trend, and Dark Island until July 10, 2019. FTC-USF ¶ 126. |
| 13 | 4.      The FTC does not dispute that Elegant started enrolling new clients in November 2017. |
| 25 | 5.      The FTC does not dispute that Trend d/b/a Mission Hills Federal did not accept new clients. The FTC also does not dispute that one of the reasons Defendants created Elegant d/b/a Federal Direct Group and Trend d/b/a Mission Hills Federal were problems with payments not being made to consumers' lenders. |

| | | |
|---|---|---|
| 26 | 6. | The FTC does not dispute that Trend, doing business as Mission Hills Federal, took over responsibility for Defendants' "legacy" clients—*i.e.*, the clients signed up by Tribune, D.O.R.M. Group, and Student Loan Service Managers, a general partnership. |
| 120 | 7. | The FTC does not dispute that Trend had 6,281 active clients as of July 10, 2019. |
| 121 | 8. | The FTC does not dispute that Elegant had more than 2,000 active clients as of July 10, 2019. FTC-USF ¶ 127 (there were 2,516 active Federal Direct Group accounts). |
| 18 | 9. | The FTC does not dispute that Radwan Classic Cars ("RCC") was a d/b/a of Defendant Dark Island Industries, Inc. ("RCC") and that RCC bought, sold, repaired, and warehoused classic cars.<br><br>To the extent Defendants assert that Dark Island was separate from the other Corporate Defendants, or that there was no common control, commingling of funds, or shared offices and officers between Dark Island and the other Corporate Defendants, this assertion is unsupported and belied by evidence in the record. As set forth in the FTC's USF, Defendants Rima Radwan, Mazen Radwan, and Dean Robbins were equal owners of all five Corporate Defendants, including Dark Island. FTC-USF ¶ 128. Dark Island shared an office building with Defendants Elegant and Trend—3 Studebaker, Irvine, CA—and officers—Rima Radwan, Mazen Radwan, and Robbins—with the other Corporate Defendants. *Id.* ¶¶ 129-30.<br><br>Further, Defendants used Dark Island, along with the other Corporate Defendants, to operate their student debt relief business. Dark Island d/b/a Federal Direct Group and EDU STUDENT LOAN contracted with Automatic Funds Transfer Services, Inc. ("AFTS") to process payments from clients of the enterprise's student debt relief business. *Id.* ¶ |

137. It also set up the Internet services that Defendants used to conduct their student debt relief operation. *Id.* ¶ 140.

Although Dark Island also operated a car business, the car business was linked with, and dependent upon, the student debt relief business for funding and facilities. *Id.* ¶ 134. Trend Capital paid the rent for Dark Island's business premises at 3 Studebaker, Irvine, California. *Id.* ¶ 135. Defendants Mazen Radwan, Rima Radwan, and Dean Robbins capitalized Dark Island Industries, in part, using funds traceable to the student debt relief business. *Id.* ¶ 136.

Defendants' statement that rent for 3 Studebaker was supposed to be split between Elegant, Trend, and Dark Island beginning in 2020 is irrelevant. F.R.E. 401-02. Defendants' arrangement for paying rent in 2020 is irrelevant to the claims in the FTC's Amended Complaint, which concern Defendants' conduct from 2014-2019.

## II. Individual Defendants Participated In, Controlled, and/or Had the Authority to Control Corporate Defendants' Practices and Had Knowledge Thereof.

7, 17

10.    The FTC does not dispute that Rima Radwan operated and controlled Elegant, Trend, Tribune, and Heritage. However, evidence in the record belies Defendants' self-serving assertion that Rima Radwan had no control over the policies and practices at Dark Island d/b/a/ Radwan Classic Cars. As an owner and officer of Dark Island, and a signatory on its bank account, Rima Radwan had at least the authority to control Dark Island's policies and practices. Defendants' statement that Rima Radwan had no control over the policies and practices at Radwan Classic Cars ("RCC") is irrelevant. F.R.E. 401-02. Rima Radwan's lack of control over the policies and practices at RCC is irrelevant to her liability for the Corporate Defendants' practices, because the car sales activities of RCC are not the subject of the Amended Complaint or alleged law violations.

8

11.     The FTC does not dispute that Mazen Radwan operated and controlled Defendant Dark Island or that Dark Island did business as RCC, in addition to Federal Direct Group. FTC-USF ¶ 18. However, evidence in the record belies Defendants' self-serving assertion that Mazen Radwan did not control or have the authority to control the other Corporate Defendants' practices. As set forth in the FTC's Uncontroverted Statement of Facts and Conclusions of Law (Dkt. 132-3) and accompanying evidence, Mazen Radwan was an equal owner and officer of all five Corporate Defendants and a signatory on all five Corporate Defendants' bank accounts. He also held one or more corporate credit cards. In addition, Mazen Radwan provided the initial funding for Defendants' student debt relief business, arranged for Corporate Defendants' Internet services, opened bank accounts for the Corporate Defendants, applied for payment processing services for certain of the Corporate Defendants, handled the Corporate Defendants' tax filings, leased office space in South Dakota for certain of the Corporate Defendants, and managed the relationship with Payment Automation Network, one of Defendants' payment processors. FTC-USF ¶¶ 28-45. Thus, he participated in, controlled, and/or had the authority to control Corporate Defendants' practices.

        Evidence in the record also belies Defendants' assertion that Mazen Radwan had "very little knowledge" of Elegant, Trend, Tribune, or Heritage's practices. In addition to being an owner and office of all five Corporate Defendants, Mazen Radwan was a named defendant in a complaint filed by the State of North Carolina in 2016 against certain of the Defendants and their predecessor companies and signed the resulting Consent Order. FTC-USF ¶ 46. He met with the State attorney prosecuting the North Carolina case, who explained why the State filed suit. *Id.* ¶ 47.

| | | |
|---|---|---|
| 1 | | Mazen Radwan also knew about similar actions initiated by the States of |
| 2 | | Oregon and Washington and received consumer complaints from the |
| 3 | | Better Business Bureau and payment processors, which he forwarded to |
| 4 | | General Manager Daisy Lopez for response. *Id.* ¶¶ 48-49. Further, as an |
| 5 | | owner and officer of the Corporate Defendants, Mazen Radwan knew or |
| 6 | | should have known about the hundreds of complaints and cancellations |
| 7 | | that Corporate Defendants received from consumers who did not know |
| 8 | | that Defendants were collecting hefty fees for failing to make payments on |
| 9 | | consumers' loans. *Id.* ¶¶ 239-42. |
| 10 | 9, 19 | 12.    The FTC does not dispute that Dean Robbins worked as an IT |
| 11 | | specialist, fixed computers, and developed and maintained software |
| 12 | | programs for the Corporate Defendants. However, evidence in the record |
| 13 | | belies Defendants' self-serving assertion that Dean Robbins did not control |
| 14 | | or have the authority to control Corporate Defendants' practices. Robbins |
| 15 | | was an equal owner and officer of all five Corporate Defendants. FTC- |
| 16 | | USF ¶¶ 74, 76-80. He also was a signatory on the Corporate Defendants' |
| 17 | | bank accounts and a holder of one or more corporate credit cards. *Id.* ¶ 83. |
| 18 | | In addition, Robbins developed and maintained the Customer Relationship |
| 19 | | Management ("CRM") software, obtained payment processing services, |
| 20 | | purchased web-hosting and domain name services, created and maintained |
| 21 | | websites, bought and evaluated leads, set up virtual office and mail |
| 22 | | forwarding services, and provided payment information to Defendants' |
| 23 | | payment processors to allow them to debit consumers' accounts, all for |
| 24 | | Defendants' student debt relief business. FTC-USF ¶¶ 81-82A, 84-89. |
| 25 | | Thus, he participated in, controlled, and/or had the authority to control |
| 26 | | Corporate Defendants' practices. |
| 27 | 10, 20, 29 | 13.    The FTC does not dispute that Labiba Radwan worked for |
| 28 | | Corporate Defendants, in part, as an HR person, held the executive title of |

VP, had full administrative access to ADP to run payroll and company healthcare benefits, communicated messages to Defendants' employees on behalf of Rima Radwan, or made an hourly wage plus benefits.

However, evidence in the record belies Defendants' self-serving assertion that Labiba Radwan did not make hiring or firing decisions and did not control or have the authority to control the Corporate Defendants' practices. Labiba Radwan held herself out as the Director of Operations for several of the Corporate Defendants. FTC-USF ¶ 94. She also held a corporate credit card and routinely received sales reports. *Id.* ¶¶ 94A-95. Her duties included: ensuring "that operations processes stay within agreed upon budgets and timelines," assisting in "developing strategies and implementation plans to improve and standardize all aspects of operations," deciding whether to pay particular consumers' lenders and the amount and timing of any payments, addressing issues with Defendants' payment processors, and handling Human Resources issues, including hiring sales representatives. *Id.* ¶¶ 96-101. Thus, she participated in, controlled, and/or had the authority to control Corporate Defendants' practices.

Defendants' assertion that Labiba Radwan had "zero knowledge of how the student loan businesses work[ed], policies or operations" is based on inadmissible evidence. Rima Radwan, on whose declaration this statement is based, cannot have personal knowledge of what Labiba Radwan knew. Fed. R. Civ. P. 56(c)(4); F.R.E. 602. In any case, uncontroverted evidence in the record belies this self-serving assertion. In addition to performing the aforementioned duties, Labiba Radwan was aware of state law enforcement actions brought by the States of North Carolina, Washington, and Oregon against certain of the Defendants and predecessor companies. FTC-USF ¶ 102. She also was included in

| | | |
|---|---|---|
| 1 | | company communications about consumer complaints, including |
| 2 | | complaints from consumers stating that the company was a "scam." *Id.* ¶ |
| 3 | | 103. Thus, she knew or should have known of Defendants' unlawful |
| 4 | | practices. |
| 5 | 21 | 14.    The materials cited to support the following "facts" cannot be |
| 6 | | presented in a form that would be admissible in evidence. The owners' |
| 7 | | belief that theirs was a reasonable business venture is irrelevant to whether |
| 8 | | Defendants' violated the FTC Act or TSR. A defendant cannot avoid |
| 9 | | liability under Section 5 of the FTC Act by showing that he acted in good |
| 10 | | faith because the statute does not require an intent to deceive. *FTC v.* |
| 11 | | *Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1084 (C.D. Cal. 2012), |
| 12 | | *aff'd in relevant part*, 815 F.3d 593 (9th Cir. 2016); *FTC v. USA Fin.,* |
| 13 | | *LLC*, 415 Fed. Appx. 970, 974 n.2 (11th Cir. 2011). |
| 14 | | Defendants' claim that "consumers chose to use services offered by |
| 15 | | the Student Loan Debt Relief Businesses and to pay for these services |
| 16 | | rather than do it themselves" is not made on personal knowledge. Fed. R. |
| 17 | | Civ. P. 56(c)(4); F.R.E. 602. Defendants have not submitted any |
| 18 | | declarations from consumers and nowhere in their declarations do |
| 19 | | Defendants indicate that they spoke with consumers about why they chose |
| 20 | | to enroll with Defendants. Even if they did, such conversations would be |
| 21 | | inadmissible hearsay. F.R.E. 801-02. The same objections apply to |
| 22 | | Defendants' claim that "[m]any clients could not deal with the |
| 23 | | bureaucracy or did not have time to wait on the phone to talk to one of |
| 24 | | their servicers." |
| 25 | 22 | 15.    Defendants' claim that "[m]any servicers were not motivated to talk |
| 26 | | about loan consolidation because they frequently lost the consumer's |
| 27 | | account if the loan was consolidated" is not made on personal knowledge. |
| 28 | | Fed. R. Civ. P. 56(c)(4); F.R.E. 602. Nowhere in Rima Radwan's |

| | | |
|---|---|---|
| | | declaration, cited by Defendants to support this fact, does she indicate that she spoke to servicers about their motivations for talking to consumers about consolidation. And, even if she did, such conversations would be inadmissible hearsay. F.R.E. 801-02. Further, Ms. Radwan testified that she never worked for a federal student loan servicer. PX 43 at 2576 (R. Radwan trans. at 20:13-15). |
| | 23, 122-23 | 16.     The FTC does not dispute that nineteen consumers of Defendants' services signed sworn declarations in support of the FTC's case and that two of these consumers—Sapphira Clemans and Jamie Shelton—entered into contracts with Defendants after November 2017. The FTC also submitted evidence showing that Defendants received at least hundreds of complaints and thousands of cancellations from deceived consumers. FTC-USF ¶¶ 239-42. |
| | 24 | 17.     The FTC does not dispute that some clients entered into agreements with D.O.R.M. Group, Inc., one of Defendants' predecessor companies, Heritage and Tribune. Defendants transferred these "legacy" clients to Trend d/b/a Mission Hills Federal in November 2017. FTC-USF ¶ 119. However, evidence in the record belies Defendants' unsupported assertion that the agreements for these legacy clients were not made available to Defendants. The FTC complied with all discovery requests in this case, including by turning over all of the forensic images it made of Defendants' servers and workstations during its Court-authorized inspection of Defendants' offices on July 10, 2019. Included on these images were call recordings, CRM data, and emails. Dkt. 134-1. In addition, the Receiver has provided Defendants access to their corporate records and computer servers since the outset of this case. |
| | 28 | 18.     The FTC does not dispute that Rima Radwan set some policy and procedure for the student debt relief business. The FTC also does not |

| | | |
|---|---|---|
| | | dispute that Daisy Lopez supervised the processing or management side of Defendants' business and that Kendra Sanchez supervised sales. The FTC objects to Defendants' claim that "[b]oth Daisy and Kendra had clear understanding of company policies and enforced them" as not based on personal knowledge. Fed. R. Civ. P. 56(c)(4); F.R.E. 602. Rima Radwan, whose declaration Defendants cite to support this claim, cannot have personal knowledge of Daisy Lopez and Kendra Sanchez's "understanding" of company policies. Further, because Ms. Radwan claims not to have overseen "day-to-day" operations, she cannot have personal knowledge of whether Ms. Lopez and Ms. Sanchez "enforced" these policies. If Ms. Radwan's knowledge is based on conversations she had with Ms. Lopez and Ms. Sanchez, such conversations are inadmissible hearsay. F.R.E. 801-02. |
| 30, 95 | 19. | The FTC does not dispute that both Kendra Sanchez and Daisy Lopez received consumer complaints. However, evidence in the record flatly contradicts Defendants' self-interested claim that Rima Radwan did not receive client complaints. In fact, Rima Radwan received numerous consumer complaints, including from the Better Business Bureau. FTC-USF ¶ 73. |

**III.   Defendants Made False Promises to Lure Consumers Into Purchasing Their Services.**

| | | |
|---|---|---|
| 31, 45, 131 | 20. | The FTC does not dispute that Defendants' services "don't make economic sense for everyone" or that consumers can apply for loan consolidations, forgiveness, and repayment programs through their federal loan servicers or the Department of Education free of charge. However, Defendants' claim that clients understood they could obtain these services free of charge is not based on personal knowledge. Fed. R. Civ. P. 56(c)(4); F.R.E. 602. Defendants have not submitted any declarations from |

|   |   |
|---|---|
| 1 | consumers and nowhere in Rima Radwan's declaration, on which |
| 2 | Defendants rely to support this claim, does she indicate that she spoke with |
| 3 | consumers about their understanding of their federal student loan |
| 4 | repayment options. Even if she did, such conversations would be |
| 5 | inadmissible hearsay. F.R.E. 801-02. |

32, 34

21.    Evidence in the record belies Defendants' bare assertion that they disclosed their fees and terms of service before proceeding to contract signing. In fact, numerous declarations, complaints, and cancellations show that consumers were not informed of and did not understand Defendants' services and costs. FTC-USF ¶¶ 166, 173, 238-42.

Defendants' scripts directed telemarketers to tell consumers that Defendants were a student loan management company that would help consumers save money by consolidating their federal student loans, enrolling them in an income-based repayment program, or qualifying them for a loan forgiveness program (though telemarketers routinely deviated from these scripts). FTC-USF ¶¶ 152-53, 160. Defendants' telemarketers also made more specific loan forgiveness claims, such as that consumers' loan balances would be forgiven after the consumers made lower monthly payments for a specific span of years, such as three, seven, ten, or fifteen. *Id.* ¶ 154.

Defendants typically quoted consumers a monthly payment amount that was significantly less than what consumers were paying at the time. *Id.* ¶¶ 156-57. For example, Defendants told one consumer who had a $200 monthly payment that her new payment would be $50 and another consumer who had been paying $130 per month that her new payment would be $61. *Id.* ¶ 158-59. Defendants often informed consumers that all or most of their payment would be applied to their student loans. *Id.* ¶ 161. Defendants typically did not disclose in this initial sales pitch that the new

monthly payment included hefty management and processing fees. *Id.* ¶¶ 163-64. Thus, numerous consumers understood that the amount quoted would be applied to their student loans. *Id.* ¶ 166.

Defendants also represented to consumers that they would be purchasing, taking over, or handling servicing of consumers' loans. *Id.* ¶ 167. For example, Defendants told one consumer that they were "a servicer" who would "service [her] loans directly through the Department of Education" and another that their goal was to "eliminate your middle lender." *Id.* ¶¶ 168-69. Defendants further instructed consumers that Defendants would handle all loan communications and that consumers should stop making payments to their "previous" servicers. *Id.* ¶ 171-72. Such representations were consistent with Defendants' scripts, one of which instructed telemarketers to tell consumers that "our main goal is to eliminate the middle lender … and get you back on track to just paying the main source." *Id.* ¶ 170.

The FTC objects to Defendants' claim that "[c]onsumers have a full understanding of services, costs and programs before proceeding to the agreement discussion phase" as not made on personal knowledge. Fed. R. Civ. P. 56(c)(4); F.R.E. 602. Defendants have not submitted any declarations from consumers and nowhere in their declarations do Defendants indicate that they personally spoke with consumers about their understanding of Defendants' services and fees. Even if they did, such conversations would be inadmissible hearsay. F.R.E. 801-02.

| | 33 | 22.    The FTC does not dispute that Defendants recorded some telephone calls with consumers. However, uncontroverted evidence in the record belies Defendants' unsupported assertion that these recordings dispel any notion that Defendants misled consumers. Whereas Defendants have failed to submit a single recorded phone call as evidence, call recordings |

submitted by the FTC corroborate consumers' testimony regarding Defendants' misrepresentations. Dkt. 134-4, PX 31 (Saunders Supp. Decl. Att. C); PX 45 (Saunders Second Supp. Decl. Atts. B-C).

The FTC further objects to Defendants' claim that "[t]hese recordings should dispel any notion that we set out intentionally or unintentionally to defraud consumers" as irrelevant and not made on personal knowledge. Fed. R. Civ. P. 56(c)(4); F.R.E. 401-02, 602. Defendants cannot avoid liability under Section 5 of the FTC Act by showing that they acted in good faith because the statute does not require an intent to deceive. *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1084 (C.D. Cal. 2012), *aff'd in relevant part*, 815 F.3d 593 (9th Cir. 2016); *FTC v. USA Fin., LLC*, 415 Fed. Appx. 970, 974 n.2 (11th Cir. 2011).

| 32, 34-52, 55-57, 61-62, 82, 99, 104, 111 | 23.     The FTC does not dispute that after consumers agreed to enroll in Defendants' "program," Defendants sent consumers a lengthy, pre-filled enrollment packet to sign electronically using DocuSign. FTC-USF ¶ 174. The packet included, among other things, a privacy policy, service agreement, and a debit authorization form, which authorized Defendants to initiate Automated Clearing House ("ACH") debits from consumers' bank accounts. *Id.* ¶ 175. The FTC does not dispute the content of these documents.

Buried in the middle of the enrollment packet was a statement of Defendants' fees, along with various other disclaimers. *Id.* ¶ 176. However, Defendants' DocuSign application automatically jumped from signature block to signature block instead of requiring consumers to scroll through each page. *Id.* ¶ 177. Thus, the FTC disputes the unsupported conclusory statement that "there is no possible way a client could skip any disclosures when signing the agreement." DUSF ¶ 35. To the contrary, |

| | | |
|---|---|---|
| | | substantial evidence indicates that numerous consumers did not receive these disclosures. *See* FTC-USF ¶ 163 (citing declarations of consumers who did not know that Defendants would collect hefty management and processing fees), ¶ 245 (one of the top five reasons why consumers cancelled was, "I didn't know I am paying fees, I thought the money I pay you goes towards my loans"). |
| | 35-36, 41, 104 | 24.     The FTC does not dispute that Defendants had a Document Disclosure & Self-Verification Script or the contents of that script. However, Defendants' sales floor supervisor, Kendra Sanchez, testified that telemarketers routinely deviated from Defendants' scripts, FTC-USF ¶ 152, a fact borne out by Defendants' own call recordings. *See* PX 45 (Saunders Second Supp. Decl. Atts. B-C) (fees not disclosed during sales calls). Further, Defendants instructed their telemarketers to read this script only *after* consumers agreed to enroll in Defendants' "program" and received the pre-filled enrollment packet. Dkt. 131-2 (Rima Radwan Decl. Ex. A-7). The script also does not direct telemarketers to explain the specific amounts of Defendants' fees or what they are for. *Id.* Instead, it directs them to tell consumers that the fees are "included in your monthly payments and *are not additional fees*." *Id.* (emphasis added). |
| | 54 | 25.     Evidence in the record belies Defendants' unsupported claim that consumers did not feel pressure to sign Defendants' contracts. For example, a consumer declarant stated that she "felt pressured to enroll with Federal DG because my loans were in default, the man seemed to be offering me a good deal, and because I did not understand that I could consolidate my loans myself." Dkt. 21, PX 7 (Clemans Decl. ¶ 5). Furthermore, consumers frequently signed the contract while on the phone with Defendants' telemarketers. FTC-USF ¶ 174. |
| | | The FTC also objects to Defendants' claim that they "did not |

| | |
|---|---|
| | pressure clients to sign contracts before the clients were ready to sign" as not based on personal knowledge. Fed. R. Civ. P. 56(c)(4); F.R.E. 602. Defendants have not submitted any declarations from consumers and nowhere in Rima Radwan's declaration, on which Defendants rely to support this claim, does Ms. Radwan indicate that she personally spoke with consumers about whether they felt pressure to sign Defendants' contracts before they were ready to do so. Even if she did, such conversations would be inadmissible hearsay. F.R.E. 801-02. |
| 58, 85 | 26.   The FTC does not dispute that Defendants created two Customer Relationship Management ("CRM") databases—Ezekial and Lazarus—or that these databases included a breakdown of Defendants' fees for each client. However, as discussed above, evidence in the record belies Defendants' unsupported claim that they provided consumers a breakdown of their fees during the initial sales pitch. *See supra* ¶¶ 21-24. |
| 63-77, 84, 89-90, 98-100, 119 | 27.   The FTC does not dispute that Defendants had various policies, procedures, and training materials. To the extent these policies, procedures, and training materials were documented, the FTC does not dispute their content. However, these policies and procedures did not prevent Defendants' practice of taking unlawful advance fees and misrepresenting their services to consumers. *See generally* Dkt. 132-2, FTC's Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("SJ Memo"); Dkt. 133-3, FTC-USF. |
| 70, 97 | 28.   Evidence in the record belies Defendants' self-serving assertion that they terminated any employees who violated a purported company policy prohibiting misrepresentations. As discussed in the FTC's SJ Memo and USF, Defendants' telemarketers routinely made false promises to consumers, but according to Defendants, only a handful of employees were ever terminated. PX 43 at 2577-78 (R. Radwan trans. at 138:20- |

| | |
|---|---|
| | 39:5); PX 44 at 2580-81 (L. Velazquez trans. at 29:24-30:9). |
| 59, 78-79, 88 | 29.    The FTC does not dispute that Defendants had a client portal or the contents of that portal. However, the material cited—Exhibit A-15 to Rima Radwan's declaration—does not support Defendants' claim that the client portal provided "full transparency" to clients, provided each client with real time up-to-date information about their student loans and FDG fees, and enabled clients to request a cancellation or return of their trust funds. Dkt. 131-2 at 206-10. |
| 86-87 | 30.    The FTC does not dispute that Defendants had one or more consumer-facing websites or the contents of these websites. However, the material cited does not support Defendants' assertion that "Elegant's website clearly states what Elegant is, what services it provides, how it provides the services, and what fees are associated with providing the services." Exhibit A-18 to Rima Radwan's declaration, which Defendants cite to support this fact, does not state the amount of Defendants' fees, while falsely claiming, "We do NOT charge any upfront fees." Dkt. 131-2 at 215 (R. Radwan Decl. Ex. A-18); *see also* FTC-USF ¶¶ 215-28 (discussing Defendants' practice of taking advance fees). It also does not clearly state what services Defendants provide and how they provide them. For example, the website does not explain that Defendants would falsify consumers' employment statuses and incomes in order to enroll them in repayment programs, as Defendants frequently did, and that many consumers would end up owing more on their student loans. FTC-USF ¶¶ 183-193. |
| | **IV.    Defendants Failed to Make Payments on Consumers' Loans.** |
| 25, 27, 93 | 31.    The FTC does not dispute that despite Defendants' promises to |

apply all or most of consumers' monthly payments to consumers' student loans, payments were not being made to consumers' lenders. The FTC also does not dispute that Defendants contracted with payment processors. Despite being aware of this issue as early as July 2014, Defendants continued to make the same claims to consumers, debit affected consumers' accounts, and not send the money to lenders, and Defendants did not terminate their relationships with two of their payment processors—Payment Automation Network and Electronic Payment Systems—until January 2016 and October 2017, respectively. FTC-USF ¶ 198.

In addition, the FTC does not dispute that that starting in late-2018, Defendants began an "audit" of MHF accounts. Through this "audit," Defendants determined that customers had a combined balance of at least $2,718,728 in "trust." FTC-USF ¶ 200. Upon verifying that customer had money in "trust," Defendants decided on an ad hoc, case-by-case basis whether to make payments to customers' lenders. *Id.* ¶ 201. Even when Defendants did make such payments, the payments frequently were for much less than the full amount consumers had in "trust." *Id.* ¶¶ 202-204. Thus, the FTC disputes Defendants' unsupported assertion that they "resolved" the problems with payments not being made to consumers' lenders.

The FTC does not dispute that from May 25, 2018 to January 31, 2019, Elegant paid $121,729.01 to lenders and from January 3, 2018 to February 28, 2019, Trend paid $2,170,886.20 to lenders. Dkt. 25, PX 20 (Goldstein Decl. ¶¶ 179, 181).

94    32.    The FTC does not dispute that Defendants' transferred at least $1.2 million in consumer "trust" funds to their operating account, even though these funds allegedly belonged to consumers and were supposed to be paid

| | |
|---|---|
| | toward their student loans. FTC-USF ¶¶ 207, 209. |

**V.     Defendants Took Advance Fees.**

| 53, 81, 109 | 33.     Uncontroverted evidence in the record belies Defendants' unsupported assertions that they provided the promised debt relief services before collecting payments from consumers and did not take upfront fees. Defendants collected consumers' bank account information from consumers interested in Defendants' services during the enrollment call. FTC-USF ¶ 215. Consumers were required to pay Defendants via ACH transfer from their bank accounts. *Id.* ¶ 216. After collecting consumers' bank account information and requiring them to sign the debit authorization form, but before providing any of the promised debt relief, Defendants began debiting consumers' accounts via ACH transfer. *Id.* ¶¶ 217.

Defendants' fee structure varied over time, but typically consisted of an annual management or service fee of between $599 and $799 for the first year and $492 for each subsequent year, broken into twelve equal monthly payments, and a monthly processing fee of between $10 and $15. *Id.* ¶ 218. From at least April 2014 to July 2016, Defendants also charged consumers an additional "down payment" or "initiation" fee of between $30 and $6,600. *Id.* ¶ 219. |
|---|---|
| 110 | 34.     The FTC does not dispute that Defendants typically began debiting consumers' accounts on a recurring monthly basis within 30 days from execution of the Service Agreement. The FTC also does not dispute that after debiting consumers' accounts, Defendants' payment processors placed the funds in a "holding" account controlled by Defendants. *Id.* ¶ 221. Further, the FTC does not dispute that from there, the management fees were disbursed to Defendants' "operating" account, the processing |

| | | |
|---|---|---|
| | | fees to the processor, and the remaining funds to a third account that Defendants referred to as the "trust" account. *Id.* ¶¶ 222-23. |
| 112 | | 35.     The FTC does not dispute that whereas Defendants began debiting consumers' accounts on a recurring monthly basis approximately 30 days from execution of the Service Agreement, it took Defendants substantially longer than 30 days to consolidate clients' loans and obtain new repayment terms for them. FTC-USF ¶ 217. Moreover, Defendants failed to obtain the promised repayment terms for consumers, frequently falsifying consumers' employment statuses and incomes in order to enroll them in repayment programs without monthly payments. *Id.* ¶¶ 183-93. Defendants also failed to make payments towards clients' loans as promised. *Id.* ¶¶ 194-211. |
| 105 | | 36.     Evidence in the record belies Defendants' self-serving assertion that clients had full access to their "trust" account funds. The "trust" account was just another business account controlled by Defendants. FTC-USF ¶ 224. Defendants did not segregate the funds in the "trust" account by consumer and consumers could not withdraw funds from the account. *Id.* ¶ 225. Nor did Defendants pay consumers' interest on their "trust" balances. *Id.* ¶ 226. |
| | | **VI.   Defendants Bilked Consumers Out of More Than $30 Million and Caused Them to Suffer Additional Harms.** |
| 27, 124-27 | | 37.     The FTC does not dispute that between April 2014 and July 10, 2019, Defendants collected $31,140.943.00 from consumers. During this time, Defendants made a total of $3,147,885.00 payments to consumers' federal student loan servicers and refunded consumers $408,089.00. Thus, Defendants' net revenues, after subtracting refunds and payments to federal loan servicers, were $27,584,969.00. FTC-USF ¶¶ 230-32. Consumers suffered other harms as well. Numerous consumers' |

| | | |
|---|---|---|
| | | loans accrued unpaid interest while they were enrolled with Defendants. *Id.* ¶ 233. In some instances, thousands of dollars of unpaid interest that accrued on consumers' loans while in Defendants' program capitalized— i.e., it was added to consumers' principal. *Id.* ¶ 234. Many consumers had to change repayment programs upon learning that Defendants had falsified their repayment applications. *Id.* ¶ 236. Changing repayment plans restarts the clock for purposes of a consumer making the required number of monthly payments towards forgiveness. *Id.* Thus, consumers who were enrolled by Defendants in the wrong repayment program often lost months or years of monthly payments towards their goal of obtaining loan forgiveness. *Id.* Some consumers' loans went into delinquency or default as a result of Defendants' failure to make payments. *Id.* ¶ 237. |
| | 106-08 | 38.     The FTC does not dispute that per the terms of Defendants' contracts, consumers could cancel their contracts only by sending written notice (a) within three (3) days of signing the agreement, or (b) before Loan Program begins. After consolidation, consumers could cancel only if they did so 90 days prior to each anniversary date of the agreement. Dkt. 131-2 at Pages 111, 127. However, evidence in the record belies Defendants' assertion that they did not pursue any collection efforts. Indeed, Defendants had a group within their processing department dedicated to collections. Dkt. 54 at 10-11 (Receivers' Report). |
| | **VII.  Unlike MOHELA, Defendants Did Not Service Consumers' Federal Student Loans.** | |
| | 128-29 | 39.     Evidence in the record belies Defendants' unsupported assertion that MOHELA and Defendants were competitors. MOHELA is a public instrumentality and body politic and corporate of the State of Missouri, established pursuant to Sections 173.350 to 173.445 of the Missouri Revised Statutes. MOHELA is engaged in the business of servicing |

student loans, including student loans that are made by the U.S. Department of Education pursuant to the Federal Direct Loan Program. Additionally, MOHELA owns and services student loans made through the Federal Family Education Loan Program ("FFELP"). MOHELA provides a full range of services to Direct Loan and FFELP borrowers, including billing payment processing and advising borrowers about a number of relevant topics, including repayment plan options, loan discharge and loan forgiveness, delinquency and default prevention initiatives, and collections. MOHELA works directly with Direct Loan and FFELP borrowers to ensure that borrowers are in the repayment plan that best meets their needs and, as necessary, to provide borrowers with forbearances and deferments during times when the borrower is in school, unemployed, or is suffering some form of financial hardship. Dkt. 27, PX 21 at 1147 (Lause Decl. ¶¶ 2-3).

Defendants, by contrast, are not federal loan servicers and are not in any way affiliated with the Department of Education or federal loan servicers. Despite their promises to the contrary, Defendants did not take over servicing of consumers' federal student loans. FTC-USF ¶ 181.

## VIII.  Defendants Misled Consumers, Including the Nineteen Consumer Declarants.

| 132-405 | 40.  DUSF Nos. 132-405 all relate to the nineteen consumers who submitted declarations in support of the FTC's case. Though not required to prove a violation of Section 5 of the FTC Act, these declarations, which are corroborated by Defendants' sales scripts and call recordings, as well as by at least hundreds of consumer complaints, provide actual evidence that consumers were deceived.  FTC-USF ¶¶ 152-53, 164, 170, 239-242.<br><br>With respect to Defendants' factual assertions, the FTC does not dispute that these consumers signed contracts with Defendants or the |

content of these contracts. The FTC also does not dispute the dates of consumers' contracts, payments, consolidations, and repayment term approvals to the extent supported by actual documentary evidence, as opposed to Defendants' mere say-so.

Numerous of Defendants' facts, however, are not supported by the materials cited, including DUSF Nos. 132, 134, 144, 146, 150-51, 157, 159-65, 175-76, 181, 187-90, 196, 198-99, 209, 223-28, 234, 236, 240-41, 248, 250, 251-257, 259-60, 264, 266-69, 271, 277, 279-81-85, 296, 298, 304, 306-07, 309-28, 335-42, 348, 355-56, 362-63, 365, 370-75, 380, 384-85, 391, 395-96. For example, the materials cited by Defendants to support DUSF Nos. 134, 150, 163, 181, 196, 209, 240, 256, 268, 296, 313, 327, 340, 356, 370, 385, 396 do not show that Defendants obtained the specific, lower payments promised consumers. Rather, they show that consumers' monthly payments to Defendants consisted largely or entirely of Defendants' fees and that Defendants frequently were paying $0 to consumers' student loans. Dkt. 131-2 (R. Radwan Decl. Exs. A-28, A-30, A-33, A-37, A-40, A-46, A-52, A-57, A-60, A-62, A-64, A-66, A-69, A-72, A-75). Likewise, the materials cited by Defendants to support DUSF No. 151 do not show that Defendants provided debt relief services to Erica Bennett before debiting her account. To the contrary, Defendants' own records show that Defendants collected payment from Ms. Bennett prior to obtaining a consolidation and new repayment terms for her. *See* DUSF No. 151-52 (first payment debited on March 16, 2016, but consolidation not approved until April 2016).

The FTC also objects to these facts to the extent they are based on customer service representatives' notes of calls with consumers. *See, e.g.*, DUSF Nos. 153, 246, 380. Federal Rule of Evidence 1002 requires parties to submit an original recording to prove its contents. F.R.E. 1002.

Defendants' call notes are not original recordings of Defendants' calls with consumers and the notes do not meet any of the exceptions under Rule 1004. Furthermore, to the extent Defendants are offering these call notes to prove the truth of matters asserted by Defendants' employees or consumers, the notes are inadmissible hearsay. F.R.E. 801-02.

The FTC also objects to Defendants' factual assertions to the extent they are based solely on Rima Radwan's declaration. *See, e.g.*, DUSF Nos. 227, 380. Nowhere in her declaration does Ms. Radwan indicate that she personally spoke with any of the nineteen declarants or reviewed their phone calls with Defendants. Thus, she lacks personal knowledge of what consumers were told and understood. Fed. R. Civ. P. 56(c)(4); F.R.E. 602.

| | | |
|---|---|---|
| **IX.** | **Many of Defendants' So-Called "Facts" Simply Are Irrelevant.** | |
| 60 | 41. | Defendants' assertion that "Rima hired in house counsel and worked closely with Elegant's attorney to research what was going on in the industry and how Elegant can be the best in the business and constantly make improvements" is irrelevant. F.R.E. 401-02. Advice of counsel is not a defense to individual liability under Section 5 of the FTC Act. *FTC v. Commerce Planet, Inc.*, 642 Fed. Appx. 680, 683 (9th Cir. 2016) (citing *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1102 (9th Cir. 2014). |
| 91-92 | 42. | Defendants' assertion that "Elegant sued Payment Automation Network because of failure to process and disburse payments" and "Electronic Payment Services was sued by the FTC because of failing to properly debit client accounts correctly" is irrelevant. F.R.E. 402. Defendants themselves promised to apply all or most of consumers' payments to their student loans. FTC-USF ¶ 182. And Defendants admit that many of these payments were never made. *Id.* ¶ 197; DUSF ¶ 25. Further, despite being aware that payments were not being made to lenders as early as July 2014, Defendants continued to debit affected consumers' |

| | | |
|---|---|---|
| | | accounts and did not terminate their relationships with PAN and EPS until January 2016 and October 2017, respectively. FTC-USF ¶ 198. Defendants also failed to credit consumers for these missed payments, instead transferring at least $1.2 million of consumer "trust" funds to their own operating and personal accounts. FTC-USF ¶ 211. |
| | 96 | 43.    The FTC objects to this fact as irrelevant. F.R.E. 401-02. How Defendants treated their employees is not relevant to whether Defendants misled consumers and took advance fees. |
| | 99, 102-03, 158 | 44.    Defendants' claim that their policies, procedures, and contracts complied with the FTC Act are legal conclusions, not based on personal knowledge. Fed. R. Civ. P. 56(c)(4); F.R.E. 602. |
| | 83, 113 | 45.    The FTC objects to the fact that Elegant and Trend's student loan programs cost 25-50% less than the average competitor. Even if this were true, it is irrelevant that Defendants charged more or less for their purported services than competitors, since as alleged in the FTC's Amended Complaint, Defendants failed to deliver the services promised. *See FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 606-07 (9th Cir. 1993). |
| | 114 | 46.    The FTC objects to the fact that Trend Capital and Elegant Solutions have never taken credit cards as forms of payment as irrelevant. F.R.E. 401-02. The TSR prohibits companies engaged in telemarketing from taking payments from consumers before providing debt relief services, regardless of the method they use to take such payments. 16 C.F.R. § 310.4(a)(5)(i). |
| | 67, 115-18 | 47.    The FTC does not dispute that NACHA's rules require the *overall* return rate for ACH transactions to be under 15%. *NACHA Operating Rules: Improving ACH Network Quality*, NACHA, https://www.nacha.org/system/files/2019-05/Risk-and-Quality-Rules-Fact-Sheet.pdf. The rules require the unauthorized return rate to be under 0.5%. |

*Id.*

Defendants' NACHA return rates, however, are irrelevant. As set forth in the FTC's SJ Memo and USF, Defendants altered consumers' contact information on file with their actual federal student loan servicers, severing consumers' communications with them. FTC-USF ¶¶ 212-14. As a result, many consumers may never have learned that Defendants' were not making payments on their student loans and therefore would not have known to dispute Defendants' charges.

In any case, evidence in the record belies Defendants' unsupported claim that Elegant and Trend's rates were always under the NACHA thresholds. Exhibit A-22 to Rima Radwan's declaration, which Defendants cite to support their contention, shows that Elegant's unauthorized return rate was more than double the 0.5% NACHA threshold for both June and July 2019. Dkt. 131-2 at 302 (R. Radwan Decl. Ex. A-22). In addition, an ACH return report found in Defendants' offices at 3 Studebaker shows that Elegant's unauthorized return rate was at or over the NACHA threshold every month between January 2018 and May 2019, with the exception of April 2018. PX 45 (Saunders Second Supp. Decl. Att. A).

| 130 | 48.     The FTC objects to this fact as irrelevant. F.R.E. 401-02. The amount of time that Defendants spent talking with consumers does not make it any more or less likely that Defendants misled them. |

Dated:  March 30, 2020                Respectfully submitted,

*/s/ K. Michelle Grajales*
K. Michelle Grajales
Samuel F. Jacobson
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES
Case No. 8:19-cv-01333-JVS-KES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>Certificate of Service</u>

I HEREBY CERTIFY that, on March 30, 2020, I served the foregoing on
Counsel for Defendants, Robert Bare and Stephen Cochell, and on the Receiver
and his Counsel through the Court's Electronic Case Filing system.

<u>/s/ K. Michelle Grajales</u>
K. Michelle Grajales