Stephen Cochell (TX SBN 24044255)
srcochell@gmail.com
The Cochell Law Firm, P.C.
5850 San Felipe, Ste.500
Houston Texas 77057
(346)800-3500
srcochell@gmail.com
Pro Hac Vice

Robert Bare (SBN 271131)
rbare@barelaw.com
Bare Law
444 W. Ocean Blvd.
8th Floor,
Long Beach, CA  90802
Telephone:   (310) 984-3670
Facsimile:    (310) 320-0102

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>ELEGANT SOLUTIONS, INC, et al.<br><br>Defendants. | Case No.:  8:19-cv-01333-JVS (KESx)<br><br>**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>TRIAL DATE:  June 8, 2020<br><br>HEARING DATE: _____<br><br>HEARING TIME: 1:30 PM<br><br>LOCATION: Courtroom 10C |

i

# **TABLE OF CONTENTS**

TABLE OF CONTENTS .......................................................................... ii

TABLE OF AUTHORITIES .................................................................. iii

I.   Elegant Solutions and Trend Capital Created and Maintained Compliant Sales Procedures and Policies. ..................................................... 5

II.   The Consumer-Declarants Were Not Acting Reasonably Under the Facts. ... 9

III.   Defendants Did Not Violate Nor Were They About to Violate the Act at the Time of Issuance of Injunctive Relief. ................................................ 10

V.   Advance Fees ............................................................................ 15

VI.   The FTC's Claim That Elegant and Trend Failed to Deliver Promised Services is Without Merit. ............................................................ 16

   A.   Alleged Failure to Obtain Promised Repayment Terms ........................ 16

   B.   Alleged Failure to Pay Consumers Loans ................................... 17

   C.   Defendants Never Promised to Take over Consumer Loans .................... 18

   D.   The State Attorney General Actions Did Not Constitute Notice. ............. 19

   E.   Defendants Did Not "Bilk" Consumers out of $30 Million or Cause Them Harm. ................................................................................ 20

VII. Elegant and Trend Capital Were Not Part of a "Maze" of Companies.  The Court Should Not Disregard the Corporate Separateness of the Companies...... 21

VIII.    Individual Liability ............................................................... 22

IX.   The FTC's Alleged Damages Are Not Equitable Restitution ................... 27

X.   The Proposed Order is Overly Broad and Disproportionately Severe ......... 28

ii

# <u>TABLE OF AUTHORITIES</u>

**CASE LAW**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ………………………….. 2

*Baxter v Intelius, Inc.* 2010 WL 3791487 (C.D. Cal. 2010) …………………..... 10

*Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528 (9th Cir. 1985) ……………... 23

*Bott v. Vistaprint*, 2009 WL 2884727 S.D. Tex. 2009,
*aff'd* 392 Fed. Appx 327 (5th Cir. 2010) ………………………………………… 9

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) …………………………………... 2

*FTC v. Am. Standard Credit Syst., Inc.*, 874 F. Supp. 1080 (C.D. Cal. 1994) … 23

*FTC v. Evans*, 775 F.2d 1084 (9th Cir. 1985) ……………………………….. 1, 11

*FTC v. Gill*, 71 F. Supp. 2d 1030 (E.D. Cal. 1999), aff'd, 265 F.3d 944 (2001) .., 9

*FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104 (C.D. Cal. 2008) ………………. 18, 21

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010) …………21-22

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) ………………………… 9

*FTC v. Pub'l Clearing House, Inc.*, 104 F.3d 1168 (9th cir. 1997) …………….. 22

*Hager v Vertrue, Inc.*, 2011 WL 4501046 (D. Mass. 2011) ………………….. 10

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) 2-3

*Pacholec v. Home Depot USA, Inc.*, 2007 LEXIS 99338;
2007 WL 4893481 , at *5 (D.N.J.) ……………………………………………… 10

**REGULATIONS**

Fed. R. Civ. P. 56(c)  ……………………………………………………...… 2

**SECONDARY SOURCES**

Restatement (Third) of Restitution and Unjust Enrichment §51 ……………….. 27

The FTC's motion is a blend of fact and fiction.  The first two pages of the FTC's motion are nothing more than an attempt to smear Defendants and mislead the Court with inaccurate characterizations of the evidence.  Essentially, the FTC filed this action based on uncorroborated claims by consumers without any knowledge of Elegant Solutions or Trend Capital's *actual* business practices. Despite the fact that RCC was a classic car business, the FTC brought RCC within its dragnet when the Receiver, the FTC and law enforcement agents raided the premises on July 11, 2019 (the "Raid").

The Ninth Circuit, *in FTC v. Evans*, 775 F.2d 1084 (9th Cir. 1985) made clear that Section 13(b) may be used to enjoin Defendants if, but only if, the evidence shows that they are violating or about to violate the FTC Act.  As set out below, Elegant ("FDG") and Trend Capital ("Mission Hills") were created in November 2017.  The other corporate defendants ceased doing business prior to that time.  The FTC has produced only two consumer declarations (Sapphira Clemans and Jamie Shelton-Larimore) filed against Elegant and Trend whose policies complied fully or substantially complied with the FTC Act.  In the two complaints made by consumers against Elegant and Trend, there is no evidence that either consumer

1

produced or reviewed their Service Agreement.[1]   DR 174.[2]   Moreover, the declarations attached to the FTC's summary judgment evidence fail to affirmatively show that the bank documents and financial records attached to their motion are authentic. Thus, virtually all of the declarations must be stricken.[3]

Rule 56 requires that a party seeking summary judgment show the *absence* of a genuine issue of material fact.[4] An issue is "material" if it affects the outcome of the litigation. Once the moving party has made this showing, the nonmoving party must "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c))[5]

---

[1] Eight of the nineteen declarants produced Service Agreements although it is clear that they did not refer to the declarations in their declarations.

[2] Defendants refer to the FTC's Statement of Material Fact as "PSMUF" and their responses as "DR" with the corresponding Plaintiff's SMUF.

[3] The Receiver took possession of documents and provided them to the FTC which, in turn, provided an external hard drive to counsel.  The FTC fails to show that it had any knowledge as to why any of these records are authentic business records.  Fed. R. Evid. 803(6); *U-Haul Intl, Inc. v. Lumbermans Mut.Cas. Co*., 576 F.3d 1040,1043 (9th Cir. 2009) The FTC alleges that it received documents from various banks, but does affirmatively show why these records are authentic. Their conclusions based on these records constitutes inadmissible hearsay. See

[4] *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp*., 475 U.S. 574 (1986).

[5] "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted). When determining whether there is a genuine issue for trial, "inferences to be drawn from the underlying

Unlike other student loan debt relief companies: (1) Corporate Defendants maintained policies and procedures that actually complied with the FTC Act;[6] (2) none of the employees for Corporate Defendants made statements that would show that the policies were not enforced; *id.* (3) The consumer declarations virtually all complained about issues that were literally explained and made clear to them when they signed up for services (DR 161-163, 165-166, 186, and 189); (4) Each consumer initialed each page including the page that described the services being provided and the charges for those services (DR 183); (5) Each declarant reviewed the "bullets" on the Explanation of Services while the Sales Representative read each bullet to them, at which time each consumer initialed each bullet point reflecting their understanding and agreement to the services and charge (DR 183 and 193); (6) Each initial sales call was recorded and Kendra Sanchez, the Elegant's Sales Manager reviewed each sales call to verify that Elegant's procedures were followed; *id.* (7) If an issue was raised by a consumer, Daisy Lopez, Trend's Processing Manager reviewed the initial sales call and verified that proper procedures were followed; *id.* (8) The complaints lodged by the consumer declarants were drafted by the FTC and are contradicted by the very clear

---

facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita*, 475 U.S. at 587 (citation omitted).

[6] *See* DR 154-155, 161-166, 168-170, 181-188, 193-202.

3

explanations of their Service Agreements;[7] (9) No funds were "stolen" from consumers but were held in a trust/holding account until services were *fully* completed (DR194-199);  (10) There were delays in payments but when Trend became aware of the problem, Trend audited the accounts and paid lenders about 80% of the consumers before the FTC filed suit (DR 200, 202, and 205).[8]

To obtain summary judgment, the FTC *must* state facts that negate the contract defenses raised by Defendants.   Both consumers and businesses have a right to enter into contract for services and to hold each other accountable under those contracts.   The FTC Act does not abrogate basic principles of contract law. The evidence *overwhelmingly* shows that Defendants had a very structured sales process using DocuSign, which required that the consumer initial each page before proceeding to the next page.  There was no discussion by either consumer regarding Elegant's Service Agreement or how they were somehow misled into signing an agreement containing clear, unequivocal contract language. Indeed, none of the other consumers discussed why their Service Agreements had initials on each page, what was discussed, why the consumers initialed the "bullet points" on the Explanation of Services and signed their respective Service Agreements. Because

---

[7] *Supra* n. 6.

[8] The Service Agreement specifically provided that a third party processor, PAN, would be responsible for payment of funds.

4

the FTC failed to refute material facts in the consumer declarations, their motion for summary judgment should be denied.

The FTC's claim that there was a "common enterprise" with companies that ceased doing business prior to Elegant's creation is without merit.  Elegant and Trend were maintained separately, did not share employees, did not share computer systems and did not commingle funds.

The Court's equitable power to enjoin does not justify imposition of an injunction where, as here, a company adopted policies and procedures that actually protected consumers, provided the services under their Service Agreement and took corrective measures to address any problems well before the FTC set foot on the premises.

## I.   Elegant Solutions and Trend Capital Created and Maintained Compliant Sales Procedures and Policies.

Defendants provided consumers with *document preparation services* that allowed them to apply for loan consolidations and other programs that would have required the consumers to devote a substantial amount of  time and paperwork dealing with their servicers and the Department of Education ("DOE"). DSMUF 11.  Consumers chose to use services offered by the Student Loan Document Preparation Businesses and to pay for these services rather than do it themselves. DSMUF 21.  The Corporate Defendants *recorded* each call to assure that their

5

services and related charges were clearly understood and the subject of agreement with each consumer. DSMUF 33, 41.[9]

In November 2017, Elegant Solutions dba FDG was formed.   New contracts were developed building off contracts used by Tribune Management dba The Student Loan Group.  **Exhibit 1,** Rima Radwan Declaration ¶ 32; DSMUF 37.[10] When Elegant began its operations, the agents were extensively trained on legal compliance and instructed on what they could and could not say or do.   Ex. 1, ¶ 45-49; DSMUF 73-77.  There were significant changes to service agreements (Ex. 1, ¶ 28-32)  and addition of a Client Portal (Ex. 1, ¶ 50-51)  that provided clients with full access and transparency to their agreements, payments made to lenders and customer service that answered client questions, addressed complaints and where the notes of service agents document the services provided. Ex. 1, ¶ 51-52; DSMUF 78-79. Elegant's and Trend's managers, Kendra Sanchez and Daisy Lopez also testified that these procedures were followed and enforced.  DSMUF 28, 30, 69 70, 97, 109 (Sanchez); DSMUF 28, 30, 69, 95, 96, (Lopez).[11]

---

[10] The policies and practices of Heritage Asset Management, Tribune Management, Ltd. and Student Loan Services Management also complied with the FTC Act. Elegant Solutions improved the Service Agreement, the Explanation of Services, created a Client Portal for greater transparency and created the holding/trust account system to protect client funds.

[11] Training materials used by Elegant make it clear that Elegant's services were intended to serve each client's goal in adjusting their student loan debt burden.  DSMUF 71, 72, 100.

The evidence shows that, in their initial phone call, consumers were thoroughly counseled and signed an FDG contract that included a checklist entitled "<u>Explanation</u> of <u>Benefits</u>."  Salespeople verbally recited each statement about Corporate Defendants' services while the consumer listened on the phone.[12] Each consumer checked each box acknowledging their understanding of the services. **Exhibit 1, ¶** 37. Ex. B; DSMUF 41-52, 71, 72, 104. These statements included:

- Company is a private organization, not a lender and <u>not affiliated with the Department of Education and/or government.</u>

- Client authorized Company to make changes to Client's current student loan accounts as needed

- Services explained in Service Agreement will begin 3-5 days prior to Clients first payment date

- Client understands the Cancellation Policy held by Company and its affiliates and <u>is free to apply for loan program(s) without the assistance of Company, Client is choosing to elect the services of Company pursuant to this Service Agreement.</u>

- If Client is ineligible for services, Client receives 100% refund of all monies paid to the Company as per Company's Refund Policy. If Company is successful in completing services, then Client will be ineligible for a refund.

- Client acknowledges that all monies received, except for Processing Fees, by Company from Client will be placed into a Trust Account until the date that the consolidation has been

---

[12] *Supra* n. 6.

7

approved. No payments will be made to past or present lenders during this time.

Despite thousands of recorded sales calls, the FTC has produced only one transcript of a sales call despite thousands of sales calls recorded by Elegant.  This call, with Yulia Sanker was not typical of all sales calls because it deviated from the DocuSign Procedures and training mandated by Elegant.[13] Exhibit A, R. Radwan Dec. ¶¶28-43. However, the call illustrates that consumers were urged to read each page of the agreement and then initial the page before proceeding to the next page.

All of the consumers received college loans and presumably, many of them graduated from college.  The consumer declarants in this case complain of various issues but <u>ignore</u> the fact that full disclosure of the scope, nature and limitations of Corporate Defendants' services were fully addressed at the time of entering into the Service Agreement. DSMUF 130-405.[14] Simply stated, the consumers were not

---

[13] The sales representative did not specifically read the bullet points on the Explanation of Benefits, but told the client to read each page of the Agreement and the Explanation of Benefits before initialing and signing the Agreement.  With three digital forensic examiners on the FTC's Team, it strains credulity that the FTC is unable to produce the recorded calls of all the consumer declarants and others who purportedly complained about Elegant or other corporate defendants.

[14] The consumer declarants are as follows:  Shawn Avant: DSMUF 130-145; Erica Bennett: DSMUF 146-158; Kelly Bishop: DSMUF 159-176; Lisa Bonilla: DSMUF 177-189; Allison Brockel: DSMUF 190-206; Mary Bursey: DSMUF 207-220; Sapphira Clemans:  DSMUF 221-235; Jared Cooper:  DSMUF 236-250; Sheri Fleming:  DSMUF 251-264; Ilander Horejs: DSMUF 265-280; Evan Preston: DSMUF 281-292; Yuliya Sanker: DSMUF 293-307; Greyson Schultz: DSMIF 308-321; Jamie Shelton-Larimore: DSMUF 322-334; Deborah Sickle: DSMUF 335-350; Misty Smith DSMUF 351-364; Crystal Somers: DSMUF 365-379; Laurie Taylor:  DSMUF 380-390; Tyler Thompson: DSMUF 391-405.

8

misled by Defendants because they <u>knew</u>, <u>understood</u>, <u>acknowledged</u> and <u>agreed</u> to the nature, type and cost of services to be rendered. *Id*. Thus, Defendants were not violating or about to violate the Act.

## II. The Consumer-Declarants Were Not Acting Reasonably Under the Facts.

To establish a violation of Section 5 under the FTC Act, the FTC must show that that Defendants' conduct was likely to mislead consumers acting reasonably under the circumstances.[15] *FTC v. Pantron I Corp*., 33 F.3d 1088, 1095 (9th Cir. 1994); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1035 (E.D. Cal. 1999), *aff'd*, 265 F.3d 944 (2001). It is *unreasonable* for consumers to assert fraud based on alleged representations that were specifically discussed and explained to each consumer at the time of entering into a contract.

Thus, a consumer who reads part of a disclosure but not the *entire* disclosure on the subject matter is acting *unreasonably* under the circumstances. In *Bott v. Vistaprint*, 2009 WL 2884727 S.D. Tex. 2009, *aff'd* 392 Fed. Appx 327 (5th Cir. 2010), the Court dismissed a class action where the class members admitted that they reviewed part of a disclosure but failed to read the entire disclosure. In that case, The Court held that "[a] consumer cannot decline to read clear and easily

---

[15] There are few service businesses that do <u>not</u> receive consumer complaints, which can be motivated by a consumer's lack of memory regarding their Service Agreement, disagreement over the quality of service or a consumer's desire to obtain a refund for economic reasons.

understandable terms that are provided on the same webpage in close proximity to the location where the consumer indicates his agreement to those terms and then claim that the webpage, which the consumer has failed to read, is deceptive." [16]

The FTC's argument on "net impression" is devoid of merit.  Courts utilize "net impression" in evaluating the net impression left by advertising on web sites and printed ads where there is some objective basis for drawing a conclusion on the net impression left by the advertising.  The issue in this case is whether consumers were acting reasonably when they enter into an agreement. Moreover, *none* of the consumers articulate when they supposedly formed their net impression. DR 161-163, 165-166, 186, and 189. While the FTC asserts that the consumers formed their net impression <u>before</u> they started discussing their Service Agreement, the actual consumer declarations do not support their arguments and are a model of ambiguity as to what was discussed, when it was discussed with sales agents.  DR 161.

## III.  Defendants Did Not Violate Nor Were They About to Violate the Act at the Time of Issuance of Injunctive Relief.

The Court cannot grant permanent injunctive relief where, as here, the evidence overwhelmingly shows that Elegant and Trend Capital were not violating

---

[16] Other courts have held that a customer cannot blindly accept offers. *Baxter v Intelius, Inc*. 2010 WL 3791487 (C.D. Cal. 2010) (customer cannot "blindly" accept offer); *Hager v Vertrue, Inc*., 2011 WL 4501046 (D. Mass. 2011) (same). *Pacholec v. Home Depot USA, Inc*., 2007 LEXIS 99338; 2007 WL 4893481 , at *5 (D.N.J.), ("Plaintiff simply chose not to read the agreement. Accordingly, there is no deception.")

or about to violate the Act.  Companies who self-police and change their policies should not be punished for modifying policies to comply or substantially comply with the Act. *See FTC v. Evans, supra.* In the instant case, Elegant and Trend adopted policies and procedures designed to comply fully with the Act.  The FTC has produced declarations relating to several different companies.[17]

As a threshold matter, however, the Court must review the two declarations relating to Elegant and Trend and determine if their policies and procedures comply with the law.  *See Evans, supra.*  Even *assuming* that individual employees may have violated company policy, the Court cannot hold the Individual Defendants liable where, as here, there is no evidence that they encouraged or turned a blind eye to policy violations.

In the two declarations pertain to Elegant or Trend, neither consumer attached their Service Agreement to their declarations.  Neither declaration provides information as to whether the Declarant reviewed the Agreement before signing it or reviewed the Agreement before signing their Declarations.  Their respective claims are devoid of merit because: (a) the Service Agreements refute their specific claims, which fall far short of the legal standard for fraud; and (b)  detailed notes of

---

[17] The FTC tries to confuse the facts by referring back five years to company practices followed by DORM Group dba SLSM which was not even named in this case!   The declarations of Avant and Bonilla, which complain about DORM should be stricken because DORM was not named in this lawsuit.  DR 106-109, 112-116, 118.

11

phone discussions with these consumers were maintained by customer service representatives showing that neither consumer complained of fraud and were given accurate information about their loans.

Sapphira Clemans (PX 7) simply alleges that she understood that if she paid $90 a year for ten years, her loan would be forgiven and then claims Elegant ("FDG") is somehow responsible for $1500 in interest that accrued while her loan was in default.   However, FDG got Ms. Clemans out of default and successfully obtained an Income Based plan on her loan balance of $37,852. Exhibit A, R. Radwan Dec. ¶209. Substantial time and effort went into serving Ms. Clemans' needs. *Id.* at ¶¶210-216. Her Service Agreement and notes unequivocally show that she was not promised a $90 forgiveness program after ten years.  Ms. Cleman's claims are unreasonable.

Jamie Shelton-Larimore (PX-14) ("Shelton") complained that he cancelled FDG after he was told by Navient that FDG was a scam. PSUMF 182 .[18]  His loan was consolidated successfully with payments reduced to $10 per month, but he ceased making payments before his third payment.  Exhibit A, R. Radwan Dec. ¶312. Per his service agreement, Shelton was advised that Defendants would communicate directly with lenders—an arrangement that he gladly accepted.  This

---

[18] There is no allegation that Shelton was misled---only a hearsay assertion that Navient told him Defendants operated a scam which is why he cancelled the services.

essentially meant that Shelton got the benefit of Elegant's services without paying the agreed upon fee for services provided. *Id.* at ¶314. Elegant suspended Shelton's services pending payment for services, leaving his $20 in trust. *Id.* at ¶313.  Mr. Shelton's claims are unreasonable.

## IV.    None of the Consumer Declarations Sufficiently Set Forth Facts Supporting Summary Judgment in Favor of the FTC.

The FTC has the burden to negate the defenses raised by Defendants.  The FTC has <u>not</u> disputed that each consumer signed a Service Agreement which included an Explanation of Benefits.  All consumers initialed and signed the Service Agreement. Sales representatives read each bullet point in the Explanation of Benefits[19] to each consumer and all consumers initialed their understanding and agreement to each point.[20]   DR 161-166. There is a continuing theme with consumers making wild claims that are specifically negated by the structured process followed in the initial customer call and execution of the Service Agreement.[21]

---

[19] *Supra* n. 6.

[20] The consumer declarations are submitted by individuals whose backgrounds and education are unknown to the court and who may or may not recall or have the ability to recall discussions that happened years ago.

[21] Corporate Defendants specifically advised them, for example, that: (a) The consumers could prepare their own requests to the DOE; (b) Consumers would be charged service fees for document preparation; (c) Corporate Defendants were not "servicers"; (d) Consumers would incur interest while their loans were reduced.  DR 226.

13

Some of the declarations contain little, if any documentation of the communications between the consumers and Corporate Defendants. It appears that in eleven cases, the FTC filed consumer declarations which did not have, much less referred to each consumer's Service Agreements and Explanation of Benefits when they signed their declarations. DR 161-163. None of the declarants have set forth specific facts supporting summary judgment. Accordingly, the FTC has failed to satisfy its initial burden on summary judgment to negate defenses raised by Defendants.

The other eight remaining declarants clearly cannot overcome their burden of showing that false representations were made during the initial sales call process. The Corporate Defendants' business records *reliably* indicate what happened in the initial and subsequent sales calls with clients. DR 161-166. Moreover, the detail of the service notes further confirm that Corporate Defendants made sure that the clients understood their agreement(s) and programs. *Id.*

The supervisors assured that employees complied with the policies and procedures. Based on changes in November, 2017, when Elegant and Trend began operating, the FTC cannot, as a matter of law, establish that Defendants were violating or about to violate the FTC Act or the Telemarketing Sales Rule. Even *assuming* that there were isolated violations, the conduct did not rise to the level of

requiring injunctive relief; in other words, the injunctive relief was disproportionately severe to the perceived harm.

## V.    Advance Fees

The FTC asserts wrongdoing because the trust/holding account maintained by Elegant and Trend was not a formal "trust" account (such as an IOLTA account) but was simply a "business" account.  Regardless of what the account is called, it held clients' money earmarked for payment to the Lenders.

There is no dispute that all funds were held there and then distributed when services were completed. DR 221-223. No client funds were stolen but Defendants candidly admit that there was a problem with PAN and other third party processors, which resulted in unacceptable delays in payment of funds to the Lenders.  *Id.* A lawsuit was filed against PAN because of the problems and Defendants tried other third party processors without success, ultimately resulting in bringing the processing function in house.  DR 182-183, 198-200, 202, and 205. Significantly, the Service Agreement makes it clear that PAN and other processors were responsible for payment to the Lenders. DR 182, 193, 198.

The FTC asserts that this arrangement violated the TSR.  Defendants complied or substantially complied with the TSR because they did not receive payment of fees until the work was actually completed.  DR 205-214. Payments by consumers were deposited in trust, much like an attorney receives a retainer to be

15

paid when services are performed.    Contrary to the FTC's claims, the CMR for Elegant and Trend maintained record of what was in trust and what fees would be paid when services were completed. *Id.* While Corporate Defendants may be criticized for not having a formal escrow account, the FTC has failed to specifically identify any loss of funds or harm to consumers from this procedure. *Id.*  If the FTC had contacted Defendants prior to filing suit, or pursued administrative remedies under the Act, this practice could have been modified without the need for a lawsuit.

## VI.    The FTC's Claim That Elegant and Trend Failed to Deliver Promised Services is Without Merit.

As a threshold matter, the FTC's evidence predates the creation of Elegant and Trend and is therefore irrelevant to determining liability.

### A. Alleged Failure to Obtain Promised Repayment Terms

Based on two anecdotes that are <u>not</u> supported by declarants with personal knowledge, the FTC suggests that Elegant or Trend falsified income for so called IDR plans.   From that, the FTC extrapolates that more than 3300 consumers had incomes that did not justify $0 monthly loan programs.  This type of calculation lacks foundation and is inadmissible.  The testimony of Daisy Lopez that she took

16

action against an employee (Than Than) for violating policy by not verifying income on an IDR.[22]

## B. Alleged Failure to Pay Consumers Loans

The FTC asserts that $1,280,000 was transferred from trust to operating accounts suggesting, of course, that Defendants stole the money.  As previously stated in prior briefs, the $1,280,000 was for fees that were realized after student funds were paid to the Lenders. DR 211, 221-223.  The FTC also asserts that, in March 2018, Mike Radwan took $60,000 from trust, but fail to state the Mr. Radwan wrote that check by mistake and was be adjusted pending completion of the audit. DR 209.

Regardless, Elegant and Trend undertook an audit of all active accounts to make sure funds were paid out to the Lenders.  DR 199-200 and 202. Regardless, at the time of filing the Lawsuit, 80% of the problem had been corrected.  Not every problem in a company is a fraud on consumers or warrants imposition of receiverships.  At best, Corporate Defendants' failure to timely pay student loans was a technical contract breach and not a violation of the FTC Act.  While the FTC

---

[22] Ms. Lopez The FTC showed Ms. Lopez select pages with handwritten notes from a but failed to show the complete file, which is necessary to determine if Also, the FTC did not provide me the CRM to review these files during my depo making my review inconclusive as the paper files provided to me as exhibits are not congruent with the clients account in the CRM. I explained this to the FTC during my depo. No concrete conclusion could be made on the files they showed me and I made that clear to them when trying to answer their questions.

17

criticizes Defendants for taking action sooner with PAN, the issue is whether Defendants took action in November 2017 and thereafter.  The undisputed fact is that they resolved this problem when Elegant brought the processing in-house.  DR 199-200, 202.

The FTC also asserts that the floor managers determined from their audit that they needed to pay $18,000 funds from one client by sending different amounts starting with $5,000. The reason for this phased payment was to other clients trust money by avoiding any bank dispute issues. If an erroneous payment was made, the Company would likely be unable to recover the funds. DR 203.

### C. Defendants Never Promised to Take over Consumer Loans

The FTC's assertion that Corporate Defendants improperly took usernames, passwords, and FSA pins to gain access to the accounts is without merit.  The consumers appointed Corporate Defendants as agents so that they did not have to wade through the bureaucracy.[23] DR 212. Obtaining user names, passwords and FSA pins is necessary to actually apply for a consolidation. DR 212. Regardless, the clients' authorized these steps to be taken.  As of November, 2017, all clients had full visibility to the status of their loans through the Client Portal.  DR 212.

---

[23] The Lenders do not like to process consolidations because they potentially lose millions in business when a loan consolidation is approved. Exhibit A, Amended Declaration Rima Radwan ¶¶ 101-102.  If consolidations were easily obtained through servicers, the student loan debt relief industry would have never developed.

18

Thus, the claim that consumers did not know about their loans for months or years is devoid of merit.

### D. The State Attorney General Actions Did Not Constitute Notice.

The FTC asserts that actions filed in the State of Washington, North Carolina and Oregon constituted notice of the violations being committed by Elegant and Trend Capital.  This claim is without merit.  A complaint was filed in Washington against DORM, Heritage and Tribune because these defendants charged more than $25 for assistance in debt adjusting in violation of RCW 18.28.080(1).  The matter was settled with a consent decree and these defendants agreed not to do business in Washington.  North Carolina law,  N.C. Gen. Stat..§ 14-423, et seq. prohibits any kind of assistance in debt adjusting.  The three companies agreed not to do further business in North Carolina.  Oregon has specific laws regarding debt related businesses and the amounts that entities engaged in that business are legally allowed to collect.  DR 117.  DORM agreed to enter into an Assurance of Voluntary Compliance. *Id.* Defendants ceased doing business in Oregon. *Id.* None of these actions claimed violation of the FTC Act or TSR. *Id.*

The FTC's claims that Corporate Defendants received "at least hundreds of complaints" is misleading and untrue.  FTC Memo at 9.  The claim is not supported by Daisy Lopez or Kendra Sanchez, who were not presented with this allegation at

19

their deposition.[24]   Indeed, the FTC did not ask <u>any</u> questions about the *consumer declarants* at their depositions.[25] Training materials on how to address consumer issues hardly proves this point.   Similarly, broad generalizations about the rate of cancellations is not evidence of fraud.

### E.  Defendants Did Not "Bilk" Consumers out of $30 Million or Cause Them Harm.

The FTC incorrectly assumes that Elegant and Trend were a common enterprise with Heritage and Tribune, which they were not.  Moreover, the FTC apparently adds revenues from DORM which was never included as a part of this lawsuit.  Finally, the FTC's logic and math is just incorrect. DR 134, 151.

All clients with student loans paid interest on their loans including time periods that loans were in forbearance or had a reduced payment plan.  The FTC's claims that consumers incurred "thousands of dollars while unpaid interest accrued on consumers loans while in Defendants' program capitalized—i.e., it was added to consumers principal."  FTC Brief at 12.  The FTC also alleges that "Defendants

---

[24] This allegation is part of Emilie Saunders Supplemental affidavit, Dkt. 134.-4 where she attaches twenty alleged complaints to her declaration.  These unsworn documents suffer from the same defects as the consumer declarations (PX1-PX19) with only a few consumers who signed agreements with Elegant; consumers being told to cancel their services by servicers or raising issues that were specifically explained in their Service Agreements.

[25] The FTC's reliance on generic training materials on how to address consumer issues hardly proves their point.

had falsified their repayment applications." Id. The FTC relies on a declaration of Scott Lause (PX 21) whose testimony lacks foundation and is hearsay.

### VII.   Elegant and Trend Capital Were Not Part of a "Maze" of Companies.  The Court Should Not Disregard the Corporate Separateness of the Companies.

The FTC contends that Elegant and Trend were part of a common enterprise with Heritage Capital Management, Inc. ("Heritage" )and Tribune Management, Inc. and generally refers to all companies and individuals as "Defendants" without specifying which company did what or when a particular act was done.

Factors relevant in a court's consideration of whether a common enterprise among entities exists include whether they: (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing. *FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1116 (C.D. Cal. 2008) (corporations found to be in common enterprise because they shared office space, executives and employees, payroll funds, and advertising).  A common enterprise may be found where companies "exhibit either vertical or horizontal commonality," such as pooling of assets and revenues. *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142-1143 (9th Cir. 2010).  However, this is not that case.  Heritage and Tribune did not share offices, employees nor did they have any ongoing economic dealings with Elegant and/or Trend.   Trend entered into a purchase agreement for legacy clients and did not do business with

Elegant.   Because of problems with third party processors, Elegant was formed to be a standalone company that did its own processing in-house.[26]   Other than ownership, there was no commonality between these companies.   This does not satisfy the test in *Network Servs.*   While Rima Radwan was the chief operating officer of both Elegant and Trend, her role was to establish policies, procedures and let the managers apply the policies and procedures. Similarly, Elegant and Trend were not a common enterprise because they were operated separately with separate employees, separate offices and did not share revenues.

## VIII.  Individual Liability

To establish individual liability to make equitable restitution under the FTC Act, the FTC must prove that an individual "had *knowledge* that the corporation or one of its agents engaged in dishonest or fraudulent conduct, that the misrepresentations were the type upon which a reasonable and prudent person would rely, and that consumer injury resulted." *FTC v. Pub'l Clearing House, Inc*., 104 F.3d 1168, 1170 (9th cir. 1997) (emphasis added).  The FTC may establish knowledge by showing that the individual defendant "had actual knowledge of material misrepresentations, [was] recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an

---

[26] A third party processor handled the ACH debiting for customers, transferring funds to Elegant's holding/trust account and Elegant paid student Lenders after completing services to its clients.

22

intentional avoidance of the truth." *Id*. (quoting *FTC v. Am. Standard Credit Syst., Inc*., 874 F. Supp. 1080, 1089 (C.D. Cal. 1994)). The FTC is not required to show that the defendant actually intended to defraud consumers. *Id*. However, questions involving a person's state of mind, e.g., *whether a party knew or should have known of a particular condition*, are generally fact issues inappropriate for resolution by summary judgment. Summary judgment should not be granted where contradictory inferences may be drawn from such facts, even if undisputed. *Braxton-Secret v. A.H. Robins Co*., 769 F.2d 528, 531 (9th Cir. 1985) (internal citations omitted). Thus, the question is whether the undisputed facts of this case admit of some reasonable inference other than the conclusion that any of the defendant acted with either: (1) actual knowledge, (2) reckless indifference to truth or falsity, or (3) an awareness of a high probability of fraud and an intentional avoidance of the truth with respect to any of the admitted misrepresentations.

As a general matter, the FTC does <u>not</u> dispute the fact that the banks, credit card companies and payment processors required the owners to designate themselves as corporate officers as a precondition to having an account. DR 29, 38, 57, and 83. Thus, the Individual Defendants were faced with an impossible choice; either designate themselves as officers or not have bank accounts, credit cards or processing services. *Id.* The FTC seeks to impose individual liability against Labiba Radwan because she was required to have an officer title in order to process pay

checks.  Otherwise, Labiba had no ownership and no control over the policies and procedures of the companies. DR 94. Labiba Radwan dealt with payment processors which was similar to a bill collector trying to collect a loan—hardly an exercise of control over the company. *Id.*

Similarly, lower level functions performed by owners should not, as a matter of law, put their personal assets on the line unless they actually *controlled* the policies and procedures of the Company.  In order to do business, the owners had to have signature authority over the companies but that did not mean that they sufficiently controlled the company to justify seizure of their assets and imposing a judgment against each of them.  Performing ministerial tasks, like processing pay checks without actually determining policy simply elevates form over substance, which is inequitable to the owners. Dean Robbins and Labiba Radwan Velasquez (referred to as Labiba Radwan) did not hire, fire or supervise employees and the policies and procedures for student loan debt relief companies were created and maintained at the direction and control of Rima Radwan  DR 74, 83, and 94. The FTC sued Labiba after she criticized one of the FTC's witnesses.[27] DR 93, 94, 97,

---

[27] The FTC had full knowledge from its investigator, Michael Goldstein, regarding the reasons set out by the FTC against Labiba in the Amended Complaint before filing this lawsuit.  Dkt. 63. This included her title as Director of Operations and issuance of a credit card. Amended Complaint.  Despite full knowledge of these issues, the FTC did not file against Ms. Radwan until they received texts criticizing Mark Drewitz, a long time personal friend, of assisting the receiver in liquidating RCC.  While the FTC may not have appreciated the emotions expressed by Ms.

102-103. Labiba had a corporate credit card for Trend which was necessary to order supplies or help Rima Radwan.  DR 94. Ms. Radwan provided guidance on amounts to be paid to Lenders but was not the Manager making the decision.[28] DR 94, 96, and 97. Labiba Radwan shared an office with her sister so that she could assist her because she frequently worked at home.  DR 98. Because of her health condition, Rima Radwan relied on her two managers, Daisy Lopez and Kendra Sanchez, to enforce company policies. *Id.*  This was not a case where Rima was reckless indifferently because, in fact, she was simply protecting her health as her condition was exacerbated by stress and reduced immunity, getting sick more frequently when mingling for sustained periods with other people.  For that reason, Ms. Radwan should not be held individually liable.  To the extent that there was misconduct by individual employees, there is no evidence that such conduct was tolerated or condoned by Rima Radwan or other management.

Imposition of personal liability against Mazen Radwan is simply unsupported. Radwan Classic Cars was not part of a common enterprise with the student loan debt relief services companies.  Mike Radwan had nothing to do with the management or control of the student loan debt relief companies. DR 28.

---

Radwan, their filing of the Amended Complaint appears to be nothing more than retaliation and harassment against a witness.  Exhibit D, L. Radwan Dec. ¶ 18.

[28] Ms. Radwan was advised that payment should be made in phases to avoid a problem in the trust account.

Although the companies shared common ownership, there was no sharing of employees, computers, information, commingling of funds.  DR 132. Because RCC leased the premises, it ordered internet lines be installed in the premises for its sub-tenants.  Internet services were paid by FDG and MHF. DR 140.  The companies were located in one building and rent paid by Trend as part of an agreement between the companies because RCC paid for the build out of the premises.   Employees from the student loan debt relief companies were <u>not</u> allowed into RCC's offices. DR 131. Payment processing was <u>not</u> arranged by RCC although a mistake was made in submitting an application to AFTS by FDG and MHF's attorney. DR 137-139. The Court should not find common enterprise based on a mistake unaccompanied by any course of conduct showing that RCC actually did something for FDG or MHF.

Mike Radwan had no knowledge of student loans or how the business operated.   In or about <u>2015</u>, Mike Radwan was asked to help her out with problems with Heritage's third party payment processor, PAN, because its executive had a problem dealing with women. DR 43. Mike attempted to communicate the processing problems to PAN (e.g. failure to timely pay Lenders). *Id.*  <u>There is no evidence that Mr. Radwan had anything to do with Elegant or Trend's business operations</u>.  For that reason, Mike. Radwan should not be held individually liable.

26

## IX.    The FTC's Alleged Damages Are Not Equitable Restitution

The principles enunciated in *Kokesh v. SEC*, 137 S.Ct. 1635 (2018) bar restitution in this case because it is nothing more than a penalty and therefore not an equitable remedy.  *Kokesh* examined basic principles of equitable restitution. The Court observed that disgorgement is a form of "[r]estitution measured by the defendant's wrongful gain." Restatement (Third) of Restitution and Unjust Enrichment §51, Comment *a*, p. 204 (2010) (Restatement (Third)). Disgorgement requires that the defendant give up "those gains . . . properly attributable to the defendant's interference with the claimant's legally protected rights." *Id.* at 1644.  In that vein, the Court also noted that the general rule is that a "defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement. Denial of an otherwise appropriate deduction, by making the defendant liable in excess of net gains, results in a punitive sanction that the law of restitution normally attempts to avoid." *Id.* at 1644-1645.

The FTC Act does not specifically provide for joint and several liability although courts have sustained joint and several liability as part of equitable restitution.  This sort of forfeiture should not be imposed for any defendant. At worst, the maximum liability should be the amount the individuals profited; that is, their income or salaries.  *See United States v. Honeycutt*, 137 U.S. 1626 (2018) (court limited forfeiture to amount that individual profited from crime).

Defendants contend that setting damages based on gross revenues is contrary to established principles of restitution.   Even *assuming* that *Kokesh* is not ultimately applied to bar restitution under Section 13(b), it is abundantly clear that the Congress did not intend that district courts punish wrongdoers beyond imposing individual liability for each defendants' gains.  Joint and several liability is not specifically authorized by the statute but violates the Act's prohibition against punitive damages.

## X.   The Proposed Order is Overly Broad and Disproportionately Severe

Defendants believe that the law and equities do not justify imposition of any any judgment or injunction against them in this case.  None of them have any prior history of fraud or illegality.  Neither Dean Robbins, Mazen Radwan or Labiba Radwan controlled the policies and procedures for the Student Loan Debt Companies.  Rima Radwan set the policies and procedures and intensive training and oversight was instituted to assure compliance.   The system may not have been perfect, but counsel has not located any authority in student loan cases where a defendants instituted the controls and oversight adopted by Elegant and Trend.  The facts in other cases do not show that the companies instituted corrective measures to assure that student loan lenders were paid.  Indeed, many of these cases show blatant disregard for the rights of their clients.

The FTC's permanent injunctions are disproportionately severe because the FTC could have, but did not know that Elegant and Trend actually had policies that protected clients through DocuSign and customer service.[29] This was a business that was and could have been operated lawfully.   At first blush, the permanent injunctions appear to be simply "obey the law" injunctions, which are generally unnecessary and disfavored. However, Section X of the Proposed Final Injunction requires each Defendant, for five years, to "deliver a copy of the Final Judgment to any any business that he or she, individually or collectively with any other Defendant, is the majority owner or controls directly or indirectly, and Corporate Defendants must deliver a copy of this Order to: (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for Financial Products or Services…."  Each prospective investor, employer, partner or supervisor must acknowledge the order in writing.

As a matter of experience, no corporate or small business employer is going to sign a 36 page Final Judgement that *exposes* them to contempt of court or sanctions if they hire or associate with any of the defendants.  Indeed, most will conclude that it is not worth the cost of having a lawyer review the document.  The

---

[29] Sanctions are not generally set aside except for abuse of discretion. Unlike criminal cases, where individuals can apply for relief pursuant to Rule 35, Fed. R. Cr. P., there is no relief from a sanctions judgment years from now.

Court may as well enter an order requiring defendants to remain unemployed for five years because they will be "radioactive." Simply stated, this may be "fencing in" provision appropriate in some cases, but not this case.[30]

Thus, the permanent injunction against all owners of companies for misrepresentations relating to financial products and services is overly broad against Labiba Radwan, Mazen Radwan, not responsible making or directing the actual policies and procedures is unduly harsh. A permanent injunction against Rima Radwan is also unwarranted because she could not control employees who disregarded or misapplied the policies she directed.[31]

WHEREFORE, Defendants request this Honorable Court deny Plaintiff's Motion for Summary Judgment, grant Defendants' Motion for Summary Judgment and enter appropriate relief including but not limited to costs and attorneys fees.

-SIGNATURE LINE ON NEXT PAGE-

---

[30] Compliance reporting in Section XI is less onerous but a twenty-year reporting requirement is unnecessary and disproportionate to each defendant's participation as either an owner or employee of the various companies.

[31] Additionally, Ms. Radwan had to preserve her health by relying on her managers to apply the policies and procedures of the different companies.

Respectfully submitted,

By: /s/ *Stephen R. Cochell*
Stephen R. Cochell
Texas Bar No.: 24044255
2616 South Loop West, Ste 470
Houston, Texas 77054
Telephone: (346) 800-3500
srcochell@gmail.com

Robert Bare (SBN 271131)
Bare Law
444 W. Ocean Blvd.
8th Floor,
Long Beach, CA  90802
Telephone:   (310) 984-3670
Fascimile:     (310) 320-0102
rbare@barelaw.com

James D. White, Esq.
Law Offices of
JAMES D. WHITE,
CA Bar # 064721
PO Box 367
113 Quarter Horse Dr.
Bellevue, ID 83313
949 697 9236
jdw@jamesdwhitelaw.com

**Attorneys for Defendants**

31

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this Declaration in Support of DEFENDANTS'
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT complies with Rule 11, Federal Rules of Civil
Procedure and the Local Rules of the Central District of California.


*/s/ Robert Bare*
Robert Bare